# EXHIBIT 1

# Part 1 of 4

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Nigerian Arbitration and Conciliation Act 2004

Schedule 1 Arbitration Rules

## (1) SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LTD

## (2) ESSO EXPLORATION AND PRODUCTION NIGERIA (DEEPWATER) LTD

## (3) NIGERIAN AGIP EXPLORATION LTD

## (4) TOTAL E & P NIGERIA LTD (FORMERLY KNOWN AS ELF PETROLEUM NIGERIA LTD)

-versus-

## NIGERIAN NATIONAL PETROLEUM CORPORATION

### PARTIAL AWARD

MR. J. WILLIAM ROWLEY QC
MR. A.B. MAHMOUD SAN
MR. NEIL KAPLAN CBE QC SBS
— PRESIDING ARBITRAOR —

MS. KIM M. ROONEY
SECRETARY TO THE TRIBUNAL

SEAT OF ARBITRATION — ABUJA, NIGERIA

MAY 2013

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

[TABLE OF CONTENTS]

CHAPTER I   INTRODUCTION............................................................... 3

CHAPTER II  THE PARTIES ................................................................. 5

CHAPTER III THE GOVERNING LAW AND THE ARBITRATION
AGREEMENT ................................................................ 8

CHAPTER IV  INSTITUTION OF PROCEEDINGS AND PROCEDURAL
TIMETABLE TO ARBITRATION CLOSING ........................... 10

CHAPTER V  THE FACTS ................................................................... 32

CHAPTER VI RELEVANT NIGERIAN LEGISLATION AND APPEALS .. 61

CHAPTER VII  THE JURISDICTION OF THE TRIBUNAL ........................ 76

CHAPTER VIII NIGERIA's LEGAL FRAMEWORK AND PRINCIPLES OF
CONSTRUCTION FOR THE BONGA PSC........................... 104

CHAPTER IX  IS THE CONTRACTOR ENGAGED IN PETROLEUM
OPERATIONS AND THEREFORE SUBJECT TO PPT...................... 114

CHAPTER X  THE STATUS OF THE RESPONDENT ............................... 127

CHAPTER XI  SUMMARY   OF   THE   CLAIMANTS'   CLAIMS,
RESPONDENT'S   DEFENCES   AND   COUNTERCLAIM   AND
THRESHOLD ISSUES....................................................... 132

CHAPTER XII REALIZABLE     PRICE     AND     RESPONDENT'S
ALLEGATIONS OF ILLEGALITY ...................................... 139

CHAPTER XIII ANALYSIS OF THE INDIVIDUAL CLAIMS................... 164

CHAPTER XIV THE RESPONDENT'S COUNTERCLAIMS .................... 330

CHAPTER XV  DISPOSITIVE ............................................................. 331

CHAPTER XVI AWARD ..................................................................... 338

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**CHAPTER I      INTRODUCTION**

1.1     This arbitration is all about oil. Nigeria is fortunate to enjoy an abundance of oil under its land and seas. Shell is a well known international company and under its former name of Shell D'Arcy Petroleum (*"Shell D'Arcy"*) it has been involved in oil operations in Nigeria since 1938. Shell was a pioneer in this endeavour. Oil was first extracted in 1956. However, as technology improved oil explorers were able to investigate more difficult terrains including in more recent times deep offshore wells. Off shore exploration is complex, expensive and risky and this case revolves around the terms of a production sharing agreement which was designed to accommodate the risk and to produce a return to both the explorer and the Federal Government of Nigeria. Unfortunately the Parties have fallen out over many issues of contractual interpretation, a number of which have some reference to tax treatment. The Claim and Counterclaim involve very substantial sums of money.

1.2     This arbitration was commenced by the Claimants by Notice of Arbitration dated 23 September 2009 (the *"Notice of Arbitration"*) because of differences or disputes between the Claimants and the Respondent concerning the interpretation and/or performance of a Production Sharing Contract dated 19 April 1993 (the *"Bonga PSC"* or the *"OML 118 PSC"*) relating to deep offshore Oil Prospecting Licence (*"OPL 212"*) which is now known as Oil Mining Lease 118 (*"OML 118"*) [1] entered into between the First Claimant and the Respondent.[2] As

---

[1]  Para 11 of the Parties' Agreed List of Non-Contentious Facts dated 4 November 2011 (the *"Parties' Agreed Non-Contentious Facts"*).
[2]  Para 1.4 of the Claimants' Statement of Claim dated 16 April 2010 (the *"CSOC"*) and para 1.1 of the Respondent's Preliminary Objection/Amended Statement of Defence (the *"RAPO/SOD"*) dated 26 April 2011.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

referred to above, OML 118 was originally granted as OPL 212. The producing field in OML 118 is referred to as the *"Bonga Field"*.[3] Under the Bonga PSC, Shell Nigeria Exploration and Production Company Limited (*"SNEPCO"*) as the Contractor, as defined in the Bonga PSC, assumed obligations to explore and, if commercial reserves were discovered, to develop OPL 212 on behalf of the Respondent and itself.[4]

1.3   Many disputes between the Parties have arisen concerning the proper construction of the Bonga PSC and the nature and effect of the Nigerian legislative framework applicable to it. In addition the Respondent alleges that several of the claims made in this arbitration are not arbitrable under Nigerian law.

---

[3]   Para 11 of the the Parties' Agreed Non-Contentious Facts.  A map showing the location of OML 118 is contained in Ex C-2.
[4]   Clause 2 Bonga PSC.

4

## CHAPTER II   THE PARTIES

### *(1)   The Claimants*

2.1   The Claimants in the Arbitration are (i) *SNEPCO,* (ii) Esso Exploration and Production Nigeria (Deepwater) Limited, ("*Esso*") (iii) Nigerian AGIP Exploration Limited ("*NAE*"), and (iv) Total E&P Nigeria Limited ("*Total*").

2.2   The First Claimant, SNEPCO is a company incorporated under the laws of the Federal Republic of Nigeria.[5]   SNEPCO is a member of the Shell group of companies and is 99.9% owned by Shell Petroleum N.V., a company incorporated in the Netherlands, which in turn is wholly owned by Royal Dutch Shell plc. a company incorporated under the laws of England and Wales (together "*Shell*").[6]   The Second Claimant is Esso. The Third Claimant is NAE.  The Fourth Claimant is Total.

2.3   The Claimants are each Nigerian subsidiaries of International Oil Companies ("*IOCs*").[7]

2.4   The First Claimant was the original party to the Bonga PSC, defined therein as the "*Contractor*".  Following a number of assignments by SNEPCO (amounting to 45% of its interest), the Claimants, as the Contractor, as defined under the Bonga PSC now comprises all four Claimants:[8]

   (1)   SNEPCO as to 55%;

---

[5]   Para 1 of the Dramatis Personae of the Parties' Agreed List of Non-Contentious Facts dated 4 November 2011 (the "*Parties' Agreed Dramatis Personae*").
[6]   Para 2 Parties' Agreed Dramatis Personae.
[7]   Para 8, Claimants' Skeleton dated 4 November 2011 (the "*CS*").
[8]   Para 3 Parties' Agreed Dramatis Personae.

5

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(2)    Esso as to 20%;[9]

(3)    NAE as to 12.5%[10]; and

(4)    Total as to 12.5%.[11]

2.5    The assignments of part of SNEPCO's interest were pursuant to Deeds of Assignment to which the Respondent consented.  SNEPCO's assignment of 20% of its interests in the respective PSCs to ESSO occurred in December 1994; its assignment of 12.5% to Nigerian Agip Oil Company Limited ("*NAOC*") occurred in June 1994 (NAOC subsequently assigned its 12.5% interest to NAE); and its assignment of 12.5% to Total in June 1994 respectively. Thus SNEPCO's interest in the PSCs was reduced to 55% while the interest of the other Parties in the PSCs amounted to 45%.[12]

2.6    SNEPCO acts as the operator of OML 118[13] which is in deep water offshore Nigeria.[14]

*(2)    The Respondent*

2.7    The Nigerian National Petroleum Corporation is the Respondent (the "*Respondent*" or "*NNPC*" or the "*Corporation*"); it manages petroleum assets on behalf of the Federal Government of Nigeria (the "*Government*").[15]

---

[9]   Exhibit C-3.
[10]  Exhibit C-204.
[11]  Exhibit C-5.
[12]  Para 2.3 Respondent's Skeleton dated 4 November 2011 ("*RS*")
[13]  Para 4 Parties Agreed Dramatis Personae.
[14]  Para 10 CS; Diagram at Exhibits C-2a and  C-2b at TB F/16.
[15]  Para 5, Parties Agreed Dramatis Personae; Legislation CL-4/RL-4.

6

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

2.8    The Respondent is a corporation established under the laws of the Federal
Republic of Nigeria pursuant to the Nigerian National Petroleum Act.[16]
Its Chairman is a Government Minister, the Minister of Petroleum
Resources,[17] as discussed further in Chapter X below.

---

[16]  Para 6, Parties Agreed Dramatis Personae; Legislation CL-4/RL-4 at TB G/4.
[17]  Section 1(3) *Nigerian National Corporation Act* 1977 Cap N123 LFN 2004, Legislation CL-4/RL-4 at TB
G/4.

7

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER III   THE GOVERNING LAW AND THE ARBITRATION AGREEMENT

3.1   Clause 19.1 of the Bonga PSC relevantly provides as to the governing law that:

> *"This Contract shall be governed by and construed in accordance with the Laws of the Federation of Nigeria, and any dispute arising therefrom shall be determined in accordance with such laws."*

3.2   Clause 21 of the Bonga PSC provides for dispute resolution by arbitration in the following terms:

> *"CONSULTATION AND ARBITRATION*
>
> *If a difference or dispute arises between the CORPORATION and the CONTRACTOR, concerning the interpretation or performance of this Contract, and if the Parties fail to settle such difference or dispute by amicable agreement, then either Party may serve on the other a demand for arbitration.   Within thirty (30) days of such demand being served, each party shall appoint an arbitrator and the two arbitrators thus appointed shall within a further thirty (30) days appoint a third arbitrator and if the arbitrators do not agree on the appointment of such third arbitrator, or if either Party fails to appoint the arbitrator to be appointed by it, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce (ICC) in Paris on the application of the other Party (notice of the intention to apply having duly given in writing by the applicant party to the other party) and when appointed the third arbitrator shall convene*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

meeting (sic) and act as chairman thereat. If an arbitrator fails or is unable to act, a successor shall be appointed by the respective party or by the arbitrators in the event the chairman must be succeeded.   The arbitration award shall be binding upon the Parties and the expenses shall be borne by the Parties in such proportion and manner as may be provided in the award.   The Nigerian Arbitration and Conciliation Act Cap 19, Laws of the Federation of Nigeria, 1990 shall apply to this contract.   The venue of the arbitration shall be any where in Nigeria as agreed by the Parties." (emphasis added)

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER IV   INSTITUTION   OF   PROCEEDINGS   AND PROCEDURAL   TIMETABLE   TO   ARBITRATION CLOSING

4.1   As referred to in para 1.2 above, the Claimants gave notice of the dispute by the Notice of Arbitration dated 23 September 2009 [18] to the Respondent.   In summary, the Claimants claimed that differences or disputes (collectively the "*Dispute*") had arisen between the Claimants and the Respondent concerning the interpretation and/or performance of the Bonga PSC relating to OML 118, originally granted as OPL 212.

4.2   The three-member Arbitral tribunal was constituted when the party appointed arbitrators, Mr. W. Rowley QC and Mr. AB Mahmoud SAN, appointed Mr. Neil Kaplan CBE QC as the Chair (the "*Tribunal*") on 21 December 2009.[19]

### (1)   *The March 2010 Procedural Hearing*

4.3   On 4 March 2010 the Tribunal met with the Parties' representatives for the first procedural hearing (the "*2010 Procedural Hearing*") at the International Dispute Resolution Centre in London, England. Among other things, at the 2010 Procedural Hearing the Respondent's Counsel reserved its right to object to the jurisdiction of the Tribunal. The Tribunal discussed with the Parties the procedure for the Arbitration as set out in a document entitled the "Agreed Terms of Procedure" (the "*Agreed Terms of Procedure*").   They also finalized the Arbitral

---

[18]   TB/B.1.
[19]   See the email of Mr. W Rowley to the Party's Counsel dated 19 December 2009 advising that he and Mr. A. Mahmoud had appointed Mr. Neil Kaplan as Chairman and that he had accepted the appointment and confirmed that he was free of conflicts and able to serve.

Tribunal's Terms of Appointment (the "***Arbitral Tribunal's Terms of Appointment***") and the Parties agreed that a Tribunal Secretary could be appointed.

### (2)   *Procedural Order No. 1*

4.4   On 10 April 2010 the Tribunal made Procedural Order No 1 ("***PO1***") which set out the procedural timetable to a hearing, including making provision for pleadings, documentation, factual evidence, expert evidence and for the place and date of the hearing, which was to be held in Abuja Nigeria (the "***Original Hearing Location***") for two weeks commencing on Monday, 4 April 2011 (the "***Original Hearing Dates***") at a venue to be arranged by the Parties.[20]

### (3)   *Agreed Terms of Procedure and Arbitral Tribunal's Terms of Appointment*

4.5   On 10 April 2010 the Respondent's representative signed the Agreed Terms of Procedure and the Arbitral Tribunal's Terms of Appointment.

4.6   On 12 April 2010 the Claimants' representative signed the Agreed Terms of Procedure and the Arbitral Tribunal's Terms of Appointment.

### (4)   *Claimants' Statement of Claim*

4.7   On 16 April 2010, pursuant to para 1 of PO1, the Claimants sent an electronic version of the Claimants' Statement of Claim dated 16 April 2010 (the "***CSOC***"). By letter dated 19 April 2010 Claimants' Counsel sent a hard copy of the CSOC together with copies of its supporting documentation.

---

[20]   Para 18 of PO1; TB/A-C.5.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**(5)**     *Appointment of Tribunal Secretary*

4.8    In August 2010 the Parties approved the appointment of Ms. Kim Rooney as Tribunal Secretary, pursuant to the Terms of Appointment of Secretary dated August 2010, as supplemented by a letter dated 12 September 2010.

**(6)**     *Respondent's Preliminary Objection/Statement of Defence*

4.9    On 18 August 2010, pursuant to para 2 of POI, the Respondent sent an electronic version of the Respondent's Preliminary Objection/Statement of Defence dated 18 August 2010 (the *"RPO/SOD"*) with copies of its supporting documentation.

**(7)**     *The Respondent's Application for a Preliminary Hearing of its Jurisdictional Objection*

4.10   By letter dated 22 September 2010 from Respondent's Counsel to the Tribunal, Respondent's Counsel applied for a preliminary hearing of its jurisdictional objection set out in the RPO/SOD (the *"Respondent's Preliminary Jurisdictional Hearing Application"*).

4.11   Following receipt of written submissions from the Claimants and the Respondent, the Tribunal delivered its decision dated 20 October 2010 regarding the Respondent's Preliminary Jurisdictional Hearing Application. The Tribunal determined that the jurisdictional objection, claims and counterclaims should be heard together, for the reasons set out therein. The Tribunal decided that the issues of jurisdiction and arbitrability would be heard and determined following the main hearing and reasons given in its Award. The Tribunal was influenced by the fact that the merits hearing was relatively close and accordingly it would be more economical and expeditious to hear this objection as part of the merits hearing.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**(8)**   *The Tribunal's First Production Order*

4.12   Pursuant to PO1 various requests for production were dealt with by the Tribunal following receipt of submissions from each of the Claimants and the Respondent.   The Tribunal made an order for production of documents by its Decision on Document Production dated 3 December 2010.[21]

**(9)**   *Claimants' Statement of Reply with Supporting Documents and Witness Statements*

4.13   By letter dated 8 December 2010, further to para 8 of PO1, the Claimants' Counsel sent electronic copies to the Tribunal and the Respondent of the Claimants' Statement of Reply with supporting documents, and 10 witness statements as follows:

(1)   Mr. Philip Turberville;

(2)   Dr. Robert Jonkman;

(3)   Mr. Edwin Turner;

(4)   Mr. John Koop;

(5)   Mr. Patrick Whittome;

(6)   Mr. Edzard van Loon;

(7)   Captain Mike Jones;

(8)   Mr. Iain Petrie;

(9)   Mr. Keith Lewis; and

---

[21] TB/A/E.31.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(10)   Mr. Olufemi Olojo.

*(10)   Vacation of Original Hearing Dates and Resetting of Hearing*

4.14   As set out in para 4.4 above, pursuant to para 18 of PO1 the Original Hearing Location was Abuja, Nigeria.  By email of 16 November 2010 the Chairman of the Tribunal, on behalf of the Tribunal, wrote with regard to the forthcoming two week hearing in Abuja in April 2011. In the light of the developments set out in the Tribunal's email, namely, the increase in terrorist activity, the Tribunal proposed to change the venue of the hearing to the Hague or Vienna or somewhere else in Europe, Cape Town or Dubai and welcomed the views of the Parties in this regard.  The Tribunal stated that it would not be able to sit in the United Kingdom. The Tribunal stated that this proposed change in the venue of the hearing would not affect the seat of the arbitration which remained Nigeria, as agreed by the Parties.

4.15   Numerous written submissions on behalf of the Claimants and the Respondent respectively were made in the period from 17 November 2010 to 30 January 2011 concerning the physical location of the Hearing. On 7 December 2010, 23 December 2010 and 31 January 2011 the Tribunal made rulings on the place of this Arbitration.

4.16   On 31 January 2011, by consent, the Tribunal adjourned the Hearing from April 2011 to November 2011 in Abuja, Nigeria, to avoid the Hearing coinciding with the Nigerian General Elections given the risk of violence and uncertainty during that period. The Tribunal was influenced by the terrorist bomb that exploded during the Independence Day Celebration on 1 October 2010 at a place not too far from the Hilton Hotel, Abuja (the location for the hearing) which killed 6 people and injured many others. In the Tribunal's decision dated 31 January 2011,

14

sent to the Parties by email, the Tribunal referred to the correspondence from both the Claimants and the Respondent. The Tribunal stated that it intended to reschedule the hearing for 10 days commencing 17 November 2011, in Abuja, Nigeria. The Tribunal directed that the Original Hearing Dates be vacated and refixed the hearing for not more than 10 days commencing on 17 November 2011 in Abuja, Nigeria.

### (11)   *Respondent's Amendment and Counterclaim Application*

4.17   By letter dated 31 January 2011 to the Tribunal, the Respondent attached a formal application for leave to amend the RPO/SOD and add a counterclaim (the *"Respondent's Amendment and Counterclaim Application"*). The Claimant and Respondent made various submissions as to this.  The Claimants opposed the Respondent's Amendment and Counterclaim Application.

4.18   On 10 March 2011 the Tribunal directed that these applications by the Respondent should be heard and determined at a case management conference in Vienna, Austria in April 2011. Each party agreed and 16 April 2011 was set by the Tribunal as the date for the case management conference in Vienna.

