# EXHIBIT 1

# Part 2 of 4

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(c)   *affect any right, privilege, obligation or liability accrued or incurred under the enactment;*

(d)   *affect any penalty, forfeiture or punishment incurred in respect of any offence committed under the enactment;*

(e)   *affect any investigation, legal proceeding or remedy in respect of any such right, privilege, obligation, liability, penalty, forfeiture or punishment,*

*and any such investigation, legal proceeding or remedy may be instituted, continued or enforced, and any such penalty, forfeiture or punishment may be imposed, as if the enactment had not been repealed.*

(2)   *Where an enactment expires, lapses or other ceases to have effect, the provisions of subsection (1) of this section shall apply as if the enactment had been repealed."*

113

## CHAPTER IX   IS THE CONTRACTOR ENGAGED IN PETROLEUM OPERATIONS AND THEREFORE SUBJECT TO PPT

### (I)   *The Respondent's Position*

9.1   The Respondent has asserted that the Claimants, as the Claimants do not conduct *"Petroleum Operations"* and therefore are not subject to PPT. The Respondent summarized its submissions as to this issue in Section 5 of the RPHB.[226]

9.2   In summary, the Respondent submits that the question of whether a company is engaged in Petroleum Operations is to be determined by the strict interpretation of Section 2 of the *PPTA*[227] which states as follows:

> *"the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria by or on behalf of a company for its own account by any drilling mining, extracting or other like operations or process, not including refining at a refinery, in the course of a business carried on by the company engaged in such operations, and all operations incidental thereto and any sale of or disposal of chargeable oil by or on behalf of a company".*

9.3   The Respondent submits that as only it holds the right to the OPL and OML pursuant to the *Petroleum Act* the Claimants are not engaged in *"Petroleum Operations"* pursuant to Section 2 of the PPTA,[228] notwithstanding that they do pay PPT.

---

[226] At para 5.1.2.1 of RPHB Respondent asserts that its arguments can be found at pages 22 and 23 of the RSOD and page 23 of the RSR.
[227] Para 5.1.2.1 RPHB.
[228] Para 5.1.2.2 RPHB.

114

9.4    The Respondent concedes that both the tax expert called by the Claimants, and the tax expert called by the Respondent to give evidence in this arbitration suggested that both the Claimants and the Respondent are engaged in *"Petroleum Operations"* pursuant to the PPTA, purportedly relying on the *DOA*[229] which states in Section 12:

> *" The chargeable tax on petroleum operations in the contract area under the production sharing contract shall be split between the Corporation or the holder and the contractor in the same ratio as the split of profit oil as defined in the production sharing contract between them".*

9.5    The Respondent denies the Claimants' tax expert's view that the *DOA* confirms that the *PPTA* applies to all petroleum operations pursuant to the Bonga PSC in a manner provided for in the Bonga PSC. The Respondent also denies that by virtue of Sections 1 and 15 of the *DOA*, the *DOA* prevails over any inconsistent legislation, including the *PPTA*. The Respondent maintains that this is one of the integration difficulties identified in the Respondent's pleadings.[230]

9.6    The Respondent submits that the fact that both Parties pay PPT is not what determines whether the Claimants are engaged in Petroleum Operations. Rather, the right approach is first to determine whether the Claimants are engaged in *"Petroleum Operations"* and then proceed to consider the relevant provisions applicable for the payment of tax for those who are engaged in *"Petroleum Operations"*. The Respondent

---

[229] Section 12 *DOA*: TB G/5 CL-5/RL-1.
[230] Para 5.1.2.3 RPHD.

asserts the fact alone that a company is paying PPT will not convert it into a petroleum operations company,[231] if it is not in fact one.

9.7    The Respondent relies upon the following provisions of the *Petroleum Act*:

    (1)    Section 4 of the 1st Schedule to the *Petroleum Act* which provides as to the holder of an OPL that:

> "*The holder of an oil prospecting license shall have the exclusive right to explore and prospect for petroleum within the area of his license*"

    (2)    Section 8 of the 1st Schedule to the *Petroleum Act* which provides as to an OML that it is a :

> "*license granted only to the holder of an oil prospecting license who has a) Satisfied all the conditions imposed on the license or otherwise imposed on him by this Act; and b) Discovered oil in commercial quantities.*"

9.8    It is the Respondent's further submission that by virtue of the definition of the OML in the *Petroleum Act* the Respondent has a *"right to lease, search for, win, work, carry away and dispose of petroleum"*. It is only the Minister that can give out a license to carry out these functions. A licensee cannot assign its license without the consent of a Minister. A licensee can however appoint a third party to carry out petroleum operation on its behalf.

---

[231] Para 5.1.2.4 RPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

9.9    It is against the above background that Respondent refers to Section 2 of the *PPTA*.[232]

9.10   The Respondent asserts that the critical question to ask is whether or not the Claimants carry out Petroleum Operations on their own account or for the account of the License holder, the Respondent. The Respondent asserts that to contend that the Claimants carry out Petroleum Operations on their own account is to contend indirectly that they have a License to so conduct Petroleum Operations (which they do not). Accordingly, the Respondent submits that as the Claimants conduct Petroleum Operations for the account of the Respondent, it inevitably follows that the Claimants are not engaged in Petroleum Operations.

     *(2)*    *The Claimants' Position*

9.11   The Claimants disagree, asserting that Respondent's argument that Claimants are not conducting petroleum operations as defined in the *DOA* and *PPTA* is contradicted by:

     (1)    the express wording of the Bonga PSC, including Clauses 2.4, 7.1(h), 7.1(o), 7.2(a), 8.1(e), 8.4, 15.2- 15.6, and Annex B, Article III;

     (2)    the Government's 19 April 1993 Letter;

     (3)    the wording of Section 2 of the *PPTA*;[233]

     (4)    the wording of the *DOA*;

     (5)    the evidence of the Claimants' tax expert at the Hearing;

---

[232] Para 5.1.2.7 RPHB.
[233] TB G/3 CL-3/RL-3.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(6)   the evidence of the Respondent's Expert, Mr. Olaleye Adebiyi at the Hearing:

○   *"In my personal opinion, I would say to the extent that the contractor pays PPT, that it is engaged in petroleum operations... But the general conclusion with the way the law has been couched, I would say the conflict should be resolved in favour of the Claimants, that it's engaged in petroleum operations"* (emphasis added).[234]

*and*

○   *"Q (Rowley): To the extent that the contractor pays PPT, it is engaged in petroleum operations, subject to your later qualification.*

○   *A:    That's correct. "*[235]

*and*

○   *"Q (Rowley): So petroleum operations are defined in section 2 [PPT Act], and so you say that for the purposes of the PPT Act, claimant is carrying on petroleum operations, do you?*

○   *A:    Yes, I say that. Yes. "*[236]

(7)   the Respondent's own entitlement models for Years 2008-2010;[237]

---

[234] Transcript, Day 4, p 69, lines 8 – 19.
[235] Transcript, Day 4, p 69, lines 21 – 24.
[236] Transcript, Day 4, p 125, line 22 – p 126, line 1.
[237] Exhibits C-128- C-130 at TB F/139, TB F/159 TB F/185.

118

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(8)    the Respondent's own practice of filing PPT Returns;[238]

(9)    the assessment by the FIRS of tax on the basis that the PPT regime applies;[239]

(10)    guidance for the 2000 and 2005 bidding rounds;[240] and

(11)    the comments of senior officials of the FIRS and Ministry of Petroleum Resources and the Respondent.[241]

*(3)*    *The Tribunal's Analysis*

9.12    It is somewhat surprising to the Tribunal that the Respondent has maintained, and continues to maintain, that the Claimants, as the Contractor, are not engaged in Petroleum Operations. This submission is completely at odds with certain provisions of the Bonga PSC, the Governments' Letter dated 19 April 1993, the provisions of the *DOA*, and of the *PPTA* read with the *DOA*, and of the evidence of the Respondent's tax expert, as well as with the other relevant evidence concerning this issue listed in Paragraph 9.11 above.

9.13    The Government's Letter of 19 April 1993 relevantly states as outlined in para 5.14 above that:

        *"Pursuant to Government policy, the PSC will be approved with the guarantee that the following terms which require amendments to existing Nigerian Laws are applicable and enforceable:[242]*

        *(i)*    *The OPL(s) shall be for a maximum of ten (10) years;*

---

[238] Exhibits C-116- C-119 at TB F/152, TB F/170, TB F/191, TB F/198.
[239] Exhibits C-123- C-126 at TB F/113, F/122, F/149, F/168.
[240] Exhibits C-120 at TB F/34; C-121at TB F/63.
[241] Exhibits C-115 at TB F/28 and C-131at TB F/181.
[242] Exhibit C-16 at TB F/19.

(ii)     The Petroleum Profit Tax (PPT) for petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;

(iii)    The Investment Tax Credit (ITC) for NNPC and the contractor in respect of petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;

(iv)    Royalty Rates shall be as provided in the PSC; and

(v)     Computation and payment of estimated and final PPT is to be made in US dollars on the basis of US dollar returns filed.

*This letter shall be valid until the respective applicable laws are amended to reflect the terms of the PSC herein stated."*

9.14    The Tribunal attaches weight to the fact that on 19 April 1993, the Hon. Secretary of the Ministry of Petroleum Resources issued the Letter to the First Claimant guaranteeing the fiscal benefits set out in it as prescribed in the PSCs,[243] which guaranteed fiscal benefits constituted changes to the existing fiscal regime set out in inter alia the ***PPTA***.

9.15    The changes guaranteed by the Government were enacted in the ***DOD***[244] (later becoming the ***DOA***),[245] had retrospective effect to 1993. The provisions of the ***DOD***, later the ***DOA***, are expressly stated to prevail over any other legislation including the ***PPTA***[246]

---

[243] Exhibit C-16 at TB F/19.
[244] Legislation CL-5/RL-1 at TB G/5.
[245] The *DOA* is to be found behind the *DOD* at TB G/5. It supercedes the *DOD*.
[246] Section 15 Deep Offshore Act and Joint Expert Opinion, para 6(a)(ii). As confirmed by the Experts, see Transcript, Day 4, p 61, lines 1 – 3.

9.16   In addition, Section 20 of the ***PPTA Cap 354*** concerning "*Chargeable Tax*" was amended by ***Decree 30 of 1999*** to expressly provide for PSCs.[247]

9.17   The ***DOA***, and the ***PPTA*** (the successor to the ***PPTA Cap 354***) as amended by the ***DOA***, provide the legislative framework for the Bonga PSC, including that the Claimants are engaged in Petroleum Operations.[248]

9.18   For example, Clause 2.1 of the Bonga PSC states:

> "*the Corporation as holder in the rights in and to the Contract Area hereby appoints and constitutes the Contractor the exclusive company to conduct Petroleum Operations in the contract area*"

9.19   Clause 2.4 of the Bonga PSC provides:

> "*The CONTRACTOR is engaged in Petroleum Operations pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws or the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies Income Tax Act 15793 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application.*"

9.20   Clause 5.1 of the Bonga PSC provides:

> "*Within two (2) months after the Effective Date and thereafter at least three (3) months prior to the beginning of each Year, the CONTRACTOR shall prepare and submit for review and approval by the Management Committee, pursuant to Clause 6, a Work*

---

[247] Legislation CL-12 RL-2 at TB G/3 CL-3 RL-3.
[248] Legislation CL-14 at TB G/5.

> *Programme and Budget for the Contract Area setting forth the Petroleum Operations which CONTRACTOR proposes to carry out during the ensuing Year, or in case of first Work Programme and Budget, during the remainder of the current Year. The Management Committee shall review and approve such Work Programme and Budget in accordance with Clause 6.3(e) prior to submission of the Work Programme and Budget to the Ministry."*

9.21   Clause 6.1(c) of the Bonga PSC provides:

> *"A Management Committee shall be established within thirty (30) days from the date of execution of this Contract for the purpose of providing orderly direction of all matters pertaining to the Petroleum Operations and Work Programme. The powers and duties of the Management Committee shall include but not be limited to the following:*
>
> > *(c)     ensuring that the CONTRACTOR carries out the decisions of the Management Committee and conducts Petroleum Operations pursuant to this Contract..."*

9.22   Clause 7.1 of the Bonga PSC provides that in accordance with [this Bonga PSC], the Claimants, as the Contractor, shall:

> *"(a)   Provide all necessary funds for payment of Operating Costs including, but not limited to, all materials, equipment, supplies, and technical requirements (including personnel) purchased, paid for or leased in Foreign currency;*
>
> *(b)   ...*
>
> *(c)   Prepare Work Programmes and Budgets and carry out*

122

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

approved Work Programmes in a good and workmanlike manner and in accordance with internationally acceptable petroleum industry practices and standards with the object of avoiding waste and obtaining maximum ultimate recovery of Crude Oil at minimum costs;

(d) Ensure that all lease equipment paid for in Foreign Currency and brought into Nigeria for Petroleum Operations is treated in accordance with the terms of the applicable leases;

(e) ...

(f) ...

(g) ....

(h) Prepare estimated and final PPT returns and submit same to the CORPORATION on a timely basis in accordance with the PPT Act;

(i) Have the right to lift in accordance with Annex D and freely export and to retain abroad the receipts from the sale of Available Crude Oil allocated to it hereunder;

(j) Prepare and carry out plans and programmes for industrial training and education of Nigerian for all job classification with respect to Petroleum Operations in accordance with the Petroleum Act Cap 350 Laws of the Federation of Nigeria 1990, as amended.

(k) Employ only such personnel as are reasonably necessary to conduct the Petroleum Operations in a prudent and cost

123

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*effective manner;*

(l)   ...

(m)   In  respect of payment of customs duties and other like charges, the CONTRACTOR and its subcontractors shall not be treated differently  from any other companies and their subcontractors engaged directly in similar Petroleum Operations in Nigeria;

(n)   Indemnify and hold harmless the CORPORATION from and against losses (including legal fees and expenses) of whatever kind and from the CONTRACTOR's wilful misconduct in carrying out Petroleum Operations and as a consequence of any final decision, given by a Nigerian Court, except where such losses are shown to result from any action or failure to act on the part of the CORPORATION, provided  however, that under no circumstances shall the CONTRACTOR be liable to the CORPORATION for reservoir damage or, pollution or any consequential losses or damages occurring including, but not limited to, lost production or lost profits;

(o)   Have the right to finance Petroleum Operations from external sources under terms and conditions approved by the CORPORATION; and

(p)   Not exercise all or any rights or authority over the Contract Area in derogation or to rights of the CORPORATION."

9.23   Clause 11.1 of the Bonga PSC provides:

124

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> *"The CONTRACTOR shall finance the cost of purchasing all equipment to be used in Petroleum Operations in the Contract Area pursuant to the Work Programmes and such equipment shall become the property of the CORPORATION on arrival in Nigeria. The CONTRACTOR and the CORPORATION shall have the right to use such equipment exclusively for Petroleum Operations in the Contract Area during the Term of this Contract. Should the CORPORATION desire to use such equipment outside the Contract Area, such use shall be subject to terms and conditions agreed by the Parties provided that it is understood Petroleum Operation's hereunder shall take precedence over such use by the CORPORATION."*

### (4)   *The Tribunal's Decision*

9.24   In light of all of the above the Tribunal has no hesitation in finding that the Claimants, as the Contractor, were engaged in Petroleum Operations, as the Claimants have alleged.

9.25   The ***DOA*** expressly provides for the Claimants' recovery of Cost Oil (Section 8) and Profit Oil (Section 10), the latter after deducting Royalty Oil, Tax Oil and Cost Oil as is expressly provided for in the Bonga PSC. Thus the Claimants are, in the words of Section 2 of the PPTA, *"winning or obtaining... Chargeable oil in Nigeria... For its own account"* and not simply that of the Respondent's.

9.26   As it has been said above, it is surprising to the Tribunal that the Respondent should have thought it right and proper to allege, and continue to allege, that the Claimants are not engaged in Petroleum Operations, in the light of the overwhelming number of references in the documents confirming that they do just that. This is a submission that

125

should never have been advanced. It runs counter to the whole PSC scheme in general, and the Bonga PSC in particular, and is quite inconsistent with the acts, conduct and stance of the Respondent (and where relevant the Federal Government) since 1993. Both Parties have for many years acted on the mutual assumption that the Claimants were clearly engaged in Petroleum Operations and it would be wholly inappropriate, unrealistic and uncommercial to allow the Respondent now, at this very late stage, to resile from that common understanding. Even without such a common understanding the documents referred to above make the position clear beyond any doubt.

9.27   If it were necessary to do so, the Tribunal would be prepared to hold that the Respondent is estopped from relying upon this point for the reasons stated above. Such a point suggests an attempt to change substantially the terms of a contract freely entered into many years ago and on which both Parties have acted. It would be quite unconscionable to give this point any credence whatsoever. This conclusion appears to be supported by Section 150 of the Nigerian *Evidence Act* which provides that:

> *"Where one person has by his declaration, act or omission, intentionally caused or permitted another person to believe a thing to be true and to act upon such belief, neither he nor his representative in interest shall be allowed in any proceedings to deny the truth of that thing".*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER X   THE STATUS OF THE RESPONDENT

### (1) *Issue*

10.1   The Respondent has submitted that it is not solely an agent of the Government but that it also separately has overriding statutory duties of prospecting and exploring for oil in its own licence area among other things.[249] By contrast the Claimants assert that the Respondent is the agent of the Nigerian Government.

### (2) *The Claimants' Position*

10.2   The Claimants rely upon the fact that the Respondent is a statutory corporation established under the laws of the Federal Republic of Nigeria, by the ***Nigerian National Petroleum Corporation Act*** (the "***NNPC Act***").[250] Section 5 of the *NNPC Act* describes it as the state oil corporation through which the Federal Government of Nigeria regulates and participates in the country's petroleum industry. Its mandate includes:

> *"doing anything required for the purpose of giving effect to agreements entered into by the Federal Government with a view to securing participation by the Government or the Corporation in activities connected with petroleum" and "generally engaging in activities that would enhance the petroleum industry in the overall interest of Nigeria."*

---

[249] RR Legal Para 2.1.2.
[250] Exhibit CL-4, RL-4 at TB G/4.