4.19   On 16 March 2011 the Respondent circulated draft forms of the amended RPO/SOD and a counterclaim which it had sought leave to serve.

### (12)   *Vienna Procedural Conference*

4.20   On 16 April 2011 the Tribunal held a case management conference at the Hotel de France, Vienna, Austria. It heard submissions from each party as to the procedural timetable and the Respondent's Application for an extension of time to file a counterclaim, reply, witness statements and the Respondent's Amendment and Counterclaim Application.

15

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

4.21   The Tribunal also discussed with the Parties the issue of the determination of the Realizable Price as defined by the Bonga PSC (see further para 5.40 below) and whether this would be placed before the Tribunal for determination at the November 2011 Hearing. The Parties exchanged correspondence regarding this issue following the 16 April 2011 conference, by Respondent's letter of 19 April 2011 and Claimants' letter of 20 April 2011. Despite this issue having been raised by the Tribunal neither Party referred the issue of Realizable Price either to this Tribunal or to the Ministry. The Parties' respective positions as to this issue are summarized in Chapter XII below.

### (13)   *Amendment and Counterclaim Applications Allowed*

4.22   By the Tribunal's Decision dated 26 April 2011 (the *"Tribunal's Amendment Decision"*), to which the Tribunal's Procedural Order No 2 dated 26 April 2011 was attached (*"PO2"*), the Tribunal granted leave to the Respondent to amend the RPO/SOD and to file a counterclaim in the form it had circulated by email of 16 March 2011.

### (14)   *Tribunal's Procedural Order No. 2*

4.23   By PO2 the Tribunal amended the timetable in PO1 as stated therein, making provision for the Tribunal's Amendment Decision, further pleadings, Expert Reports, schedule of witnesses and provision of other documents prior to the November 2011 Hearing.

### (15)   *The Respondent's Amended Pleadings and Counterclaim*

4.24   Pursuant to PO2, by letter dated 2 May 2011 the Respondent enclosed its:

   (1)   Amended Preliminary Objection/Amended Statement of Defence dated 26 April 2011 (the *"RAPO/ASOD"*);

16

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(2)    Counterclaim ("*RCC*");

(3)    Rejoinder ("*RR*");

(4)    Witness Statements from:

    (a)    Mrs. David-West;

    (b)    Mr. Mele Kyari;

    (c)    Mr. David Mbanefo;

    (d)    Mr. Yusuf Matashi; and

    (e)    Mr. Uwaifo Egbe

**(16)   *The Claimants' Pleadings and Witness Statements of 24 June 2011***

4.25   On 24 June 2011 the Claimants delivered, in electronic form, their Defence to Counterclaim dated 24 June 2011 (the "*CDCC*"), their Statement of Reply on Realizable Price (the "*CSRRP*") and 3 further witness statements namely:

(1)    the second witness statement of Mr. Edzard van Loon dated 24 June 2011;

(2)    the second witness statement of Mr. Iain Petrie dated 30 June 2011, and

(3)    the witness statement of Mr. H. Doody dated 30 June 2011 (which was subsequently amended on 12 July 2011).

**(17)   *The Claimants' Surrejoinder***

17

4.26    On 1 July 2011 the Claimants delivered their Surrejoinder (the "*CS*") in electronic form.

### (18)    *The Respondent's Further Pleading and Witness Statements*

4.27    On 22 July 2011 the Respondent delivered its Reply to Defence to Counterclaim (the "*RRDRSS*") in electronic form.

4.28    The Respondent also submitted in electronic form two further witness statements namely:

(1)    the second witness statement of Mr. Y. Matashi dated 22 July 2011, and

(2)    the second witness statement of Mr. D. Mbefano dated 26 July 2011.

### (19)    *The Tribunal's Second Order for Document Production*

4.29    On 5 September 2011 the Chairman of the Tribunal received a letter from Messrs Lucius E. Nwosu & Partners, solicitors for FIRS. In this letter it was stated that FIRS was of the view that the subject matter of this arbitration, namely taxation, was not an arbitrable dispute. By this letter the Tribunal was given notice that the FIRS had applied or would apply to the Federal Court of Nigeria seeking certain injunctions effectively to restrain the Parties to this arbitration from continuing with this proceeding or taking the benefit of any award. The Chairman acknowledged this letter and copied it to the Parties. It now appears that FIRS commenced proceedings against the Parties on 9 September 2011. By letter dated 27 March 2012, the Claimants informed the Tribunal that as a consequence of a ruling granting an injunction (which was, the Tribunal now knows, made on 29 February 2012) of the Nigerian Federal

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

High Court (the *"Injunction"*) they could not take any further steps in the arbitration. By email of 28 March 2012 the Respondent stated that it was checking the status of the judgment made in a suit commenced by FIRS against the Parties. By email dated 25 April 2012 counsel for the Claimants sent the Tribunal a copy of the 44 page judgment of Mr. Justice Bello. It is clear from a reading of this judgment that the Injunction was not directed at the Tribunal.

4.30    Pursuant to PO1, a further request for production of documents was dealt with by the Tribunal following receipt of submissions from each of the Claimants and the Respondent. The Tribunal made a second Order for Document Production dated 8 August 2011.[22]

### (20)    *Decision as to the Place of Hearing in November 2011*

4.31    The place of the Arbitration became an issue again, following a terrorist bombing in Abuja on 27 August 2011 causing approximately 26 deaths and injuring scores more. Following correspondence between the Tribunal and the Parties, a teleconference was held among the Tribunal Chairman, the Parties and their representatives on 12 September 2011 (also attended by the Tribunal's Secretary) and submissions on behalf of the Parties were made before and after this conference.

4.32    On 3 October 2011 the Tribunal delivered its decision as to the place of the November 2011 hearing (the *"Tribunal's October 2011 Decision"*). The Tribunal referred to the commencement date of the hearing of this arbitration on 17 November 2011 (the *"Hearing"*), just over 6 weeks away, the further concerns that had arisen concerning the safety of Abuja by reason of the terrorist bombing on 27 August 2011, the teleconference

---

[22]   TB/A/E.41.

19

of 12 September 2011, the submissions made by the Parties during it and afterwards and the fact that the Parties had not jointly proposed a place for the Hearing that satisfied the security and safety concerns of the Tribunal arising from the tragic events of late August 2011 in Abuja. It stated that the place where it would be held must be finalized, and in the circumstances, the Tribunal must make a decision as to this.

4.33 In the Tribunal's October 2011 Decision the Tribunal confirmed that the Parties had agreed that the legal seat of the Arbitration was the Federal Republic of Nigeria (the "*Situs*" or the "*Seat*") by Clause 4(b) of the Agreed Terms of Procedure which provides:

> "*(b) The Seat of this Arbitration shall be the Federal Republic of Nigeria ("Situs"). The law of the Situs shall be the applicable lex arbitri. Unless otherwise specified, the local time of the Situs shall be decisive with regard to any deadlines, time limits and the like.*"

4.34 The Tribunal confirmed that the place of the Hearing is distinct from the legal seat of the Arbitration. By Clause 4(c) of the Agreed Terms of Procedure the Parties have agreed that:

> "*(c) The Tribunal shall endeavour to hold all future hearings (including preliminary hearings) at the Situs save where it is, in the opinion of the Tribunal, impractical to do so. Regardless of where the hearing(s) may actually be held, the Situs shall always remain as stipulated in (b) above.*"

4.35 The Tribunal made clear that although this was a domestic arbitration, the distinction between the "*seat*" and the "*place*" of an arbitration is nevertheless well recognized in the jurisprudence of arbitration referring to *Union of India v McDonnell Douglas Corp.* [1993] 2 Lloyd's Rep. 48.

It observed that the position stated in ***Union of India v McDonnell Douglas Corp.*** is in accord with the position of the Nigerian Supreme Court in the case of ***Nigerian National Petroleum Corporation v. Lutin Investment Ltd LER*** (2006) 57/2002 where the issue of the validity of an arbitral tribunal holding hearings in London, outside Nigeria arose and the Court held as follows:

> *"From the foregoing, I hold the view that under our law, an arbitrator or an arbitral tribunal has the power and discretion to decide as regards where it holds its meetings, conduct hearings, take evidence etc. I further hold the view that such place as decided by the arbitrator or arbitral tribunal may be different from the seat of the arbitration except the Parties expressly agree to the contrary in their arbitration agreement. In the instant case as found earlier in this judgment, there is no such agreement by the Parties. I therefore hold that the decision of the arbitrator to go to London to take evidence of the 1st respondent's witnesses, which decision was confirmed by both the trial and lower courts, was not in violation of the terms of the arbitration agreement between the Parties thereto neither is it in violation of the provisions of the Arbitration and Conciliation Act particularly the provisions of Section 16 thereof".*

4.36 The Tribunal also stated that although in the present proceedings, the Parties had agreed that the seat of the arbitration was Nigeria and the hearings should be held in Abuja, they had also given the Tribunal a discretion, in the Agreed Terms of Procedure, to hold hearings outside the Seat where hearings at the Seat became impractical.

21

4.37 The Tribunal commented that the place of the Hearing had been the subject of numerous submissions by each party following the Tribunal's email of 27 August 2011 expressing its great sadness and concern at the brutal terrorist attack in Abuja earlier that day.

4.38 The Tribunal's October 2011 Decision stated that the Tribunal had conferred and had carefully considered the submissions of the Claimants and the Respondent respectively. The Parties had been given an adequate opportunity to make submissions, as outlined in the October 2011 Decision. The Claimants were content to abide by the decision of the Tribunal, providing the place of the Arbitration was other than The Netherlands, France, Italy or the United States. While earlier in September 2011 the Respondent had proposed Ghana as an alternative place for the Hearing, it had since withdrawn this proposal and asked that the Tribunal hold the Hearing in Abuja on the basis that it would make arrangements to ensure that it was *"hitch free"*.

4.39 The Tribunal stated that it had again reviewed Clause 4 (c) of the Agreed Terms of Procedure expressly empowering it to hold hearings of the Arbitration in a place outside Nigeria, while making it clear that that the seat of the Arbitration will continue to be Nigeria. Neither party had submitted that the Tribunal lacked the legal power to so direct. The Tribunal had also borne in mind up to date travel warnings with regard to Nigeria.

4.40 The Tribunal took into account ease of travel from Nigeria, suitable and available facilities, ease of visa entry and the minimum vaccination requirements. Whilst the Tribunal appreciated and understood the Respondent's desire to hold the arbitral hearing in Abuja or Lagos the Tribunal had come to the conclusion that in the light of recent happenings,

22

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

as well as what has been threatened, it could not ignore the security and safety concerns of the members of the Tribunal and others attending the Hearing. Accordingly, on the basis of all this material, and in the exercise of the discretion bestowed upon the Tribunal by the Parties, the Tribunal unanimously concluded that it was now impracticable to hold the Hearing in Abuja or Lagos.

4.41 The Tribunal took note of the places that the Claimants had invited the Tribunal to avoid. The Tribunal agreed to heed this advice. The Tribunal was conscious of the cost involved of moving the place of this Hearing, but it noted that the Claim and Counterclaim totaled several billions of US dollars. The Tribunal had considered various venues with cost, distance and facilities in mind and concluded that the Hearing should take place in Cape Town, South Africa. The Tribunal was anxious to hold the Hearing in Africa, with a similar time zone to Nigeria.

4.42 Accordingly, the Parties were instructed to work with the Secretary to the Tribunal, in finalizing arrangements for the Hearing in Cape Town, South Africa, commencing on 17 November 2011 and finishing on 26 November 2011.

### (21) *Pre-Hearing Case Management Conference of 12 October 2011*

4.43 On 12 October 2011 pursuant to para 12 of PO2 the Tribunal held a pre-hearing case management conference by telephone with the Parties and their legal and other representatives; the Tribunal Secretary also participated.

### (22) *Expert Witnesses*

4.44 Pursuant to para 9 of PO2, by email dated 30 September 2011 the Parties submitted a copy of a joint tax report of Mr. Victor Onyenkpa (for

23

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Claimants) and Mr. Olaleye Adebiye (for Respondent) dated 26 September 2011 (the "*Joint Tax Report*").[23]

4.45    By email dated 30 September 2011 the Claimants submitted a copy of the expert tax report of Mr. Victor Onyenkpa dated 28 September 2011.[24]

4.46    On 12 October 2011 the Respondent submitted copies of (1) the expert tax report of Mr. Olaleye Adebiye regarding the Claimants' Claims dated 2 August 2011,[25] and (2) the expert tax report of Mr. Olaleye Adebiye regarding the Respondent's Counter-Claim dated 3 August 2011.[26]

4.47    By email dated 7 October 2011 the Claimants submitted a legal expert report by Hon. Justice George A. Oguntade dated 7 October 2011 (the "*Justice Oguntade's Report*").[27] At the Hearing in November 2011 the Respondent elected not to call Justice Oguntade and decided not to cross examine him. In these circumstances, the Tribunal will treat Justice Oguntade's expert report as if it were a submission on Nigerian law.[28]

### (23)   *Witness List*

4.48    Pursuant to para 10 of PO2, by emails of 4 October 2011 and 11 November 2011 from the Claimants, and emails of 4 October and 9 October 2011 from the Respondent, the Parties exchanged the names of witnesses whom each required to attend at the hearing for cross-examination.

### (24)   *Agreed List of Issues*

---

[23]   TB/D.1.
[24]   TB/D.2.
[25]   TB/D.3.
[26]   TB/D.4.
[27]   TB/D.5.
[28]   Transcript pp 137 – 139 Day 2; pp 2 and 3 Day 3.

24

4.49   Pursuant to para 11 (b) of PO2, on 4 November 2011 an agreed list of issues was submitted to the Tribunal by the Parties.

### (25)   *Agreed Statement of Non-Contentious Facts*

4.50   Pursuant to para 11 (a) of PO2, on 4 November 2011 an agreed statement of non-contentious facts was submitted to the Tribunal by the Parties.

### (26)   *Core Bundles*

4.51   Pursuant to para 13 of PO2, on 4 November 2011 the Parties provided the Tribunal with Hearing bundles which included in addition to an order bundle (1) a core list of documents, and (2) a bible of transaction documents that are contractual in nature.

### (27)   *Skeleton Arguments and Other Documents*

4.52   Pursuant to para 14 of PO2, on 4 November 2011 the Parties provided the Tribunal with their respective (1) skeleton arguments, (2) an agreed dramatis personae, (3) an agreed chronology of events, and (4) bundles of legal authorities each relied upon; the Claimant also provided an additional chronology.

### (28)   *Schedule of Witnesses*

4.53   Pursuant to para 15 of PO2, by emails of 10 November 2011 and 16 November 2011 the Parties provided the Tribunal with a schedule of witnesses.

4.54   On 4 November 2011 the Respondent sought leave to produce an additional witness statement of Dr. T. Okon.  By email dated 4 November 2011 Claimants' counsel did not oppose this.  The Tribunal granted leave for production of Dr. Okon's witness statement.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

### (29)   *The Hearing*

4.55   The Hearing took place at the Taj Hotel in Cape Town, South Africa between 17 November 2011 and 21 November 2011 pursuant to the Tribunal's order made on 3 October 2011. All Parties and witnesses willingly attended. The Parties cooperated in making excellent arrangements for all concerned. At the end of the Hearing, in response to a question from the Tribunal, both Parties confirmed that they were satisfied with the arrangements for the Hearing in Cape Town and confirmed that they had both had a full opportunity of presenting their cases, subject to the submissions of the written submissions which would follow.[29]

4.56   The Claimant was represented by Messrs. Audley Sheppard, James Dingley, William Hooker and Benjamin Barratt of Clifford Chance, as well as by Mrs. Olufunke Adekoya SAN, Mr. Theo Emuwa, Mr. Chinyerugo Ugoji and Ms. Emmanuela Uche of AELEX.

4.57   The Respondent was represented by Messrs. Osaro Eghobamien SAN, Mr. Olawale Adebambo, and Mr. Toloupe Aderemi of Perchstone & Graeys.

4.58   The following witnesses appeared at the Hearing and gave evidence on behalf of the Claimant and were cross examined/re-examined:

(1)   Mr. John Koop;[30]

(2)   Mr. Patrick Whittome;[31]

---

[29]   Transcript, Day 4, p 225, lines 3-10.
[30]   Transcript, Day 1, pp 194 – 219, Day 2, pp 6 – 28.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

    (3)    Mr. Edzard van Loon;[32]

    (4)    Captain Mike Jones;[33]

    (5)    Mr. Humphrey Doody;[34]

    (6)    Mr. Edwin Turner;[35]

    (7)    Mr. Robert Jonkman;[36]

    (8)    Mr. Philip Turberville;[37]

    (9)    Mr. Keith Lewis;[38] and

    (10)   Mr. Iain Petrie.[39]

The Respondent did not call Mr. Olufemi Olojo for cross-examination.

4.59    The following witnesses appeared at the Hearing and gave evidence on behalf of the Respondent and were cross examined/re-examined:

    (1)    Mr. Uwaifo Egbe;[40]

    (2)    Mr. David Mbanefo;[41]

    (3)    Mrs. Juliet David-West;[42]

    (4)    Dr. Timothy Okon;[43]

---

[31] Transcript, Day 2, pp 29 – 58.
[32] Transcript, Day 2, pp 58 – 81.
[33] Transcript, Day 2, pp 81 – 100.
[34] Transcript, Day 2, pp 100 – 134.
[35] Transcript, Day 3, pp 1 – 17.
[36] Transcript, Day 3, pp 17 – 28.
[37] Transcript, Day 3, pp 29 – 41.
[38] Transcript, Day 3, pp 42 – 57.
[39] Transcript, Day 3, pp 58 – 134.
[40] Transcript, Day 3, pp 197 – 208.
[41] Transcript, Day 3, pp 144 – 196.
[42] Transcript, Day 3, pp 209 – 230.

27

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(5)  Mr. Mele Kyari.[43]

*(30)  Hot tubbing of experts*

4.60   The Tribunal proposed that the Parties' two tax experts, Mr. Victor Onyenkpa (called by the Claimants) and Mr. Olaleye Adebiyi (called by the Respondent) should give their evidence by "hot-tubbing" i.e. that they should sit together and be questioned by both Parties representatives and the Tribunal, and in effect enter into a dialogue in response to questions. The Parties agreed and this was done on 21 November 2011 on Day 4 of the Hearing.[45]

*(31)  Expert Legal Evidence/Legal Submissions*

4.61   As referred to in Paragraph 4.47 above, at the Hearing the Respondent's Counsel said it was not necessary to call Hon. Justice G. Oguntade for cross-examination as to his expert legal report dated 7 October 2011, which the Tribunal agreed to treat as a legal submission. Justice Oguntade's legal report is treated as a legal submission but will be referred to in this Partial Award as *"Justice Oguntade's Report"*.