127

10.3   Justice Oguntade's Report refers to the two Nigerian Supreme Court cases of *Onuorah v. K.R.P.C. Ltd* (2005) 6 NWLR (pt. 921) at 393 and *N N P C v. Evwori* (2007) All FWLR (pt. 369) 1324 at 1341 Paras C-G (CA), both of which held that the Respondent is an organ and agency of the Federal Government of Nigeria.[251]

### (3)   *The Respondent's Position*

10.4   The Respondent submits that the references in the report of the Justice Oguntade's Report to the cases of *Onuorah v. K.R.P.C.* and *NNPC v Evwori's* in defining the the Respondent as an agent of the Federal Government are self-serving.[252]

10.5   The Respondent further submits that regard must be had to the provisions of Section 5(a) of the *NNPC Act* which states as follows:

> *"Subject to the provisions of this Act, the Corporation shall be charged with the duty of (a) exploring and prospecting for, working, winning or otherwise acquiring, possessing and disposing of petroleum products...".*

10.6   The Respondent asserts that it is not only an agent of the Government required solely for the purpose of giving effect to agreements entered into by the Federal Government.[253] The Respondent states that whilst it does not contest that it is a creation of statute with the Minister of Petroleum as its Chairman, it maintains that the Corporation has statutory duties of exploration, prospecting for, working, winning or otherwise acquiring, possessing and disposing of petroleum products within its Licensed Areas.

---

[251] TB D/5 para 3.3.
[252] Para 2.1 RRLegal.
[253] Para 2.1.2 RRLegal.

128

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

10.7  Similarly, Respondent submits in support of its position on this point that Section 6(I) (d) of the *NNPC Act* also provides that:

> *"The Corporation shall have powers to do anything which in its opinion is calculated to facilitate the carrying out of its duties under the Act including the power to ... enter into contracts or partnerships with any company, firms or persons which in the opinion of the Corporation will facilitate the discharge of the said duties under the Act... "*

### (4)  *Tribunal's Decision*

10.8  It is necessary for the Tribunal briefly to discuss the status of the Respondent.  It is clearly a corporation set up under the *NNPC Act* *"charged with the duty of....exploring and prospecting, working, winning or otherwise acquiring possessing and disposing of petroleum."*[254]

10.9  The Respondent has submitted that it is not solely an agent of the Government required solely for the purpose of giving effect to agreements entered into by the Federal Government, but also has an overriding duty of prospecting and exploring for oil in its own licence area.[255]

10.10 The Supreme Court of Nigeria has held in two cases that the Respondent is an organ, an agency, of the Federal Government of Nigeria namely in *Onuorah v. K.R.P.C.* and *NNPC v Evwori's*. The Minister of Mineral Resources is the Chairman of the Respondent and the Permanent Secretary of the Ministry of Finance is a member of the Respondent's Board of Directors pursuant to Section of the *NNPC Act*. The other

---

[254] Section 5(1)(a) NNPC Act.
[255] RRLegal 2.1.2.

129

Respondent Board directors are appointed by the President, as is the Managing Director. Under Section 5(2) of the *NNPC Act* the President, if he thinks it appropriate may require the Corporation to undertake a general review of the Corporation and any of its subsidiaries and report back to him.

10.11 Under Section 6(2) of the *NNPC Act* any contract above a prescribed limit shall be referred by the Corporation to the President for approval before the award of any such contract. Under Section 7(5) of the *NNPC Act* the Corporation has to submit to the President its estimates of expenditure and income relating to the next financial year. Under Section 8(2) of the *NNPC Act* there are limits on the Corporation's borrowing power without presidential approval. Under Section 9 of the *NNPC Act* the President may direct the Corporation to do whatever he thinks is necessary relating to the disposal of any surplus funds of the Corporation. These and other Sections of the *NNPC Act* make it perfectly plain that the Respondent is firmly controlled by the Federal Government.

10.12 Accordingly in light of the above, it is fanciful to suggest that the Respondent will take a stance that is contrary to the interests of the Federal Government and that is sufficient to deal with any issue where the interplay between the Respondent and the Federal Government becomes relevant.

10.13 The above conclusions seem to be supported by the judgment of Bello J in his ruling on the Injunction application by FIRS of 29 February 2012. At page 27, he states:

> "*It is not in any dispute that in this case, two of the parties to the suite, i.e. the Plaintiff and 1st Defendant are federal government agencies .... *"

130

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

At page 32, Bello J added:

> "*After all, it is not out of place for the 1st Defendant within the context of this case to support the Plaintiff's case because both of them, as Federal Government Agencies, should be seen to be working together to protect the interest of the Federal Government on Tax matters...*"

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER XI   SUMMARY OF THE CLAIMANTS' CLAIMS, RESPONDENT'S DEFENCES AND COUNTERCLAIM AND THRESHOLD ISSUES

11.1   This chapter provides an overview of the Claimants' Claims, the Respondent's Defences, and the Respondent's Counterclaim. The Tribunal will address the various issues raised by the Parties in later Chapters of this Award as relevant.

11.2   The Respondent's preliminary objection to the Tribunal's Jurisdiction has been dealt with in Chapter VII above.

### (1)   *Overview of the Claimants' Claims*

11.3   The Claimants assert that the Respondent is in breach of the Bonga PSC because it has allegedly usurped:

(1)   their right to determine the Lifting Allocation applicable to production of Available Crude Oil from OML 118 and, as a result, has lifted substantially more Available Crude Oil than that to which it is contractually entitled, based on an interpretation of the Bonga PSC which is plainly incorrect; and

(2)   their right to have the PPT Returns that they have prepared filed with the *FIRS*.[256]

11.4   The Claimants deny the Respondent's Counterclaim.[257]

---

[256] Para 2 CS
[257] Para 3 CS.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

11.5   The Claimants submit that their case is founded upon the principle of *pacta sunt servanda* and they ask the Tribunal to determine that:

    (1)    under the Bonga PSC, the Claimants, as the Contractor, have the exclusive (sole) right and obligation to determine the Lifting Allocation applicable to the production of Available Crude Oil;

    (2)    the Respondent is in breach of the Bonga PSC by usurping their rights as the Contractor and has lifted substantially more Available Crude Oil than that to which it is contractually entitled;

    (3)    under the Bonga PSC, the Claimants, as the Contractor, have the right to have the PPT Returns that they have prepared filed with the FIRS without amendment and to allocate Tax Oil based on such PPT Returns; and

    (4)    the Claimants, as the Contractor, are entitled to be compensated so as to be put in the position it would have been in but for the Respondent's breaches of contract (quantified and updated to 30 November 2011 at US$3,130,869,782 together with interest to the same date of US$557,266,300).

11.6   In particular the Claimants claim that:

    (1)    Lifting Allocation: the Respondent is in breach of the Bonga PSC for not lifting Available Crude Oil in accordance with the Contractor's Lifting Allocation (the "**Claimants' First Claim**" or "**Claimants' Lifting Allocation Claim**"): see Section 13.1 below;

    (2)    Cost Oil: when allocating Cost Oil, the Claimants, as the Contractor, are entitled to allow the recovery of all Operating Costs

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

incurred in OML 118 ("**Claimants' Second Claim**" or "**Claimants' OML 118 Costs Claim**"): see Section 13.2 below;

(3) <u>Cost Oil</u>: OML 118 Cost Oil includes recovery of Operating Costs incurred in OML 135 and OPLs 803, 806 and 809 (the "**Claimants' Third Claim**" or "**Claimants' Other OML/OPL's Recovery Claim**"): see Section 13.3 below;

(4) <u>Royalty Oil</u>: when allocating Royalty Oil, the Claimants, as the Contractor, are entitled to apply a Royalty rate of 1% (the "**Claimants' Fourth Claim**" or "**Claimants' Royalty Oil Claim**"): see Section 13.4 below;

(5) <u>PPT Returns</u>: the Claimants have the exclusive right to prepare the PPT Returns, and the right to have the PPT Returns that they have prepared filed with FIRS without amendment, and to allocate Tax Oil based on such PPT Returns (the "**Claimants' Fifth Claim**" or the "**Claimants' PPT Returns Claim**"): see Section 13.5 below;

(6) <u>Tax Oil</u>: when allocating Tax Oil, the Claimants are entitled to apply the ITC as a credit against Assessable Tax without reduction of Qualifying Capital Expenditure (the "**Claimants' Sixth Claim**" or the "**Claimants' ITC Claim**"): see Section 13.6 below;

(7) <u>Tax Oil – Consolidation</u>: the Claimants' are entitled to consolidate costs incurred in OML 118 with costs from OML 135 and OPL's 803, 806 and 809 for PPT purposes (the "**Claimants' Seventh Claim**" or the "**Claimants' Tax Oil Consolidation Claim**"): see Section 13.7 below;

(8) <u>Tax Oil Calculation</u>: when allocating Tax Oil, the Claimants are entitled to allow:

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

    (a)    <u>as tax deductions</u> – the signature bonuses, sole costs;[258] interest on intra-group loans, and Contractor's Operating Costs in accordance with the *PPTA* (in addition to the Bonga PSC items)

    (b)    <u>a 20% Capital Allowance in the First Year</u> (as detailed in the Bonga PSC);

    (the "**Claimants' Eighth Claim**" or the "**Claimants' Tax Oil Calculation Claim**"): see Section 13.8 below;

(9)    <u>Stabilisation</u>: pursuant to Clause 19.1 of the Bonga PSC and relief arising therefrom and interest (the "**Claimants' Stabilization Claim**"); see Section 13.9 below; and

(10)    <u>Costs</u> (the "**Claimants' Costs Claim**"): see Chapter XV below.

*(2)    <u>Overview of the Respondent's Defences</u>*

11.7    In defence, the Respondent has submitted[259] that several disputes have arisen between the Respondent and the Claimants, as the Contractor, with regards to the interpretation and application of:

(1)    the Bonga PSC;

(2)    the *DOA*;

(3)    the *PPTA;*

(4)    the *Petroleum (Drilling & Production) Regulations.*[260]

---

[258] Sole Costs as discussed further in Chapter 13.8 below.
[259] RS – para 2.
[260] Cap P10 Laws of the Federation of Nigeria, 2004: CL-7/RL-6 at TB G/7.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

11.8   The Respondent further asserts that the Bonga PSC incorporates, by cross-reference, provisions of the *DOA*, the *Petroleum Act 1969*[261] (the "*PA*"), the *PPTA* and other relevant Statutes. The Respondent submits that the *PA* and *PPTA* both have criminal penalties for failure to comply with its provisions strictly.   Consequently, where there is a conflict between the provisions of the Bonga PSC and the applicable law, the provisions of the law will naturally prevail more so where there are criminal penalties attached.[262]

11.9   The Respondent asserts, more specifically, that the dispute between the Parties is with regard to the interpretation and application of the Bonga PSC's fiscal terms including but not limited to:

   (1)   the rate of Royalty to be paid;

   (2)   the quantum of oil to be allocated for purposes of cost recoverability; and

   (3)   the quantum of oil to be allocated as a result of general tax treatment;

   (4)   the Claimants' allegation that the Respondent has lifted Available Crude Oil over and above its entitlement.[263]

11.10 Among other things the Respondent asserts that:

   (1)   the Realizable Price required under Clause 9 of the Bonga PSC has not been agreed upon, and accordingly the Bonga PSC is contrary to law as being a breach of Section 13 of the *DOA*;

---

[261]   TBG/10: Cl-10/RL-5.
[262]   Para 2.4 RS.
[263]   Para 2.5 of RS.

136

(2)   there are integration difficulties arising from the execution of the Bonga PSC in 1993, prior to the enactment of the **DOA** in 1999 providing a legal framework for the Bonga PSC structure;

(3)   the Claimants, as the Contractor, are not involved in carrying out "**Petroleum Operations**", and therefore the Claimants, as the Contractor, are not entitled to claim ITC;

(4)   the Respondent lacks the capacity as the Licence Holder, to contract beyond its contract area for OML 118 (OPL 212) as defined in Clause 1(i) of the Bonga PSC as "*the area of the OPL and any OML(s) derived therefrom*" and as more particularly delineated in Annex A to the Bonga PSC.

### (3)   *The Respondent's Counterclaim*

11.11   The Respondent is also counterclaiming based on its interpretation and application of the **PPTA**. The Respondent asserts that its Counterclaim has no bearing on the tax liability of either of the Parties. The Respondent asserts that it is in simple terms an allegation that the Claimants have lifted oil that should otherwise accrue to the Respondent.[264]

11.12   In summary, the Respondent asserts that both itself as the Counterclaimant, and the Claimants, as the Contractor, contributed in various proportions to reduce the overall tax burden of the "**Contract Area**". However, the CounterClaimants' higher contributions to that reduction in the tax burden are not recognized and accorded to it before the split of profit oil. This higher contribution is derived mainly from Capital Allowances and ITC granted on Qualifying Capital

---

[264] Para 2.6 RS.

Expenditure[265] as to which it asserts that only the Respondent is entitled to receive the benefit as the Licence Holder engaged in *"Petroleum Operations"*. In this context the Respondent relies upon its assertion that the Claimants are not engaged in *"Petroleum Operations"*. The Respondent asserts that the Claimants, as the Contractor, are not entitled to the benefit of ITC and Capital Allowances at all.

### (4)   *The Claimants' Position*

11.13   The Claimants point out that the Counterclaim was brought late, and furthermore that it did not feature in any of the other arbitrations where the same points were open to the Respondent to take. The Claimants reject the Counterclaim as having no basis in law or fact.[266]

### (5)   *The Tribunal's Analysis*

11.14   It seems to the Tribunal that the Counterclaim is in fact largely the mirror image of the Respondent's defence to the Claims. Clearly if the Respondent is correct that the Claimants are not involved in Petroleum Operations, and are not thereby entitled to the benefit of ITC, then it follows that adjustments have to be made to correct this position and that this will enure to the benefit of the Respondent. Similarly if the issue relating to the ownership of assets is resolved in the Respondent's favour a similar adjustment needs to be made.

---

[265] Para 2.7 RS.
[266] Para 208 CPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER XII   REALIZABLE   PRICE   AND   RESPONDENT'S ALLEGATIONS OF ILLEGALITY

### (1)   *The Realizable Price Issue*

12.1   The Respondent submits that failure to agree a valuation method for Available Crude Oil pursuant to Clause 9 of the Bonga PSC, defined by the Bonga PSC as the *"Realizable Price,"* is not only a breach of the Bonga PSC, but also an illegality such that all PPT Returns that have been filed are null and void.[267] In the Respondent's *"Address on the consequence(s) of illegality"* dated 30 November 2011, the Respondent commended what it described as *"Consequence 2"* to the Tribunal,[268] namely that:[269]

> *"all contractual rights in the PSC that relate directly to the filing of PPT Returns are unenforceable";*
>
> and
>
> *"the Tribunal must restrain itself from enforcing any contractual rights that directly violates such legal obligations".*

12.2   The Claimants deny that any illegality or illegal act of any nature has occurred by reason of the Parties' failure to date to agree on the Realizable Price which gives rise to the consequence that the Respondent has put to the Tribunal.

### (a)   *The Respondent's Position*

---

[267] See RASOD, page 39, para 6.4(iii).
[268] See Page 3.
[269] See Page 4.

139

12.3    The Respondent has submitted that because the obligation to use a Realizable Price is contained not only in the Bonga PSC but also in Section 13 of the *DOA* any failure to comply with that provision amounts to illegality, as the use of the Realizable Price in the valuation of the Available Crude Oil is a requirement of law. The Respondent asserts that the Parties' entitlements, including tax liabilities, are met by delivering a quantum of oil that will generate an amount of proceeds sufficient to meet Royalty Oil, Cost Oil, Tax Oil and Profit Oil. The Respondent further submits that it becomes immediately apparent that to determine the appropriate quantum to be distributed at the various cascades, there must be an established Realizable Price.

12.4    Thus the Respondent's position is that to the extent that a Realizable Price was not used by the Parties to the Bonga PSC this has a consequence both in law and in contract. Indeed the Respondent contends that the Claimants deliberately refused to cooperate in determining the Realizable Price. The variation in price will obviously affect the quantum of oil delivered and ultimately the Profit Oil of each party.

12.5    The Respondent asserts that the failure to use a Realizable Price in the valuation will have a number of consequences including:[270]

(1)    that the Parties had effectively waived the Realizable Price provision and therefore none of the Parties could subsequently seek a determination as to it; and

---

[270] Para 18.3, RS

(2) the failure to establish a Realizable Price is a further indication that the Parties never insisted on following the strict terms of some of the fundamental provisions of the contract.

12.6 The Respondent submits that the foregoing arguments notwithstanding (i.e., that the Parties may have waived their rights to insist on the determination of a Realizable Price), such a waiver is not permitted in law. The Respondent argues that the requirement to use a Realizable Price is a mandatory provision for use in determining the quantum of oil lifted to meet Royalty and PPT liabilities: see Section 13 of the *DOA.*

12.7 The Respondent has contended that having regard to the clear provisions of the law, no price other than the Realizable Price can be used in determining the amount of Royalty and PPT in respect of Available Crude Oil. Failure to follow the clear expression of the law effectively nullifies the returns that may have been filed to date. The Respondent has urged the Tribunal to disregard PPT Returns if it is not in a position to nullify the same. Setting aside the PPT Returns does not necessarily mean that tax will not be paid; merely that all the entitlements in terms of oil lifted will have to be in accordance with a Realizable Price.

12.8 The Respondent asserts that on their own admission, the Claimants never used a Realizable Price, and indeed the price used for Available Crude Oil had no reference to the Respondent.[271] The oral testimony of Mr. Humphrey Doody, who was primarily responsible for

---

[271] Para 7.2.1 RPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

negotiating the Realizable Price on behalf of the Claimants, reveals the following :

> "*Q:* *You understand that the whole essence of the realizable price was to get a participation on the part of the contracting employer, in other words, your contracting party. The idea was to get a participation. That's the point. In other words, they must participate in developing a formula and submitting a price that would give rise to the realizable price; is that correct?*
>
> *A:* *I agree it is correct that the Parties should agree. So both Contractor and the Respondent should agree a valuation method.*"[272]

12.9    Although one or two of the Claimants' witnesses had given the impression that the Respondent may not have come up with a Realizable Price and as a result, the Claimants had acted reasonably in using a price that was transparent or at least a price to determine a value, the Respondent submits that the Bonga PSC specifically required the Parties to value the available crude using a Realizable Price.

12.10   The Respondent submits that during the Hearing Mr. Humphrey Doody laid this matter to rest when he simply said there were counter proposals which were unacceptable to the Claimants.

12.11   This disagreement as to the Realizable Price meant that either of the Parties in accordance with the provisions of the contract could have

---

[272] Transcript Day 2, lines 2 – 25 at page 115 (Mr. Doody).