*(32)  Directions at End of Oral Hearing*

4.62   At the end of the oral hearing on 21 November 2011 the Tribunal made the following orders:

(1)  it closed the evidential phase of the arbitration;[46]

(2)  post hearing submissions limited to 50 pages to be delivered on 9 January 2012;[47]

---

[43]   Transcript, Day 4, pp 1 – 26.
[44]   Transcript, Day 4, pp 26 – 50.
[45]   Transcript Day 4, pp 59 – 154.
[46]   Transcript Day 4, p 222.

28

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(3)   reply post hearing submissions to be delivered on 23 January 2012;[48]

(4)   costs schedules to be circulated 14 days after the close of final submissions.

4.63   As a result of the way that the Respondent's case had proceeded the Tribunal invited Mr. O. Eghobamien, Respondent's lead counsel, to address the Tribunal briefly on what he submitted on behalf of the Respondent were the consequences of any finding of illegality by the Tribunal. The Tribunal confirmed to Counsel for Respondent that any submissions he made were, of course, subject to what he might contend in the closing submissions, but that nevertheless in the course of his oral submissions he had submitted that as a result of the alleged illegality (reference to which is made below) the Bonga PSC may have come to an end.

4.64   Counsel for the Claimants took the strongest objection to this submission not only because it was not properly pleaded but because of the enormity of the consequences flowing from it.

4.65   In the circumstances the Tribunal thought it right and proper to give Counsel for the Respondent an opportunity to reflect on these consequences and to take further instructions when he returned to Nigeria. Accordingly the Tribunal afforded Counsel for the Respondent an opportunity to revert to the Tribunal within 7 days to confirm whether he

---

[47]   Transcript Day 4, p 222.
[48]   Transcript Day 4, p 222.

29

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

maintained his stance on illegality or preferred to take a different course.[49]

*(33)   Subsequent Correspondence re Illegality Issue*

4.66   Accepting the invitation of the Tribunal the Respondent wrote to the Tribunal by email dated 1 December 2011, attaching a copy of its letter dated 30 November 2011 setting out its position concerning the illegality issue, with which the Tribunal will deal below.[50]

4.67   The Claimants responded to the Respondent's letter on illegality by email dated 20 December 2011 and a letter dated 20 December 2011;[51] this too will be dealt with below.

*(34)   Post Hearing Submissions*

4.68   On 12 January 2012 pursuant to the order of the Tribunal made at the Hearing the Claimants delivered their Post Hearing Brief dated 12 January 2012 (the *"CPHB"*).[52]

4.69   On 12 January 2012 pursuant to the order of the Tribunal made at the Closing of the Hearing the Respondent delivered their Post Hearing Brief dated 12 January 2012 (the *"RPHB"*).[53]

4.70   On 12 January 2012 pursuant to the order of the Tribunal during the Hearing, the Respondent delivered its submissions in response to Justice

---

[49]   Transcript Day 4, pp 218-222.
[50]   TB I/1.
[51]   TB I/3.
[52]   TB I/5.
[53]   TB I/6.

30

Oguntade's Report entitled *"Reply to Expert Report on Nigerian Law"* (the *"RR Legal Report"*).[54]

4.71   Pursuant to the order of the Tribunal made at the Closing of the Hearing on 26 January 2012 the Claimants delivered their Reply Post Hearing Submissions dated 26 January 2012 (the *"CRPHB"*).[55]

4.72   Pursuant to the order of the Tribunal made at the Closing of the Hearing on 27 January 2012 the Respondent delivered their Post Hearing Submissions dated 26 January 2012 (the *"RRPHB"*).[56]

*(35)   Costs Schedules*

4.73   Although the order of the Tribunal at the end of the Hearing provided for the service by each party of a schedule of costs which it claimed in the event of success, the Parties failed to serve their respective schedules as a result of the terms of the Injunction granted on 29 February 2012. Accordingly, the only information that the Tribunal has in relation to costs is the amount that both Parties paid to the Permanent Court of Arbitration by way of deposits. Accordingly, as this is a partial award, the Tribunal will reserve all questions of costs until such time, if ever, that it is in a position to deal with it, and reserves the right to render a costs award.

---

[54]  TB1/4.
[55]  TB 1/7.
[56]  TB 1/8.

31

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER V    THE FACTS

### 5.    The Background [57]

### (1)   *Claimants' Presence in Nigeria*

5.1    The Claimants assert[58] that the Shell group of companies has had a presence in Nigeria dating back more than seventy years to November 1938, when Shell D'Arcy, now known as The Shell Petroleum Development Company of Nigeria Limited ("*SPDC*"), was granted an exploration licence to prospect for oil throughout Nigeria. Shell D'Arcy pioneered the oil & gas industry in Nigeria and, in January 1956, the company drilled a successful well at Oloibiri (in the onshore Niger Delta region), which was the first major discovery of oil in Nigeria. That discovery paved the way for a rapid expansion of the Nigerian oil & gas industry, and soon other major international oil companies, including Esso, NAE and Total and/or certain of their affiliated companies also commenced operations in Nigeria.

5.2    The Claimants further assert that over the course of the following decades, Nigeria developed its onshore and shallow water oil reserves, latterly through the Respondent. By the end of the 1980s, SPDC had become the largest operator in Nigeria with operations covering a total area of some 30,000 square kilometres (onshore and shallow offshore), more than 90 oil fields, in excess of 70 flow stations and two major oil export terminals. SPDC presently operates a joint venture between it (as to 30%), the

---

[57]   The background set out in Part 5 is extracted from the Claimants' Chronology dated 4 November 2011 (the "*Claimants' Chronology*"), the Respondent's Skeleton exhibits, and other evidence & submissions of the Parties as indicated therein.

[58]   Paras 3.2-3.6 of CSOC:TB/B3/10.

Respondent (as to 55%), the Total group of companies as to 10%) and the ENI group of companies (as to 5%), in relation to certain petroleum activities in Nigeria.[59] Nigeria then turned its attention to its deepwater reserves, which was understood to mean water depth below 200 meters.

### (2)   *1990 Bidding Round*

5.3     On 8 October 1990, the Government issued a press statement inviting applications from international oil companies to bid for various open acreages by Nigeria's then-Minister of Petroleum Resources, Professor Jibril Aminu, explaining that it was "*government policy to encourage exploration in all ... sedimentary basins including the deep offshore with a view to increasing [Nigeria's] proven reserves from the current level of 16 bll. to 20 bll. barrels by 1995*".[60]

5.4     Minister Aminu observed that the Federal Government had in the past given "*various fiscal and other incentives [to] encourage investment in oil exploration*" and that the Government planned to "*continue to review these incentives [so as to] ensure the attractiveness of investment in the Nigerian petroleum sector*".

### (3)   *Negotiations for a Model PSC*

5.5     The previous joint venture model had proved not to be satisfactory because it required a substantial financial input from the Government as a joint venturer.[61] The move to a production sharing contract ("*PSC*") model was designed to take away the Government's investment obligations and to impose the financing and the risk of exploration and

---

[59]   Para 3.5 CSOC.
[60]   Exhibit C-7 at TB F/2.
[61]   CS para 29; RS para 4.2.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

development on the IOCs in return for a reimbursement of their costs and expenses, and a suitable return after taking into account matters such as royalty and tax.[62]

5.6   In March 1991 the Respondent issued a draft model Production Sharing Contract (the "*Model PSC*"), which it indicated would form the basis of an agreement in respect of each of the offered blocks.[63]  The Respondent also invited comments from the wider oil & gas industry on the incentives required to attract investment from international oil companies.

5.7   Shell and other international oil companies operating in Nigeria made it clear that conducting deepwater drilling and exploration was extremely challenging, both technically and commercially. The international oil companies indicated that the fiscal terms - such as the royalty rate, tax rate and investment tax credit rate - would need to be improved to make such projects economically feasible.[64]

(1)   Royalty: the existing royalty rates in Nigeria provided for royalty to be paid to the Government on production of Crude Oil at the rate of: 20% for onshore; 18.5% for offshore to 100 metres water depth; and 16.67% for offshore of water depth greater than 100 metres. The IOCs indicated that lower royalty rates would be necessary to reflect the increasing cost of exploration and production with increasing water depth.

(2)   Petroleum Profits Tax: the tax rate applicable in respect of onshore and shallow water (up to 200 metres) operations was 65.75% for the first five years of a company's actual production and 85% for

---

[62]   Para 30 CS; para 4.2 RS
[63]   Para 32, CS
[64]   As discussed in an article from *Guardian* newspaper "*The Lure into Oil, Gas*" dated 17 January 1996 (ExhibitC-8).

*SHEPCO et ors v NNPC*
*Privileged and Confidential*

the period thereafter. Again, the IOCs indicated that lower tax rates would be necessary to recognize the capital expenditure and risk associated with deepwater operations

(3) Investment Tax Credits ("*ITC*"): under the then *PPTA*, (as defined in para 5.15 below) taxpayers were underlined entitled to a tax credit, calculated as a percentage of capital investment. This operated as a full credit against any tax due (and not as a deduction against capital expenditure for purposes of depreciation). The applicable ITC rates were:

(a)   5% for onshore;

(b)   10% for offshore waters up to and including depths of 100 meters;

(c)   15% for offshore water depths of 100 and 200 meters;[65] and

(d)   20% for more than 200 meters.

Again, the IOCs indicated that a more favourable ITC regime would be necessary given the challenges posed by exploration in deepwater.

5.8   The Nigerian government and the Respondent indicated that they were willing to improve the fiscal terms.[66]

(4)   *Award of OPLs 212, 219, 803, 806 and 809 to SNEPCO*

5.9   Shell submitted bids for two OPLs: 212 and 219.

5.10   On 20 November 1991, the Minister of Petroleum Resources wrote to

---

[65] TB F/5 at Art 14.
[66] e.g. Exhibit C-11 at TB F/57.

35

Shell confirming the award of Oil Prospecting Leases ("*OPLs*") 212, 219 and 803, 806 and 809 to it.[67]  On 19 April 1993 SNEPCO and the Respondent entered into the Bonga PSC.[68]  The Bonga PSC was "*approved*" by the Honourable Secretary of Petroleum and Mineral Resources, who signed the Bonga PSC.[69]

### (5)   *Further Bonga PSC Negotiations*

5.11   On 16 April 1992 the Respondent wrote to SNEPCO setting out the fiscal measures to be recommended to the Government as an extension of existing Nigerian laws.[70]

5.12   Between April 1992 and April 1993 negotiations continued over the fiscal terms that would apply to open acreage deep offshore Nigeria.[71]

### (6)   *Fiscal Incentives and Legal Framework*

5.13   By the Government's 19 April 1993 letter from Mr. P. C Aslodu, Hon. Secretary of Petroleum & Mineral Resources, for and on behalf of the Federal Government of Nigeria, to the Chairman and Managing Director, Shell Petroleum Development Company (Nig) Limited (the "*Government's April 1993 Letter*") Mr. Aslodu referred to the "*Production Sharing Contract (PSC) to be signed between NPC and Shell Petroleum Development Company of Nigeria Limited (Contractor) relating to OPL's No. 212, 219, 803, 806 and 809 and any subsequent OML's that may be derived therefrom*" and stated that "*Pursuant to Government policy, the PSC will be approved with the guarantee*" as set

---

[67]   Para 3, Claimants' Chronology; Exhibit C-10 at TB F/4.
[68]   Para 6 of Claimants' Chronology; Exhibit C-13/RE-3 at TB F/13.
[69]   Para 6 of Claimants' Chronology; Para 12 of Parties' Agreed Non-Contentious Facts.
[70]   Para 4 of Claimants' Chronology; C-12/RE-2 at TB F/5.
[71]   Para 5 Claimants' Chronology.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

out therein and described in more detail below.[72]

(7)     *The Government's April 1993 Letter, the DOD and the DOA*

5.14   In the Government's April 1993 Letter Mr. Aslodu stated that:

> "*Reference is made to the Production Sharing Contract (PSC) to be signed between Nigerian National Petroleum Corporation (the Corporation) and Shell Petroleum Development Company of Nigerian Limited (Contractor) relating to OPL(s) No. 212. 219, 803, 806 and 809 and any subsequent OML(s) that may be derived therefore.*
>
> *Pursuant to Government policy, the PSC will be approved with the guarantee that the following terms which require amendments to existing Nigerian Laws are applicable and enforceable:*[73]

> (i)     *The OPL(s) shall be for a maximum of ten (10) years;*

> (ii)    *The Petroleum Profit Tax (PPT) for petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;*

> (iii)   *The Investment Tax Credit (ITC) for NNPC and the contractor in respect of petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;*

> (iv)    *Royalty Rates shall be as provided in the PSC;*

> (v)     *Computation and payment of estimated and final PPT is to be made in US dollars on the basis of US dollar returns*

---

[72]   Exhibit C-16 at TB F/19.
[73]   Exhibit C-16 at TB F/19.

> *filed.*
>
> *This letter shall be valid until the respective applicable laws are amended to reflect the terms of the PSC herein stated."*

5.15   On 23 March 1999 the *Deep Offshore and Inland Basin Production Sharing Contracts Decree No. 9 of 1999* (the "*DOD*") was enacted and provided, among other things, that it "*shall be deemed to have come into force on 1st January 1993*".[74] This was later superceded by the *Deep Offshore and Inland Basin Production Sharing Contracts Act 1999 D3* (the "*DOA*").[75] The DOA states that it takes precedence over any other legislation.[76] In addition, Section 22 of the *Petroleum Profits Tax (PPT) Act* 1959 Cap 354 as amended (the "*PPTA*") was amended by Decree No. 30 of 1999 to make provision for PSC's.[77]

*(8)   Execution of the Bonga PSC and other PSCs*

5.16   On 19 April 1993 SNEPCO and the Respondent entered into the Bonga PSC with respect to OPL 212 (now known as OML 118) with regard to the Bonga Field.  As referred to above, on 19 April 1993 the Bonga PSC was "*approved*" by the Honourable Secretary of Petroleum and Mineral Resources, who signed the Bonga PSC.[78]

5.17   On 19 April 1993 the First Claimant, as the then Contractor, and the Respondent entered into other Bonga PSCs on identical terms (except as to the description of the Contract Area) in relation to (1) OPL 219

---

[74]   Legislation CL5/RL-1 at TB G/5, section 19.
[75]   The Act is found behind the DOD at TB G/5.
[76]   Section 15 *DOA* and Joint Expert Opinion, para 6(a)(ii); as confirmed by the Parties' Tax Experts at the Hearing, see Transcript, Day 4, p 61, lines 1 – 3.
[77]   See also Section 20 of the *PPTA*.
[78]   Para 12, Parties' Agreed Non-Contentious Facts.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(subsequently converted into OML 135) and (2) OPLs 303, 806 and 809[79] (the "*other SNEPCO/Respondent PSCs*").

5.18    The Bonga PSC and the other SNEPCO/Respondent PSCs were among several PSCs that the Respondent entered into at that time with international oil companies with the purpose of encouraging exploration in Nigeria's deepwater acreages.[80]

(9)    ***Key Provisions of OML 118 PSC***

(a)    Scope

5.19    Clause 2 of the Bonga PSC provides as to its scope as follows:

"A.    *SCOPE*

2.1    *This Contract is a Production Sharing Contract governed in accordance with the terms and provisions hereof. Petroleum Operations and provision of financial and technical requirements by the CONTRACTOR in accordance with the terms of this Contract shall be in consultation with the CORPORATION. The CORPORATION, as holder of all rights in and to the Contract Area, hereby appoints and constitutes the CONTRACTOR the exclusive company to conduct Petroleum Operations in the Contract Area.*

2.2    *During the term of this Contract the total Available Crude Oil shall be allocated to the Parties in accordance with the provisions of Clause 8, the Accounting Procedure (Annex B) and the Allocation Procedure (Annex C).*

---

[79]  Para 12, Claimants' Chronology.
[80]  Para 1.5 CSOC, para 2.2 Part 2, RAPO/ASOD at p20.

39

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

2.3   The CONTRACTOR shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations and shall therefore have an economic interest in development of Crude Oil deposits in the Contract Area.

2.4   The CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws or the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies Income Tax Act 19793 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application".

5.20   **"Petroleum Operations"** is defined in Clause 1(y) of the Bonga PSC as being "the same as defined in the Petroleum Profits Tax (PPT) Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 as amended." Section 2 of the PPT Act defines **"Petroleum Operations"** as follows:

"the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria by or on behalf of a company for its own account by any drilling, mining, extracting or other like operations or process, not including refining at a refinery, in the course of a business carried on by the company engaged in such operations, and all operations incidental thereto and any sale of or any disposal of chargeable oil by or on behalf of the company; ...".

5.21   **"Contractor"** is the term by which the First Claimant is defined in the first Paragraph of the Bonga PSC. Clause 2.4 of the Bonga PSC provides that:

"the CONTRACTOR is engaged in Petroleum Operations pursuant to the [1959 PPT Act] as amended and accordingly the Companies

40

*Income Tax Act 1979 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application."*

5.22   Clause 2.3 of the Bonga PSC provides that *"The Contractor shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations ..."*

5.23   *"Contract Area"* is defined in Clause 1(i) of the Bonga PSC as *"the area of the OPL and any OML(s) derived therefrom."* The Contract Area is described and its location identified in Annex A to the Bonga PSC which is headed "OPL 212".

5.24   *"Oil Mining Lease"* (*"OML"*) is defined in Clause 1(u) of the Bonga PSC as meaning *"a lease granted by the Minister under the Petroleum Act Cap 350, Laws of the Federation of Nigeria 1990 as amended, to a lessee to search for, win, work, carry away and dispose of Petroleum."*

5.25   *"Oil Prospecting Licence"* (*"OPL"*) is defined in Clause 1(v) of the Bonga PSC to mean *"a licence granted by the Minister under the Petroleum Act Cap 350, Laws of the Federation of Nigeria 1990 as amended, to a lessee to prospect for Petroleum."*

(b)   Term

5.26   Clause 3.1(a) of the Bonga PSC provides that the term of the PSC (subject to rights of termination) is *"thirty (30) years from the Effective Date inclusive of ten (10) years exploration period and 20 years OML period"*. This term may be extended (Clause 3.1(b) of the Bonga PSC).

5.27   The Effective Date is *"the date of this Contract"*, i.e. 19 April 1993 being the date of the Bonga PSC, pursuant to its Clause 1(n).