142

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

escalated the matter before the Ministry for a resolution. The evidence on record suggests that neither of the Parties did so. In effect both Parties have by their conduct waived that contractual provision. This was not fault-based. It is however important to appreciate the consequences of failing to use a Realizable Price. These are twofold:

(1)  a failure to ascertain a Realizable Price will automatically mean that the fiscal value of Available Crude Oil will be incorrectly ascertained. This will in turn distort the cascade distribution as provided in Clause 8 of the Bonga PSC; and

(2)  it can be manipulated to the advantage of the Claimants which inevitably affects other stakeholders in the Bonga PSC.  Mr. Doody again confirmed this.

12.12  The Respondent submits that the complexity however arises because this price was also to be used to determine the tax to be paid as well as Royalty.[273]

12.13  The Respondent contends[274] that the allocation of Tax Oil and Royalty Oil was as expressly provided by law and referenced to the determination of the Realizable Price.

12.14  The Respondent submits that Mr. Doody, who was negotiating the Realizable Price, was well aware that the only price that could have been used for the allocation of Tax and Royalty Oil was the Realizable Price. Notwithstanding this knowledge, Mr. Doody failed to exhaust the provisions in the contract to arrive at a Realizable Price and

---

[273]  Para 2.1.6 RPHB.
[274]  Section 2.2 RPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

proceeded to use the price which was unilaterally determined by the Claimants.

12.15   The Respondent contends that this attitude of the Claimants in deliberately disregarding the provisions of the law was most unreasonable and indeed in some circumstances arrogant. This arrogance can de deduced from the statement of Mr. Patrick Whittome, witness for the Claimants, where he repeated the objections of the Respondent to the use of the Realizable Price in the following words:

> *"NNPC objected to the underlying model and to the realizable price figure used by SNEPCO in its calculation".[275]*

12.16   The Respondent submits that the sequence of the objections went as follows:

> *"Q:   Regardless of objections being raised by the Respondent and this is in your statement, there were objections by the Respondent and you effectively disregarded those objections.*
>
> *A:   I took the actual prices and the actual volumes, actual proceeds."[276]*

12.17   The Respondent submits that the consequence of using a different price is not only a breach of the contract as indicated above, but also a breach of the law that has potential criminal consequences.

*(b)    The Claimants' Position*

---

[275]   Witness statement of Mr. P. Whittome at para 22.  TB F/5; Transcript Day 2, lines 16 – 18 p42.
[276]   Transcript Day 2, lines 16 – 21 at p51, Mr. P. Whittome.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

12.18    The Claimants accept in CRPHB at para 2 that the Claimants have not used an agreed price when allocating Available Crude Oil. However, Claimants submit that, as explained by Mr. Doody, that this was because:

     (1)    the Respondent itself was seeking to achieve an industry-wide solution; and

     (2)    the Respondent's proposal to use the Official Selling Price ("*OSP*") was not acceptable to the Claimants because it was determined solely by the Respondent and therefore was not objective and transparent.[277]

12.19    The Claimants assert that until agreement is reached, the Claimants have been using a methodology that the Respondent had previously approved for use in respect of other fields, namely applying a differential to the Bonny Light Price. They rely upon the Respondent's statement that:

> *"This disagreement meant that either of the Parties in accordance with the provisions of the contract could have escalated the matter before the Ministry for a resolution. The evidence on record suggests that neither of the Parties did so".*[278]

12.20    The Claimants assert that this indicates that the Respondent was content to keep negotiating. The Respondent asserts in its Post-hearing

---

[277] Transcript, Day 2, p 122, lines 4 – 8 and p 124, lines 3 – 7.
[278] RPHB para 2.1.5; See also Transcript, Day 1, p 111, lines 10 – 15.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Brief that: *"In effect both Parties have by their conduct waived that contractual provision. This was not fault-based."*[279]

12.21    The Claimants assert that the Respondent accepts that both Parties in effect waived the requirement to apply an agreed price whilst negotiations were continuing (as they still are) and that there was no fault on either side; accordingly the Respondent's whole case premised on the failure to agree a formula to determine price must collapse. The Claimants are not at fault in not applying an agreed price.

12.22    The Claimants deny that the price applied by them could be, or was, manipulated to their advantage, asserting that unlike the Respondent's proposal to use OSP, the Claimants' methodology was transparent and fair.

12.23    The Claimants assert that the net impact of Realizable Price on liftings up to 30 November 2011 is, at most, US$21.762 million.[280]

12.24    The Claimants undertake to make any adjustment to their Lifting Allocation model once a formula to determine Realizable Price methodology is agreed with the Respondent (or determined in a final and binding ruling of an appropriate forum).

12.25    The Claimants note that the Respondent has put increasing emphasis throughout the arbitration on the issue of the valuation method for determining the price for: (1) each lifting of Available Crude Oil; and (2) gross revenue in PPT Returns (referred to as Realizable Price).[281]

---

[279] RPHB para2.1.5.
[280] As at 30 November 2011: see CPHB, para 199.
[281] *See:* CSOR on RP TB B/7.

146

12.26   The Claimants submit that this is a not an issue for this Tribunal. The Bonga PSC provides for a Realizable Price to be used to value Available Crude Oil so as to determine how many barrels of oil should be allocated to a Party. Section 13 of the *DOA* provides for the Realizable Price (established in accordance with the Bonga PSC) to be used to determine the amount payable on Royalty and PPT.

12.27   Clause 9 of the Bonga PSC provides for information to be gathered during a six month TMP and a valuation method for computing Realizable Price to then be agreed. In fact, the period in which to agree such a formula after the TMP was extended by agreement to August 2007. However, the Parties could still not agree on a valuation method. Nevertheless, negotiations have continued over nearly 5 years since, not only as between the Parties to the Bonga PSC but also with other IOCs in order to try to reach an industry-wide solution.[282]

12.28   During this period, the Claimants, as the Contractor, have used a method for the purposes of valuing Available Crude Oil which they consider to be transparent and fair. It is based on a methodology that the Respondent has previously approved and used for Nigerian crude oils produced from other fields, i.e. a differential to Bonny Realizable Price (see CSOR on Realizable Price, paras 5.9 to 5.12).

12.29   For purposes of computing Royalty Oil and PPT liability and, accordingly, Tax Oil, the Claimants say that they gave used the actual FOB sales price because this represents the actual revenue obtained by the Parties on which they should pay PPT (after any allowed deductions). They refer to Clause 9.1(v) of the Bonga PSC which

---

[282] See Witness Statement of Mr. Humphrey Doody: TB C/13.

provides that the actual FOB sales price should continue after the TMP until the Parties agreed to a valuation method (albeit it anticipates agreement being reached within 90 days after the conclusion of the TMP).

12.30   The Respondent has proposed that an OSP be used as the agreed valuation method. The Claimants (as well as the rest of the oil & gas industry in Nigeria) are reluctant to agree to this OSP because it is fixed by the Respondent, is neither transparent nor determined using independent assessments that are widely accepted within the industry and could be manipulated so as to benefit the Respondent / the Federal Government as the following evidence of Mr. Mbefano shows:

> o   *"Q (Sheppard): The arriving at an OSP number, on price, on any particular day is done by the Respondent, isn't it?*

> o   *A (Mbanefo): You take the reference price published – depending on – there are three pricing options. Depending on the option, you take the average prices published by Platts, and the add or subtract the differential.*

> o   *"Q: And the Respondent, the Respondent, determines what that differential should be, doesn't it?*

> o   *A: Yes."*[283]

12.31   Clause 9.1(e) of the Bonga PSC provides that absent agreement, *"determination of such valuation shall be referred to the Ministry"* (see also Clause 9.2). Notably, neither the Claimants nor the

---

[283] Transcript, Day 3, p 185, lines 13 – 21.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Respondent have referred the issue to the Ministry of Petroleum Resources for determination, precisely because they both anticipate reaching agreement sooner or later. This is supported by the following exchange between Mr. Eghobamien SAN and the Tribunal:

- ○ *"Q (Rowley): Let me just ask you, would that have been the case if the Respondent had elevated it to the ministry?*

- ○ *A: No, sir. It will not. The position will be that if the Respondents had done so, there perhaps would have been a resolution to the problem, but the Respondents have also not done so. ..."* (emphasis added).[284]

12.32    The Claimants assert that it would be wrong in these circumstances to consider the conduct by both Parties over the past 5 years to amount to illegality or even a breach of contract. If there is a breach (which is denied), it is mutual, because the Respondent has similarly not used an agreed valuation method (i.e. an agreed RP) in its entitlement model and any such breaches have been mutually waived:

- • Mrs. Juliet David-West:

  - ○ *"Q (Adekoya): The price which goes into the NNPC model, is it a price that confirms (sic) with the clause in the PSC?*

  - ○ *A: No, because the two Parties have not agreed to a firm and Realizable price, so we use the OSP."*[285]

---

[284] Transcript, Day 1, p 111, lines 10 – 15.
[285] Transcript, Day 3, p 213, lines 4 – 8.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

○   *"Q: The price that is utilised by the NNPC model is not the Realizable price as agreed under the terms of the PSC?*

○   *A: Yes, it's not."*[286]

\* \* \*

○   *"Q: the price figure that goes into the NNPC model is not an agreed price?*

○   *A: Yes, it's not an agreed price."*[287]

• Mr. Mele Kyari:

○   *"Q (Adekoya): You also confirmed that the price that went into the model used by the Respondent was not agreed by both Parties?*

○   *A: That's correct.*

○   *Q: Is there anything in the contract that allows the Respondents to make this model or use these calculations, using a price not agreed to by both Parties?*

○   *A: None of the Parties can use an independent price".*[288]

12.33   The Claimants refer to RASOD which states at page 36, para 6.2(v):

*"To the extent that the obligation to agree a valuation of crude oil is vested in both Parties, the Respondent will contend that*

---

[286] Transcript, Day 3, p 213, line 24 – p 214, line 1.
[287] Transcript, Day 3, p 220, lines 3 – 6.
[288] Transcript, Day 4, p 34, lines 12 – 21.

150

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> *both Parties had waived their rights to insist on the strict*
> *compliance in the valuation of the crude oil in as much as the*
> *Parties had waived substantial compliance with the provisions*
> *of the PSC."*

12.34   The Claimants assert that the Respondent's analysis as referred to in RASOD at para 6.2(v) (referred to immediately above) is misconceived, because both Parties have been seeking to agree a valuation method (as between themselves and as part of a wider industry resolution) and neither thought it necessary to refer the matter to the Ministry of Petroleum Resources or considered that they were acting illegally in implementing the Bonga PSC in the meantime.

12.35   The Claimants further submit that the Parties can amend the Allocation Model and historic PPT Returns once a valuation method has been agreed. The Claimants, as Contractor, noted in their covering letters accompanying the PPT Returns that they had prepared the basis for the valuation method used, and the fact that it was not agreed. They noted that the valuation method used by the Claimants in calculating Tax Oil was the actual FOB sales price, which was the actual price received as revenue by the Parties and therefore reflected the actual proceeds received by the Parties which, they asserted is, in default of an agreed price, an appropriate basis for the PPT Returns. The Claimants asserted that using the actual FOB sales price was consistent with Clause 9.1(v) Bonga PSC; the PPT Returns prepared by the Respondent used a valuation method that was not agreed, and FIRS has never objected or alleged that such PPT Returns are illegal; the effect on PPT liability of using the Claimants' valuation method or the Respondent's is *de minimis*; and if the Respondent was right, the Claimants would be left without any remedy in the event that the

151

Respondent disregarded any of its obligations relating to production sharing under the Bonga PSC (as it has done).

12.36   The Claimants submit that the Respondent does not appear to be pursuing a claim that this Tribunal should determine the valuation method to be applied. (In the RSOD at page 39, para 6.4(iii), the Respondent stated that it would be applying to the Minister of Petroleum Resources, but it has not yet done so). Claimants submit that in any event, this Tribunal would not have jurisdiction to do so until the matter had first been referred to the Ministry of Petroleum Resources.[289]

12.37   At the hearing, the amount of **US$14 million** was referred to as the impact of using the Respondent's OSP (as if it were an agreed price) on Claimants' calculation of the Respondent's overlift up to 30 September 2010. The comparable figure up to 30 November 2011 (the revised date of the Annexes A – E) is **US$21.762 million**. The Claimants submit that this is the "worst case" impact on Claimants' calculation based on the hypothetical assumption that all PPT filings and all past oil allocations up to 30 November 2011 should be based on OSP (except for the initial six (6) month TMP), giving a revised total overlift of **US$3,109,107,782**.

12.38   As far as the individually quantified elements of the Claimants' claims are concerned were OSP to be applied in this manner (i.e. on a revised total overlift of **US$3,109,107,782**):

---

[289] Justice Oguntade's Report at TB D/5, paras 11.1-11.4.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(1)   the compensation sought for overlifting of <u>Cost Oil</u> is not affected by the issue of Realizable Price because it is the actual dollar value of such costs that is being claimed;

(2)   the compensation sought for overlifting of <u>Royalty Oil</u> depends on Realizable Price, but application of the Claimants' price results in a lower claim than if the Respondent's proposed price was used; and

(3)   the compensation sought for overlifting of <u>Tax Oil</u> is not affected by Realizable Price because it is the actual dollar value of disallowed expenditure and deductions that is being claimed (which is unaffected by the value of gross revenue).

12.39   The Claimants deny that they deliberately disregarded the provisions of the law or acted arrogantly. They assert that the evidence shows that Claimants were well aware that the Bonga PSC and the *DOA* provided for an agreed price to be applied and the Claimants were, and still are, actively seeking to agree a formula to determine the Realizable Price with the Respondent.

12.40   The Claimants further deny that their conduct constitutes a breach of contract and breach of law with criminal consequences, on the grounds that:[290]

(1)   the Respondent itself states that in effect both Parties have waived that contractual provision pending an agreement;[291]

(2)   criminal consequences have not been mentioned prior to this

---

[290]   RPHB para 2.2.5
[291]   RPHB para 2.1.5

153

arbitration, notwithstanding that the Respondent, the Ministry of Petroleum Resources and FIRS have been aware of the Claimants' application of a price that differs from the Respondent's proposed Realizable Price methodology and no criminal prosecution has been commenced or even suggested; and

(3) since September 2006, Available Crude Oil has in fact been allocated on the basis of the Respondent's own Lifting Allocation model and, since 2007, PPT has been paid on the basis of PPT Returns prepared by the Respondent, neither of which use an agreed formula to determine the price to be applied.[292] Accordingly – if the Respondent's submission that a failure to use an agreed price constitutes a breach of the Bonga PSC were correct (which is denied by the Claimants) – it is the Respondent's conduct that constitutes a breach of contract and a breach of law with any attendant criminal consequences. The Claimants submit that this shows the inconsistency in the Respondent's case.

(c)  *Analysis of the Tribunal*

12.41  This issue concerning the Parties' failure to agree upon the Realizable Price for the Available Crude Oil lies at the very heart of the Respondent's defence. It is the basis of its various (but late) suggestions of some form of illegality.

---

[292] Transcript, Day 3, p 213, lines 4 – 8; Transcript, Day 3, p 213, line 24 – p 214, line 1; Transcript, Day 3, p 220, lines 3 – 6; Transcript, Day 4, p 34, lines 12 – 21.

12.42   It is clear that the whole structure of the Lifting Allocation provisions provided for in the Bonga PSC is posited upon a price per barrel of oil. Clause 9 of the Bonga PSC deals with this issue.  When a new stream of oil is available there is first a TMP of 6 months.  In this case the period commenced immediately following first production in November 2005. The TMP enables the Parties to gather pricing information based on the quality of oil coming on stream. The purpose of this stage is to allow the Parties to be better informed for the purposes of agreeing a "*Realizable Price*" pursuant to the Bonga PSC.

12.43   Unfortunately when the TMP expired no agreement had been reached and the 90 day post TMP period was, by agreement, extended until August 2007 as referred to in Chapter V above.

12.44   Despite the lack of agreement it was of course necessary to have a price to insert into the calculations. The Parties had differing ideas as to how this should be done. The Claimants suggested using a differential on Bonny crude which was originally acceptable to the Respondent on a temporary basis. This method had been used by the Respondent in respect of other oil fields. This method is based on actual FOB sale prices and thus according to the Claimants it is fair and transparent. Further the Claimants contend that it is in line with Clause 9.1(b) (v) of the Bonga PSC which refers specifically to "*actual FOB sales price*".

12.45   The Respondent on the other hand has contended for and lifted on the basis of a different approach. It suggests that the correct way of dealing with this is to take an OSP approach. The Claimants (and other OICs) object to this method because, as it is fixed by the Respondent, it is not transparent and nor does it use widely accepted

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

independent assessments. In short the Claimants fear that this method could be manipulated to their detriment.

12.46  Accordingly throughout the period covered by the claim made in this arbitration the Claimants have been basing their Lifting Allocation models on a method of ascertaining *"Realizable Price"* that they suggest is both fair and transparent. The Claimants have always informed FIRS when submitting PTT Returns the basis of the calculation of the Realizable Price and further that it has not yet been agreed with the Respondent. However as the Claimants point out their method is based on actual receipts and thus is wholly appropriate for the calculation of tax.

12.47  Clause 9.2 of the Bonga PSC provides that if the Parties cannot agree a *"Realizable Price"* then the matter can be referred to the Minister for a determination. Neither party has, as yet, taken this course and this suggests, very strongly, to the Tribunal that both sides consider the continuation of negotiations a fruitful exercise. This was certainly the impression left with the Tribunal after hearing all the witnesses relevant to this issue. The Tribunal is satisfied that this is because negotiations are on-going and both sides consider that there is a strong likelihood that agreement will be reached. As set out earlier, the Tribunal specifically raised this issue at the Vienna CMC thinking that it might be appropriate to refer it to the Tribunal rather than leave it in issue. The Parties were asked to consider their positions but never subsequently agreed to the Realizable Price issue being referred to the Tribunal, nor has it been referred to the Ministry.