5.28   Pursuant to Clause 3.5 of the Bonga PSC, it will terminate, inter alia, *"if*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

no *Petroleum [is] found in the Contract Area after ten years from the Effective Date*" or, alternatively, if Petroleum is found, at the end of the OML period (if not extended)"

(c)    Work Programme

5.29    Clause 5.1 of the Bonga PSC provides that within 2 months after the Effective Date and thereafter at least 3 months prior to the beginning of each Year [81] the Claimants, as the Contractor, shall prepare and submit for review and approval by the Management Committee an annual "*Work Programme and Budget*" for the Contract Area setting forth the Petroleum Operations which the Claimants, as the Contractor, propose to carry out during the ensuing Year, or in the case of the first Work Programme and Budget during the remainder of the current year. The Management Committee shall review and approve such Work Programme and Budget, in accordance with Clause 6.3(e) of the Bonga PSC prior to the submission of the Work Programme and Budget to the Ministry as defined in Clause 1(s) of the Bonga PSC.[82]

(d)    Management Committee

5.30    Clause 6 of the Bonga PSC provides for the establishment of a "*Management Committee*" for the "*purpose of providing orderly direction of all matters pertaining to the Petroleum Operations and Work Programme*". (referred to by the Parties as the "*MACOM*"). Its powers and duties are set out in Clause 6.1 of the Bonga PSC and include the approval of all proposed Work Programmes and Budgets (Paragraph 6.1 (a)) in accordance with Clauses 5, 6.3 (e) and 6.4(a) of the Bonga PSC.

---

[81]  Clause 1(ah) of the Bonga PSC defines "*Year*" to mean a period of ...12 consecutive months according to the Gregorian calendar.
[82]  Clause 1(s) provides that "*Ministry*" means the "ministry charged with the responsibility for Petroleum Resources.".

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

5.31 Pursuant to Clause 6.2 (a) of the Bonga PSC, the MACOM consists of ten persons, five of whom are appointed by the Claimants, as the Contractor, and five by the Respondent.

5.32 Pursuant to Clause 6.4(d) of the Bonga PSC, except as otherwise expressly provided therein, MACOM's decisions are to be by unanimous vote, and in the event that a unanimous vote cannot be achieved after three meetings, then an independent qualified expert may be appointed to give binding advice on the relevant matter, failing which the Clause 21 dispute resolution provisions of the Bonga PSC apply.

(c)   Rights and Obligations of the Parties

5.33 The Respondent's rights and obligations under the Bonga PSC include:

(1)   to pay to the Government in a timely manner all Bonuses, royalties, concession/rentals and profits petroleum tax ("*PPT*") accruing out of Petroleum Operations pursuant to Clause 7.2(a) of the Bonga PSC;

(2)   to work jointly with the Contractor's staff in the Contractor's Exploration, Petroleum Engineering, Facilities/Materials and Finance Departments pursuant to Clause 7.2(b) of the Bonga PSC;

(3)   not to exercise all or any of its right or authority over the Contract Area in derogation of the rights of the Claimants, as the Contractor, pursuant to Clause 7.2(c) of the Bonga PSC;

(4)   to take in kind, lift and dispose of its allocation of Available Crude Oil in accordance with the Lifting Allocation prepared by the Claimants, as the Contractor, pursuant to the Lifting Procedure set out in Annex D to the Bonga PSC as required by Annex C, Article

43

III, Paragraph 6. Annex C, Article III, Paragraph 4 of the Bonga PSC provides that "*...each Party's Primary Nomination of Available Crude Oil which it intends to lift during the Forecast Quarter... shall not exceed its estimated Lifting Allocation*".

5.34   The Claimants' rights and obligations under the Bonga PSC include to:

(1)   provide all necessary funds for the payment of Operating Costs pursuant to Clause 7.1(a) of the Bonga PSC;

(2)   assign, transfer, convey or otherwise dispose of any part of its rights and interests under the Bonga PSC to third Parties with the prior written consent of the Respondent pursuant to Clause 7.1(e) of the Bonga PSC;

(3)   prepare estimated and final PPT Returns, and the submission of the same to the Respondent on a timely basis in accordance with the PPT Act pursuant to Clause 7.1(h) of the Bonga PSC;

(4)   lift, in accordance with Annex D to the Bonga PSC, and freely export, the crude oil allocated to it pursuant to Clause 7.1(i) of the Bonga PSC; and

(5)   prepare the Parties' Lifting Allocations pursuant to Clause 8.3 and Annex C, Article III, Paragraph 3 of the Bonga PSC.

(f)   <u>Crude Oil Allocation</u>

5.35   The Bonga PSC sets out a mechanism by which "*Available Crude Oil*" (as defined therein) is allocated as between the Claimants, as the Contractor, and the Respondent on the basis of "*Royalty Oil*", "*Cost Oil*", "*Tax Oil*" and "*Profit Oil*" (all as defined by the Bonga PSC) and how such allocations are determined. The crude oil is then lifted (i.e. loaded

44

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

onto nominated crude oil tanker ships) [83] according to the "*Lifting Allocation*" (as defined by the Bonga PSC). [84] The relevant terms are defined as follows:

(1)   "*Contract Area*" is defined in Clause 1(i) of the Bonga PSC to mean "*the area of the OPL and any OML's derived therefrom*";

(2)   "*Crude Oil*" is defined in Clause 1(l) of the Bonga PSC to mean "*liquid petroleum which has been treated but not refined and includes condensates but excludes water and sed'ments*";

(3)   "*Available Crude Oil*" is defined in Clause 1(c) of the Bonga PSC to mean "*Crude Oil won and saved from the Contract Area after deducting amounts used in Petroleum Operations;*"

(4)   "*Royalty*" is defined in Clause 1 (ad) of the Bonga PSC to mean:

> "*...the amount payable pursuant to the Petroleum Act 1969 and Petroleum (Drilling Production) Regulations 1969 Cap 350 Laws of the Federation of Nigeria 1990, as amended.*"

(5)   "*Royalty Oil*" is defined in Clause 1(ae) of the Bonga PSC to mean:

> "*the quantum of Available Crude Oil allocated to the CORPORATION which will generate an amount of Proceeds equal to the actual payment of Royalty and Concession Rentals*". The Royalty rates are set out in Clause 15.1 and Annex B, Article III, Paragraph 1, of the Bonga PSC.

(6)   "*Cost Oil*" is defined in Clause 1(k) [34] of the Bonga PSC to mean:

---

[83] Para 1.10 CSOC/para 5.4, Part 2 RAPO/SOD at p26 & following.
[84] Para 13, Parties' Agreed Non-Contentious Facts.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*"the quantum of Available Crude Oil allocated to CONTRACTOR to enable it to generate the Proceeds to recover all Operating Costs as specified in the Accounting Procedure".*

(7)   *"Operating Costs"* is defined in Clause 1(w) of the Bonga PSC to mean:

*"expenditures made and obligations incurred in carrying out Petroleum Operations as determined in accordance with the Accounting Procedure."*

(8)   *"Accounting Procedure"* is defined in Article 1(a) of the Bonga PSC to mean *"the rules and procedures set forth in Annex B and attached to and forming part of this Contract."*

(9)   *"Tax Oil"* is defined in Clause 1(af)[35] of the Bonga PSC to mean:

*"the quantum of Available Crude Oil allocated to the CORPORATION will (sic) generate an amount of Proceeds equal to the actual payment of PPT".*

The PPT rate is set out in Clause 15.2 of the Bonga PSC by reference to the *PPTA*. Clause 15.3 of the Bonga PSC acknowledges that ITC shall be applied. See also Annex B of the Bonga PSC, Article III, Paragraph 2 of the Bonga PSC; and

(10)   *"Profit Oil"* is defined in Clause 1(ab)[36] of the Bonga PSC to mean:

*"the balance of Available Crude Oil after the allocation of Royalty Oil, Tax Oil, and Cost Oil". The Profit Oil split is set out in Clause 8.1(t)."*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(11)  *"Profits Petroleum Tax"* or *"PPT"* is defined in Clause 1(z) of the Bonga PSC to mean *"the tax pursuant to the Petroleum Profits Tax (PPT) Act 1959 Cap 354 Laws of the Federation of Nigeria as amended."*

(12)  *"Lifting Procedure"* is defined in Clause 1 (q) of the Bonga PSC to mean *"the rules and procedures set forth in Annex D and attached to and forming part of this Contract"*.

5.36  Crude Oil extracted from the Contract Area is to be allocated in accordance with Clause 8 of the Bonga PSC, the Accounting Procedure contained at Annex B of the Bonga PSC, and the Allocation Procedure contained at Annex C, of the Bonga PSC.

5.37  Clause 8.1 of the Bonga PSC provides that:

*"8.1  The allocation of Available Crude Oil shall be in accordance with the Accounting Procedure (Annex B), the Allocation Procedure (Annex C) and this Clause 8 as follows:*

(a)  *Royalty Oil shall be allocated to the CORPORATION in such quantum as will generate an amount of Proceeds equal to the actual Royalty payable during each month and the Concession Rental payable annually;*

(b)  *Cost Oil shall be allocated to the CONTRACTOR in such quantum as will generate an amount of Proceeds sufficient for recovery of Operating Costs in OPLs 212, 219, 803, 806 and 809 and any OMLs derived therefrom. All operating Costs expended in U.S. Dollars will be recovered in U.S. Dollars through Cost Oil allocations.*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(c)   Tax Oil shall be allocated to the CORPORATION in such quantum as will generate an amount of Proceeds equal to the actual PPT liability payable during each month.

(d)   All approved expenses incurred on the OPLs for exploration activities prior to the Effective Date of this Contract shall be recoverable as Operating Cost by the CONTRACTOR from Cost Oil under this Contract. Such cost shall be capitalized and recoverable in accordance with the PPT Act 1959 as amended.

(e)   The CONTRACTOR shall for PPT purposes be entitled to consolidate OPLs 212, 219, 803, 806 and 809 and any OMLs derived therefrom.

(f)   Profit Oil, being the balance of Available Crude Oil after deducting Royalty Oil, Tax Oil, and Cost Oil, shall be allocated to each Party pursuant to Schedule B-2 of the Accounting Procedure (Annex B) as follows:

| CUMULATIVE PRODUCTION MMB FROM CONTRACT AREA | PROFIT OIL PERCENTAGES CORPORATION | CONTRACTOR |
|---|---|---|
| 0 – 350 | 20 | 80 |
| 351 – 750 | 35 | 65 |
| 751 – 1000 | 45 | 55 |

48

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

|  |  |  |
|---|---|---|
| *1001 – 1500* | *50* | *50* |
| *1501 – 2000* | *60* | *40* |

> (g) *Above 2000 MMB Cumulative Production the CORPORATION and the CONTRACTOR shall meet to agree on the profit sharing percentage."*

(g)   Lifting of Crude Oil

5.38   Clause 8.3 of the Bonga PSC provides that:

> *"8.3 Each Party shall take in kind, lift and dispose of its allocation of Available Crude Oil in accordance with the Lifting Procedure (Annex D)."* (emphasis added)

5.39   The terms of the relevant Annexes are set out where relevant below.

(h)   Realizable Price

5.40   *"Realizable Price"* is defined in Section 1(ac) of the Bonga PSC to mean *"the price in US Dollars per Barrel determined pursuant to Clause 9."* Clause 9 is entitled *"Valuation of Available Crude Oil"* and provides for the mechanism by which the Parties were to reach agreement as to the *"true market value of the new Crude Oil"*. (para 9.1( c). This is discussed further in Chapter XII below.

(i)   Stabilization Provision

5.41   Clause 19.2 of the Bonga PSC provides that:

> *"In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies, pertaining to the Contract*

49

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*introduced by any Government department or Government parastatals or agencies occurs subsequent to the Effective Date of this Contract which materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR, the Parties shall use their best efforts to agree to such modifications to this Contract as will compensate for the effect of such changes. If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 hereof. Following arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination."*

(10)   **Performance of the 1993 Shell PSCS and the Background to the Disputes**

(a)   Exploration Work

5.42   Further to the signing of the Bonga PSC in April 1993, SNEPCO, as Contractor, carried out exploration. The first exploration well was drilled in OPL 212 in 1995.[85] Between 1997 and 1998, a further four exploration wells were drilled in the Bonga Field.

5.43   On 18 December 1997, the Work Programme and Budget for 1998 was approved.[86]

5.44   On 9 December 1998, the Work Programme and Budget for 1999 was

---

[85]   Para 14, Claimants' Chronology.
[86]   Exhibit C-56 at TB F/26.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

approved.[87]

5.45   On 9 December 1999, the Work Programme and Budget for 2000 was approved.[88]

5.46   Five major engineering, procurement, installation and commissioning (*"EPIC"*) contracts were executed on the following dates, with each contract being expressly approved by the Respondent:[89]

    (1)   construction of the Bonga Floating Production, Storage and Offloading facility (*"FPSO"*) and hull and marine systems, awarded to Samsung Heavy Industries Co., Ltd on 24 May 2000;[90]

    (2)   Bonga FPSO topsides integration, commission and handover, awarded to AMEC plc on 5 January 2001;[91]

    (3)   pipelines, flowlines and risers, originally awarded to Nigerian Deepwater Developers and subsequently to its successor Stolt Offshore S.A. (now known as Acergy Group plc) on 12 January 2001;[92]

    (4)   Bonga FPSO mooring and installation, awarded to Single Buoy Moorings on 12 January 2001;[93] and

    (5)   Bonga subsea systems and umbilicals, awarded to ABB Vetco Gray Inc on 12 January 2001.[94]

5.47   On 2 October 2000, the Work Programme and Budget for 2001 was

---

[87]   Exhibit C-57 at TB F/29.
[88]   Exhibit C-20 at TB F/33 and C-58 at TB F/36.
[89]   Para 20, Claimants' Chronology.
[90]   Exhibit C-21 at TB F/35.
[91]   Exhibit C-22 at TB F/40.
[92]   Exhibit C-23 at TB F/41.
[93]   Exhibit C-24 at TB F/42.
[94]   Exhibit C-25 at TB F/43.

approved.[95]

5.48  On 28 September 2001, the Work Programme and Budget for 2002 was approved.[96]

5.49  On 25 March 2002, a revision to the Work Programme and Budget for 2001 was approved.[97]

5.50  On 11 July 2002, a revision to the Work Programme and Budget for 2002 was approved.[98]

5.51  On 17 October 2002, the Work Programme and Budget for 2003 was approved.[99]

5.52  On 28 October 2003, a revision to the Work Programme and Budget for 2003 was approved.[100]

5.53  The FPSO arrived in position offshore Nigeria on 19 December 2003.[101]

5.54  On 29 January 2004, the Work Programme and Budget for 2004 was approved.[102]

5.55  On 18 March 2005, the Work Programme and Budget for 2005 was approved.[103]

5.56  On 27 June 2005, a revision to the Work Programme and Budget for

[95]  Exhibit C-59 at TB F/38.
[96]  Exhibit C-61 at TB F/45.
[97]  Exhibit C-60 at TB F/46.
[98]  Exhibit C-62 at TB F/50.
[99]  Exhibit C-63 at TB F/52.
[100]  Exhibit C-64 at TB F/54.
[101]  Para 27, Claimants' Chronology.
[102]  Exhibit C-65 at TB F/57.
[103]  Exhibit C-67 at TB F/64.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

2004 was approved.[104]

(b)   Commencement of Commercial Production

5.57   Commercial production from the Bonga Field commenced on 25 November 2005.[105]

5.58   On 21 December 2005, the Work Programme and Budget for 2006 was approved.[106]

5.59   The first lifting of crude oil produced from the Bonga Field occurred on 29 December 2005.[107]

(c)   The Trial Marketing Period

5.60   During the six-month period immediately following the first lifting of oil, the Parties operated a trial marketing period (the *"TMP"*).  During this period, 50% of the Available Crude Oil was lifted by the Respondent and the remaining 50% was lifted by the Claimants, as the Contractor.[108]

5.61   The TMP which started on 29 December 2005 was due to last until 29 June 2006. The Contractor agreed to extend the TMP until 4 July 2006.[109]

5.62   On 9 February 2006, the Claimants, as the Contractor, provided the Respondent with their estimated PPT Return for 2005.[110]

5.63   On 21 February 2006, the Respondent forwarded the Claimants'

---

[104]   Exhibit C-66 at TB F/65.
[105]   Para 1.9 CSOC.
[106]   Exhibit C-68 at TB F/69.
[107]   Para 33, Claimants' Chronology.
[108]   Para 34, Claimants' Chronology.
[109]   Para 35, Claimants' Chronology.
[110]   Exhibit C-37 at TB F/72.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

estimated PPT Return for 2005 to FIRS noting its disagreement.[111]

5.64   On 24 February 2006, the Claimants, as the Contractor, provided the Respondent with the Contractor's estimated PPT Return for 2006.[112]

5.65   On 6 March 2006, the Respondent forwarded the Contractor's estimated PPT Return for 2006 to FIRS noting its disagreement.[113]

5.66   On 8 June 2006, the Claimants, as the Contractor, provided the Respondent with the Contractor's final PPT Return for 2005.[114]

5.67   On 26 June 2006, the Respondent forwarded the Contractor's final PPT Return for 2005 to FIRS noting its disagreement.[115]

5.68   On 26 June 2006, the Claimants, as the Contractor, the DPR and the Respondent attended a meeting concerning the interim royalty rate applicable to oil produced pursuant to the Bonga PSC.[116]

5.69   On 27 June 2006, the Claimants, as the Contractor, wrote to the Respondent recording what it described as the understanding reached at a meeting on 26 June 2006 that an interim 1% royalty rate would apply to oil produced pursuant to the Bonga PSC.[117]

(d)   Post TMP

5.70   On 10 August 2006, the Claimants, as the Contractor, provided the Respondent with the Contractor's estimated PPT Return for 2006.[118]

---

[111] Exhibit C-38/Re-6 at TB F/73.
[112] Exhibit C-39 at TB F/74.
[113] Exhibit C-40 at TB F/75.
[114] Exhibit C-172 at TB F/81.
[115] Exhibit C-42/RE-8 at TB F/82.
[116] Exhibit C-138 at TB F/83, Exhibit C-138 at TB F/84 & Exhibit C-85 at TB F/85.
[117] Exhibit C-85 at TB F/85.
[118] Exhibit C-44 at TB F/91.

5.71 On 22 August 2006, the Respondent forwarded the Contractor's estimated PPT Return for 2006 to FIRS noting its disagreement.[119] As from about this time the Respondent began lifting on the basis of its own lifting allocation.

5.72 The Claimants, as the Contractor, and the Respondent were unable to reach mutual agreement on a formula to determine the Realizable Price by 2 September 2006.[120]

5.73 On 18 October 2006, the ninety (90) day contractual period following the end of the TMP in which to agree a formula for determining Realizable Price was extended.[121]   This occurred several times, with the period being extended up until 31 August 2007.[122]

5.74 On 19 October 2006, the Work Programme and Budget for 2007 was approved.[123]

5.75 On 26 February 2007, the Respondent forwarded the Contractor's estimated PPT Return for 2007 to FIRS noting its disagreement.[124]

5.76 On 26 March 2007, a meeting was held between the Claimants, as the Contractor, and the Respondent with a view to identifying all areas of difference between their lifting allocation models.[125]

5.77 On 30 April 2007, the Claimants, as the Contractor, provided the Respondent with the Contractor's final PPT Return for 2006. The Claimants informed the Respondent that there was no PPT liability for

---

[119] Exhibit C-45/RE-9 at TB F/93.
[120] Exhibit C-185 at TB F/95.
[121] Exhibit C-185 at TB F/95.
[122] Exhibits C-186 at TB F/98, C-187 at TB F/101, C-188 at TB F/103, C-189 at TB F/107, C-190 at TB F/112 and C-191 at TB F/118.
[123] Exhibit C-69 at TB F/96.
[124] Exhibit C-46/RE-10 at TB F/104.
[125] Exhibit C-173 at TB F/105.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

2006.[126]

5.78  In May 2007, the Respondent sent its own cargo nomination letter for July 2007.[127]

5.79  The Claimants and the Respondent extended the date by which they were to reach an agreement on a formula to determine the Realizable Price to 31 August 2007.