156

12.48   It is necessary to refer to the *DOA* effective 1 January 1993. It is important to note the long title to the Act which, as referred to in paragraph 6.5 above, states;

> "*An Act to, among other things, give effect to certain fiscal incentives given to the oil and gas companies operating in the Deep Offshore and Inland Basin areas under Production Sharing Contracts between Nigerian National Petroleum Corporation or other companies holding Oil Prospecting Licenses or Oil Mining Leases and various petroleum exploration and production companies*"

12.49   Section 13(1) of the *DOA* provides as follows:

> "*(1) The realizable price as defined in the production sharing contract established by the Corporation or the holder in accordance with the provisions of the production sharing contract, shall be used to determine the amount payable on royalty and petroleum profit tax in respect of crude oil produced and lifted pursuant to the production sharing contract.*"

12.50   With this background it is surprising that the Respondent should contend that there is any illegality due to the failure to agree a "*Realizable Price*" and the use of a previously agreed method of ascertaining it albeit on a temporary basis. Either there will be an agreement or there will be a determination by the Minister. If either course leads to a different Realizable Price the difference (whichever way it goes) will be corrected in the months following agreement or determination. The Tribunal was informed that there are ongoing negotiations between the Parties as to the Realizable Price, the

continuation of which the Parties have considered worthwhile. The Tribunal was left with a very strong impression that agreement was in fact possible and desirable.

12.51    A Realizable Price will be agreed or determined. The fact that pending agreement or determination the Claimants, as the Contractor, has been using a non agreed or determined price does not render performance of this contract illegal or in breach of contract.

12.52    The *DOA* was intended to give effect to the PSC's. Clause 13 of the *DOA* merely mirrors the Bonga PSC provision with regard to *"Realizable Price"*. The *DOA* assumes that the Parties' agreement or a determination has resolved it but it does not deal with any interim situation pending either of these events. Further, because once agreement has been reached or a determination made the figures will all be unwound and corrected so there is no question but that there will be in place a *"Realizable Price"* covering the whole period in dispute and that this will conform to the *DOA* and the Bonga PSC.

12.53    Another problem facing the Respondent is that since September 2006 Available Crude Oil has been allocated on the basis of the Respondent's own lifting allocation model, and, since 2007, PPT has been paid on the basis of the Respondent's PPT returns which have not been agreed. Accordingly, if the Respondent's allegations of illegality are taken at face value it is their conduct which is in breach of the contract and the law. The Respondent has never acknowledged that it has acted in breach of the Bonga PSC or the law but if it is correct this must be so. It is as nonsensical to suggest that the Respondent has broken the law as it is for the Respondent to allege that the Claimants have done so.

158

12.54    The correct legal analysis must be that both Parties have waived present compliance with the *"Realizable Price"* provision in the Bonga PSC. Pending agreement or determination both Parties have used, at different times, their own preferred method of ascertaining the price.

12.55    Once the Realizable Price is agreed or determined it will be applied retrospectively and so will then be brought within the terms of the Bonga PSC. In any event the amount involved is *de minimis* and the Respondent is doing exactly what it complained the Claimant was doing. Insofar as waiver is concerned, at most this amounts to a temporary mutual waiver pending agreement or determination. There is absolutely nothing in the allegation of illegality.

12.56    In a sense the Parties are in a sort of "no man's land". The Tribunal is satisfied that the PSC is not unlawful; however the effect of Section 13(1) of the DOA needs to be considered carefully. On a proper construction of the section, it cannot mean that Realizable Price as determined has to be used immediately following following first lifting. The Parties agreed to a TMP and this was extended by agreement for a period of at least 2 years. This was in accordance with the terms of the PSC. Once the TMP's extension by agreement came to an end, there would be an inevitable time lag to come to an agreement, or refer the matter to the Ministry and receive a decision or to refer the matter to arbitration and await an award. The Tribunal finds it an incredible argument that once the TMP's extension came to an end there was no price that could properly be used for the purposes of the contract between the Parties that was legal.

12.57   As has been noted above, the Respondent takes the view that OSP should be used than the methodology contended by the Claimant. For the purposes of this Partial Award, and this Partial Award only, the Tribunal proposes to use the Respondent's price, on the basis that it is unlikely in the extreme that the Minister would have determined upon a methodology that would have derived a figure lower than that contended for by the Respondent. On this basis the Tribunal considers that Section 13(1) of the DOA is fully respected for the purposes of this Partial Award. What may happen thereafter remains to be seen.

12.58   As has been set out above, the difference beween the 2 Parties' methodology in relation to Realizable Price produces a difference of some US$21.762 million as of 30 November 2011. This is in the context of an allegation of overlift by Respondent of US$3,109,107,782. This amounts to 0.6999%. To take into account the time lag and for the abundance of caution, the Tribunal proposes to deduct US$25 million from the amount of the Claimant's claim so as to ensure that the Respondent's contentions are fully respected. On this basis it is not necessary to consider the application of the principle of *de minimis* [ ].

   (2)   *The Abandonment Issue*

   (a)   *The Respondent's Position*

12.59   In the Overview of the RPHB, the Respondent also asserts that the Parties may have abandoned the whole of the Bonga PSC, submitting in summary that:

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> *"The evidence reveals that both Parties abandoned, a substantial part of the terms of the contract if not all"*,[293]

and

> *"The Respondent contends that the conduct of the Parties no doubt reveals the existence of a contract but that its terms can only be inferred from their conduct rather than as provided in the 'PSC'".*[294]

(b)  <u>The Claimants' Submission</u>

12.60  The Claimants deny that the Bonga PSC has been abandoned, referring to the Respondent's own conduct in repeatedly affirming the Bonga PSC, including as recently as June 2011. The Claimants assert that there is no evidence to support such a submission and complain that it has not been previously pleaded. The Claimants state that if the Respondent is now seeking to rescind the Bonga PSC, such rescission is not accepted.

(c)  <u>The Tribunal's Decision</u>

12.61  This unpleaded assertion is totally without foundation. Both Parties have throughout acted on the basis that the Bonga PSC is a valid agreement and both have taken and continued to take substantial benefits therefrom. True it is that there are unfortunate disputes between the Parties as to the precise meaning as to parts of the Bonga PSC, and that is what the Parties have asked this Tribunal to determine. The suggestion that there has been a mutual abandonment

---

[293] RPHB para 1.4.
[294] RPHB para 1.7.

is far fetched and unsustainable in law and in fact. This allegation is rejected by the Tribunal.

**(3)     *Whether Breach of the Law is a Breach of the Contract***

**(a)     *The Respondent's Submission***

12.62     In the RPHB the Respondent also introduces the argument that a breach of the law automatically amounts to a breach of the contract,[295] with reference to Clause 19 of the Bonga PSC which relevantly provides as follows:

> "*This Contract shall be governed by and construed in accordance with the Laws of the Federation of Nigeria, and any dispute arising therefrom shall be determined in accordance with such laws*".

**(b)     *The Claimants' Position***

12.63     The Claimants submit that Clause 19.1 is a standard provision stipulating the substantive governing law of the contract.[296] They submit that the phrase "*Laws of the Federation of Nigeria*" is not defined, but it has been understood by the Parties in this arbitration as being the statutory and case law of Nigeria (as is clear from both Parties' prior submissions and the Justice Oguntade's Report). Further, that a standard governing law provision such as Clause 19.1 does not – under Nigerian law or English law (which fills any lacuna in Nigerian law) – result in any breach of Nigerian law amounting to a breach of the Bonga PSC.

---

[295] RPHB para 1.4 as expanded upon in paras 2.1 to 2.6.
[296] Para 7 of CRPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(c)   *The Tribunal's Analysis*

12.64   With regard to the argument set out in para 12.60 above and responded to as set out in para 12.61 above there appears to be an attempt to make a distinction which has little relevance. Of course, a contract cannot be performed illegally, and if it is, it may not be enforceable. That is notwithstanding that the performance may well be precisely in the manner provided for in the contract. Illegality in performance of a contract must be distinguished from situations where there is a simple breach of contract. The Tribunal has some difficulty in understanding the relevance of this distinction to the facts of this case. Either the Bonga PSC is unenforceable on the grounds of illegality of performance, but if it is not, then it is enforceable as a matter of contract.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER XIII  ANALYSIS OF THE INDIVIDUAL CLAIMS

13.    Before considering the individual claims and the defences thereto, the Tribunal wishes to thank Counsel for the enormous help that they have provided both in written form and orally at the Hearing. No criticism is intended by saying that the Memorials were extremely substantial and detailed and that the Skeletons and Post Hearing Briefs were helpfully concise. The Tribunal can assure the Parties that it has taken into account everything that has been written and said, even though not every single point has been set out in this Award. The Tribunal has set out all those points which it considers bear on the issues between the Parties that require a determination by the Tribunal. Furthermore, the details of this long and ongoing dispute are well known to the Parties and it has not been necessary to refer to every event or contention that has been made during the course of the development of this dispute and the steps leading to its ultimate resolution.

**13.1    The Claimants' First Claim – the Claimants' Lifting Allocation Claim**[297]

*(1)    The Issues*

13.1.1    The Parties have agreed by the Parties Agreed List of Issues dated 4 November 2011(the *"Agreed List of Issues"*) that the issues arising for determination with regard to the Claimants' Lifting Allocation Claim are as follows:

---

[297] *See:* CSOC Chapters 2, 3, 4 and 5 TB B/3; CSOR Chapters 2, 3, 4 and 5 TB B/6; and CS, Chapters 2 and 3.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(1)   does the Bonga PSC confer on the Claimants, as the Contractor, the exclusive right to determine the Parties' Lifting Allocation from the Available Crude Oil produced from OML 118?

(2)   is the Respondent in breach of the Bonga PSC by not complying with the Claimants' as the Contractor Lifting Allocation?

(3)   has the Respondent overlifted cargoes in excess of its entitlement?

(4)   are the Claimants entitled to compensation for the Respondent's breach, and in what amount?

(5)   whether the Respondent has any control (direct or indirect) over the Estimates of Available Crude Oil allocations advised by the Claimant;

(6)   whether the Parties waived the procedure for the contractual allocation of crude oil;

(7)   whether the Respondent complied strictly with the contractual terms regarding estimated allocation of crude oil; and

(8)   whether the Claimants advised of their estimated allocation of crude oil in accordance with the law.

(2)   *Summary of the Lifting Allocation Dispute*

13.1.2   The Claimants assert that their right, as the Contractor, to determine the applicable Lifting Allocation of the production of Available Crude Oil from OML 118 has been usurped by the Respondent, in particular that the Respondent is in breach of the Bonga PSC

165

for not lifting Available Crude Oil in accordance with their Lifting Allocation. That, as a result thereof, the Respondent has lifted substantially more Available Crude Oil than that to which it is contractually entitled, based on an interpretation of the Bonga PSC which is plainly incorrect.

13.1.3   The Respondent disputes this, denying that it has overlifted and is in breach of the Bonga PSC. The Respondent asserts, among other things, that the Claimants, as the Contractor, wrongly maintain that notifications of estimated lifting allocations are not subject to any approval from the Respondent. The Respondent submits that the estimated lifting allocation is predicated on the Respondent's approval and that the Respondent never gave its approval to the Claimants' various Schedules B-1. The Respondent asserts that not having approved the actual lifting, it indirectly controls the estimated Lifting. Any nominations over and above the Claimants' estimates by the Respondent, must have been carried out to reduce the Proceeds Imbalance in other words the Respondent submits that under these circumstances they are entitled to claim.

*(3)   Position of the Claimants[298]*

13.1.4   The Claimants assert that the Bonga PSC was one of several PSCs entered into by the Respondent with IOCs in 1993, following a bidding round and negotiations involving the Respondent, the Federal Ministry of Petroleum Resources and the IOCs. Those negotiations focused primarily on the fiscal terms and incentives to be provided to the IOCs for taking on the huge costs and risks of *"frontier"*

---

[298] The Claimants summarize their assertions as to the Claimants' Lifting Allocation Claim in paras 11 to 62 of their Post Hearing Brief dated 12 January 2012 ("CPHB").

166

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

exploration in the deep and ultra-deep water,[299] in particular lowering the royalty rate, lowering the tax rate and increasing the ITC rate.[300]

13.1.5   The Claimants assert that the 1993 PSCs were significantly different from the existing joint venture arrangements that existed between the Respondent and IOCs in that, under the 1993 PSCs, the Claimants, as the Contractor, were responsible for <u>all</u> the costs of exploration and development. They would recover <u>none</u> of those costs if commercial quantities of oil or gas were not discovered. Under the joint venture arrangements, costs are contributed by the Respondent and the IOCs according to their respective Participating Interests.[301]

13.1.6   The Claimants rely on the facts set out in Chapter V above, including the letter of 19 April 1993, from the Hon. Secretary of the Ministry of Petroleum Resources guaranteeing benefits prescribed in the PSCs.[302]

13.1.7   As referred to in paras 2.4 and Chapter V above, Shell entered into the PSC on 19 April 1993. Shell also entered into two other PSCs on 19 April 1993 (in respect of (i) OPL 219, which was also in deep and ultra-deepwater, and (ii) OPLs 803, 806 and 809, which were onshore areas in the north of Nigeria).

13.1.8   The Claimants assert that the undisputed evidence in this arbitration was that the substantive terms of the several 1993 PSCs, both with Shell and the other IOCs, are identical (such as the Abo and Erha fields).[303]

---

[299] Deepwater is water of a depth greater than 200m and ultra-deepwater is water of a depth greater than 1,000 m.
[300] Para 11, CPHB.
[301] Para 12, CPHB.
[302] Exhibit C-16 at TB F/19.
[303] Para 16, CPHB: TB I/5.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.1.9    The scope of the Bonga PSC is as set out at Clause 2 of the Bonga PSC summarized in Chapter V above.

13.1.10   The Claimants assert that it is also undisputed that exploration work was carried out under the Bonga PSC and commercial quantities of oil were discovered, and that of the three PSCs entered into by Shell in 1993, only the Bonga PSC has entered into production.[304]

13.1.11   Up to the start of commercial production of the Bonga field in November 2005, the Claimants assert that the Claimants, as the Contractor, had incurred exploration and development costs of approximately US$4.3 billion.[305]

13.1.12   The Claimants assert that once commercial production was achieved, Available Crude Oil was to be allocated as prescribed in Clause 8.1 Bonga PSC:

Available Crude Oil

Less      Royalty Oil (to the Respondent)

Less      Cost Oil (to Contractor)

Less      Tax Oil (to the Respondent)

=    **Profit Oil**

x    Contractor's Profit Oil Percentage (e.g. 80%)

=    **Contractor Profit Oil**

And

---

[304] OPL 219 / OML 135 has been retained but OPLs 803, 806 and 809 have been relinquished: para 6.68 CSDR: TB B/7.
[305] Para 16, the CS.

168

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

x. the Respondent's Profit Oil Percentage (e.g. 20%)

**= the Respondent Profit Oil**

13.1.13  Clause 8.1(f) of the Bonga PSC sets out the Profit Oil split. It is not in dispute that this changed from 80%/20% to 65%/35% on 31 May 2011 upon production surpassing the first cumulative production tranche.[366]

13.1.14  The Claimants, as the Contractor, had determined the Lifting Allocation every month since the start of commercial production, i.e. since November 2005, and had notified the Respondent in the form of Schedule C1 (as prescribed in Annex C to the Bonga PSC – Allocation Procedure).[307] The Claimants have asserted that they maintain a computerized spreadsheet of its allocation model.[308]

13.1.15  Annex C of the Bonga PSC provides that each Party shall then nominate the amount of Available Crude Oil it intends to lift, which the Claimants assert shall not exceed their entitlement under the estimated Lifting Allocation, relying upon Annex C, Art. III, para 4 of the Bonga PSC.

13.1.16  The Claimants assert that each Party is obligated to lift its own Lifting Allocation in accordance with its Nomination, Ship Scheduling, and the Lifting Procedure in Annex D of the Bonga PSC. The Claimants further assert that where one Party lifts the other Party's Lifting Allocation, it shall pay to the non-lifting Party the applicable Proceeds pursuant to Annex C, Art. III, para 6 of the Bonga PSC.

---

[366] Para 8.1(f) of the Bonga PSC.
[307] Exhibit C-164 at TB F/61.
[308] Exhibit C-206 at TB F/62; Exhibit C-207 at TB F/137; Exhibit C-208 at TB F/157; Exhibit C-209 at TB F/184.

13.1.17  The Claimants assert that the key issue for determination is the alleged ignoring by the Respondent since September 2006 of the Lifting Allocation determined and notified to it by the Claimants, and the Respondent's preparation instead, since September 2006, of its own Lifting Allocation Model and its lifting on the basis of its own calculation since then to the present.

13.1.18  The Claimants assert that the Respondent has lifted Available Crude Oil in volumes that vastly exceed that which was allocated to it in the Lifting Allocations prepared by the Claimants since September 2006.

13.1.19  Thus the Claimants assert that the key issue in this arbitration is whether, pursuant to the terms of the Bonga PSC, the Respondent is entitled to disregard the Claimant's allocation of Available Crude Oil (including their allocation of Tax Oil).

13.1.20  The Claimants assert that if, as they submit, the answer is "No", then the Claimants seek to be put in the position they would have been but for such breach, i.e. the wrongful lifting of Available Crude Oil by the Respondent, which would mean a payment of approximately US$3.13 billion as at 30 November 2011 (plus interest).[369]

13.1.21  The Claimants further assert that the Respondent has the burden of proof of justifying why it has deviated from what the Claimants assert are the terms of the Bonga PSC.

13.1.22  The Claimants submit that the Respondent's argument that it disagrees with the Contractor's computations is no justification for unilaterally imposing its own Lifting Allocation. Rather than exercising a self-help

---

[369] Annex B, CPHB: TB 1/5

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

remedy, the Respondent could, and should have, followed the correct procedures that the Claimants allege to be:

(1)     referring any disagreement or dispute over the Royalty rate to the Minister of Petroleum Resources and, subsequently, to the Nigerian courts or arbitration;

(2)     participating in MACOM meetings and having any *"exceptions"* to Cost Oil determined by MACOM and, if dissatisfied with the determinination, referring the matter to arbitration;

(3)     having raised any tax issues with FIRS in a covering letter, allowed FIRS to render its PPT Assessment based on the PPT Return prepared by the Claimants, and then appealed any element of such PPT assessment that it did not agree with to TAT or the Nigerian courts; and

(4)     referring any dispute concerning the failure to agree a formula for Realizable Price to the Minister of Petroleum Resources and, subsequently, to the Nigerian courts or arbitration; and

(5)     unless and until any final and binding determination favourable to the Respondent is rendered by the competent body, the Respondent must comply with the Contractor's Lifting Allocation.

13.1.23   The Claimants accept that the Respondent could not knowingly be a party to tax evasion or fraud, but the Respondent does not make any such allegations against the Claimants. The Claimants assert that there has been a genuine difference of opinion between the Claimants and the Respondent, and, in this arbitration, the Respondent's own tax

expert has agreed with the Claimants' interpretation on most of the previously disputed issues.