5.80  On 29 November 2007, the Work Programme and Budget for 2008 was approved.[128]

5.81  On 21 December 2007, the Claimants, as the Contractor, wrote to the Respondent setting out a proposal for use of the Realizable Price for the Bonny Oilfield in determining a Realizable Price for the Bonga Field.[129]

5.82  On 30 June 2008, the Respondent forwarded the Claimants' as the Contractor's final PPT Return for 2007 to FIRS.[130]

5.83  On 18 August 2008, the Respondent filed its own final PPT Return for 2007 with FIRS.[131]

5.84  By letter dated 6 November 2008 [132] the Federal Ministry of Energy wrote to the First Claimant concerning its intention to apply Section 16 of the *DOA* and to make adjustments to the fiscal terms of the Bonga PSC pursuant to this section. However, to date no action has been taken to

---

[125] Exhibit C-43 at TB F/106.
[127] Para 52, Claimants' Chronology.
[128] Exhibit C-70 at TB F/132.
[129] Para 55, Claimants' Chronology.
[130] Exhibit C-47 at TB F/146.
[131] Para 57, Claimants' Chronology.
[132] CB/37

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

implement this letter.[133]

5.85   On 2 March 2009, the Respondent wrote to the Claimants, as the Contractor, attaching the Respondent's estimated PPT Returns for 2009 that it had filed with FIRS on the Contractor's behalf. The Respondent informed the Claimants, as the Contractor, that it had used the Respondent's, and not their, model for calculating PPT.[134]

5.86   On 12 May 2009, the Claimants, as the Contractor, provided the Respondent with their final PPT Return for 2008, which was subsequently refiled on 12 April 2010.[135]

5.87   On 25 May 2009 the Respondent submitted the actual 2008 PPT Return to FIRS stating, among other things, that it had used the Respondent's model in the computation of the actual figures.[136]

5.88   On 8 July 2009 the Respondent sent the Claimants, as the Contractor, a copy of the 2008 PPT Actual Return with FIRS on behalf of the Contractor. Among other things, the Respondent stated it had used its model in the computation.[137]

5.89   On 15 July 2009, the Work Programme and Budget for 2009 was approved.[138]

5.90   On 24 September 2009, the Claimants wrote to the Respondent (reserving their rights) regarding Lifting Allocations.[139] The Claimants stated that the Respondent's nomination of two cargoes for November 2009 was at

---

[133] See also Ex C-114 at TB F/173 – key note addition of Hon Minister of Petroleum Resources on the proposed Petroleum Industry Bill dated 16 July 2009, Exhibit C-139 at TB F/176 and Exhibit C-131 at TB F/181.
[134] Exhibit C-49 at TB F/162.
[135] Para 59, Claimants' Chronology.
[136] Exhibit C-48 at TB F/167.
[137] Exhibit C-117 at TB F/170.
[138] Exhibit C-71 at TB F/172.
[139] Exhibit C-51/RE-11 at TB F/178.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

variance with their calculation of zero entitlement for the Respondent that month.

5.91   On 28 December 2009, a revision to the Work Programme and Budget for 2009 was approved.[140]

5.92   On 22 January 2010, the Work Programme and Budget for 2010 was approved by MACOM and forwarded to the Respondent for sign-off.[141]

5.93   On 6 April 2010, the Respondent re-filed its own estimated PPT Return for 2010 with FIRS (excluding the name of the Claimants' entities).[142] On the same date, the Respondent also filed its own revised final PPT Return for 2008.[143]

5.94   On 30 April 2010, the Claimants filed their final PPT Return for 2009 with the National Petroleum and Investment Management Services ("*NAPIMS*") for onward filing with FIRS.[144]

5.95   By letter dated 24 May 2010, from FIRS to the Respondent[145] in reply to Respondents' letters of 19 February 2010 and 27 April 2010, FIRS set out its position as to issues raised by the Respondent regarding (1) the timing of amortization of capital costs, (2) consolidation of OPL 316/OML 125 and OPL 211/OML 134 for the purposes of computation of PPT under the Bonga PSC, (3) allocation of Tax Oil, (4) ITC, (5) Signature Bonuses, Loan Interest and Non-operator Costs, (6) the Arbitral Proceedings, and (7) PPT administration.

5.96   On 26 May 2010, the Respondent filed its own final PPT Return for 2009

---

[140] Exhibit C-72 at TB F/183.
[141] Para 63, Claimants' Chronology.
[142] Exhibit C-50 at TB F/190.
[143] Exhibit C-118 at TB F/191.
[144] Exhibit C-201 at TB F/194.
[145] Exhibit C-108/RE-12 at TB/F/197.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

with FIRS, calculated using the Respondent's own model.[146]

5.97   On 4 October 2010, the Claimants, as the Contractor, wrote to the Respondent requesting negotiations over modifications to the Bonga PSC pursuant to Clause 19.2 of the Bonga PSC.[147]

5.98   On 18 November 2010, the Respondent wrote to the Claimants, as the Contractor, confirming its refusal to hold negotiations concerning modifications to the Bonga PSC pursuant to Clause 19.2 of the Bonga PSC.[148]

5.99   On 18 April 2011, the Respondent invited the Claimants, as the Contractor, to recommence discussions with a view to agreeing a formula to determine the Realizable Price.[149]

5.100  On 3 May 2011, the Claimants, as the Contractor, filed its final PPT Return for 2010 with NAPIMS for onward filing with FIRS.[150]

5.101  On 17 May 2011, the Claimants and the Respondent held a meeting with a view to agreeing a formula to determine the Realizable Price.[151]

5.102  On 27 June 2011, the Respondent forwarded to SNEPCO a Tax Clearance Certificate issued by FIRS dated 24 June 2011 to *"cover the operations in the ... Contract Area"* for the years 2007, 2008, 2009.[152]

5.103  On 1 July 2011, the Respondent filed its own final PPT Return for 2010

[146] Exhibit C-119 at TB F/198.
[147] Exhibit C-109 at TB F/202.
[148] Exhibit C-110 at TB F/203.
[149] Exhibit C-204 at TB F/207.
[150] Exhibit C-203 at TB F/210.
[151] Para 71, Claimants' Chronology.
[152] Exhibit C-205 at TB F/209.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

with FIRS, calculated using the Respondent's own model.[153]

---

[153] Exhibit C-203 at TB F/210.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER VI   RELEVANT   NIGERIAN   LEGISLATION   AND APPEALS

### A.   Relevant Nigerian Legislation

#### (1)   *Introduction*

6.1   In the Joint Tax Report the Parties' tax experts agreed that:[154]

(1)   the relevant tax law applicable to the Bonga PSC is to be found in the *DOA* and the *PPTA*;[155] and

(2)   where there is a discrepancy between the *DOA* and the *PPTA* the *DOA* prevails.[156]

6.2   Amendments to the petroleum profits tax ("*PPT*") regime applicable to the Bonga PSCs were included in the *DOD* which was superseded by the *DOA* [157] as referred to in para 5.15 above.

6.3   At the time that the Bonga PSC was signed in April 1993 up to and including, the Tribunal believes, 2007 the Petroleum Profits Tax Act 1959 Cap 354 ("*PPTA Cap 354*") was in force. The Bonga PSC refers to the provisions of the PPTA Cap 354, e.g. Clause 1(y) (defining "*Petroleum Operations*"), Clause 1(z) (defining "*Petroleum Profits Tax*" or "*PPT*") and Clause 2.4 which provides that "*the CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354...and accordingly the*

---

[154] TB D/1 at para 6.
[155] TB G/2 CL-2/RL-2 being the version in force in 1993, & TB G/3 CL-3/RL-3, being the version presently in force.
[156] TB D/1 at para 6(a)(ii); s 15 of the DOA at G/5.
[157] TB G/5: CL-5/RL-1 contains copies of both the *DOD* and the *DOA*.

61

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Companies Income Tax Act 1979 Cap 60 shall have no application". The Claimants referred to this distinction in footnote 5 of the CSOC. Otherwise neither party has distinguished between the scope or application of the two laws. Generally the Parties appear to have referred to and relied upon the provisions of the *PPTA*. Accordingly, unless otherwise stated the Tribunal will refer to the provisions of the *PPTA* rather than those of the *PPTA Cap 354*.[158]

6.4  *The Finance (Miscellaneous Taxation Provisions) Decree No. 30* of 1999 ("*Decree No. 30/99*")[159] amended various provisions of the *PPTA Cap 354* to allow for PSCs.[160]

(2)  *The DOA*

6.5  The long title to the *DOA* describes it as being:

"*An Act to, among other things, give effect to certain fiscal incentives given to the oil and gas companies operating in the Deep Offshore and Inland Basin areas under production sharing contracts between the Nigerian National Petroleum Corporation or other companies holding oil prospecting licenses or oil mining leases and various petroleum exploration and production companies*"

6.6  Section 1 of the *DOA* provides for "*production sharing contracts*" in the following terms:

---

[158] On 21 March 2012 the Tribunal asked the Parties to confirm whether for the purposes of this arbitration there is no difference between PPTA Cap 354 and PPTA on the one hand and the *DOD* and *DOA* on the other. Due to the terms of the injunction as of the date hereof this question has not been answered by the Parties.
[159] TBG/17 CL-14, e.g. sections 21 and 23.
[160] TBG/14 RL-8.

> *"Notwithstanding anything to the contrary contained in any other enactment or law, the provisions of this Act shall apply to all production sharing contracts as defined in section 17 of this Act."*

6.7    Section 17 of the **DOA** defines *"production sharing contracts"* as meaning:

> *"...any agreement or arrangements made between the Corporation or the holder and any other petroleum exploration and production company or companies for the purpose of exploration and production of oil in the Deep Offshore and Inland Basins;"*

6.8    Section 3 of the **DOA** provides for *"Determination of petroleum profit tax"* as follows:

> *"(1)    The petroleum profits tax payable under a production sharing contract shall be determined in accordance with the Petroleum Profits Tax Act: Provided that the petroleum profits tax applicable to the contract area as defined in the production sharing contracts shall be 50 per cent flat rate of chargeable profits for the duration of the production sharing contracts.*
>
> *(2)    Nothing contained in this Act shall be construed as having exempted the contractors from the payment of any other taxes, duties or levies imposed by any Federal, State or Local Government, or Area Council Authority."*

6.9    Section 4(1) of the **DOA** provides for *"Determination of investment tax credit and investment tax allowance"* in the following terms:

> *"Where the Nigerian National Petroleum Corporation (in this Act referred to as "the Corporation") or the holder and the contractor*

*have incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried out under the terms of a production sharing contract in the Deep Offshore or Inland Basin, there shall be due to the Parties in respect of the production sharing contracts executed prior to 1 July 1998, a credit (in this Act referred to as "investment tax credit") at a flat rate of 50 per cent of the qualifying expenditure in accordance with the production sharing contract terms for the accounting period in which that asset was first used for the purposes of such operations.*

6.10   Section 5 of the *DOA* provides for *"Royalty payable in respect of deep offshore production sharing contracts"* as follows:

"*(1)   The payment of royalty in respect of the Deep Offshore production sharing contracts shall be graduated as follows, that is—*

| Area | Rate |
|------|------|
| (a) | In areas from 201 to 500 metres water depth . 12 per cent |
| (b) | From 501 to 800 metres water depth ............... 8 per cent |
| (c) | From 801 to 1000 metres water depth ............. 4 per cent |
| (d) | In areas in excess of 1000 metres depth ......... 0 per cent" |

6.11   Section 6 of the *DOA* provides for *"Computation of petroleum profit tax"* as follows:

"*Computation and payment of estimated and final petroleum profit tax shall be made in US dollars on the basis of the US dollar returns filed."*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

6.12   Section 7 of the *DOA* provides for "***Allocation of royalty oil***" as follows:

> "*Royalty oil shall be allocated to the Corporation or the holder, as the case may be, in such quantum as shall generate an amount of proceeds equal to actual royalty payable during each month and the concession rental payable annually in accordance with the production sharing contracts terms.*"

6.13   Section 8 of the *DOA* provides for "***Allocation of cost oil***" as follows:

> "*(1)   Cost oil shall be allocated to the contractor in such quantum as shall generate an amount of proceeds sufficient for the recovery of operating costs in oil prospecting licences as defined in the production sharing contracts and any oil mining leases derived therefrom.*
>
> *(2)   All operating costs shall be recovered in U.S. dollars through cost oil allocations in accordance with the terms of the production sharing contract.*"

6.14   Section 9 of the *DOA* provides for "***Allocation of tax oil***" as follows:

> "*Tax oil shall be allocated to the Corporation or the holder, as the case may be, in such quantum as shall generate an amount of proceeds equal to the actual petroleum profit tax liability payable during each month.*"

6.15   Section 10 of the *DOA* provides for "***Allocation of profit oil***" as follows:

> "*Profit oil, being the balance of available crude oil after deducting royalty oil, tax oil and cost oil, shall be allocated to each party in accordance with the terms of the production sharing contract.*"

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

6.16   Section 11 of the *DOA* provides for *"Payment of royalty"* as follows:

> "(1)   The Corporation or the holder, as the case may be, shall pay all royalty, concession rentals and petroleum profit tax on behalf of itself and the contractor out of the allocated royalty oil and tax oil.
>
> (2)   Separate tax receipts in the names of the Corporation or the Holder and the contractor for the respective amounts of petroleum profit tax paid on behalf of the Corporation or the holder and contractor shall be issued by the Federal Inland Revenue Service (in this Act referred to as "the Service") in accordance with the terms of the Production Sharing Contract."

6.17   Section 12 of the *DOA* provides for *"Chargeable tax on petroleum operations"* as follows:

> "The chargeable tax on petroleum operations in the contract area under the production sharing contracts shall be split between the Corporation or the holder and the contractor in the same ratio as the split of profit oil as defined in the production sharing contract between them."

6.18   Section 13 of the *DOA* provides for *"Use of realisable price in determining royalty and petroleum profit tax in respect of crude oil, etc."* as follows:

> "(1)   The realisable price as defined in the production sharing contract established by the Corporation or the holder in accordance with the provisions of the production sharing contract, shall be used to determine the amount payable on

66

> *royalty and petroleum profit tax in respect of crude oil produced and lifted pursuant to the production sharing contract.*
>
> (2)  *The parameters for new crude oil streams produced from the contract area shall also be determined in accordance with the provisions of the production sharing contract."*

6.19   Section 14 of the *DOA* provides for "*Submission of receipts*" as follows:

> *"The Corporation or the holder, as the case may be, shall make available to the contractor copies of the receipts issued by the Service bearing the names of each party as defined in the production sharing contract in accordance with each party's tax oil allocation for the payment of petroleum profit tax under the provisions of the production sharing contract."*

6.20   Section 15 of the *DOA* provides for "*Adaptation of laws*" as follows:

> *"(1)  The relevant provisions of all existing enactments or laws, including but not limited to the Petroleum Act, and the Petroleum Profit Tax Act, shall be read with such modifications as to bring them into conformity with the provisions of this Act. [Cap. P10. Cap. P13.]*
>
> (2)  *If the provisions of any other enactment or law, including but not limited to the enactments specified in subsection (1) of this section, are inconsistent with the provisions of this Act, the provisions of this Act shall prevail and the provisions of that other enactment or law shall, to the extent of that inconsistency, be void."*

6.21   Section 16 of the *DOA* provides for *"Periodic review"* as follows:

"*(1)*   *The provisions of this Act shall be subject to review to ensure that if the price of crude oil at any time exceeds $20 per barrel, real terms, the share of the government of the Federation in the additional revenue shall be adjusted under the production sharing contracts to such extent that the production sharing contracts shall be economically beneficial to the government of the Federation.*

*(2)*   *Notwithstanding the provisions of subsection (1) of this section, the provisions of this Act shall be liable to review after a period of fifteen years from the date of commencement and every five years thereafter."*

6.22   Section 17 of the *DOA* relevantly provides for *"Interpretation"* as follows:

"*In this Act, unless the context otherwise requires—*

*"Corporation"* *means the Nigerian National Petroleum Corporation;*

*"Contractor"* *means any petroleum exploration and production company which has entered into a production sharing contract agreement with the Corporation or entered into an agreement or arrangement with any Nigerian holder of an oil prospecting licence or an oil mining lease within the Deep Offshore and Inland Basin;*

*"Deep Offshore"* *means any water depth beyond 200 metres;*

...

68

*"Minister"* means the Minister charged with responsibility for matters relating to petroleum and *"Ministry"* shall be construed accordingly;

*"Parties"*    includes the Corporation or any Nigerian company as the holder and the Contractor;

*"Production sharing contracts"* – (the definition of this term is set out in para 6.7 above).

*"Service"*   means the Federal Inland Revenue Service."

(3)   The PPTA

6.23   Both Parties' tax experts agree that PPT payable pursuant to the Bonga PSC is calculated by reference to the *DOA* and the *PPTA* as referred to in the Paragraph 6.1 earlier.

6.24   As to the calculation of PPT under the *PPTA*, section 9(1) of the *PPTA* [161] provides as to *"Ascertainment of profits, adjusted profit, assessable profits and chargeable profits"* that:

*"(1)   Subject to any express provisions of this Act in relation to any accounting period, the profits of that period of a company shall be taken to be the aggregate of:0-*

(a)   the proceeds of sale of all chargeable oil sold by the company in that period;

(b)   the value of all chargeable oil disposed of by the company in that period;

---

[161]  See also section 9 of the *PPTA*.

69

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

    (c)    *all income of the company of that period incidental to and arising from any one or more of its petroleum operations."*

6.25    Section 9(2) of the *PPTA* sets out the constituent elements of the value of any chargeable oil.[162]

6.26    Section 9(3) of the *PPTA* provides for such deductions as are permitted by Section 10(1) of the *PPTA*, to arrive at *"Adjusted Profit"* in an accounting period. The deductions which are allowed pursuant to section 10(1) are *"all outgoing and expenses wholly, exclusively and necessarily incurred, whether within or without Nigeria during that period by such company for the purpose of those operations..."* These criteria are known as the *"WEN"* test.[163]

6.27    *"Royalty payments"* are an expressly allowed deduction pursuant to section 10(1) (d) of the *PPTA*.