*(a)   Realizable Price*[310]

13.1.24   The Claimants reject the Respondent's contention that the Contractor's failure to use an agreed price i.e. the Realizable price as defined by the Bonga PSC (and as referred to in para 5.40 above) constitutes an illegality entitling the Respondent to ignore the PPT Returns prepared by the Claimants and the Claimants' Lifting Allocation. This issue is discussed in Chapter XII above.

*(b)   Respondent's Allegations of Derogation in Form*

13.1.25   As to the Respondent's complaint that there has been a derogation in form by the Claimants of the Lifting Allocation procedure,[311] the Claimants accept that the scheduling activity deviates from that prescribed in the Bonga PSC. The Claimants submit, as explained by Captain Mike Jones in the passage quoted at RPHB para 2.3.2 and in his other testimony,[312] that this was at the request of the Respondent and applies *"across all streams"* of crude oil in Nigeria. The Claimants assert that while the Respondent does not dispute the evidence that the purpose of such change in procedure was to position Nigerian crude oil better in the international market, the Respondent questions the existence of such a request.

*(c)   Respondent's Allegations of Derogation in Substance*

---

[310] As to the Claimants' submissions on Realizable Price see CSOR on Realizable Price, Chapters 3 – 5; CS, Chapters 3 and 17; and CPHB, Chapter 13.
[311] RPHB para 2.3.
[312] Transcript, Day 2, p 96, lines 1 – 18.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.1.26   As to the Respondent's complaint that the Claimants have derogated in substance from the Allocation Procedure,[313] the Claimants deny that they did not seek the Respondent's agreement to their calculation of the Proceeds Imbalance (in the form of Schedule B-1). The Claimants assert that Schedule B-1 was discussed at each Curtailment Meeting and was always rejected by the Respondent.[314]   Moreover, the Claimants deny that the Parties' agreement to past Proceeds Imbalances in Schedule B-1 was a necessary requirement before the Claimants could do the forward-looking Lifting Allocation for the next period (in the form of Schedule C-1).

13.1.27   The Claimants assert that the Respondent would not agree to Schedule B-1, nor accept the Claimants' Schedule C-1, because it insisted on its own Lifting Allocation, in breach of the Bonga PSC.

13.1.28   The Claimants accept that no independent audits were carried out. They deny the Respondent's assertion that such audits would have *"resolved most of the issues brewing between both Parties"*,[315] in the light of the fundamental differences arising between the Claimants and the Respondent.  Such that, as at November 2011, the Respondent's overlift amounted to approximately US$3.13 billion. The Claimants submit that in any event, the carrying out of an independent audit is irrelevant to whether or not the Respondent is entitled to impose its own Lifting Allocation.

13.1.29   Moreover, the Claimants assert that the actual lifting was done in accordance with the Respondent's model, so it was the Respondent

---

[313] RPHB para 2.4.
[314] Witness Statement of Captain Mike Jones at TB C/8; Transcript, Day 2, p 89, line 18 – p 90, line 3.
[315] RPHB para 2.4.1(iii).

173

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

that should have had an independent audit carried out pursuant to Annex C, Art. IV, para 5 of the Bonga PSC.

(d)   *Contractor's sole right to compute Lifting Allocation*[316]

13.1.30   The Claimants assert that the Bonga PSC is very clear in providing that the Contractor has the exclusive or sole right to compute the Lifting Allocation, as confirmed by the Respondent's witnesses at the hearing.

13.1.31   While the Claimants admit that the Bonga PSC does not use the term *"exclusive"* or *"sole"* they submit that this is to be inferred from the express wording of the Bonga PSC which allocates computational responsibility only to the Contractor referring the Tribunal, in particular, to:

(1)   Royalty Oil - Annex B, Art. III, para 1 Bonga PSC;[317]

(2)   the testimony of Mr. David Mbanefo at the Hearing,[318]

(3)   Cost Oil - Annex B, Art. IV, para 5(b) Bonga PSC;[319]

(4)   Tax Oil - Annex B, Art. III, para 2(a) Bonga PSC;[320]

(5)   Annex B, Art. III, para 2(e) Bonga PSC;[321] and

---

[316] See: CSOC Chapter 6; CSOR Chapter 3; CS Chapter 5.
[317] ("The CONTRACTOR shall compute the amount of Royalty payable by the CORPORATION pursuant to Clause 8.1 of this Contract. ... For the purposes of Article IV hereof, the CONTRACTOR shall compute the Royalty payment ...").
[318] Transcript, Day 3, p 154, lines 6 – 9. "Q (Sheppard): Just in respect of each of those tranches, do you agree with me that the contract provides that royalty oil shall be computed by the contractor? A: Computed by the contractor? Yes".
[319] ("The Operating Costs applicable for such month for purposes of Cost Oil as follows ... [Non-Capital Costs and Capital Costs] recorded in the books and accounts of the CONTRACTOR ....").
[320] ("The CONTRACTOR shall compute the PPT payable by the CORPORATION pursuant to Clause 8.1 of this Contract ....").

174

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(6)    the testimony of Mr. Olaleye Adebiyi, the Respondent's tax expert.[322]

13.1.32    The Claimants assert that the Bonga PSC is equally clear in providing that the Respondent must lift Available Crude Oil in accordance with the Lifting Allocation notified by the Claimants, as the Contractor:

(1)    <u>Notification</u> - Annex C, Art. III, para 3 of the Bonga PSC;[323]

(2)    the testimony of Mr. Mele Kyari at the Hearing;[324] and

(3)    <u>Lifting</u> - Annex C, Art. III, para 4 of the Bonga PSC.[325]

13.1.33    The Claimants assert that for 9 months from December 2005, the Respondent lifted in accordance with the Contractor's Lifting Allocation. In September 2006 the Respondent then started preparing its own Lifting Allocation model (perhaps to ensure sufficient supply to satisfy long term contracts).[326]

13.1.34    However, the Claimants assert that as from September 2006, the Respondent would inform the First Claimant (as Operator on behalf of the Claimants) of a Primary Notification that far exceeded that which had been computed by the Claimants and subsequently lifted Available Crude Oil according to its own entitlement model. The

---

[321] ("*The CONTRACTOR shall prepare all returns required under the PPT Act and timely submit them to the CORPORATION for onward filing with the Federal Board of Inland Revenue. The monthly PPT Payable shall be determined from such PPT returns*", i.e. the ones prepared by the Contractor.)

[322] Transcript, Day 4, p 163, lines 14 – 20: "*At least it is a process that needs to be done through, but if you look at the obligation of the Parties, that is annex B, article 5, Paragraph 2A and B, says the contractor shall compute the tax, and that the corporation shall pay the tax. It is the same language for section 11.1 of the Deep Offshore Act. And in my view, somebody computes, somebody pays*".

[323] ("... *the CONTRACTOR shall notify the CORPORATION of the estimated Lifting Allocation* ...").

[324] Transcript, Day 4, p 28, lines 22 – 25. "*What we have here - if you look at 11, what I simply mean is this: <u>it's the contractor's responsibility to create the lifting allocation</u>. In essence to create schedule C-1 and C-2*" (emphasis added).

[325] ("... *each Party shall notify the other of its Primary Nomination of Available Crude Oil which it intends to lift during the Forecast Quarter which shall not exceed its estimated Lifting Allocation*").

[326] Transcript, Day 3, p 150, line 24, and p 153, lines 4 – 7.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Respondent's increasing overlift to over US$3 billion was depicted in the graph that was provided at the Hearing.[327]

13.1.35   The Claimants assert that the Respondent's disregard for the terms of the Bonga PSC as to the Lifting Allocation was confirmed by its own witnesses at the Hearing:[328]

(1)   Mr. David Mbanefo;[329] and

(2)   Mr. Mele Kyari.[330]

13.1.36   The Claimants assert that in answer to questions from the Claimants' counsel and Mr. Rowley, Mr. Mbanefo could not point to a contractual provision that gave the Respondent the right to lift in accordance with its own model.[331] Mr. Mbanefo referred to the failure to agree the Proceeds Imbalance as entitling the Respondent to ignore the Contractor's Lifting Allocation.[332]

(e)   *Failure to agree Proceeds Imbalance*

13.1.37   The Claimants submit that Annex C, Art. IV, para 1 of the Bonga PSC provides that actual liftings (and their proceeds) shall be compared with the Lifting Allocation, and that the Proceeds Imbalance shall be agreed with the Respondent and recorded in Schedule C-2. This is then fed into the next period's Lifting Allocation and its Schedule C-1.

---

[327] Transcript, Day 1, p 39, lines 10 – 15.
[328] See Witness Statement of Mr. David Mbanefo, para 13 at TB C/15.
[329] Transcript, Day 3, p 154, line 17 – p 155, line 12. "*Q (Sheppard): But is it your recollection that from about mid-2006... the physical liftings on to ships have been based on the entitlement model that the Respondent has prepared A: To an extent, yes ...*".
[330] Transcript, Day 4, p 45, lines 19 – 21. "*...It's a nomination the corporation makes to the contract, based on our understanding and computation of the entitlements*".
[331] Transcript, Day 3, p 160, line 18 – p 161, line 7.
[332] Transcript, Day p 159, lines 13-21

176

13.1.38   The Claimants assert that the Respondent would not agree the Contractor's calculation of the Proceeds Imbalance because it would not accept the Contractor's Lifting Allocation, rather than *vice versa*. In any event, nowhere in the Bonga PSC does it say that the Respondent can disregard the Contractor's Lifting Allocation if it does not agree with the Proceeds Imbalance. Unlike Annex C, Art. IV, para 1 of the Bonga PSC which includes the express wording "*agreed to by the CORPORATION*", the Claimants submit that the provisions relating to determining the Lifting Allocation in Annex C, Art. III Bonga PSC do not include any wording – express or implied – requiring agreement with the Respondent.

(1)   *The Contractor did not waive its rights*

13.1.39   The Claimants deny the Respondent's argument that the Claimants did not protest, save in respect of two cargoes in November 2009, such that the Claimants waived their rights. The Claimants submit that they protested as soon as it became clear that the overlifting was continuing and very regularly thereafter, by letters to the Respondent dated 14 September 2007,[333] 4 October 2007[334] and 14 December 2007[335] protesting the Respondent's overlifting.  In addition, the Claimants assert that their representatives protested at every Curtailment Meeting.[336]

13.1.40   The Claimants refer to evidence of the Respondent's witnesses at the Hearing, who acknowledged that the Claimants had protested:

---

[333] Exhibit C-156 at TB F/120.
[334] Exhibit C-157 at TB F/123.  Note, this letter is actually dated 4 September 2007.
[335] Exhibit C-96 at TB F/135.
[336] Exhibit C-133 at TB F/102; Exhibit C-134 at TB F/116; Exhibit C-135 at TB F/142; Witness Statement of Captain Mike Jones, Paragraphs 31 – 33 (at TB C/8); see also Transcript, Day 2, p 87, lines 4 – 11 re objections generally.

177

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(1)    Mr. David Mbanefo;[337] and

(2)    Mr. Mele Kyari.[338]

13.1.41   The Claimants submit that as a practical matter they are unable to prevent the Respondent from lifting in accordance with its entitlement model because the Respondent and other Government entities control the procedures and sea lanes, as acknowledged by Mr. M. Kyari in evidence at the Hearing:

> "*Q*    (*Adekoya*): *No. I'm first of all asking you to confirm the procedure, that even though the contractor is on the FPSO, it is DPR that actually opens the tap and allows the crude oil to be off-loaded from the FPSO into vessels that are allowed to come in and lift?*
>
> *A:    That's correct.*"[339]

13.1.42   The Claimants assert that in any event, any waiver would have to be unequivocal and the Respondent's case does not get close to satisfying that test.

### (2)    *Declarations and Awards Sought*

13.1.43   The Claimants seek the declarations and the monetary award set out at Paragraph 347 of the CS, namely that:

---

[337] Transcript, Day 3, p 195, lines 21 – 24.
[338] "*Q (Sheppard): So if you look at that [TB F/125], that is Shell objecting, back in October 2007, to your entitlement model, isn't it?*
*A: Yes, that's correct.*"
[338] Transcript, Day 4, p 30, line 24 – p 31, line 4.
"*Q (Rowley):... are you aware that at various curtailment meetings the claimants actually did object to lifting allocations? What she means is did they object?*
*A: Yes, they do raise issues, but that is not the forum for discussing that*".
[339] Transcript, Day 4, p 46, lines 18 – 23.

178

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(1)    the Bonga PSC provides that the Claimants have the exclusive right to determine the Lifting Allocation;

(2)    the Respondent's liftings must not exceed its Lifting Allocation as determined by the Claimants (unless otherwise agreed by the Parties); and

(3)    the Respondent has breached, and continues to breach, the Bonga PSC by lifting Available Crude Oil in amounts that exceed its Lifting Allocation as determined by the Claimants.

13.1.44    The Claimants seek a monetary award of US$3,130,869,782 in respect of the Available Crude Oil that would have been available for allocation to the Claimants (as its share of Cost Oil and Profit Oil) in accordance with the terms of the Bonga PSC, but for the Respondent's overlifting.

13.1.45    The said figure of US$3.1 billion claimed by the Claimants (as at 30 September 2010) is explained in the First Witness Statement of Mr. Edzard van Loon, and the Claimants assert that it has not been challenged by the Respondent.[340]

13.1.46    The value of the Respondent's overlifting has been updated by the Claimants as at 30 November 2011 (as set out in Annexes A and B to the CPHB). The Claimants have explained that the quantum has increased due to the underlying increase in the US dollar amounts of Operating Costs that have been expended in relation to the Bonga Field since 30 September 2010. The rationale remains as explained by Mr. van Loon in his First Witness Statement.

---

[340] See First Witness Statement of Mr. Edzard van Loon at TB C/6.

13.1.47   The Claimants also seek interest on any monetary Award – from the date of breach (i.e. on each month's overlifting) till the date of the Award, as well as from the date of the Award till payment.

13.1.48   The Claimants propose simple interest at a rate of LIBOR plus 4%.

13.1.49   The Claimants have submitted that interest calculated on that basis from the date of each overlifting until 30 November 2011 amounts to US$557,266,300.[341]

13.1.50   The Claimants assert that if the Tribunal agrees with the Claimants that the Respondent must lift Available Crude Oil in accordance with the Claimants' Lifting Allocation and can raise any grievance about its computation by pursuing other procedures, the Tribunal need not decide in this arbitration whether the Claimants were right or wrong in respect of each of the disputed elements (except in relation to costs incurred under other PSCs being allocated as Cost Oil, which can finally be determined in these proceedings). Nevertheless, to assist the Parties, the Claimants invite the Tribunal to conclude in respect of each of the disputed elements of the Lifting Allocation computation that the Claimants' approach was justified (or, at least, was not unreasonable).

### (4)   *Position of the Respondent*

13.1.51   The Respondent asserts that this issue relates to the extent to which the Respondent is permitted to nominate cargoes over and above the advised estimates communicated by the Claimants.[342]

---

[341] See CPHB, Annex E for the calculation of simple interest at a rate of LIBOR plus 4% on the cumulative overlift.
[342] RS para7.1.

13.1.52   The Respondent asserts that to appreciate the issues clearly, it is necessary to state briefly the method by which Crude Oil is lifted. Both Parties admit that the strict procedure for allocating Available Crude Oil was never followed. In other words, what happens in practice is different from the stipulations in the contractual provisions.[343]

13.1.53   The Respondent submits that each month, the Claimants complete a monthly Accounting analysis. Schedule B-1 of the Bonga PSC records details of the past month's lifting of Available Crude Oil and how that lifting has been allocated as a matter of accounting as between the different financial categories of Available Crude Oil.

13.1.54   Annex B, Article IV, Paragraph 1 of the Bonga PSC, states that *"schedule B-1 is to be furnished to the Corporation for consideration and approval"*. The Respondent asserts that the word *"approval"* is significant as this is an internal mechanism to ensure that the lifting is in accordance with the Bonga PSC, and any relevant statute and it is also a barometer by which the Respondent checks the forward allocation. Because part of the inputs in this historical record is inevitably used to forecast what will be lifted in future, the approval affects not only the historical fact but also the forward-looking allocations. Consequently, the input in the historical data has a significant impact in the future allocation. The information that goes into Schedule B-1 is relevant and consists of two parts:

(1)   Section A records the lifting dates, the *"Realizable Price"*, the Volume lifted, the proceeds generated and the party who has

---

[343] RS para 7.2.

181

lifted the cargo. That party will inevitably get the benefits of the proceeds and it will be recorded accordingly. This is what is usually referred to as *"actual liftings"*; and

(2)   Section B records the allocation of the distribution in the cascade i.e., as between Royalty Oil, Cost Oil, Tax Oil and Profit Oil.

13.1.55   Following the strict terms of the Bonga PSC, after two Schedule B-1s have been generated, that is Monthly Allocations for a quarter, the two separate Schedule B-1s are represented in Schedule C-2. Schedule C-2 is a reflection of information that is ordinarily contained in Schedule B-1; the difference being that two Schedule B-1s are now reflected. Another significant addition to C-2 is that Section A records liftings over the past months while Section B records the total amount of proceeds allocated (contractual allocation) and compares this against the total amount of proceeds physically received by the Parties during the quarter.

13.1.56   The difference between the contractual allocations and the amount actually received is recorded as the *"Proceeds Imbalance"* for the past quarter. See Annex C, Article 11, Paragraph 1 (f) of the Bonga PSC, which states :

*""Proceeds Imbalance" means the difference between each Party's Proceeds to which it is entitled and the Proceeds which each Party has actually received, as reflected in each quarter's Schedule C-2 of this Procedure".*

13.1.57   The Respondent asserts that the Proceeds Imbalance obviously forms part of the inputs for the estimated lifting allocation into the future.

182

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Pursuant to Annex C, Article 111, Para 3 of the Bonga PSC on a quarterly basis, the Claimants advise the Respondent of the Estimated Lifting Allocation. This information is forward-looking. The significance of this forward looking estimation is underscored by the factors that assist in making the estimates which include:

(1)    the production rate of the Bonga field;

(2)    the size of the FPSO;

(3)    the estimated Realizable Price; and

(4)    the proceeds imbalance.

13.1.58   The Respondent asserts that the Proceeds Imbalance is critical as it partly determines the basis of the forecast. Loosely put, it is the opening balance for the forecast period. The Respondent not having approved the inputs in Schedule B-1 (including price), indirectly disapproves of the forecast estimated.