6.28    Section 9(4) of the *PPTA* then provides for such deductions as are permitted by Section 20 of the *PPTA* (e.g. losses carried forward), to arrive at *"Assessable Profits"*.

6.29    Section 20(1), Section 20(2) and the Second Schedule of the *PPTA* then provide for the deduction of Capital Allowances to arrive at *"Chargeable Profits"*.

6.30    Section 22 of the *PPTA* provides for *"Chargeable tax"* of a crude oil producing company which executed a Bonga PSC with the Respondent in 1993 as follows:

---

[162] See section 9(2) of the *PPTA*.
[163] TB D/1, para 6(d) Joint Tax Expert Report.

*SMEPCO et ors v NNPC*
*Privileged and Confidential*

"(1)   A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax in accordance with the provision of the Production Sharing Contract".

(2)   The investment tax credit rate applicable to the contract area shall be 50% flat rate of chargeable profit for the duration of the Production Sharing Contract.

(3)   In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.

(4)   The chargeable tax computed under subsection (3) of this section shall be split between Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit of oil split.

(5)   In this section —

"Contract area" means the contract area as defined in the Production Sharing Contract";

"Production Sharing Contract" has the meaning assigned to it in the Deep Offshore and Inland Basin Production Sharing Contracts Act".

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

6.31   Section 33 of the *PPTA* provides for *"Returns of Estimated Tax"* as follows:

> *"(1)   Not later than two months after the commencement of each accounting period of any company engaged in petroleum operations, the company shall submit to the Board a return, the form of which the Board may prescribe, of its estimated tax for such accounting period.*
>
> *(2)   If, at any time during any such accounting period the company having made a return as provided for in subsection (1) of this subsection is aware that the estimate in such return requires revision then it shall submit a further return containing its revised estimated tax for such period."*

6.32   Section 45 of the *PPTA* provides for the *"Time within which payment is to be made"* (subject to Section 44 concerning cases where appeals or objections are pending).

6.33   Part X of the *PPTA* deals with offences and penalties under it.

6.34   The Second Schedule of the *PPTA* provides for *"Capital Allowances"*.

**B.   Appeals Procedure**

6.35   The Nigerian Tax Appeals Tribunal  (the *"TAT"*) is established pursuant to  the  provisions of Section 59 of the *Federal Inland Revenue Service (Establishment) Act* No. 13 of 2007 (the *"FIRS Act"*).[164]   It has the power pursuant to Section 59 (2) of the *FIRS Act*:

---

[164]   TB/G-13; CL-13; RL-7.

*SHEPCO et ors v NNPC*
*Privileged and Confidential*

"*.... To settle disputes arising from the operations of this Act and under the First Schedule*".[165]

6.36   Section 25 (1) of the *FIRS Act* provides as to the "*Administration of Tax Laws*" that:

"*The [Federal Inland Revenue] Service shall have power to administer all the enactments listed in the First Schedule to this Act, and any other enactment or law on taxation in respect of which the National Assembly may confer power on the Service*".

6.37   The First Schedule to the *FIRS Act* sets out all the enactments that FIRS is entitled to administer.[166]  The Fifth Schedule to the *FIRS Act* makes provision for the establishment, jurisdiction, authority and procedure of the TAT.  Paragraph 1 of the Fifth Schedule to the *FIRS Act* states *inter alia* that:

"*(1)   The Tribunal shall have power to adjudicate on disputes and controversies arising from the following tax laws (hereinafter referred to as the "Tax Laws")-*

*...*

*(iii)   Petroleum Profits Tax Act Cap 354 LFN 1990;*[167]

*...*

*(vi)   any other law contained or specified in the First Schedule to this Act or other laws made or to be made from time to time by the National Assembly.*"

---

[165] TB/G-13; CL-13; RL-7.
[166] Para 7.9, Justice Oguntede's Report at TB D/5.
[167] While there is no express reference to the later PPTA, note para 1(vi) of the 1ˢᵗ Schedule to the *FIRS Act* and section 4(1) of the *Interpretation Act*.

6.38   The First Schedule to the *FIRS Act* is entitled *"Legislations Administered by the Service"* (sic). Among the legislation listed are:

(1)   Item 2 - the *PPTA Cap 354*

(2)   Item 8 – *"All regulations, proclamations, government notices or rules issued in terms of these legislations"*;

(3)   Item 9 – *"Any other law for the assessment, collection and accounting of revenue accruable to the Government... as may be made by the National Assembly from time to time or regulations incidental to those laws, conferring any power, duty and obligation on the Service"*;

(4)   Item 10: *"Enactment or Laws imposing taxes and levies within the Federal Capital Territory"*;

(5)   Item 11: *"Enactment or Laws imposing collection of taxes, fees and levies collected by other Government agencies and companies including signature bonus, pipeline fees...fees for Oil Exploration Licence (OEL), Oil Mining Licence (OML), Oil Production Licence (OPL), royalties, rents (productive and non-productive), fees for licences to operate drilling rigs, fees for oil pipeline licences, haulage fees and all such fees prevalent in the oil industry but not limited to the above listed."*

6.39   Order XXIV(I) of the *Tax Appeal Tribunal (Procedure) Rules* 2010 provides that:

> *"Any party dissatisfied with a decision of the Tribunal may appeal against such decision on a point of law to the Federal High Court ..."*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

6.40   The Tribunal discusses the issue of jurisdiction further in Chapter VII
following.

## CHAPTER VII   THE JURISDICTION OF THE TRIBUNAL

### *(1)   Overview of Respondent's Position*

7.1   The Respondent's position has been amended during the course of this arbitration as to which of the Claimants claims are arbitrable and which are not.

7.2   The Respondent asserted in the Respondent's Jurisdictional Objection dated 18 August 2010[168] (earlier defined as the "*RPO*") that the Claimants' claims were largely non-arbitrable, on the basis that the relief claimed by the Claimants fell within one of 2 broad categories:[169]

(1)   an alleged breach of contractual obligations which directly challenges the fiscal regime as contained in the *PPTA* - the Respondent asserted that although the Claimants' claims were formulated as breaches of contract, in substance the complaints were about the quantum of oil allocated to both Parties for the purposes of settling their respective tax liabilities; and,

(2)   a dispute as to the quantum of "*Cost Oil*" allocated to each party that "*automatically diminishes or increases tax liabilities and thus raises a dispute... [under] the PPTA*".[170]   The Respondent asserted that the Claimants sought to mask tax claims as contractual claims.

7.3   The Respondent also asserted in the RPO of 18 August 2010, as amended on 26 April 2011 (earlier defined as the "*RAPO*") that most of the relief

---

[168]   The RPO was included with the RSOD dated 18 August 2010 that was served pursuant to PO1. This was later amended by leave of the Tribunal as set out in PO2 on 26 April 2011.
[169]   Part 1/1.1 of RJO; para 1.2 RAJO: TB B/4.
[170]   Para 1.2(ii), RJO.

sought by the Claimants was properly to be characterized as being claims in the nature of tax disputes, although the Respondent conceded that some of the claims made by the Claimants appeared to be founded in contract (e.g. whether all operating costs incurred in OML135 and OPLs 803, 806 and 809 may be recovered from the production from OML 118).[171] The Respondent also asserted that "*the Parties contractual agreement as to what amounts to cost cannot override the provisions of the law*".[172]

7.4     By the Respondent's Skeleton dated 4 November 2011, defined earlier as the "*RS*", the Respondent revised its position on arbitrability to concede that a number of issues were properly before the Tribunal, after summarizing its formulation of the relevant issues. In para 5.2 of the RS the Respondent submitted that: "*A very simple test to determine whether the matter is arbitrable is to ask the question whether it could be resolved by accord and satisfaction.*" In para 5.3 of the RS, the Respondent asserted that the relief claimed by the Claimants and the Respondent as Counterclaimant respectively fell into four categories:

> "(i)     *Relief that have no impact on the tax payable but involves the interpretation of a tax legislation ("Category (i)");*
>
> (ii)    *Relief that have direct impact on the tax liability ("Category (ii)");*
>
> (iii)   *Relief that have an impact on taxable income ("Category (iii)"); and*
>
> (iv)    *Relief in respect of an item which may or may not be a tax issue depending on the nature of the argument being*

---

[171] RPO paras 5.5, 5.9, and 5.10; RAJO paras 5.5, 5.9 & 5.10: TB B/4.
[172] RPO para 5.4 at page 13, para 5.4 of RAJO: TB B/4.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

canvassed (*"Category (iv)."*

7.5    In para 6.4.1 of the RS the Respondent asserted that the following were arbitrable as falling within Category (i):

(1)    Respondent's Counterclaim;

(2)    the following Claimants' claims: Relief 17.1 (d), (e), (f), (g), (h), (i), (l), (o), (p), (q), (r), (s) of the CSOC namely:

    (a)    <u>17(1) (d):</u> A declaratory Award that, unless and until a cost is raised as an exception by the Respondent and resolved against the Claimants, as the Contractor, pursuant to the Bonga PSC prescribed procedures, all Operating Costs incurred in OML 118 shall be recoverable from Available Crude Oil;

    (b)    <u>17(1) (e):</u> A declaratory Award that, pending the resolution of the dispute with DPR on the applicable royalty rate, the Respondent, in line with the provisions of Section 61(2) (a) of the *Petroleum Act* is to lift Royalty Oil and pay Royalty in accordance with the royalty rate of 1%;

    (c)    <u>17(1) (f):</u> A declaratory Award that the Respondent shall file only the Contractor's PPT Returns, without amendment;

    (d)    <u>17(1) (g):</u> A declaratory Award that, under the terms of the Bonga PSC, the Claimants are entitled to compute and allocate Tax Oil on the basis of the Contractor's PPT Returns;

    (e)    <u>17(1) (h):</u> A declaratory Award that the Respondent shall pass on communications from FIRS promptly;

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(f)   17(1) (i): A declaratory Award that the Respondent shall, in accordance with Clause 15.6 of the Bonga PSC, make available to the Claimants, as the Contractor, copies of receipts issued by FIRS bearing the names of each Party for all payments made (including past payments) for PPT;

(g)   17(1) (l): A declaratory Award that, in calculating Tax Oil, tax deductibility (of items including Signature Bonuses, loan interest and sole costs) is to be determined in accordance with the *PPTA* and is not limited to those expense items which are cost recoverable under the Bonga PSC;

(h)   17(1) (o): An order for specific performance that the Respondent stop submitting its own returns and purporting to make tax payments that are inconsistent with the returns prepared by the Contractor and instead only submit PPT returns prepared by the Claimants, as the Contractor, and make tax payments which are consistent with the returns prepared by the Claimants, as the Contractor;

(i)   17(1) (p): An Award of damages (or such other relief as is appropriate) compensating the Claimants for the Respondent's wrongful overlifting;

(j)   17(1) (q): An Award ordering that, without prejudice to the Claimants' right to enforce the above monetary awards by any and all other means available to them, the Claimants, as the Contractor, shall be entitled to allocate to itself, nominate and lift such quantum of Available Crude Oil as enables the Contractor to

generate Proceeds sufficient to satisfy the above monetary awards;

(k) 17(1) (r): An Award of interest on any monetary sums awarded to the Claimants, from the date of breach up to the date of payment;

(l) 17(1) (s): An Award of their costs and expenses of the arbitration (including interest on such costs and expenses.

7.6 The Respondent asserted that the following claims were not arbitrable as they fell within:

(a) Category (ii)- Relief 17.1(j);[173]

(b) Category (iii) Relief 17.1 (a), (b) (c) (k) (m) (n) and (t) of the CSOC;[174] and

(c) Category (iv) Relief 17.1(j),[175]

which are referred to in Paragraph 17(1) of the CSOC as follows:

(1) 17(1) (a): Declarations in support of the Claimants' interpretation of the contested provisions of the Bonga PSC;

(2) 17(1) (b): A declaratory Award that the Respondent has breached, and continues to breach, the Bonga PSC, as described above, and that, for the remainder of the term of the Bonga PSC, it shall not lift any Available Crude Oil in excess of the Contractor's Lifting Allocation;

---

[173] Para 6.4.2 RS
[174] Para 6.4.3 RS
[175] Para 6.4.4 RS

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(3)   17(1) (c):  A declaratory Award that all Operating Costs incurred in OML 135 and OPLs 803, 806 and 809 may be recovered from the production from OML 118;

(4)   17(1) (j):  A declaratory Award that, in calculating Tax Oil, ITC shall only be deducted from assessable tax and shall not also be deducted from qualifying expenditure;

(5)   17(1) (k):  A declaratory Award that, in calculating Tax Oil, the Claimants, as the Contractor, is entitled to consolidate costs of OML 135 and OPLs 803, 806 and 809 with costs of OML 118;

(6)   17(1) (m):  A declaratory Award that, in calculating Tax Oil, capital allowances shall be allowed at 20% in the Year in which they are incurred;

(7)   17(1) (n):  An order for specific performance that the Respondent comply with the terms of the OML 118 PSC so that all liftings from the Bonga Field should be made in accordance with the Lifting Allocations and/or entitlement schedules prepared by the Claimants, as the Contractor;

(8)   17(1) (t):  Such other relief as the Tribunal determines appropriate.

7.7   The Respondent also submitted that some of the Claimants' relief may not be arbitrable pursuant to the 5th Schedule to the *Federal Inland Revenue Service (Establishment) Act* No. 13 2007.[176]

7.8   In the RPHB[177] of 12 January 2012 the Respondent further revised its submission as to what is arbitrable and what is not, adding to the list of

---

[176] Para 5.5 RS.
[177] RPHB para 4.1 (e) under the heading *"Other Relief"*.

non-arbitrable matters the Claimants' claims for relief in the CSOC as follows :

(1) 17(1) (g): A declaratory Award that, under the terms of the Bonga PSC, the Claimants are entitled to compute and allocate Tax Oil on the basis of the Contractor's PPT Returns;

(2) 17(1) (l): A declaratory Award that, in calculating Tax Oil, tax deductibility (of items including signature bonuses, loan interest and sole costs) is to be determined in accordance with the *PPTA* and is not limited to those expense items which are cost recoverable under the Bonga PSC;

7.9   As to Respondent's change of position concerning the non-arbitrability of the claims for relief in para 17 (1) (g) of the CSOC, the Respondent submitted in the RPHB[178] that the Respondent in the RS had conceded that this relief was arbitrable only to the extent that it relates to the contractual obligations regarding the preparation of PPT Returns. However, the question of whether there is a legal obligation involved in the computation of the inputs in the PPT Return is a matter which may or may not be arbitrable depending on the nature of the arguments canvassed.

7.10   As to Respondent's change of position concerning the non-arbitrability of the claims for relief in para 17 (1) (l) of the CSOC, the Respondent acknowledged that it had conceded in the RS that this relief was arbitrable, but submitted that such concession was erroneous.

7.11   The Respondent conceded that the remainder of the relief was arbitrable,

---

[178] RPHB para 4.1(c ) (iv).

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

although it asserted that a deeper consideration of some of the relief might generate issues not within the Tribunal's jurisdiction.[179]

7.12   Thus, as of the RS dated 12 January 2012, the Respondent appeared to be submitting that the following claims for relief in the CSOC are arbitrable: paras 17(1) (d), (e), (f), (h), (i), (o), (p), (q), (r), and (s); a summary of each of these claims has been set out above in paras 7.5 and 7.6.

7.13   Further by the RS, the Respondent submitted that the following claims for relief by the Claimants set out in the CSOC are not arbitrable:

(1)   17(1)(a): Declarations in support of the Claimants' interpretation of the contested provisions of the Bonga PSC;

(2)   17(1)(b):  A declaratory Award that the Respondent has breached, and continues to breach, the Bonga PSC, as described above, and that, for the remainder of the term of the Bonga PSC, it shall not lift any Available Crude Oil in excess of the Contractor's Lifting Allocation;

(3)   17(1)(c):  A declaratory Award that all Operating Costs incurred in OML 135 and OPLs 803, 806 and 809 may be recovered from the production from OML 118;

(4)   17(1) (g): A declaratory Award that, under the terms of the Bonga PSC, Claimants are entitled to compute and allocate Tax Oil on the basis of the Contractor's PPT Returns;

---

[179] RPHB para 4.1(viii).

(5)   17(1) (j):   A declaratory Award that, in calculating Tax Oil, ITC shall only be deducted from assessable tax and shall not also be deducted from qualifying expenditure;

(6)   17(1) (k):   a declaratory Award that, in calculating Tax Oil, the Claimants, as the Contractor, are entitled to consolidate costs of OML 135 and OPLs 803, 806 and 809 with costs of OML 118;

(7)   17(1) (l):   A declaratory Award that, in calculating Tax Oil, tax deductibility (of items including signature bonuses, loan interest and sole costs) is to be determined in accordance with the *PPTA* and is not limited to those expense items which are cost recoverable under the Bonga PSC.

(8)   17(1) (m):   A declaratory Award that, in calculating Tax Oil, capital allowances shall be allowed at 20% in the Year in which they are incurred;

(9)   17(1) (n):   An order for specific performance that the Respondent comply with the terms of the Bonga PSC so that all liftings from the Bonga Field should be made in accordance with the Lifting Allocations and/or entitlement schedules prepared by the Claimants, as the Contractor;

(10)   17(1) (t):   Such other relief as the Tribunal determines appropriate.

*(2)   The Respondent's More Detailed Position*

7.14   The Respondent asserts that arbitrability involves the question what type of disputes can and cannot be submitted to arbitration, or whether specific classes of disputes are exempted from arbitral proceedings. The simple rationale behind this exclusion is that the determination of certain

disputes go beyond the interest of the Parties presenting the dispute before the arbitrator and have a significant impact on public policy.[180]

7.15 The Respondent submits that an Arbitral Tribunal is not a court and it would be contrary to public policy to permit it to determine issues of public law, in particular, a tax dispute. Whilst a dispute between a tax obligor and the tax assessor certainly falls into this category, a dispute that indirectly challenges the tax assessor's position also falls into this category. Indeed, where the dispute will either increase or reduce a tax obligation, it is obviously a tax dispute that is not susceptible to arbitration.[181]

7.16 The Respondent explains that its approach in considering whether or not the dispute is arbitrable is to consider the substance of each relief claimed and to consider whether or not it is arbitrable. A very simple test to determine whether the matter is arbitrable is to ask the question whether it could be resolved by accord and satisfaction. In other words, if a dispute is submitted to the Tribunal and the Tribunal gives an award that cannot resolve the dispute in its finality, then that dispute is likely to be regarded as one that is not arbitrable. This is likely to be the case where the Tribunal makes an award that is not binding on the tax assessor or the regulator.