13.1.59   The Respondent submit that the Claimants wrongly maintain that the notifications of each Estimated Lifting Allocation are not subject to any approval from the Respondent, the assumption being that the Bonga PSC only provides for notification of nomination to either party as provided in its Annex C, Article III, Para 4, which states as follows:

> "...each Party shall notify the other of its Primary Nomination of Available Crude Oil which intends to lift during the Forecast Quarter which shall not exceed its estimated Lifting Allocation"

13.1.60   The Respondent argues that the Estimated Lifting Allocation is predicated on the approval by the Respondent, and that it is on record

183

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

that the Respondent never gave its approval to any Schedule B-1. By the express terms of the Bonga PSC, the Respondent may nominate a cargo to be lifted, but not exceeding the Estimated Lifting Allocations.

13.1.61   The Respondent says that the point it is making is that the Respondent not having approved the actual lifting, indirectly controls the estimated lifting, and any nominations over and above each Estimated Lifting Allocation by the Respondent must have been carried out to reduce the Proceeds Imbalance. The Respondent asserts that it is partly for this reason that the nominations by the Respondent which exceeded the Estimated Lifting Allocation were not formally objected to by Claimants other than in the retention of the right in respect of one or two cargos.

13.1.62   The Respondent has submitted the importance of the Realizable Price in the context of the Lifting Allocation and that using such a price in the valuation of the Available Crude Oil is a requirement of law, pursuant to Section 13 of the *DOA*, and that it has consequences in terms of the returns prepared for PPT purposes. A summary of the Respondent's submissions as to Realizable Price is set out in Chapter XII above.

13.1.63   If, which the Respondent does not admit, the Respondent had no right to nominate cargoes over and above the estimates advised by the Claimants, it contends that the Claimants waived their right to insist on strict compliance with the Bonga PSC.[344] The Respondent asserts that a party who intentionally and voluntarily surrenders a known privilege or right which ordinarily it is entitled to, and on which it is

---

[344] RS Section 8

entitled to insist, but does not do so either by inference or implied conduct, is considered to have waived such right or privilege.

13.1.64   The Respondent further asserts that the Claimants, having recognized the Allocation Procedure, which is dependent upon the provision of the Accounting Analysis, set out under Article IV.1 of Annex B to the Bonga PSC, submitted a monthly accounting analysis for the Respondent's consideration and approval. However, Claimants then failed to ensure that the requisite approval to that allocation was given by the Respondent.  The Respondent submits that the Claimants, in failing to ensure a grant of approval from the Respondent of the monthly accounting analysis, willfully and intentionally waived their right to insist on that procedure in compliance with the Lifting Allocation formula adopted by the Claimants.

13.1.65   As to the form of the Allocation procedure, the Respondent submits that the procedure as specified, in particular as regards, date, timing, and the format for lifting of Available Crude Oil as contained in Article III, Annex C of the Bonga PSC, was not followed.[345]  This is confirmed both in the witness statement of Captain Mike Jones, and during his cross-examination where he said as follows:

> "The scheduling activity within Nigeria is spread across, in fact, across all crude oil streams, and there is a single process that is now in place within the industry in Nigeria which schedules crude-oil off-takes across all streams, and Bonga is one of those streams. Those procedures that are now in place are not in compliance with any of the other JV or PSC contracts that I'm

---

[345] Section 2.3 RPHB.

185

*aware. They have developed over time, and the procedures within the joint venture and PSC documents are basically outdated and not in order with or in compliance with the procedures that are now in place. And we specifically industry requested have received letters from the Respondent (sic) which request us to adopt a different process for scheduling of crude oil than is formalized within the PSC".[346]*

13.1.66   Although Captain Mike Jones claimed that a letter had been written to this effect, Respondent asserts that letter was never produced in evidence.

13.1.67   As to the alleged derogation in substance of the allocation procedure, the Respondent submits that by the provisions of the Bonga PSC, there are certain approvals that the Claimants were expected to have obtained from the Respondent.[347] In addition, there were contractual checks and balances to monitor the quantum of oil allocated by the Claimants. Again none of these were adhered to. These include:

(1)   an approval by the Corporation of the monthly Accounting Analysis in form of Schedule B-1; and

(2)   the Claimant never sought and obtained the agreement of the Respondent as regards the Proceeds Imbalance.

13.1.68   The Respondent submits, as outlined above, that the Proceeds Imbalance provision in Annex C, Article IV of the Bonga PSC is a key and fundamental provision, as it forms a substantial component of the forecast Allocation. They assert that Mr. van Loon, a witness for

---

[346] Evidence of Captain Mike Jones, Transcript Day 2, p 96.
[347] Section 2.4 RPHB.

186

the Claimants, also confirmed this position during his cross-examination during the Hearing where he said as follows:

> Q:   Right, and the proceeds imbalance must also be approved
>       by the corporation?
>
> A:   The proceed imbalance as part of the B1 must also be
>       approved by the corporation, yes.
>
> Q:   Did you obtain that approval?
>
> A:   No, we did not obtain that approval.[348]

13.1.69   The Respondent asserts that there was also supposed to be an independent audit. This to a large extent would have resolved most of the issues brewing between both Parties, but again, as like most other provisions, it was abandoned. No such audit took place.

   (5)   *Analysis of the Tribunal*

13.1.70   The Tribunal has addressed the submissions of the Parties as to the effect of their failure to agree upon the Realizable Price to date in Chapter XII above.

13.1.71   It is clear to the Tribunal that the Bonga PSC was a carefully crafted and negotiated contract. It has its own in-built checks and balances.

13.1.72   As to any other disputes between the Parties there is of course the arbitration clause activated in this case by the Claimants if all else fails. Importantly, because this is a long term contract, there is ample

---

[348] Evidence of Mr. E. van Loon. Transcript, Day 1, lines 7 – 12 at p 64.

opportunity each month to pick up and correct any errors or mistakes in the next or following months.

13.1.73   The Tribunal is quite satisfied that it was because of all the checks and balances that the Parties agreed that the responsibility for preparing the monthly Lifting Allocations was given to the Claimants, as the Contractor. It must have been realized that this vital monthly activity could not in reality be carried out by a committee made up of representatives of both sides. As events turned out this view was prescient.

13.1.74   The important activity under this contract was to get the oil flowing for the benefit of both Parties and in to the hands of willing purchasers on the international market. Accordingly issues relating to proceeds imbalances, over and under lifting and a range of other issues could safely be left over to be sorted out in the next or ensuing months. The Parties entered into this contract in good faith and trusted each other. The procedure they set up was well equipped to deal with any problems arising provided the Parties complied with the terms of the contract.

13.1.75   It is clear to the Tribunal that the Bonga PSC affords to the Claimants, as the Contractor, the initial right to determine the Lifting Allocation. The Respondent is correct however in maintaining that such right is neither exclusive nor final. The Bonga PSC itself makes provision for dealing with any differences. If the Respondent feels unable to approve a Lifting Allocation notified by the Claimants it must discuss and attempt to agree the matter with the Claimants, as the Contractor. The Tribunal has referred to Clause 6 of the Bonga PSC, the role of MACOM and the dispute resolution mechanism provided for in

Clause 6.4 (d) of the Bonga PSC (see Chapter V above). There was no evidence before the Tribunal that any binding advice pursuant to this clause was ever given. Ultimately, if agreement cannot be arrived at then there is a dispute concerning the *"interpretation or performance of the contract"* and thus either party may refer the dispute to arbitration.

13.1.76 In this case it took the Claimants some time to commence the arbitration – no doubt on the basis that it hoped that it could eventually agree matters with its long term counterparty, a corporation effectively controlled by the Federal Government of Nigeria. However it is worth noting, for example, in relation to Realizable Price, that the determination had to be made by the Minister to whom the matter has not yet been referred, as stated above. So the issue before the Tribunal is how to characterize the legal situation with respect to the Lifting Allocation at a time when there is disagreement but no resort made to a determining mechanism.

13.1.77 The one conclusion that cannot be arrived at is that the Bonga PSC has for this reason broken down and become unenforceable in whole or in part. That is clearly not the intention of either party nor is it a reasonable commercial conclusion. Both want the oil to continue to flow for their mutual benefit and Mr. Eghobamien's initial surprising views on illegality expressed at the Hearing had to be trimmed after the Tribunal had given him time for thought, reflection and further instruction.

13.1.78 Thus even though the Parties are not agreed as to the correctness of the Claimants' Lifting Allocation for all the reasons maintained in this arbitration, the Claimants' Lifting Allocation should nevertheless be

189

the starting point until properly revised in accordance with the terms of the Bonga PSC. What cannot be right is for the Respondent to take the law into its own hands and lift according to its own allocation which assumes that their as yet untested allegations are correct: see the Respondent's letters to the FIRS dated 5 November 2007 and 25 May 2009 stating that it is using its own lifting entitlement model.[349]

13.1.79   Therefore subject to considering the various components of the Claimants' Lifting Allocation that are before the Tribunal (subject to some contest on arbitrablity) the Tribunal considers it appropriate to proceed initially on the basis of the Claimants' Lifting Allocation. The Tribunal sees nothing in the words *"for consideration and approval"* in Article IV of  Annex B of the Bonga PSC that would give the Respondent the right contrary to the clear terms of the Bonga PSC to arrogate to itself the right to determine the Lifting Allocation. The Respondent was clearly in breach of the Bonga PSC when they lifted in excess of the Claimant's initial allocation.

13.1.80   In coming to this conclusion, the Tribunal is comforted by the fact that after such determination, whether by the Minister as to Realizable Price, or by this Tribunal when considering the components of the Lifting Allocation, if it should transpire that the Claimants' Lifting Allocation was inaccurate in part, then the Claimants accept that any payments by overlifting shall be reimbursed to the Respondent and because of the continuing nature of this Agreement this can easily be achieved.

---

[349] CB/30 and 42.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.1.81   The Tribunal cannot possibly accept the Respondent's submission that the Claimants have waived their rights under the Bonga PSC. Throughout the time of this dispute and by virtue of this arbitration, they have been attempting to enforce their rights under the Bonga PSC. The Claimants never waived their rights as regards to the Lifting Allocation but were faced with a *fait accompli* by the Party that had control of the taps and sea lanes. Accordingly appropriate declarations will be made.

**13.2   The Claimants' Second Claim – Cost Oil**

  *(1)   The Agreed Issues*

13.2.1   The Parties have agreed that the following issues arise concerning the Claimants' Second Claim:

  (1)   are such Operating Costs to be those recorded in the Claimants' books and accounts (the "***First Costs Oil Issue***")? and

  (2)   are the Claimants entitled to be allocated such quantum of Available Crude Oil as will generate an amount of proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 212 / OML 118 (the "***Second Costs Oil Issue***")?[350]

13.2.2   As they raise largely common issues the Tribunal has considered the First and Second Costs Oil Issues together.

  *(2)   The Claimants' Position as to the First and Second Costs Oil Issues*[351]

13.2.3   The Claimants refer to Annex B, Art. IV, para 5(b) of the Bonga PSC which provides that it is the Claimants, as the Contractor, that have the right and responsibility to compute the amount of Cost Oil.[352]   The Claimants assert that Annex B, Art. IV, para 5(b) Bonga PSC, is also clear that the Operating Costs for purposes of Cost Oil shall be those Non-Capital Costs and Capital Costs recorded in the books and accounts of the Claimants, as the Contractor.

[350] Parties Agreed List of Issues.
[351] Joint Preparation of the Contractor's Books and Accounts (RPHB para 2.5).
[352] Part V, CPHB pages 15-17.

192

13.2.4    The Claimants refer to the evidence of Mr. David Mbanefo, witness for the Respondent during the Hearing who agreed:

o    *"Q (Sheppard): And would you agree that the contract provides that cost oil is to be taken from the books and accounts of the contractor?*

*A: Yes."*[353]

13.2.5    The Claimants submit that as the Contractor they record all costs incurred in carrying out Petroleum Operations in their Lifting Allocation model. The total of such costs from the commencement of commercial production to 30 September 2010 (which amount they submit is therefore properly recoverable as Cost Oil, save as expressly agreed otherwise by the Claimants) is US$8.3 billion.[354]

13.2.6    In the CRPHB the Claimants refer to the Respondent's argument that the Claimants derogated from the Bonga PSC by failing to have the Respondent jointly prepare the Contractor's books and accounts. This is denied by the Claimants.

13.2.7    The Claimants refer to Clause 12 (4) of the Bonga PSC which relevantly provides that:

*"Competent professionals of the CORPORATION shall be attached to work with the CONTRACTOR from time to time and such officials and the CONTRACTOR's officials shall not be treated differently with regard to salaries and other benefits".*

13.2.8    Clause 13.1 of the Bonga PSC provides that:

---

[353] Transcript, Day 3, p 154, lines 10 – 13.
[354] CSOR, Annex 1.

193

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> "13.1  *Books and Accounts*
>
> *The CONTRACTOR shall be responsible for keeping complete books of accounts consistent with modern petroleum industry and accounting practices and procedures. The statutory books and accounts of this PSC shall be kept in Naira and U. S dollars. All other books of accounts as the operator may consider necessary shall be kept in columnar form in both Naira and U .S. Dollars. Officials of the CORPORATION and the CONTRACTOR shall have access to such books and accounts and officials of the CORPORATION attached to the CONTRACTOR pursuant to Clause 12.4 shall participate in the preparation of same."*

13.2.9   The Claimants submit that accordingly Clause 13.1 of the Bonga PSC read in context does not prescribe a fundamental obligation that the Contractor's books and accounts must be jointly prepared by the Claimants with the Respondent and that they are somehow invalid or ineffective if not jointly prepared.

13.2.10   The Claimants submit that the Respondent's representatives were not denied access to, or prevented from participating in the preparation of the Contractor's books and accounts. They assert that the Respondent has provided no evidence to support this contention.

13.2.11   The Claimants further submit that it was the Respondent's own failure to mobilize its own staff to work with the Claimants. The evidence of Mr. John Koop on behalf of the Claimants that the Respondent started

194

withdrawing its personnel in 2003 has not been contradicted.[355]

13.2.12 The Claimants submit that the Respondent's argument that the accounts prepared by the Claimants, are not valid or binding on the Respondent because they were prepared without the involvement of the Respondent's own personnel, has no basis in the Bonga PSC.[356] The Respondent should not be entitled to rely on its own failure to exercise a contractual right pursuant to Clause 12.4 of the Bonga PSC to frustrate the Claimants' attempts to rely on their contractual rights.

13.2.13 The Claimants acknowledge that the Respondent has a right to audit the books and accounts pursuant to Clause 13.2 of the Bonga PSC. The Claimants assert however, that the Claimants' accounts will be deemed accepted and not capable of further challenge if the Respondent has either:

(1) not exercised its right to audit the accounts *"within two (2) Years following the end of the Year in question"*; or

(2) alternatively, exercised the right to audit the accounts, but has not made an *"exception in writing ninety (90) days following the end of such audit"*.

13.2.14 The Claimants submit that until any exceptions have been resolved against the Claimants, (i.e. by being disallowed by MACOM or if the Claimants accept the Respondent's objection), the Bonga PSC entitles it to recover those and all other Operating Costs that are recorded in its books and accounts. However, the Respondent in its Lifting

---

[355] Transcript, Day 1, p 208, lines 12 – 16.
[356] Mr. Mbanefo gave evidence that the books and accounts had to be prepared *"hand in hand"*, but that finds no support in the PSC: Transcript, Day 3, p 167, line 4 – p 169, line 10.

Allocation model has omitted some costs to which it has objected notwithstanding that MACOM has not made any decision in the Respondent's favour in respect of such costs.[357]

13.2.15  The Claimants refer to the Respondent's argument that it is entitled to exclude costs that it has challenged from its entitlement model and submit that such an argument is totally at odds with the express terms of the Bonga PSC.

13.2.16  The Claimants submit that the Respondent has taken advantage of the contractual audit and challenge process in most years. The Claimants have accepted some of the Respondent's objections. However, it is the Respondent's fault that its outstanding *"exceptions"* have not been resolved because the Respondent itself has frustrated the MACOM process.[358]   The Respondent should have complied with and completed the contractual audit procedure instead of exercising a self-help remedy by unilaterally over-lifting Available Crude Oil.

  (a)  *Declarations and Awards sought*

13.2.17  The Claimants seek the declarations at Paragraphs 349(d), (e) and (f) of the CS.

13.2.18  The Claimants seek a monetary Award (updated on 30 November 2011) of US$102,207,000 in respect of this element of the total overlift,[359] plus interest of US$17,813,435.[360]

  (3)  *The Respondent's Position as to the First and Second Costs Oil Issues*

---

[357] See evidence of Mr. Mbanefo, Transcript, Day 3, p 166, lines 13 – 16.
[358] See evidence of Mr. Keith Lewis, Transcript, Day 3, p 45, lines 1 – 3.
[359] See Annex B to CPHB.
[360] See Annex D to CPHB.

196

13.2.19   The Respondent submits in Paragraph 2.5.1 of the RPHB that pursuant to the provisions of the Bonga PSC, the Claimants could only contractually recover costs recorded in the Books and Account of the Claimants pursuant to Article IV, Annex B of the Bonga PSC. However, such books of account must be prepared jointly with the Respondent pursuant to Clause 13.1 of the Bonga PSC.[361]

13.2.20   The Respondent asserts that the Claimants failed to follow the procedure set out in the Bonga PSC concerning the preparation of the accounts. Although the Claimants assert that no official of the Respondent was attached to its accounting department, Mr. Koop's oral evidence at the Hearing stated that officials of the Respondent were indeed attached to the Claimants but began to withdraw sometime in the year 2003.[362]

13.2.21   The Respondent submits that clearly the Claimants, as the Contractor, started activities that require the keeping of account long before 2003 as disclosed at Paragraphs 5.10 to 5.21 of the CSOC. Whilst the absence of officials after 2003 could explain the failure to comply with the requirement to have officials of the Respondent participate in the preparation of accounts, the same cannot be said of accounts prior to 2003.[363]

13.2.22   Thus the Respondent submits that that the accounts prepared by the Claimants are not valid or binding on the Parties because they were prepared without the involvement of the Respondent's own personnel

---

[361] Clause 13.1 of the Bonga PSC.
[362] See lines 10 to 13 at page 208, Day 1 of Mr. John Koop's oral testimony.
[363] Para 2.5.2 RPHB.

and have no basis in the Bonga PSC.[364] It is the Claimants who failed to follow the approval procedure in refusing to prepare an account in accordance with Clause 13.1 of the Bonga PSC which requires that an employee from the Corporation participate in the preparation of the accounts.