7.17 The Respondent submits that the rationale behind the non-arbitrability of tax disputes was eloquently provided in *Heritage Oil & Gas Limited v. Uganda Revenue Authority*[182] a case originating from the Republic of Uganda.   The Respondent submits that the case has a number of

---

[180] RS para 5.1.
[181] RS para 5.2.
[182] *Heritage Oil & Gas Limited v. Uganda Revenue Authority* (Civil Appeal No. 14 Of 2011).

similarities with the facts before this Tribunal. It concerned a Bonga PSC between the Appellants and the government of Uganda. The Appellant sold its interest under the agreement to one Tullow Uganda Limited under a sale and purchase agreement and a supplemental agreement thereto. As a result of the said sale and under the authority of the Ugandan *Income Tax Act*, the Respondent issued tax assessments for capital gains tax which the Appellant objected to and filed two applications before the Ugandan Tax Tribunal (the court accepted that the tax authority was an agent of the government, hence it became a Respondent). The Appellant having brought an application before the Tax Tribunal, later altered its argument, contending that the issues to be determined were a subject of the Bonga PSC and therefore arbitrable. The Appellant approached a Ugandan Court of First Instance requesting a stay of proceeding of the matter before the Tax Tribunal on the ground that the subject matter ought to be referred to arbitration in accordance with the arbitration clause. The Court of First Instance refused to grant the Appellant's prayers whereupon he (the Appellant) appealed the decision which gave rise to the appeal the subject of the judgment relied upon by the Respondent.

7.18   The Court of Appeal, per Hon. Lady Justice Helen Obura made the following pronouncement:

> "*The rationale for making tax matters statutory and not contractual is to enable the Government achieve the objective of taxation which, as stated by Prof. D.J. Bakibinga in his book; Revenue Law in Uganda are:- to raise revenue; to achieve economic stability and development; and to bring about income distribution. Taxation is a tool by which the sovereign state extracts finances or funds from its people and property to provide*

86

*public revenue to support Government expenditures and public expenses. It is the most reliable source of funds for most developing economies and therefore subjecting it to the whims and negotiation skills of contractors and Government Officials would create uncertainty and inequity on the amounts payable and cause economic instability*

*In the instant case, it could not have been the intention of at least Government to agree that tax would be referred to arbitration as any attempt to do so would be contrary to the laws of Uganda in a timely fashion. Allowing the tax dispute to go through the arbitration process in London would definitely not facilitate the timely payment of the taxes as agreed. This means that tax by inference was excepted from the scope of this arbitration agreement and as such it was not one of the contemplated arbitrable disputes under section 26.1 of the [PSC].[183]*

7.19   In considering the entire relief of the Claimants and that claimed by the Counterclaimant, the Respondent submits that the Claimants' claims fall into four categories, as outlined in Paragraph 7.4 above;

7.20   In the RS the Respondent states that it had earlier articulated its position as regards the arbitrability of some of the Claimants' relief. In the Respondent's Rejoinder to the CSOR (earlier defined as the "*RRCSOR*")[184] and the RS, the grounds upon which the Respondent states that some of these relief are not arbitrable were put into the following three categories, namely that:

---

[183] RS paras 5.2- 5.3.
[184] Page 12-17 of the Respondent's Rejoinder to Statement of Reply dated 26 April 2011.

(1) the relief is such that it cannot be settled civilly;

(2) the award to be delivered will amount to a judgment in *rem*; and

(3) the relief is excluded by statute.

7.21 The Respondent submits that the above proposition is supported in ***Kano State Urban Development Board v. Fanz Construction***[185] where the Supreme Court of Nigeria adopted a test for arbitrability which states as follows:

> *"The dispute or difference which the Parties to an arbitration agreement agree to refer must consist of a justiciable issue triable civilly. A fair test of this is whether the difference can be compromised lawfully by way of accord and satisfaction. Thus an indictment for an offence of a public nature cannot be the subject of an arbitration agreement, nor can disputes arising out of an illegal contract nor disputes arising under agreements void as being by way of gaming or wagering. Equally disputes leading up to change of status, such as a divorce petition, cannot be referred, nor, it seems, can any agreement purporting to give an arbitrator the right to give a judgment in rem. Similarly, there is no dispute within the meaning of an agreement to refer disputes where there is no controversy in being, as when a party admits liability but simply fails to pay, or when a cause of action has disappeared owing to the application, where it now continues to apply, of the <u>maxim action personalis moritur cum persona</u>".*

7.22 The Respondent sought to establish through the Claimants' tax expert

---

[185] [1990] 4 NWLR 1.

(Mr. Onyenkpa) that some of the reliefs sought by the Claimant fall into at least one if not all categories as enumerated above to determine the test of arbitrability.[186] The Respondent's Counsel presented an exhibit[187] to Mr. Onyenkpa during the Hearing and had asked his view regarding the position or decision taken by FIRS as regards the test to determine tax deductibility. FIRS had taken the view that tax deductibility was determined by cost recoverability.

7.23   The Respondent relies upon Mr. Onyenkpa's oral testimony below:

    o    *Q:*    *Go on. Read on, please.*

    o    *A:*    *The first sentence, if I may say: "It is trite law that accounting profit is not the same as taxable profit." And the second sentence: "By similar token, cost recoverability is not conterminous with tax deductibility." What that suggests to me is that they are different.*

    o    *Q:*    *Read on.*

    o    *A:*    *"In effect, what is not cost recoverable cannot be tax deductible." But that's inconsistent with the (inaudible) in the preceding sentence.*

    o    *Q:*    *I agree with you. I actually agree with you. I want to ask a question. It's consistent, correct. This letter is from FIRS, at least by the signature.*

    o    *A:*    *Yes.*

---

[186] See the case of *Kano State Urban Development Board v. Fanz Construction Co. Ltd* (supra).
[187] FIRS letter dated 24 May 2010 TB F/197).

     Q:   *You obviously don't agree, from what we have heard, with the contention that an item that is not cost recoverable is also not tax deductible. You don't agree with that statement; correct?*

     A:   *Yes.*

     *Mr. Mahmoud: Yes or no?*

     Q:   *You do not agree?*

     A:   *What is the question?*

     Q:   *It is not a question. It's an indication of what is represented here. Do you agree with the proposition that is being put forward in this paragraph? Do you agree that an item that is not cost recoverable is also not tax deductible?"* [188]

7.24   In particular the Respondent submits that the exchange between Counsel and Mr. Onyenkpa at the Hearing established the fact that a relief predicated on whether a cost item is tax deductible may be unarbitrable regardless of the position taken by both Parties before this arbitration. The point is further amplified where the FIRS may have taken a different position against both Parties jointly.

---

[188] Transcript Day 4, lines 1 – 25 at p 140 and lines 1 – 6 at p 141.

7.25   The Respondent submits that once it became clear that the FIRS had taken a position with regard to the relief that the Claimants have raised in these proceedings, then the Claimants ought to have done one of two things:

    (1)   in the event that an assessment has been issued then the Claimants would need to challenge that Assessment and resort to the mechanism set out in the *FIRS Act;* and

    (2)   where an Assessment has not been issued, then the party that disagrees with the FIRS would need to institute an action before the Federal High Court seeking a declaration as regards the interpretation of the relevant Act as a matter of principle.

7.26   The Respondent submits that to satisfy the condition that there ought to be a dispute, the party should seek the position of the FIRS on the matter; however it is not correct that it is only when there is an assessment that the resolution of a dispute will be referred to the Federal High Court.

7.27   The Respondent contends that where there is a disagreement as to a matter of fact including a FIRS assessment, the TAT becomes relevant. However, where there is a disagreement in law or on a matter of principle, the Federal High Court is the appropriate forum with jurisdiction to entertain such dispute. The Respondent submits that support for this contention is found in Section 251 of the *Constitution of the Federal Republic of Nigeria* (the *"Constitution"*) .

7.28   The Respondent further submits that its contention that the Federal High Court is the proper forum to resolve this dispute is predicated on the fact that it is the jurisdiction with the widest authority to deal with this relief having regard to the fact that the resolution of the dispute goes beyond

the Parties now before this arbitration.[189]

7.29   Therefore, the Respondent requests the Tribunal to decline to exercise jurisdiction in respect of the relief Respondent identified in the RS because any decision thereon would be a decision which would affect a third party and would not be binding on that third party. Put differently, the pronouncement upon the particular relief would not provide an effective resolution of the dispute between the positions of the Claimants, as the Contractor, and FIRS. It is submitted on this point by the Respondent, that even if the Tribunal assumed jurisdiction in respect of some relief as was admitted in the RS, to the extent that the Federal High Court has a wider jurisdiction to determine all the relief, it is the forum with the widest jurisdiction that is the most appropriate dispute resolution forum.[190]

7.30   The Respondent in the RS also contends that where it involves the interpretation of the law which has an impact on tax, a pronouncement on the same will be one which goes beyond the two Parties before the arbitrator and therefore it is unarbitrable. It asserts that where the award is one equivalent to a judgment *in rem* or affects public policy then it is a relief that is unarbitrable.

7.31   In the RPHB the Respondent considered two main claims for relief which it asserted basically demonstrate the arbitrability or non-arbitrability of the dispute presently. These are: (1) the ITC claim in para 17(j) of the CSOC; and (2) the ITC claim in the Counterclaim.

(1)   ITC in the CSOC

---

[189] This is not predicated on the fact that the Federal High Court has exclusive jurisdiction vis-à-vis arbitration. That is a different and separate argument.
[190] See the case of *Ramanga Tukur v. Governor of Gongola State* (1989)

92

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

7.32   As to the ITC Claim in the CSOC, the Respondent refers to the Claimants seeking a declaratory Award that, in calculating Tax Oil, ITC shall only be deducted from assessable tax and shall not also be deducted from Qualifying Capital Expenditure (each as defined in para 13.6.2 below).

7.33   The Respondent contends that the relief being sought as to ITC indirectly reduces the allocation of Tax Oil and is therefore unarbitrable for the following reasons.

(1)   it is a relief that cannot be settled by accord and satisfaction between the Parties before the Tribunal;

(2)   it is also a relief that requires an interpretation of fiscal legislation which will have a direct impact on any tax payable;

(3)   an award delivered on any interpretation given to Section 4 of the *DOA* transcends the Dispute beyond the two Parties before this Tribunal and thus will amount to a *judgment-in-rem*; and

(4)   the interpretation of how ITC should operate is an interpretation for the benefit of the FIRS. This deals with the general administration of petroleum tax law which ordinarily should be a matter of a court of superior record.

(2)   <u>Other Claimants' Relief</u>

(i)   *Declaration in support of the Claimants' interpretation of the contested provisions of the Bonga PSC (Relief 17.1)(a)).*

7.34   As far as this relief is concerned, the Respondent submits that it is too broad to determine its arbitrability using the arbitrability tests enumerated above. To the extent that the contractual provision incorporates a substantial part of the *PPTA* and the *DOA* without being more specific,

this Tribunal is put in a position where it is unable to grant this award.[191]

> (ii)    *A declaratory Award that the Respondent has breached and continues to breach the Bonga PSC, and that, for the remainder of the term of the Bonga PSC, it shall not lift any Available Crude Oil in excess of the Contractor's Lifting Allocation (Relief 17(1)(b)):*

7.35   Again the Respondent contends that this relief equally suffers the same difficulty as above. In other words, using the arbitrability test discussed above, the Respondent submits that the Tribunal will be unable to grant this award.[192]

> (iii)   *A declaratory award that all operating costs incurred in OML 135 and OPLs 803, 806 and 809 may be recovered from the production from OML 118 (Relief 17(1)(c)):*

7.36   The Respondent submits that although on the face of it, this claim looks to be arbitrable, the evidence reveals that consolidation has inherent tax incidences and that such consolidation may offend Section 3 of the *DOA* which requires the application of 50% PPT to the Contract Area. To that extent, this is relief that requires the interpretation of tax legislation and ultimately has an impact on tax payable. This relief put against the remaining tests of arbitrability must also fail.[193]

> (iv)   *A declaratory Award that under the terms of the PSC, Claimants are entitled to compute and allocate Tax Oil on the basis of the Contractor's PPT Returns (Relief 17(1)(g)):*

7.37   The Respondent in the RS concedes that the relief sought in subpara

---

[191]  Para 4(1)(c)(i) RPHB.
[192]  Para 4.1(c)(ii) RPHB.
[193]  Para 4.1(c)(iii) RPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

17.1(g) of the CSOC is arbitrable to the extent it relates to its contractual obligations regarding the preparation of the PPT Returns. However, the question whether there is a legal obligation as to computation of the inputs into the PPT Returns is a matter which may or may not be arbitrable depending on the nature of the arguments canvassed.[154]

> (v) *A declaratory Award that, in calculating Tax Oil, ITC shall only be deducted from assessable tax and shall not also be deducted from qualifying expenditures:*

7.38 The Respondent contends that this is not arbitrable, as set out in paras 7.32 to 7.33 above.

> (vi) *A declaratory Award that in calculating Tax Oil, the Contractor is entitled to consolidate costs of OML 135 and OPLs 803, 806 and 809 with costs of OML 118:*

7.39 The Respondent contends that for the same reasons discussed above, this is not arbitrable.[195]

> (vii) *A declaratory Award that in calculating Tax Oil, tax deductibility (of items including signature bonuses, loan interest and sole costs) is to be determined in accordance with the PPTA and is not limited to those expense items which are cost recoverable under the OML 118 PSC.[196]*

7.40 The Respondent stated that it had conceded in the RS, albeit erroneously, that this relief is arbitrable. For avoidance of any doubt, the Respondent now asserts that this relief is not arbitrable.

---

[154] Para 4.1(c)(iv) RPHB.
[195] Para 4.1(c)(vi) RPHB.
[196] Para 4.1(c)(vii) RPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

7.41   The Respondent concedes that the remainder of the relief sought by the Claimants is arbitrable.   Nevertheless a deeper consideration of some of this relief might generate issues not within the Tribunal's jurisdiction.[197]

(3)    *The Claimants' Position*.

7.42   The Claimants assert that the Respondent had acknowledged that many of the Claimants' claims fall within the jurisdiction of the Tribunal and are arbitrable.[198]

7.43   The Claimants submit that the only claims the Respondent continues to challenge are those related to the correct computation of various elements of Tax Oil.[199]   They reiterated that the Claimants are not seeking determinations as to the tax ultimately payable, but determinations as to how the contractual provisions relating to the allocation of Tax Oil are to apply as between the Claimants, as the Contractor, and the Respondent pending any final ruling. Accordingly, the Claimants submitted that they fall with the jurisdiction of this Tribunal and are arbitrable.[200]

7.44   The Claimants submit that their claims are arbitrable as they can be compromised lawfully by way of accord and satisfaction.[201]   The Claimants further submit that each of their claims asserts a breach of contract, all of which are arbitrable and that not all claims require reference to the *PPTA* or other tax legislation. The Bonga PSC contains fiscal terms approved by the Nigerian Government[202] and disputes as to these were clearly intended to be arbitrated.

---

[197] Para 4.1(c)(viii) RPHB.
[198] Paras 205 and 206 CPHB; TB I/5; See the RS, page 7, para 6.4.1 (referring to CSOC para 17).
[199] See CPHB, paras 206-207.
[200] Para 207 CPHB.
[201] Para 38 CRPHB.
[202] Para 39 (RPHB Ex C-1 at TB E/1 p36.

96

7.45   The Claimants submit that the scope of the arbitration clause in the Bonga PSC is wide enough to cover all the disputes. Also that FIRS recognizes the contractual nature of the Disputes.

7.46   In Section III at paras 38 to 47 of the CPHB, the Claimants respond to the Respondent's submissions in the RPHB. The Claimants submit that applying the test postulated by the Respondent, from *Kano State Urban Development Board v Fanz Corporation*, the Claimants' claims are arbitrable because they "*can be compromised lawfully by way of accord and satisfaction*" (RPHB para 3.1.3), in that the Claimants and the Respondent can lawfully agree that:

(1)   the Claimants, as the Contractor, has the sole right to determine the Lifting Allocation and that the Respondent will submit a nomination in accordance with such Lifting Allocation; and

(2)   the Claimants, as the Contractor, has the sole right to prepare PPT Returns and have such PPT Returns filed with the FIRS without amendment.

7.47   Indeed, that is what the Parties agreed in the Bonga PSC, which was expressly approved by the Federal Government of Nigeria (as evidenced by the signature of the Honourable Minister of Petroleum Resources).[203]

7.48   The Claimants accept that this Tribunal cannot determine what PPT is ultimately payable: that is for the TAT and the Nigerian Courts. But this Tribunal can determine that the Claimants, as the Contractor, was entitled to prepare the PPT Returns and compute Tax Oil as it did (in good faith and based on its interpretation of tax) and that the Respondent should not

---

[203]   Exhibit C-1 at TB E/1, p 36.

97

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

have usurped the role of the Claimants, as the Contractor.

7.49   The Claimants submit that the same applies to Royalty Oil. Ultimately what Royalty rate should apply is a decision for the DPR and any subsequent arbitration or litigation; but the Tribunal can determine that the Claimants, as the Contractor, were entitled to compute Royalty Oil as they did (based on the rate they admitted was payable, as agreed with the Respondent) and that the Respondent should not have usurped the role of the Claimants.

7.50   As for Cost Oil, the Claimants submit that what Cost Oil <u>is</u> payable is a contractual issue. As for recovering costs of other OPLs from the Available Crude Oil produced from OML 118, that issue <u>can</u> finally be determined by this Tribunal. As for resolution of audit exceptions that have been properly raised, that is ultimately for MACOM and any subsequent arbitration, but this Tribunal can determine that the Claimants were entitled to compute Cost Oil as they did (based on their books and accounts) and that the Respondent should not have usurped the role of the Claimants.

7.51   The Claimants submit that the Respondent now accepts that the procedural disputes relating to Tax Oil are arbitrable.[204] In addition, Mr. Osaro Eghobamien SAN, counsel for the Respondent, stated at the hearing: *"The submission of PPT itself is a fiscal act, and indeed that act is one that the tribunal can arbitrate upon"*.[205]

7.52   The Claimants submit that whether a cost is allowed as a <u>tax deduction</u> is ultimately for the TAT or the Nigerian courts to decide. However, that

---

[204] See RS, p 7, para 6.4.1 (referring to CSOC para 17(f),(g),(h),(i) and (o)).
[205] Transcript, Day 1, p 136, line 25 – p 137, line 2.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

does not make the Claimants' claims in this arbitration regarding Cost Oil unarbitrable for the reasons summarized above.

7.53  The Claimants submit that it is disingenuous for the Respondent to suggest that the Claimants should instead appeal any PPT Assessment rendered by FIRS or institute an action before the Federal High Court (RPHB para 3.1.8) when the Respondent itself has not been passing on PPT Assessments to the Claimants, as the Contractor, in a timely manner, thereby making it difficult (if not impossible) to pursue such claims. Furthermore, the Claimants' entitlement to have the Respondent observe their rights under the Bonga PSC is separate and distinct from any cause of action that might accrue before the TAT or the Federal High Court concerning a PPT Assessment rendered by the FIRS.