13.2.23   The Respondent contends that the Claimants were in breach by failing to comply with these key provisions and to the extent that the obligation is imposed on both Parties, they had waived their rights to insist on compliance.[365]

13.2.24   Thus the Respondent submits that to the extent that the accounts were not prepared jointly, they are not accounts prepared in accordance with the Bonga PSC and therefore the Respondent is not contractually bound to accept and pay costs derived from that account. This contention relates to accounts in respect of years 2006 to 2007.

13.2.25   As regards the objections the Respondent raised in years 2003-2006 the Respondent contends that where an exception has been raised to a cost it is not obliged to pay that cost until the issues have been resolved relying upon Clause 13.2 of the Bonga PSC.

13.2.26   The Respondent further submits that the Bonga PSC makes provision for a prior approval procedure for the accounts by the Respondent and this is achieved in Clause 13.1 (referred to as prior approval). It also relies upon the need for approval by the Management Committee (MACOM) (referred to as intermediate approval), and in Clause 13.2

---

[364] Mr. Mbanefo gave evidence that the books and accounts had to be prepared *"hand in hand"* Day 3, p 167, line 4 – p 169, line 10.
[365] RASOD para 6.7.

198

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(which is referred to as post approval) of the Bonga PSC.[366]

13.2.27   The Respondent also submits that an over-bloated claim on Cost Oil by the Claimants diminishes automatically the availability of Profit Oil and the Respondent's profit thereof. The Respondent's concern lies in preventing the Claimants from recovering costs that are not allowed to be recovered under the Bonga PSC and the relevant provisions of the laws.[367]

(4)   *The Tribunal's Analysis of the First and Second Costs Oil Issues*

13.2.28   The issue arises as to whether for the purposes of computing Cost Oil the Claimants can include all operating costs incurred in the conduct of Petroleum Operations under OML 118 recorded in its books and accounts unless such expenditure has been disallowed by MACOM or with the Contractor's agreement.

13.2.29   Again the starting point is Clause 8.1(b) of the Bonga PSC set out above.   The Tribunal refers to the definitions of *"Cost Oil"*, *"Operating Cost"* and *"Petroleum Operations"* cited above. Annex B, Article IV (Accounting Analysis) makes clear that the allocation of Cost Oil shall be based simply on such costs as are recorded in the contractor's books and accounts.   Paragraph 5 states relevantly as follows:

> *"The amount of chargeable to and recoverable from ... Cost Oil to be entered in section B of Schedule B-1 shall be determined as follows:*

---

[366] Para 6.8 RASOD.
[367] Para 6.8(ii) RASOD.

> "(1)  Non-capital costs shall be the amount recorded in the books of the Contractor for such month in accordance with this accounting procedure.
>
> (2)  Capital costs recorded in the books and accounts of the Contractor shall be recoverable in full and chargeable in equal instalments over a five (5) year period or the remaining life of the Contractor, whichever is less...."

13.2.30  Accordingly the Claimants contends that they are entitled to recover as Cost Oil all operating costs incurred by it in exploring and developing the contract area which is recorded in their books and accounts (Clause 13.1 of the Bonga PSC obliges the Claimants to give the books etc to the Respondent). The Claimants maintain that they record such costs incurred in their Lifting Allocation model.

13.2.31  The Claimants have satisfied the Tribunal on the evidence placed before it that the total of such costs recorded in the accounts as at the commencement of commercial production to 30 September 2010 is US$8.3 billion and indeed the Respondent has not challenged this figure.

13.2.32  The Bonga PSC itself provides checks and balances such that Clause 13.2 of the Bonga PSC contractually entitles the Respondent to audit the books and accounts. Clause 13.2 provides as to "*Audits*" that:

> "The CORPORATION and its external auditors shall have the right to inspect and audit the books and accounts relating to this Contract for any year by giving thirty (30) days written notice to the CONTRACTOR and the CONTRACTOR shall facilitate the work of such inspection and auditing; provided

> *however, that the costs of such inspection and auditing shall be met by the CORPORATION, and provided also that if such inspection and auditing have not been so carried out within two (2) Years following the end of the Year in question, the books and accounts relating to such Year shall be deemed to be accepted by the Parties as satisfactory. Any exception must be made in writing ninety (90) days following the end of such audit and failure to give such written notice within such time shall establish the correctness of the books and accounts."*

13.2.33   Accordingly the Claimants, as the Contractor, contend that until any exception has been reviewed and resolved against the Claimants, as the Contractor, such as by agreement or disallowance by MACOM the Bonga PSC entitles it to recover those and all other operating costs that are recorded it its books and records.

13.2.34   The Respondent submits that it is entitled to exclude costs that it has challenged.

13.2.35   Whereas it is clear that the Bonga PSC permits the Respondent to have access to the Contractors' books and accounts the Tribunal cannot read this as some form of condition precedent nullifying the books and records if access is denied or not taken up.

13.2.36   The Respondent could have, but did not, second staff to the Contractor's accounts department and it thus lies ill in their mouth to complain that in some way they were not involved in the preparation of the same.

(5)   *The Tribunal's Decision as to the First and Second Costs Oil Issue*

201

13.2.37   The Tribunal is quite satisfied that the Operating Costs are those recorded in the Claimants' books and accounts. They have not been disallowed by MACOM and the Respondent has had every opportunity, but declined, to participate in the preparation of the accounts. Accordingly the Operating Accounts are those recorded in the books and records of the Claimants. The Respondent can only challenge costs in accordance with the provisions of the Bonga PSC which it has not done. It cannot do it unilaterally.

(a)   *Declarations*

13.2.38   Accordingly the Claimants, as a matter of contract, are entitled to a declaration that:

(1)   unless and until a cost is raised as an exception by the Respondent and resolved against the Claimants pursuant to the Bonga PSC's prescribed procedures, the Claimants are entitled to recover as Cost Oil all Operating Costs (as defined in the Bonga PSC) incurred in OML 118 that are recorded in its books and accounts from the Available Crude Oil produced from OML 118;

(2)   the Respondent has breached the Bonga PSC by not allowing the Claimants to recover such costs as Cost Oil; and

(3)   the Respondent cannot raise any *"exceptions"* in relation to Year 2007.

(b)   *The Second Costs Oil Issue – Quantum*

13.2.39   The Claimants have sought a monetary Award (updated to 30 November 2011) of <u>US$102,207,000</u> in respect of this element of the

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

total overlift.[368] The Tribunal is quite satisfied on both the written and oral evidence placed before it which has not been effectively challenged in this arbitration that this claim has been established and that the Claimants are entitled to a declaration of entitlement as well as to a monetary award for the amount of the overlift established. This is clearly a contractual matter.

---

[368] See Annex B to CPHB.

**13.3**     **The Claimants' Third Claim – The Costs Oil Consolidation Claim**

      *(1)*     *The Agreed Issue*

13.3.1     The Parties have agreed that this issue regarding the Claimants' Third Claim is whether the Claimants in their capacity as the Contractor are entitled to be allocated such quantum of Available Crude Oil under OPL 212 / OML 118 as will generate an amount of Proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 219 and OPLs 803, 806 and 809 (the "*Third Costs Oil Issue*").

      *(2)*     *Position of the Claimants as to the Third Costs Oil Issue* [369]

13.3.2     As outlined in Section 13.2 above, the Claimants submit that Annex B, Art. IV, para 5(b) of the Bonga PSC, provides that it is the Claimants that have the sole right and responsibility to compute the amount of Cost Oil.

13.3.3     The Claimants rely upon Clause 8.1(b) of the Bonga PSC which, as set out in para 5.37 above, provides that Cost Oil may include such quantum as will generate an amount of Proceeds sufficient for recovery of Operating Costs in OPLs 212 <u>and</u> 219 (now OML 135), 803, 806 and 809.

13.3.4     The Claimants assert that this cost recovery provision was agreed to by the Respondent and approved by the Government to provide an incentive for the Claimants to explore onshore OPLs 803, 806 and 809 (with their highly speculative prospects) and offshore OPL 219 (which

---

[369] *See:* CSOC Chapter 7; CSOR Chapter 9; Claimants' Skeleton Chapter 6.

was technically very challenging).[370] They submit that Claimants'
interpretation is supported by the Department of Petroleum Resources'
presentation of February 2006 made by E.K Bekko.[371]

13.3.5   However, the Respondent in its allocation model has omitted these
costs.[372] In response to the Respondent's submissions that it was not
the intention of the Parties for these costs to be included because para
(b) does not include the word *"consolidate"* unlike para (e), the
Claimants submit that Paragraph (e) addresses the inclusion
potentially of both revenue and expenses of other OPLs / OMLs for
PPT purposes, so "consolidation" is the appropriate terminology,
whereas para (b) is simply concerned with recovering costs of an OPL
/ OML through allocation of Cost Oil from another producing OPL /
OML. The Claimants assert that it is therefore unsurprising that
*"consolidation"* was not the term used.

13.3.6   The Claimants assert that the Respondent should not have disregarded
this element of the Claimants' Lifting Allocation computation, but
rather should have commenced contractual arbitration proceedings in
order to get a ruling. Now that it is an issue in this arbitration, the
Tribunal may make a final determination of the contractual position.

13.3.7   The Claimants assert that the Tribunal has jurisdiction to determine
the dispute concerning the proper treatment of costs of other OPLs /
OMLs and it is arbitrable because allocation of Cost Oil is a
contractual issue as between the Parties to the Bonga PSC.

---

[370] See, for example, Witness Statement of Mr. Philip Turberville, paras 13 and 14, at TB C/1.
[371] Exhibit C-156 at TB F/71.
[372] See evidence of Mr. David Mbanefo, Transcript, Day 3, p 164, line 24 – p 165, line 1.

205

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.3.8  The Claimants seek the declarations at Paragraphs 349(a), (b) and (c) of the CS.

13.3.9  The Claimants seek a monetary Award (updated on 30 November 2011) of US$71,828,000 in respect of this element of the total overlift,[373] plus interest of US$12,518,706.[374]

(3)  *Position of the Respondents as to the Third Costs Oil Issue*

13.3.10  The Respondent asserts that the issues being disputed in relation to the Claimants Third Claim are:[375]

(1)  whether costs generated in a contract area unrelated to OML 212 are recoverable from resources generated by OML 212; and

(2)  the application of the method prescribed for the recovery of Capital Costs.

13.3.11  The Respondent refers to the Claimants' claiming the right to consolidate all operating costs incurred in OMLs that do not form part of the Contract Area as defined in the Bonga PSC and to offset those costs against oil produced in the Contract Area.

13.3.12  The Respondent asserts that it is important to state that the Bonga PSC relates to the licence that pertains to one contract area. For this reason, the Respondent contends that the Contract Area, as defined in the Bonga PSC, is ring-fenced for the purposes of cost recoverability and the Claimants, as the Contractor, can only recover costs incurred in respect of OMLs and OPLs within the Contract Area. As referred to in

---

[373]  See Annex B CPHB.
[374]  See Annex D CPHB.
[375]  Para 16, RS.

206

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

para 5.35 above, *"Contract Area"* is defined in Clause 1(i) of the Bonga PSC to mean *"the area of the OPL and any OML's derived therefrom"*.

13.3.13   The Respondent asserts that the provision governing the Claimants' cost recovery under the Bonga PSC is Section 8 of the *DOA* as well as Clause 8 of the Bonga PSC.

13.3.14   Section 8 of the *DOA* provides that:

> *"Cost Oil shall be allocated to the Contractor in such quantum as shall generate an amount of proceeds sufficient for the recovery of operating costs in oil prospecting licences as defined in the production sharing contracts and any oil mining leases derived therefrom".*

13.3.15   The Respondent contends that Section 8 of the *DOA* does not grant consolidation on the grounds that the phrase *"operating costs in oil prospecting licenses as defined in the Production Sharing Contracts and any oil mining leases derived therefrom"* can only be interpreted to mean operating costs incurred in respect of oil prospecting licences and oil mining licenses as those costs are defined in the Bonga PSC. In other words, that Section 8 of the *DOA* makes a cross reference to the definition of *"OPL"* in the Bonga PSC for the purpose of determining what operating costs are properly allowable.

13.3.16   The Respondent also refers to Clause 1(w) of the Bonga PSC that defines *"Operating Costs"* as meaning:

> *"expenditures made and obligations incurred in carrying out Petroleum Operations as determined in accordance with the Accounting Procedure".*

207

13.3.17   Annex B, Article II of the Bonga PSC defines *"Operating Costs"* as:

> *"all costs, expenses paid and obligations incurred by the CONTRACTOR in carrying out Petroleum Operations and shall consist of (1) Non-Capital Costs and (2) Capital Costs".*

Annex B, Article II of the Bonga PSC goes on to list the categories of what constitute *"Non-Capital Costs"* and *"Capital Costs"*.

13.3.18   The Respondent submits that once the Operating Costs are determined as they relate to each Contract Area, then they are recovered from the corresponding OML.  Clause 8.1 (b) of the Bonga PSC says nothing about consolidation, consequently the enumeration of each Contract Area must be read separately, since to do otherwise will be to consolidate and grant an incentive which is not contemplated by law.

13.3.19   The Respondent submits that the above interpretation is to be commended for the following reasons:

(1)   costs consolidation grants fiscal incentives which must be provided for expressly by law. Allowing consolidation of costs from other OPLs for cost recovery purposes directly impacts the tax payable on OPL 212. Accordingly, the Claimants seek to obtain a tax incentive which the Parties have no power to agree upon. Clause 8.1(e) of the Bonga PSC is of no relevance as it expressly attempts to grant a tax incentive in the absence of an enabling Statute;

(2)   the issue of costs consolidation was not listed as one of the incentives which the Claimants alleged they were granted; and

208

    (3)   the minutes referred to by the Claimants where the issue was allegedly discussed diminishes the importance of any of its discussion in its last paragraph which states as follows: *"A relaxed and convivial meeting mainly clarifying rather than negotiating. No real concessions were made by the DPR side ..."*

13.3.20  Thus the Respondent submits that cost consolidation is not permissible.

13.3.21  In the Respondent's Rejoinder to the CSOR (the RRCSOR) the Respondent submitted that there has been a misappreciation of the contention of the Respondent by the Claimants. The Respondent repeats its Paragraph 9.3 of the CSOR to the effect that:

> *"The Respondent argues that it is to be inferred from the paucity of contemporaneous documentation that there was no intention to provide for the recovery of "cross-cost" in the PSC. This argument has no merit".*[376]

13.3.22  The Respondent's contention is that in arriving at the most appropriate interpretation as between that contended by the Claimants, as opposed to that contended by the Respondent, the paucity of the contemporaneous document might be of significance in assisting the Tribunal to reaching a final determination.

13.3.23  The Respondent contends that the interpretation given to Clause 8.1(b) of the Bonga PSC by the Claimants is erroneous and urges the

---

[376] Para 15.1 RRCSOR

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Tribunal to construe Clause 8.1(b) in accordance with the interpretation given in Para 6.2 of the RASOD.

13.3.24    The Respondent maintains that consolidation of costs automatically and inevitably grants tax concessions which can only be granted by an express provision of the law.

13.3.25    The Respondent refers to Paragraph 9.14 of the CSOR and reiterates that the terms of the Bonga PSC and the *DOD* are both clear in any event, and notes that there is no provision of the *PPTA* which prohibits the consolidation of OPLs for the purposes of consolidation of costs.

13.3.26    The Respondent contends that the Claimants' assertion that the absence of any specific law necessarily means that an act may be permitted, is a misapplication of the jurisprudential rationale that underpins the existence or non-existence of laws. The Respondent submits that in the seat of arbitration (Nigeria), an act remains unlawful unless permitted by law. This is unlike the situation in the United Kingdom where an act is permitted unless otherwise prohibited by law (save for the UK Bill of Rights Act, 1988)[377].

(4)    *Analysis of the Tribunal as to the Third Costs Oil Issue*

13.3.27    The Tribunal's starting point for this inquiry is Clause 8.1(b) of the Bonga PSC which provides:

> *"Cost Oil shall be allocated to the Contractor in such quantities as would generate an amount of proceeds sufficient for*

---

[377] Para 16ii RRCSOR

210

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

recovery of Operating Costs in OPL's 212 219, 803, 806 and
809 and any OMLs derived therefrom."

13.3.28   As set out in Paragraph 5.35(6) above *"Cost Oil"* is defined in Clause
1(k) of the Bonga PSC to mean *"the quantum of Available Crude Oil
allocated to CONTRACTOR to enable it to generate the Proceeds to
recover all Operating Costs as specified in the Accounting Procedure"*.

13.3.29   *"Operating Costs"* is defined in Clause 1(w) of the Bonga PSC to
mean *"expenditures made and obligations incurred in carrying out
Petroleum Operations as determined in accordance with the
Accounting Procedures"*.   The Tribunal has ruled that the Claimants
are engaged in carrying out Petroleum Operations, so accordingly this
definition is properly engaged.

13.3.30   It is clear to the Tribunal on the evidence placed before it, that this
cost recovery was agreed to by the Respondent and the Government in
order to provide an incentive for the Claimants to explore OPLs 803,
806 and 809 which were speculative, and off shore OML 135 which
provided extreme technical challenges.

13.3.31   In February 2006 the DPR made a presentation entitled *"Royalty
Determination for Bonga Project"* given by E.K. Bekke in which it
was noted that:

> "Cost Oil based on expenditure from the five OPLs (ring fenced)
> under the PSC Agreement – Clause 8.1(a) to (e).
>
> The total cost for the ring fenced area is US$4.5 billion.
>
> The total cost is borne by Bonga as Cost Oil.

211

*Royalty calculation ring fenced on OPLs 212 and 219 (OPL's*
*803, 806 and 809 have been relinquished)."*

13.3.32   The Claimants rest their case on the clear wording of Clause 8.1(b) of the Bonga PSC, supported as it is by the DPR in its presentation referred to above.   The wording of Clause 8.1(b) accords with the incentives that the OICs sought and to which the Federal Government agreed.   The wording of Clause 8.1(b) is, in the opinion of the Tribunal, clear and unambiguous.

13.3.33   In its defence the Respondent argues that the OPL under the Bonga PSC must be understood in the singular, as summarized in para 13.3.12 above.   This argument cannot stand in the light of the clear words of Clause 8.1(b) of the Bonga PSC.