7.54  The Claimants deny that an interpretation by the Tribunal of the law *per se* is non-arbitrable (RPHB para 3.1.13), when a decision of the Tribunal is not determinative of the PPT ultimately payable.

7.55  The Claimants further deny that the Tribunal's Award would be the equivalent to a judgment *in rem* or affect public policy (RPHB para 3.1.14). The Claimants submit that the Respondent provides no reasons or legal authorities in support of such contentions which should therefore be dismissed.[206]

7.56  The Claimants also submit that neither the TAT nor the Nigerian High Court have exclusive jurisdiction.

7.57  Claimants assert that the Tribunal has jurisdiction over the Stabilization Claim in any event.

---

[206] The Claimants referred the Tribunal to: CSOR Chapter 20; CS, Chapter 16; and CPHB Chapter 15.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(4)   *Tribunal's Analysis and Decision as to the Respondent's Jurisdictional Objections*

7.58   The Respondent's initial position on jurisdiction and arbitrability was that the Tribunal had no jurisdiction to hear this case on the grounds that whole dispute was within the purview of the Nigerian tax authorities. Accordingly it was originally submitted that this dispute was not arbitrable. The Tribunal fully accepts that this is a very important point raising, as it does, whether this dispute or part of it, is arbitrable under Nigerian law. It is interesting to note, at the outset, that whereas the Respondent itself does NOT contend that all of the Claimants' claims are not arbitrable, nevertheless the Injunction granted by Bello J extends beyond this and is in fact a blanket injunction covering each and every claim made by the Claimants in this case.

7.59   Over time the Respondent has softened and ameliorated its position and now concedes that the bulk of the claims advanced by the Claimants, and indeed its own counterclaim, are properly within the jurisdiction of this Tribunal.

7.60   However the Respondent still maintains that the following claims are not arbitrable nor within the jurisdiction of this Tribunal for the reasons set out above. These are:

(1)   Section 17(1) (a) of the CSOC – Declarations supporting the Claimants' interpretation of the Bonga PSC;

(2)   Section 17(1) (b) of the CSOC – Declaratory awards relating to breach of the Bonga PSC;

(3)   Section 17(1) (c) of the CSOC – Cost Oil: Consolidation of Operating Costs;

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(4)   <u>Section 17(1) (g) of the CSOC</u> – Claimants' entitlement to Calculate Tax Oil on the basis of the Contractor's PPT Returns;

(5)   <u>Section 17(1) (j) of the CSOC</u> – Claimants' ITC Claim;

(6)   <u>Section 17(1) (k) of the CSOC</u> – Tax Oil : Consolidation;

(7)   <u>Section 17(1) (l) of the CSOC</u> – Tax Oil: Calculation;

(8)   <u>Section 17 (1)(m) of the CSOC</u> – Timing of 20% Capital Allowance;

(9)   <u>Section 17 (1)(n) of the CSOC</u> – Order for specific performance that the Respondent lift in accordance with Claimants' calculations;

(10)   <u>Section 17 (1)(t) of the CSOC</u> – Such Other Relief.

7.61   At the very outset of this discussion, the Tribunal must make plain that nothing it says or does can possibly amount to a binding decision on any tax matter. Clearly, the Tribunal has no jurisdiction to rule on any tax issue as between taxpayer and the FIRS representing the Federal Government of Nigeria. The FIRS is not a party to this arbitration and the ultimate amount of tax payable will not be affected by anything the Tribunal does or does not do.

7.62   It is obvious that tax features in the Bonga PSC because that is the way that it has been structured and agreed. It would be trite to conclude that merely because the word "*tax*" appears many times in the Bonga PSC that any decision construing the Bonga PSC is thus a tax decision which thereby bypasses the FIRS and becomes a binding decision on the amount of tax due to the Federal Government. It plainly does not.

7.63   The Tribunal has been empowered by the Parties to decide issues of

contractual interpretation as between themselves and that is all that it is doing. If, when the matter gets before the FIRs, they consider that our construction leads to an interpretation impermissible by current tax legislation they have the right, and indeed the duty, to ignore the Tribunal's contractual determination. Under the law and the *Constitution* of Nigeria, only FIRs can make an assessment which obliges a taxpayer to pay the tax assessed by it. There may be appeals but this is the standard position.

7.64   As an example, the Respondent has invited the Tribunal to set aside some of the Claimants' PPT Returns. The Tribunal clearly has no jurisdiction to do that; only FIRS has power to do that under the relevant tax legislation. By parity of reasoning, neither could this Tribunal set aside any tax assessment issued by the FIRs.

7.65   The Tribunal fails to see how anything the Tribunal says in ruling on *"a difference or dispute... concerning the interpretation or the performance of the contract"* can amount to any fetter on FIRS in the exercise of its statutory power to gather in tax due. Nothing the Tribunal rules as a matter of construction of the Bonga PSC can bind FIRS nor create any estoppel or res judicata affecting FIRS.

7.66   As an example of how not all claims can possibly be non-arbitrable, one need only refer to the royalty rate dispute. This is quintessentially a point of contractual interpretation, agency as well as fact finding. It does not *per se* involve tax but relates to a dispute as to the interim rate that the Respondent on behalf of both Parties agrees to pay, pending the final determination in accordance with the *Petroleum Regulations*. What is in dispute is the interim rate – how can that possibly be non-arbitrable – it cannot.

7.67   All that the Tribunal has been asked to do by the Claimants and has attempted faithfully to do is to provide its interpretation of those parts of the Bonga PSC which are in dispute between the Parties. Of course, it is inevitable that the subject of tax has to be considered because that is the way in which the whole Bonga PSC has been constructed.  It would be very surprising if on the one hand NNPC agreed to the Bonga PSC which contained an arbitration clause but locked into its chest the knowledge that because this dealt with tax none of it was in fact arbitrable.  That would be a somewhat inconsistent and not very attractive approach to be taken by a company wholly owned and controlled by a responsible Federal Government.

7.68   Therefore, having regard to the Respondent's now more limited submissions on arbitrability, the Tribunal has come most firmly to the view that the claims that have been made by the Claimants in this case are perfectly arbitrable and do not in any way trespass upon decisions as who pays what amount of tax in Nigeria which all Parties accept, and the Tribunal confirms, is solely within the jurisdiction of FIRS subject to any statutory appeals. The Tribunal agrees entirely with Justice Oguntade's Repoert where he says that *"the disputes in this case are contractual in nature. The existence of elements relating to taxation does not transform it into a tax dispute outside the scope of arbitration"*.[207]

---

[207] Para 7.1 of Justice Oguntade's Report.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER VIII NIGERIA's LEGAL FRAMEWORK AND PRINCIPLES OF CONSTRUCTION FOR THE BONGA PSC

### (1) *Nigeria's Legal Framework*

8.1 Nigeria is a federation and became a Federal Republic in 1963. The first military intervention in governance occurred in 1966. During the periods of military regimes, the executive and legislative arms of government were fused and the military head of state promulgated Federal legislation titled Decrees.[208]

8.2 Following the advent of a democratically installed government in May 1999, power to legislate now rests with a democratically elected National Assembly for Federal Acts, with legislators also being elected to perform similar functions for a State House of Assembly. All military decrees and edicts prior to 1990 have been re-titled as Federal Acts and State laws.[209]

8.3 Nigeria, being a former British colony, has a legal system that is closely modelled on that of Great Britain:

(1) statutes of general application in England prior to 1900 still form part of Nigeria's inherited laws pursuant to Section 32(1) of the *Interpretation Act* Cap 123, LFN 2004;[210] and

(2) the rules of English common law and equity in force as of 1900 are

---

[208] Justice Oguntade's Report para 2.1 TB D/5.
[209] Justice Oguntade's Report para 2.1: TB D/5.
[210] TB G/12: CL-12.

104

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

part of the Nigerian legal system.[211]

8.4   Justice Oguntade's Report states that English cases are often cited in courts as either precedents or persuasive authority; that the doctrine of precedent is observed, with judgments of superior courts binding the inferior courts, until set aside on appeal; and that Judgments of courts of similar jurisdiction are not binding but persuasive.[212]

(2)   *Statutory Framework for PPT under the Bonga PSC*

8.5   It is not in dispute as discussed earlier (see paras 6.1 and 6.23) that PPT payable pursuant to the Bonga PSC is calculated by reference to the *DOA* and the *PPTA.*

8.6   By virtue of Section 16 of the *DOA* its provisions are:

> "*subject to review to ensure that if the price of crude oil at any time exceeds $20 per barrel, real terms, the share of the government of the Federation in the additional revenue shall be adjusted under the production sharing contracts to such extent that the production sharing contracts shall be economically beneficial to the Government of the Federation.*"

8.7   The review under Section 16 of the *DOA* is permissible after a period of 15 years from the date of commencement of the *DOA* (1 January 1993) and every five years thereafter. Therefore at any time since 2008 it has been open to the Federal Government of Nigeria to consider reviewing any provisions of the *DOA* on the basis that the price triggering mechanism has been engaged. The Tribunal has not been informed that

---

[211] TB G/12: CL-12.
[212] Para 2.2 TB D/5.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

the Federal Government has exercised this right.

### (3)   General Principles of Contractual Interpretation

8.8   The applicable law of the Bonga PSC is the law of Nigeria.[213] As Nigeria is a common law country and shares a common legal tradition with England and Wales general principles of contractual interpretation from either jurisdiction are of particular assistance, as the Parties have agreed, as may be seen from a summary of their relevant submissions later in this Chapter.

8.9   Under English law the general rule applicable to commercial contracts, which are those agreements regulating business relations, is that the Parties intend legal consequences to follow: *Rose and Frank Co v J R Crompton & Bros Ltd* [1923] 2 KB 261, CA, per Bankes LJ. Generally, such an implication will be deduced from the existence of consideration *Carlill v Carbolic Smoke Ball Co* [1893] 1 QB 256, CA (Eng).   *'The onus is on the party who asserts that no legal effect was intended, and the onus is a heavy one'*: *Edwards v Skyways Ltd* [1964] 1 All ER 494 [1964] 1 WLR 349 at 355 per Megaw J.

8.10   The doctrine of *pacta sunt servanda* is a cornerstone of Nigerian law as was said by the Supreme Court of Nigeria in *Arjay Limited v Airline Management Support Limited* [2003] 7 NWLR Part 820 at page 634[214]:

> *"Where parties enter a contract or an agreement they are bound by the provisions of the contract or the agreement. This is because a party cannot ordinarily resile from a contract or agreement because he later found that the conditions of the contract are not*

---

[213] Clause 19(1), PSC: TB E/1.
[214] Para 6.2 of Justice Oguntade's Report.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*favourable to him. This is the whole of the doctrine of the sanctity of contracts or agreement.... "*

8.11   In *F.G. Sykes (Wessex) Ltd v. Fine Fare Ltd* [1967] 1 Lloyds Rep 53 Lord Denning at page 57 said:-

> *"In a commercial agreement the further the Parties have gone with their contract, the more ready are the courts to imply any reasonable term so as to give effect to their intention. When much has been done, the courts will do their best not to destroy the bargain. When nothing has been done it is easier to say that there is no agreement between the Parties because the essential terms have not been agreed.*
>
> *But when an agreement has been acted upon and the Parties, as here have been put to great expense in implementing it, we ought to imply all reasonable terms so as to avoid any uncertainties. In this case there is less difficulty than others because there is an arbitration clause, which liberally construed is sufficient to resolve any uncertainties which the Parties have left."*

8.12   The Respondent's Counsel submitted at the Hearing that Nigerian law does provide that the Courts shall attempt, if possible, to keep alive contracts.[215]

(4)   *Claimants' Submissions as to Contractual Construction Principles*

8.13   On behalf of the Claimants, Justice Oguntade's Report asserted as to the applicable rules of interpretation that the approach of the Nigerian

---

[215] Transcript, Day 4 lines 12 – 16 at p 214.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

courts does not deviate significantly, if at all, from the approach of the English court.[216] Justice Oguntade observed that the guiding principle to construction/interpretation of contract documents in Nigeria, as stated in the case of *Adetoun Oladeji (Nig.) Ltd. v. N.B. Plc*, (2007) 5 NWCRCPL 1027, is that where there is a contract regulating any arrangement between Parties, the main duty of the court is to interpret that contract to give effect to the wishes of the Parties as expressed in the '*contract document*': per Tobi, J.S.C. (p 14, Para C-D). In *C.B.N v. Igwillo* (2007) 14 NWLR (pt. 1054) 393 (SC) which restated the position in the *locus classicus* of *Royal Exchange Assurance Nig. Ltd. & 4 Ors. v Aswani Textile Industries Ltd* (1991) 2 NWLR (Pt. 176) 639 at 669 CA, it was held that in the interpretation of a contract involving several documents, the documents must be read together.

8.14    Justice Oguntade also submitted among other things, that under Nigerian law the "*Five Canons*" approach, as formulated by Lord Hoffmann in 1998 in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, is the starting point for deciphering and interpreting uncertain contract clauses. He observed that Lord Hoffman's approach has been affirmed in the recent Nigerian judgments of *Chartbrook Limited v Persimmon Homes Limited and others* [2009] UKHL 38 and *Crema v Cenkos Securities Plc* [2010] EWCA Civ 1444.[217]

(5)    *Respondent's Submissions as to Contractual Construction Principles*

---

[216] Justice Oguntade's Report para 2.3: TB D/5.
[217] Justice Oguntade's Report para 2.3.5: TB D/5.

108

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

8.15   As to the principles of contractual interpretation, in the Respondent's *"Reply to Expert Report on Nigerian Law" dated 12 January 2012"* ("*RRLaw*") as to the *"Bindingness of Agreement"*[218] it submits that:

> *"Being of inherited colonial/English legal heritage, the attitude of Nigerian Courts at interpreting contracts is predominantly guided by the received common law and doctrines of equity, the applicable English statutes and Nigerian case laws and legislations. The starting point is that Parties are bound by the clear provisions of the agreement they freely entered into without much ado. See the case of **Nigerian Supplies v N.B.C** (1967) 1 ALL N.L.R 35 at 42, **Nwobosi v. A.C.B Ltd** (1995) 6 N.W.L.R (pt 404) 658.*"[219]

8.16   The Respondent submits that *consensus ad idem* is not determined by intent but by the attitude of Parties as follows:

> *"In interpreting contractual provisions, the Nigerian courts, following the English courts' position on the issue, have further held that no stipulation or presumption should be implied in a contract except where it is proven that clear intentions of both Parties are not expressly stated. In other words, the party's clear and express intentions should be interpreted stricto sensu. See **McClelland v. Northern Ireland General Health Service Board** (1957) 2 All E.R 129."*[220]

8.17   Citing the English's court decision in *McCutcheon v. David Macbrayne Ltd* (1964) 1 W.L.R at 128 with approval, the highest Nigerian court in *Esin v. Matzen & Timm (Nig.) Ltd* (1966) N.C.L.R 229 at 235 held that:

---

[218] Para 1.1 at p2, RRLaw TB 1/4.
[219] Para 1.1 RRLaw.
[220] Para 1.2 RRLaw.

*"The judicial task is not to discover the actual intentions of each party; it is to decide what each was reasonably entitled to conclude from the attitude of the other."* Respondent also referred on this point to: *Ikomi v. Bank of West Africa Ltd.* (1965) 1 ALL N.L.R 39 at 47.[221]

8.18   The Respondent also cites *Nwobi v. Anukam* (2001) 14 W.R.N 38 at 47, where the Nigerian Court of Appeal held that a Court should not strictly confine itself to the party's written or oral agreement; it must also examine the conduct of the Parties in the agreement.[222]

8.19   The Respondent submits that:

> *"Where Parties to a contract agree in writing certain terms but conduct themselves in a manner different from their agreed written contract, the Courts will usually guide itself in interpreting the terms of the contract with reference to the manner in which the Parties have conducted themselves to determine the rights and obligations of the Parties under the contract. See the case of Nwobi v Anukam (supra)."*[223]

8.20   The Respondent therefore submits that in interpreting the Bonga PSC the Tribunal must not only consider the agreement but it must also look at the manner in which both Parties have conducted themselves from the commencement of the contract in 1993. The Respondent submits that the Tribunal in the circumstances must inevitably come to the conclusion that as regards the Bonga PSC, both Parties have conducted themselves on a *"let's see how it goes"* basis.[224]

---

[221] Para 1.3 RRLaw.
[222] Para 1.4 RRLaw.
[223] Para 1.5 RRLaw.
[224] Para 1.6 RRLaw.

110

### (6)    *Relevant Principles of Statutory Construction*

8.21    If the terms of the *DOA* are materially in conflict with the Bonga PSC then it is clear that the Tribunal must give effect to the *DOA*. On the other hand, the Tribunal is perfectly entitled to take into account that, as the long title to the *DOA* makes clear (see para 6.5 above), this Act was the necessary statutory underpinning to give effect to the PSCs. Therefore the Tribunal should attempt, if it is possible to do so, to ensure that the *DOA* is interpreted in this light.

8.22    It is clear from the Government's letter of 19 April 1993 (see para 5.14 above) that it was intended that the necessary underpinning legislation would be passed. However, for reasons that were not made clear to the Tribunal, the *DOD* was not made until 23 March 1999, by the then Head of State. However, by virtue of Clause 19 thereof, it was deemed to have come into effect on 1 January 1993. When the Military Government ended, many of the previous decrees were converted into Acts of Parliament and this explains why the *DOA*, after its long title, refers to the *DOD* and also has a 1993 effective date. Accordingly this explains why the Government's 19 April 1993 letter was said by the Government to be *"valid until the respective applicable laws are amended to reflect the terms of the PSC herein stated"*. In fact when the appropriate legislation was passed in 1999 it was given retroactive effect to 1 January 1993 so as to accord with the Government's April 1993 Letter (set out in para 5.14 above).

8.23    In interpreting the relevant statutes in this case the Tribunal will have regard to the provisions of the *Interpretation Act*.[225] Section 4 of the

---

[225] TB G/12.

111

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*Interpretation Act* provides as to *"Amended and substituted enactment"* that:

"(1)  A reference in an enactment to another enactment shall, if the other enactment has been amended, be construed as a reference to the other enactment as amended.

(2)  Where an enactment is repealed and another enactment is substituted for it, then —

(a)  the repealed enactment shall remain in force until the substituted enactment comes into force;

(b)  any reference to the repealed enactment shall, after the substituted enactment comes into force, be construed as a reference to the substituted enactment;

(c)  any subsidiary instrument in force by virtue of the repealed enactment shall, so far as the instrument is not inconsistent with the substituted enactment, continue in force as if made in pursuance of the substituted enactment."

8.24  Section 6(1) of the *Interpretation Act* provides as to *"Effect of repeals, expiration etc."* that:

"(1)  The repeal of an enactment shall not —

(a)  revive anything not in force or existing at the time when the repeal takes effect;

(b)  affect the previous operations of the enactment or anything duly done or suffered under the enactment;

112