13.3.34   The Respondent has also relied on the absence of the word "*consolidate*" in Clause 8.1(b) in contra distinction to Clause 8.1(e) of the Bonga PSC.   These two sub clauses deal necessarily with different matters and the use of the word "*consolidate*" in (e) is appropriate, whereas in (b) it is otiose.   This argument is unavailing.

13.3.35   The Respondent suggests blandly that Clause 8.1(b) of the Bonga PSC, if interpreted in the way suggested by the Claimants, is in some unspecified way, contrary to Section 3 of the *DOA*.   Section 3 states:

> "*(1)   The petroleum profits tax payable under a production*
> *sharing contract shall be determined in accordance with*
> *the Petroleum Profits Tax Act:   Provided that petroleum*
> *profits tax applicable to the contract area as defined in*
> *the production sharing contracts shall be 50 per cent flat*

212

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> *rate of chargeable profits for the duration of the production sharing contracts.*
>
> (2)   ... "

13.3.36   Section 8 of the *DOA* provides:

> "(1)   *Cost oil shall be allocated to the contractor in such quantum as shall generate an amount of proceeds sufficient for the recovery of operating costs in oil prospecting licences as defined in the production sharing contracts and any oil mining leases derived therefrom.*
>
> (2)   *All operating costs shall be recovered in U. S. dollars through cost oil allocations in accordance with the terms of the production sharing contract.*"

13.3.37   The accounting experts were most helpful on this issue. They acknowledged the width of Clause 8.1(3) of the Bonga PSC. They agreed that the wording was consistent with the *PPTA* pursuant to which PPT is levied on the Petroleum Operations *"of a company"* taking into account *"any one or more of its petroleum operations"* Section 9(1)(c).

13.3.38   Both Parties' tax experts agreed that pursuant to Section 9(1)(c) of the *PPTA* a company engaged in Petroleum Operations is entitled to consolidate for PPT purposes costs incurred *"in any or more of its petroleum operations"*. Where however the experts differ is the interpretation of the Section 3(1) of the *DOA* set out above.

13.3.39   Mr. Adebeyi on behalf of the Respondent is of the view that while the above may be true for joint ventures for which taxes are paid by each

213

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

venturer for Bonga PSCs, the provision of Section 3(1) of the *DOA* to the effect that "... *provided that the petroleum profits tax applicable to the contract area as defined in the production sharing contracts shall be 50 per cent flat rate of chargeable profits...*" effectively restricts consolidation of the contract area with any other OML or OPL. This is because each Bonga PSC defines what a contract area means. Otherwise, the phrase "*contract area*" in Section 3 is being treated as meaningless.[378]

13.3.40   Mr. Onyenkpa holds a contrary view. He believes that the first part of Section 3(1) of the *DOA* already provided for the PPT to be determined in accordance with the *PTTA* (which permits consolidation). He sees Section 3(1) of the *DOA* as providing for the lower tax rate (of 50% against 85% in the *PPTA*) and not restricting the ability of the taxpayers to consolidate petroleum operations from several contract areas.[379]

13.3.41   The Tribunal has already decided that the Claimants, each of which is a company, is engaged in Petroleum Operations.

13.3.42   The Tribunal also bears in mind the terms of Clause 5(b) of Article IV of Annex B of the Bonga PSC. This provides that:

> "The amount chargeable to and recoverable from Royalty Oil, Tax Oil and Cost Oil to be entered in Section B of Schedule B-1 shall be determined as follows:....
>
> (6)   Cost Oil – The Operating Costs applicable to such month for purposes of Cost Oil as follows:

---

[378] Section 6(h)(ii) Joint Tax Experts Report.
[379] Section 6(h)(iii) Joint Tax Experts Report.

214

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(i)   Non-Capital Costs shall be the amount recorded in the books and accounts of the CONTRACTOR for such month in accordance with this Accounting Procedure.

(ii)   Capital Costs recorded in the books and accounts of the CONTRACTOR shall be recoverable in full and chargeable in equal instalments over a five (5) year period or the remaining life of the Contract, whichever is less. Amortization of such costs shall be in accordance with the method prescribed under the Second Schedule of the PPT Act, or over the remaining life of the contract, whichever is less.

(iii)   Qualifying Pre-Production Costs for the Contract Area shall be in accordance with the PPT Act 1959 as amended."

13.3.43   The Tribunal is unable to discern any inconsistency between the Bonga PSC and the *DOA* in this regard.

13.3.44   This issue is clearly one of contractual interpretation. It is only the Tribunal that can construe the Bonga PSC in respect to which there is a dispute. Having considered the submissions of both sides the Tribunal has come to the very clear conclusion that as a matter of contractual interpretation, the Claimants are entitled to be allocated a sufficient quantum of Available Crude Oil under OPL 212/OML 118 as would generate an amount of proceeds sufficient for the recovery of all Operating Costs that it has incurred in the development of OPL 219, and OPLs 803, 806 and 809.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.3.45  The Tribunal has decided this issue of contractual interpretation. However, insofar as it is necessary to express a preference for the vew of Mr. Oenyekpa or Mr. Adebyi, the Tribunal considers that Mr. Oenyenkpa was the more impressive and reliable of the two witnesses. At this junction the Tribunal should make absolutely clear that it rejects the suggestion made by the Respondent that Mr. Oenyenkpa was other than an independent and impartial expert because some years ago he had been employed by the one of the Claimants.  This was not a matter which he kept secret, and in any event his report was co-signed by another partner of KPMG. It is thus comforting that the experts agree with the Tribunal's conclusion.

13.3.46  Having come to the conclusion that the Claimants are correct when dealing with this issue it is comforting to note that FIRS itself in its Upstream Operation Manual (Section UT901.01.01, under *"Key Unique Provisions"*) states:

> *"Consolidation: Consolidation of production and costs for recovery and fiscal deduction should in principle be possible for the contract area, between assets of a given block and also between blocks attributed during the same round (as per Clause 8 of the PSC)."*

13.3.47  To come to the opposite conclusion would in effect mean that the Federal Government was giving a contractual benefit on the one hand and negating it by statute which was itself designed to give effect to the PSCs and the fiscal incentives contained therein.

13.3.48  Finally, there is nothing in any of the relevant Acts which prohibits the taking of the benefit freely conferred by the Federal Government on the Claimants by virtue of the Bonga PSC.

216

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**(5)    *Quantum of Claim re Third Costs Oil Issue***

13.3.49   As noted above, the Claimants seek an award of US$71,828,000 (updated to 30 November 2011) together with interest of US$12,518,706. The figure of US$71,828,000 has been established by the evidence placed before the Tribunal and has never been challenged in these proceedings as a figure by the Respondent. Accordingly under this head of claim the Tribunal will award the Claimants US$71,828,000.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.4    <u>**The Claimants' Fourth Claim – the Claimants' Royalty Claim**</u>

13.4.1    There is no dispute that Royalty Oil is payable by the Claimant. What is at issue between the Parties is the rate.

13.4.2    Clause 8.1 (a) of the Bonga PSC states:

> *"Royalty Oil shall be allocated to the CORPORATION in such quantities as will generate an amount of proceeds equal to the actual Royalty payable during each month and the Concession Rental payable annually"*

13.4.3    Annex B to the Bonga PSC by Article III, Paragraph 1, states;

> *"The CONTRACTOR shall compute the amount of Royalty and Concession Rentals payable by the CORPORATION pursuant to Clause 8.1 of this Contract. Such amounts shall be computed as provided under the Petroleum Act 1969 as amended and the PPTA 1959 as amended and the provisions of this Contract."*

13.4.4    As outlined in para 5.35 above, **"*Royalty*"** is defined in Clause 1 (ad) to mean:

> *"...the amount payable pursuant to the Petroleum Act 1969 and Petroleum (Drilling and Production) Regulations 1969 Cap 350 Laws of the Federation of Nigeria 1990, as amended."*

13.4.5    Royalty Oil is computed by multiplying the applicable Royalty rate by the chargeable value of crude oil produced each month.

13.4.6    The Royalty rate is arrived at by reference to water depth. Clause 15.1 of the Bonga PSC states:

> *"Royalty rates will be graduated as follows:*

218

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

| Area | Rate |
|------|------|
| *In areas up to 200 metres water depth* | *16.67%* |
| *In areas from 201 to 500 metres water depth* | *12%* |
| *From 501 to 800 metres water depth* | *8%* |
| *From 801 to 1000 metres water depth* | *4%* |
| *In areas in excess of 1,001 metres water depth* | *0%* " |

(It is to be noted that the Royalty rates set out in Section 5 of the *DOA* differ slightly to be the Bonga PSC rates, but this difference has no relevance in this case).

13.4.7   This Royalty regime was required by the IOCs, including the Claimants, when negotiating the 1993 PSCs and was agreed by the Federal Government of Nigeria and the Respondent as an incentive for conducting exploration and production projects in very deep water such as that found in OML 118.   It is a trite observation that exploration and production in ultra deep water is both complicated and expensive -- hence the 0% rate for depths in excess of 1,001 metres. The sliding scale of Royalty rates was of considerable importance to the IOCs, such that it was incorporated by reference in the Government's April 1993 letter referred to above.

13.4.8   The Claimants and the Respondent both recognized that there was some uncertainty in determining the Royalty rate applicable to the Bonga Field due to its varying water depth. The Claimants' case is that there was an agreement at a meeting in June 2006 that the rate of 1% would be used until otherwise determined. This meeting was attended by Mr. Koop and representatives of other co-venturers

219

among the Claimants and by representatives of the Respondent and the DPR.   A presentation was placed before the meeting which is Exhibit C-138 at Tab 83 of Bundle F of the Trial Bundle. The Claimants contend that this understanding was confirmed in letters sent by the Claimants, as the Contractor, to both the Respondent and the DPR the day after this meeting. Exhibit C-85 is a letter dated 27 June 2006 from the then Managing Director of SNEPCO to the then Group   General   Manager   of   Nigerian   Petroleum   Investment Management Services which stated as follows:

> "*Re: Bonga Royalty Discussions*
>
> *Thank you for leading yesterday's meeting on Bonga Royalty in such a constructive manner. The feedback I received from my staff was very positive and I look forward to a speedy conclusion on this issue. The summary I received of this meeting was as follows:*
>
> *DPR and NAPIMS will consult to propose to contractor group an applicable royalty rate for Bonga.*
>
> *Parties agreed that an interim 1% royalty rate would be utilized for payment until an agreement is reached at which time an adjustment will be made, as supported by the Petroleum Act. (emphasis added).*
>
> *Parties noted that royalty payments have been from start of production to date based on the interim rate.*
>
> *Please let me know if your interpretation is different so that we can move the issue forward as expediently as possible.*"

220

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.4.9   It now appears that for some time the Respondent has been calculating Royalty Oil by applying a Royalty rate of 1.75%; the Claimants complain that neither the Respondent nor the DPR has explained how the 1.75% rate has been determined.

(1)   *The Claimants' Position*

13.4.10   The Claimants refer to Section 61(2)(a) and (b) of the ***Petroleum (Drilling and Production) Regulations Cap P19, LFN 2004*** (the "***Petroleum Regulations***") which state that:

> *"If any dispute arises as to the amount of royalty due for a quarter, the licensee or lessee—*
>
> (a)   *shall pay within the time provided by or under paragraph (1) of this regulation whatever he admits to be due; and*
>
> (b)   *where on the settlement of the dispute by agreement, arbitration or otherwise, any further amount is agreed or found to be due, shall pay that further amount within seven days of the settlement."*

13.4.11   The Claimants contend that the Respondent should assert and maintain the correct contractual position with the DPR, pursuant to Section 61(2)(a) and (b) of the *Petroleum Regulations* referred to above and *pro-tem* apply the agreed rate of 1%. The Claimants allege that the Respondent agreed to discuss the issue with the DPR but subsequently refused to do so. The Claimants thus submit that in applying a Royalty rate of 1.75%, and in not complying with its contractual obligation to seek a satisfactory clarification from the DPR, the Respondent is in breach of the Bonga PSC, and accordingly the Claimants seek a

221

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Declaratory Award that pending the resolution of the dispute with the DPR on the applicable Royalty rate, the Respondent should lift Royalty Oil and pay Royalty in accordance with the agreed Royalty rate of 1%.

(2)   *The Respondent's Position*

13.4.12   In the RASOD the Respondent refers to the *Petroleum Regulations* set out above, and avers that the Respondent, being the license holder, is required by the said person to pay what it considers to be the Royalty rate. The Respondent contends that if the Claimants disagree with the rate paid by the Respondent this may be settled "*in one of three ways; either by agreement, arbitration or otherwise.*" The Respondent contends that the Parties agreed to refer the matter to the DPR who resolved that the rate should be 1.75%.[380] Accordingly the Respondent contends as follows:

"(a)   That the [Respondent] has no control over DPR's determination of Royalty rate.

(b)   This arbitration does not extend to DPR since it is not a party to the PSC contract.

(c)   The Claimant [sic] will have to challenge the determination of DPR's pronouncement through the available procedure channel, i.e. through a judicial review."

(3)   *The Claimants' Reply*

---

[380] Para 7iii RASOD.

222

13.4.13   In the CSOR the Claimants note the Respondent's case on the Royalty rate and point out that the Respondent does not challenge the following facts or matters;

(1)   Article III (1) of Annex B, Bonga PSC applies which states that "*CONTRACTOR shall compute the amount of Royalty ...*";

(2)   the Claimants, as the Contractor, DPR (represented by its director Mr. A.O. Chukwueke, and Dr. Walker) and the Respondent agreed at a meeting in June 2006 that the 1% rate would be used until otherwise determined, and that this was confirmed in writing to the Respondent and DPR by the Claimants; and

(3)   the Respondent committed to discuss this issue with the DPR but subsequently refused to do so.

13.4.14   The Claimants contend that they can demonstrate that when the Royalty rate is calculated pursuant to either of the two methods discussed namely, the aerial extent of OML 118, or the aerial extent of the producing Bonga Field within OML 118, that the proper rate according to either calculation is closer to 1% than 1.75% - in fact 0.9974%.

13.4.15   The Claimants note that the Respondent has failed to produce any evidence to show any attempt to challenge the DPR's purported calculation of 1.75% nor to explain how this percentage has been calculated (if at all) by the DPR, nor to explain on what basis it agrees with that purported calculation, if ever made.

13.4.16   Further, the Claimants submit that the Respondent's reliance on Section 61(2)(a) of the *Petroleum Regulations* is misplaced.   They

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

contend that this section does not give the DPR the power to resolve Royalty disputes as between PSC Contractors and license holders. Rather, it sets out a procedure to be followed in the event of a dispute between the DPR and the holder of an OPL or OML providing that the OPL or OML holder may pay the amount of Royalty which it does not dispute, and may subsequently have the question of whether the disputed Royalty is due or not resolved either by agreement or by arbitration. Thus the Claimants contend that it is somewhat strange that the Respondent should rely on Section 61(2) which provides for the resolution of disputes as to the amount of Royalty that is payable to DPR as the basis for its contention that the dispute between the Respondent and the Claimants as to the applicable Royalty rate for Bonga may be finally determined by the DPR.

13.4.17 The Claimants also contend that it is not for the Respondent alone to admit what Royalty rate it considers to be due pursuant to Section 61(2) of the *Petroleum Regulations*. The Claimants point out that Section 11(1) of the *DOD* (see also section 11 of the *DOA*) which states that:

> "*the Corporation....shall pay all Royalty on behalf of itself and the Contractor out of the allocated Royalty Oil...*"

13.4.18 Clause 15.4 of the Bonga PSC confirms this by stating that "*the CORPORATION shall pay all Royalty, Concession Rentals and PPT on behalf of itself and the CONTRACTOR out of Available Crude Oil allocated to it under Clause 8.1 of this Contract*".

13.4.19 Accordingly, the Claimants contend that the Respondent is the Claimants' agent for the purposes of payment of Royalty pursuant to

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

both Section 61.2 of the *Petroleum Regulations*, the terms of the Bonga PSC and common law.

13.4.20   The Claimants then submit that under Nigerian law: (1) the rights and duties arising out of the relationship of agent and principal must be ascertained by reference to the express or implied contract that exists between them; (2) the agent's primary duty is to carry out the business undertaken provided that if given specific instructions from the principal as to how this should be done then those instructions must be carried out precisely provided that they are lawful; and (3) the agent is responsible to the principal for any loss occasioned by the agent's want of proper care, skill or diligence in the performance of carrying out the principal's business. The Claimants further contend that the Respondent owes them a tortious duty of care.

13.4.21   Putting the above submissions in context the Claimants accept that the Respondent is obliged to pay Royalty on behalf of itself and the Claimants but only it, as holder of OML 118, has a relationship with DPR. The Respondent should therefore, in addition to its obligations under Clause 7.2(e) of the Bonga PSC not to "*exercise all or any of its right or authority over the Contract Area in derogation of the rights of the Contractor*", also be required, as the Contractor's agent, to: (1) take into account and reflect the Claimants' position with the DPR if instructed to do so; and (2) do so with proper care, skill and diligence.

13.4.22   The Claimants contend that the Respondent has failed to comply with its obligations set out above by reason of its failure to:

(1)   procure a rational explanation of the DPR's rate of 1.75%; and

225

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(2)   pay only that proportion of the Royalty rate accepted by the Claimants, as the Contractor, namely 1.00%.

13.4.23   Further, it is contended that the Respondent has, contrary to Clause 7.2(e) of the Bonga PSC, exercised its rights in derogation of those of the Claimants, as the Contractor.

13.4.24   As a result, the Claimants claim to be entitled to both contractual and equitable relief in respect of the losses suffered by the Claimants as a result of the Respondent's breach. The Claimants seek the declarations at Paragraphs 349(h),(i),(j) and (k) of the CS. The Claimants seek a monetary Award (updated to 30 November 2011) of US$86,585,000 in respect of this element of the total overlift,[381] plus interest of US$15,090,589.[382]

(4)   Analysis of the Tribunal

(i)   Evidence

13.4.25   Underlying the dispute with regard to the Royalty rate is the factual assertion of the Claimants that the evidence available supports 1.00% and that there is no evidence at all supporting any other figure, let alone 1.75%.

13.4.26   Accordingly, in order to see whether there is any factual foundation for the Claimants' allegations of breach of duty etc. set out above, it is necessary for the Tribunal to have regard to such evidence as is available.

---

[381] See Annex B CPHB.
[382] See Annex D CPHB.

226