# EXHIBIT 1

# Part 3 of 4

13.4.27   Mr. Koop, who gave evidence in a most convincing manner, makes clear in his statement that the DPR originally suggested that the method of calculation of the depth of the Bonga Field should be by reference to the aerial extent of OML 118.

13.4.28   On 13 July 2006, Mr. Koop received a call from Dr. Walker of the DPR in which he suggested that the Parties negotiate a goodwill amount above the calculated rate so as to get closer to the Government's expectation of a Royalty rate of 2.00%. Four days later Mr. Koop and Dr. Walker met and Mr. Koop explained that in the Contractor's view the Royalty calculation should be field specific and not merely one number for the whole license as proposed by DPR. Dr. Walker said that in his view using the footprint of the Bonga Field to calculate an average Royalty rate would be within the Regulations and that he expected this to be between 1.5% and 2.00%. The Contractor's own calculation showed that this would be under 1.00%.

13.4.29   On 7 August 2006 Mr. Koop received a letter from DPR stating that the Royalty rate was to be 1.75% but no explanation as to how this was arrived at was provided.

13.4.30   The Claimants then raised the matter with Mr. Membere of NAPIMS who objected to the process followed by DPR. Apparently, NAPIMS was of the view that the Royalty rate should be calculated using the producing wells' water depth. He agreed to follow up with the DPR but suggested that the use of the interim rate be continued. At the MACOM meeting of 6 July 2007 Mr. Membere confirmed his intention to raise the matter with DPR.

13.4.31   On 19 December 2007, Mr. Koop met with Mr. Membere's successor, Mr. Adeyemo, who informed him that DPR was unwilling to share

further information as to how they had arrived at the Bonga Royalty rate. Mr. Adeyemo stated that he had taken the matter as far as he could and he suggested that the Claimants should escalate the issue.

13.4.32   Mr. Koop points out in Paragraph 21 of his statement that this state of affairs placed the Claimants in a very awkward "*Catch 22*" situation. The Respondent, as concession holder, was standing back and saying in effect "*sort this out yourself*", but on the other hand the DPR, the Regulator, was declining to engage the Claimants and stating that they only dealt with the concession holder.

13.4.33   Clearly this state of affairs was very difficult for the Claimants caught as they were between two Government agencies. Further discussions did not advance the matter. The agreed interim rate of 1% was then ignored and to date neither the Respondent nor DPR has given any explanation as to how they arrived at 1.75% or as to why they say 1% is too low.  Accordingly, the Claimants contend that the lifting should only be at the Royalty rate of 1% for which there is evidential support and not at the arbitrary figure of 1.75%, for which there is none. In cross examination at the Hearing Mr. David Mbefano stated that the Respondent's calculation of the Royalty rate arrived at was 1.75%,[383] although neither he, nor anyone else on the Respondent's side, nor the DPR, has ever provided a proper calculation which takes issue with that presented to the meeting by Mr. Koop on 26 June 2006. Furthermore, in his cross examination Mr. Mbefano agreed that the Claimants were impliedly permitted to negotiate with the DPR on behalf of themselves and the Respondent.

---

[383] Transcript Day (3) at pages 163 (lines 16-25) to 164 (lines 1-15)

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.4.34  The Tribunal rejects the Respondent's contention that the Parties agreed to refer the matter to the DPR. There is no evidence whatsoever that the Claimants so agreed.

13.4.35  The only material placed before the Tribunal as to the appropriate Royalty rate is an analysis which was presented by Mr. Koop at the 26 June 2006 meeting and which shows that:

(1)  0.088 sq. kms. (or 0.008%) of OML 118 lies between a water depth of between 500 and 800 metres (attracting a Bonga PSC Royalty rate of 8.00%);

(2)  249.4036 sq. kms. (or 21.389%) of OML 118 lies in a water depth of between 800 and 1,000 metres (attracting a Bonga PSC Royalty rate of 4%) ; and

(3)  916.5495 sq. kms (or 78.604%) of OML 118 lies in water depth in excess of 1,000 metres (attracting a Bonga PSC Royalty rate of 0%).

13.4.36  Accordingly, on this basis of calculation which was the DPR's own preferred basis (see Mr. Koop's witness statement at para 13),[384] the average Royalty rate would result in an average of 0.8562% for the whole of OML 118.

13.4.37  The Contractor's counter-proposal as to the method of calculation was that the Royalty rate should be based on the aerial extent of the producing Bonga Field within OML 118.

---

[384] TB C/4.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.4.38   On this basis the analysis shows (see Mr. Koop's witness statement at para 16) that;

    (1)   29.2347 sq. kms. (or 24.93%) of the producing Bonga Field lies in water depth of between 800 and 1,000 metres (attracting a Bonga PSC Royalty rate of 4%) and

    (2)   88.0137 sq. kms. (or 75.07%) of the producing Bonga Field lies in water depth in excess of 1,000 metres (attracting a Bonga PSC Royalty rate of 0%).

13.4.39   Applying this method of calculation, the average Royalty rate payable would be 0.9974% for the producing Bonga Field.

    *(ii)*   *Discussion*

13.4.40   When parties enter into important commercial arrangements covering a long period of time they must clearly intend that the agreement should work and accordingly a judge or tribunal should strive to give effect to that intention. The law reports in both Nigeria and England abound with statements to this effect.

13.4.41   In considering the issue of Royalty Oil the Tribunal cannot but fail to observe that the DPR and the Respondent are Government entities. The position regarding the Respondent was made clear by Justice Oguntade's Report on behalf of the Claimants. To find otherwise would add a veneer of unreality to this case.

13.4.42   It may well be correct that the arbitration foreshadowed by the *Petroleum Regulations* would in fact be between the DPR and the Respondent as licencee. The Tribunal accepts that it is not seized of

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

any dispute between those Parties concerning the correct rate for Royalty oil.

13.4.43   However to leave this issue dangling, so to speak, and allow the DPR to impose a rate not supported by any proper analysis and thus to cause the Claimants to be caught, perhaps intentionally, in a sort of *"no man's land"* could not have been the genuine intention of either Party when they entered into the Bonga PSC.

13.4.44   The Tribunal accepts the Claimants' contention that in relation to the issue of the Royalty rate the Respondent is in fact the agent of the Claimants, owing to them the duties articulated above. The Tribunal is satisfied, and so holds, that the Respondent is bound by an obligation to have regard to the Claimants' interests when negotiating with DPR with regard to the appropriate rate. Such duty extends to taking the issue of Royalty rate to arbitration, absent a proper response from DPR.

13.4.45   What the Respondent cannot do is to leave the Claimants in limbo caught between two Government entities sharing the same objective, namely, the highest rate that can be achieved without recourse to any conclusionary mechanism. The Respondent should have taken the rate issue to arbitration. If the Respondent is correct in its submission then the Claimants are left in a position where they can never invoke a contractual mechanism to break the deadlock on the disputed Royalty rate. They cannot invoke the *Petroleum Regulations*. Although the Respondent glibly states that the Claimants can apply for judicial review they may well find insurmountable difficulties in their path caused: (1) by the passage of time; and (2) because there are other Parties who can lawfully get this matter resolved.

231

13.4.46  Had the Arbitration gone DPR's way then subject to any appeal process in Nigeria that would have bound the Respondent and the Claimants. What cannot be tolerated is for those responsible for sorting out the issue to fail to take any steps to achieve this end and instead impose on the Respondent and the Claimants an arbitrary and capricious rate which does not, on the evidence accepted by the Tribunal, accord with the result indicated by either of the two methods of calculation considered by the Parties when they were discussing the issue.

13.4.47  All Parties agreed to 1% as a temporary measure in June 2006; this was unilaterally changed by the DPR one month later [385] and the Tribunal sees no hardship in holding the Parties *pro tem* to that agreement especially as the remedy seeking a higher rate lies with two Government entities.

13.4.48  It seems to the Tribunal quite clear that there was a temporary agreement between the Claimants and the Respondent that the Royalty rate they would use was 1% for the Bonga Field. This is the only figure borne out by the only calculation produced to the Tribunal. No calculation has been provided to the Claimants nor the Tribunal which supports a rate of 1.75% or higher. The Respondent has failed to iniate an arbitration against DPR under the *Petroleum Regulations* and it is only those two entities that can contest this issue.

13.4.49  In the special situation of this case it is clear that for the reasons given above the Respondent owed a fiduciary duty to act fairly on the Claimants' behalf when dealing with the Royalty rate with the DPR.

---

[385] CB/ 17

The Respondent could not have fulfilled its duty by failing to take up the Claimants' case with the DPR and if necessary instituting proceedings to get the matter clarified. This is an egregious omission given that the only calculation on the table showed 1% and no evidence was provided to support the higher figure now contended. The damage for such breach of duty is clearly the difference between 1% and 1.75% and the Tribunal will also make a declaration affirming this decision.

13.4.50    The Tribunal fully accepts that if this matter goes to arbitration and the arbitrator supports the higher figure, the Claimants will have to pay Royalty at that rate, and there are ample mechanism within Bonga PSC under or over payment to be recovered.

*(iii)    Determination*

13.4.51    Accordingly, the Tribunal will make declarations as sought by the Claimants, as set out in Chapter XV.

13.4.52    As to the Claimants' Royalty Claim, the Tribunal awards the Claimants the principal sum of US$86,585,000.

233

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**13.5**  **The Claimants' Fifth Claim: The Claimants' PPT   Returns Claim**

*(1)*   *The Parties' Agreed Issues*

13.5.1  The Parties have agreed that the issues arising with regard to the Claimants' PPT Returns Claim are as follows:

(1)   does the Bonga PSC confer on the Claimants, as the Contractor, the exclusive right to prepare the PPT Returns in respect of OPL 212 / OML 118 that are to be filed with FIRS without amendment by the Respondent; and

(2)   are the Claimant as, as the Contractor, entitled to allocate Tax Oil to the Respondent on the basis of such PPT Returns?

13.5.2  The Claimants assert that Annex B, Art. III, para 2(a) of the Bonga PSC provides that it is the Claimants, as the Contractor, that have the sole right and responsibility to compute the amount of Tax Oil.  The Respondent denies this and submits that it has an overriding legal obligation to submit PPT Returns that have been prepared in accordance with Nigerian law. Where it is of the view that a PPT Return has not been so prepared it is entitled to prepare and submit a PPT Return in place of the erroneous one prepared by the Claimants.

13.5.3  This section addresses the issue generally. The specific contractual disputes concerning the calculation of Tax Oil are addressed in Sections 13.6 to 13.8.

*(2)*   *The Claimants' Position*

13.5.4  The Claimants assert that the Bonga PSC clearly provides that the Claimants, as the Contractor, have the sole right to prepare the PPT

234

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Returns on which the allocation and lifting of Tax Oil is to be based, and that those PPT Returns should be filed with the FIRS without amendment, relying on:

(1)   Clause 7.1(h) of the Bonga PSC which relevantly provides that:

> "*The CONTRACTOR shall ... prepare estimated and final PPT returns and submit same to the CORPORATION on a timely basis in accordance with the PPT Act*";

and

(2)   Annex B, Art. III, para 2(e) of the Bonga PSC which provides that:

> "*The Corporation shall make all required PPT payments to Federal Board of Inland Revenue.   The CONTRACTOR shall prepare all returns required under the PPT Act and timely submit them to the CORPORATION for onward filing with the Federal Board of Inland Revenue. The monthly PPT Payable shall be determined from such PPT returns*".

13.5.5   The Claimants rely upon the evidence of their witnesses that in compliance with Annex B, Art. III, para 2(e) of the Bonga PSC, the Claimants estimate the annual PPT to be paid, and in each month prepare an estimated PPT Return, which is updated monthly to reflect actual revenue and costs as they become known, and a final annual PPT Return is prepared.[386]   The monthly allocation of Tax Oil is based

---

[385] Transcript, Day 3, p 118, lines 11 – 22.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

on the Claimants' monthly estimated PPT Return. The various (i.e. monthly) estimated and final annual PPT Returns are sent to the Respondent for onward filing with FIRS.

13.5.6   The Claimants also refer to Clause 8.1(c) of the Bonga PSC which provides that Tax Oil shall be allocated to the Respondent in such quantum as will generate an amount of Proceeds equal to the actual PPT liability payable during each month.

13.5.7   The Claimants assert that the Bonga PSC provides that they are entitled to have the PPT Returns they have prepared filed without amendment because it provides a check and balance against the Respondent seeking to increase the tax take of the Nigerian Treasury.

13.5.8   The Claimants assert that the Respondent has been lifting Available Crude Oil in the form of Tax Oil based on its own calculation of PPT. The Claimants submit that the Bonga PSC does not make express provision for the Respondent having the right or obligation to amend the PPT Returns. Nevertheless, that is what the Respondent has done as confirmed by the Respondent's witnesses Mr. David Mbanefo,[387] and Mrs. Juliet David-West[388] in the Hearing. Thus:

(1)   <u>for the Years 2005 and 2006</u>, the Respondent filed the PPT Returns prepared by the Claimants. However, the Claimants

---

[387] Transcript, Day 3, p 173, line 22 – p 174, line 2. (Sheppard): "*Q. Do you complete or do you prepare the PPT Returns at NNPC?A: The – the contractor prepares the PPT returns, submits to NNPC, NNPC looks at it, and then if it's not in line with what the contractor is expected to prepare, then we would change it*".
[388] Transcript, Day 3, p 221, line 24 – p 222, line 8: "*Q (Adekoya):... You commenced a filing of PPT returns prepared by the respondent? A: Yes. Q (Rowley): That is rather than filing the contractor's returns? A: Yes, because the earlier filings were filed with the caveat because of the contentious issues. Q: So when the contractor then sent its own prepared PPT returns, you didn't file them? A: No*". See also, Transcript, Day 3, p 222, line 21 – p 223, line 2: "*Q: We have agreed that when you came on board, you changed that position. You filed PPT returns prepared by NNPC. A: I filed PPT returns based on the entitlement, the liftings that have been done in the past, based on NNPC's model, to bring the books to order, because liftings were not recognised in the NNPC book of accounts.*"

state that they understand from the PPT Assessments received as part of the discovery process in this Arbitration that the Respondent must also have submitted its own PPT Returns for Years 2005 and 2006, although copies of these PPT Returns have not been provided to the Claimants;

(2)   for the Year 2007, the Respondent filed the PPT Returns prepared by the Claimants, as the Contractor, but also filed PPT Returns that it had prepared; and

(3)   for the years since 2008, the Respondent filed the PPT Returns which it had prepared.[389]

13.5.9   The Claimants dispute that the Respondent is entitled to amend the Claimants' PPT Returns before they are filed with FIRS and to insist that the Tax Oil allocation be based on such amended computation. The Claimants assert that the Respondent is in breach of the Bonga PSC for failing to lift Available Crude Oil in accordance with the Claimants' Tax Oil computation and for not filing the Claimants' PPT Returns with FIRS unamended.[390]

13.5.10   The Claimants further assert that the Respondent's witness Mrs. David-West, during cross-examination at the Hearing, could not justify the Respondent's approach to the preparation and filing of PPT Returns from the Year 2007 onwards by reference to the Bonga PSC. The Claimants submit that it appears that it was done to reconcile the PPT with the Respondent's entitlement model.[391]   The Claimants

---

[389] Para 112 and footnote 58 CPH: TB 1/5.
[390] *See:* CSOC Chapter 10; CSOR Chapter 12; CS Chapter 9.
[391] Transcript, Day 3, p 222, lines 21 – 25.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

submit that the PPT computed by the Respondent is higher than that computed by the Claimants.

13.5.11  The Claimants submit that the Respondent has continued to file single column PPT Returns which they have prepared in respect of the Contract Area as defined in para 1(i) of the Bonga PSC.

13.5.12  The Claimants accept that the Respondent is entitled to bring any issues on which it disagrees to the attention of FIRS.[392]   The Claimants themselves did this in their own covering letters.[393] However the Claimants submit that the Respondent is not entitled to amend the PPT Returns prepared by the Claimants or prepare separate PPT Returns.

13.5.13  The Claimants also point out that the allocation of Tax Oil shall be applied towards the liability of themselves as the Claimants and the Corporation for PPT among other things and the proceeds paid to the Government by the Respondent *"on behalf of both Parties"* pursuant to Clause 8.4 Bonga PSC. Accordingly, the Respondent is the agent of the Claimants in respect of the payment of PPT (or at least in respect of the Contractor's 80% or 65% portion) and the Respondent owes the Claimants a contractual and fiduciary duty to take all reasonable steps to protect the interests of the Claimants, as the Contractor, and not to act in derogation of the Contractor's rights in breach of Clause 7.2(e) of the Bonga PSC.[394]

13.5.14  The Claimants assert that ascertaining Chargeable Profit for the purposes of calculating PPT liability is not the same as simply

[392] See Expert Tax Report of Mr. Victor Onyenkpa, p 19, para 2.3.3.2 at TB D/2.
[393] See, for example, Exhibit C-41 at TB F/80 and Exhibit C-178 at TB F/111.
[394] See CSOR at TB B/6, paras 11.13 to 11.24.  And see Expert Report of Hon. Justice Oguntade, Chapter 9 at TB D/5.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

deducting Royalty Oil and Cost Oil from Available Crude Oil. They are distinct and separate calculations. For example, what is allowed as a Section 10 *PTTA* deduction for the purposes of calculating PPT liability is not necessarily recoverable through an allocation of Cost Oil under the Bonga PSC.

13.5.15 The Claimants submit that PPT liability for the Contract Area was computed in a single PPT Return (also referred to as a single column approach) with the chargeable tax split between the Parties in accordance with their share of Profit Oil. In effect, the Contract Area is treated as a single fiscal entity.[395]

13.5.16 The Claimants also assert that the Respondent has failed to inform them in a timely manner of PPT assessments or other correspondence from FIRS such that the Claimants may be unable to appeal the FIRS' PPT assessments.[396]   The Claimants assert that as regards the Respondent's failure to inform Claimants in a timely manner of correspondence from FIRS relating to the Education Tax for the 2006 year of assessment has exposed the Parties to a penalty and potentially affected the computation of Tax Oil in which Education Tax is a feature.[397]

13.5.17 The Claimants submit that the reason the issue of whose PPT Returns are filed with FIRS and used to compute Tax Oil is very important, because:

   (1)   the evidence shows that PPT assessments issued by the FIRS reflect the amount of chargeable tax calculated in the PPT

---

[395] See witness evidence of Mr. Iain Petrie – Transcript, Day 3, p 82, line 23 – p 83, line 3 and p 83, line 23 – p 84, line 1.
[396] Exhibits C-125 at TB F/149, C-83 at F/175, C-51 at F/178.
[397] Witness statement of Mr. I Petrie, para 49; TB C/9.

Return.[398]   Consequently, the Claimants must file an appeal with the TAT and/or Nigerian courts, but the Claimants may not be able to do so because:

(a)   the Respondent has not passed on the PPT assessments in a timely manner such that the Claimants may receive any such assessments after the statutory period for filing an appeal has expired, so that the assessments received become *"final and conclusive"* pursuant to Section 43(1) of the *PPTA*[399] so that the Claimants, as the Contractor, have no further recourse in Nigeria; and

(b)   the Respondent also argues that the Claimants are not tax-payers;

(which may mean that the Claimants' only redress is before this Tribunal).   The Claimants submit that this is contrary to Section 11(2) *DOA*, which states that each of the Parties is entitled to a tax receipt; and

(2)   even if the TAT were to agree with the Respondent's and FIRS' interpretation of any of the disputed issues, such additional PPT would not be payable until such ruling had been made. Accordingly, the Claimants, as the Contractor, by having to pay PPT prematurely, have been deprived of the time value of that additional tax, as disputed PPT is not payable until there has been a final determination by the TAT pursuant to Section 44 of the *PPTA*.

---

[398] See, for example, the gross proceeds / Chargeable Tax figures mirrored in a) Exhibit C-116 at TB F/152 and Exhibit C-195 at TB F/189 and b) Exhibit C-117 at TB F/170 and Exhibit C-194 at TB F/180.
[399] Legislation CL-3 / RL/3: TB G/B.

240

SNEPCO et ors v NNPC
Privileged and Confidential

13.5.18   As to the Respondent's justification for filing PPT Returns that it has prepared the Claimants assert that:

(1)     differences of interpretation do not amount to illegality;

(2)     the Respondent is denying the Claimants their contractual right to present its PPT Returns to FIRS and defend their interpretation of the various disputed issues;

(3)     the Respondent can achieve its objective by submitting a covering letter to FIRS, setting out the basis of any disagreement;

(4)     it is FIRS and not the Respondent that is responsible for assessing PPT liability for the Contract Area and FIRS can issue a higher PPT assessment if it disagrees with the Claimants' interpretation;

(5)     the Respondent could, if it was so minded, appeal a FIRS PPT Assessment to the TAT; and

(6)     the sanctions prescribed in the *PPTA*[400] would not apply where the tax payer files a PPT Return which it believes to be correct, all the more so if any disputes between the Claimants and the Respondent were brought to the attention of FIRS in a covering letter.[401]   As the Hon. Justice George A. Oguntade, noted in his report:

---

[400]  Sections 52 and 53(1) *PPTA* CL-3/RL-3 at TB G/3.
[401]  As indeed they were in the PPT Returns prepared by the Contractor that were filed with the FIRS for 2005 (Exhibit C-172 at TB F/81) and 2006 (Exhibit C-43 at TB F/106).

241

> "However, *a taxpayer is at liberty to file returns based on its understanding* of the tax law, *even if this understanding is at variance with that of the FIRS, and such taxpayer will not be liable to penalty* so long as its intention in doing so is not to defraud the Revenue".[402]
>
> (emphasis added)

13.5.19   The Claimants submit that the proper procedure for calculation of Tax Oil is that:

(1)   monthly Tax Oil should be allocated in line with the computation of PPT prepared by the Claimants; and

(2)   the Respondent should file the PPT Returns prepared by the Claimants and await a PPT assessment from FIRS. The Respondent may, if it wishes, identify issues of difference between it and the Claimants in a covering letter to the FIRS.

13.5.20   The Claimants submit that they are not asking this Tribunal to make a final ruling on the issue of PPT liability: that falls to the TAT and the Nigerian courts. Rather the Claimants are asking for determinations that the procedures prescribed in the Bonga PSC must be respected by the Respondent -- *pacta sunt servanda* -- and that the Claimants be put in the position they would have been but for such breaches.

13.5.21   In the event that the Tribunal makes a monetary Award to compensate the Claimants for the Respondent's alleged overlift of Tax Oil, and should the Claimants be able to challenge any PPT assessment by

---

[402] Justice Oguntade's Report at TB D/5, p.24, para. 10.2. See also Mr. Adebiyi, Transcript, Day 4, p.167, line 5 -- p.168, line 3.

FIRS in respect of PPT liability the Respondent has already paid, the Claimants undertake not to seek double recovery.

13.5.22   The Claimants seek declaratory Awards set out at Paragraph 348 of the CS namely that:

(1)   the Claimants, as the Contractor, have the exclusive right to compute and allocate Tax Oil in accordance with its Lifting Allocation;

(2)   the Claimants, as the Contractor, shall allocate Tax Oil to the Respondent on the basis of the PPT Returns prepared by the Claimants, as the Contractor;

(3)   the Respondent shall file with the FIRS only the PPT Returns prepared by the Claimants, as the Contractor, (without amendment);

(4)   the Respondent shall pass on communications (including, in particular, PPT Assessments and receipts for PPT paid) from the FIRS to the Claimants, as the Contractor, promptly;

(5)   that the Respondent owes a fiduciary duty to the Claimants, as the Contractor, in respect of the payment of Tax Oil and must take all reasonable steps to protect the Claimants' interests in that respect; and

(6)   the Claimants seek a monetary Award (updated to 30 November 2011) of US$2.87 billion in respect of Tax Oil element of the total overlift,[403] plus interest of US$511,843,568.[404] The

---

[403] See Annex B CPHB.
[404] See Annex D CPHB.

Claimants assert that the Respondent has not challenged the amounts being claimed in these proceedings.

13.5.23  The Parties' submissions as to the various disputed items of the Tax Oil element of the alleged total overlift are described in more detail in the following Sections. The Claimants submit that they total US$2.87 billion which also includes sums attributable to the differing approach of the Parties as regards the timing of the filing of monthly estimated PPT Returns pursuant to Section 33(1) of the *PPTA* and the timing of PPT payments pursuant to Section 45(2) of the *PPTA*.[405]

13.5.24  The Claimants submit that as a result of receiving advice from its Expert, Mr. Adebiyi, the Respondent has now resiled from certain positions that it previously held to justify preparing amended PPT Returns and allocating Tax Oil on that basis. The Claimants submit that it follows that the Respondent should at least file amended PPT Returns with FIRS (as acknowledged by Mr. Adebiyi[406] and Mrs. David-West[407]) and accept that there has been an overlift of Tax Oil. The Respondent has not done so and has made no commitment to do so – rather it has evidenced an intention in these proceedings not to take any steps to correct its acknowledged errors.

13.5.25  Accordingly, the Claimants strongly urge the Tribunal to make a monetary Award.

(3)  *The Position of the Respondents*

---

[405]  See CSOR, para 10.4 and 10.5; First Witness Statement of Mr. Edzard van Loon, paras 104 – 107 at TB C/6.
[406]  Transcript, Day 4, p 165, lines 4 – 11.
[407]  Transcript, Day 3, p 225, line 12.

244

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.5.26   In the RPHB the Respondent refers to its earlier submissions concerning the issue of *"Whether the contractual obligation to prepare PPT Returns inherently comprises of an obligation to ensure compliance with the provisions of the law and whether the Claimant is under an obligation to prepare the PPT Returns in accordance with the law notwithstanding the contractual provisions of the PSC".*[408]

13.5.27   The Respondent denies the Claimants' submission that the Respondent is contractually under an obligation to file PPT Returns as prepared by the Claimants without amending each or substituting a different return. The Respondent submits that it is not obliged to file PPT Returns prepared by the Claimants, as the Contractor, that are wrong with FIRS. The PPT Returns being filed are for and on behalf of both the Claimants as Contractor and the Respondent. For the Respondent to have accepted the PPT Returns prepared by the Claimants would have meant that the Respondent was acting in violation of the law. The Respondent further contends that any PPT Return in respect of a lifting not pursuant to the law is null and void.[409] The Respondent submits that whilst the Claimants in their capacity as the Contractor have a contractual duty to prepare and forward each PPT Return, the Respondent is under a legal duty to ensure that the inputs in the PPT Returns are in accordance with Nigerian law. The Respondent submits that where there is a deliberate attempt to derogate from the law as it asserts is the case here, the Respondent can amend the PPT Returns.

---

[408] See p 44, RASOD, p 29 RRCSOR.
[409] Para 18 i. at 29, RRCSOR.

245

13.5.28 The Respondent refers to the evidence of Mr. Whitomme on behalf of the Claimants and asserts that he presented a contractual model absent an integrated tax component.[410] The Respondent asserts that it is difficult looking at the contractual model to tell what the resulting tax would amount to. The Respondent says that it is therefore not surprising that the Respondent objected to the contractual model on its first presentation.

13.5.29 The Respondent further submits that it was under no obligation to submit a tax return that has now been clearly shown to be in derogation of the law particularly as regards the Realizable Price. As to the Claimants' contention that the Respondent itself had filed a return with a price other than a Realizable Price, while this may be correct, the Respondent asserts that it is not an answer to the Respondent's contention that it was not obliged to file such returns that were in derogation of the law.

13.5.30 The Respondent avers that it is entitled to ignore or amend the PPT Returns prepared by the Claimant for filing with FIRS, pursuant to the provisions of the *PPTA* where they have not been prepared in accordance with the law, in particular Sections 9 (Allocation of Tax Oil), 11 (Payment of Royalty) and 13 (Use of Realizable Price in determining royalty and PPT in respect of crude oil etc) of the *DOA*.[411]

13.5.31 The Respondent asserts that Paragraphs 2(a) and (3) of Article III, Annex B of the Bonga PSC must be read subject to Sections 9, 11 and 13 of the *DOA*. These are mandatory provisions of law and contract

---

[410] See Paragraph 12 at page 4 of Patrick Whitomme's Witness Statement dated 12 July 2010 TB: C/5.
[411] Para 5.5 of the RSOD, Section 6 of RPHB.

which "*thrust on the Respondent the obligation to pay taxes which meet its actual petroleum tax liabilities.*"[412]

13.5.32 The Respondent submits that the allocation of Tax Oil to it must be such that meets the "*actual petroleum profit tax liabilities*" which the Respondent is obliged to pay pursuant to Section 11 of the *DOA*. Consequently the Respondent is under a legal obligation to pay the actual tax.

13.5.33 The Respondent submits that the PPT Returns are a reflection of tax liability. Where these returns are incorrect resulting from an erroneous allocation, if the Respondent were to accept the returns, it would be in breach of its legal obligation to satisfy its tax liabilities. To that extent, the Respondent is legally empowered to amend the PPT Returns regardless of the provisions of the Contract.

13.5.34 The Respondent submits that the issue for consideration is whether taxes and allowances as enumerated in the *PPTA* are paid on an estimated basis as provided for in Sub-sections 33(1) and (2) of the *PPTA* or whether the *DOA* requires a different method i.e., whether taxes should be paid on an actual monthly basis.[413]

13.5.35 The Respondent submits that sections 33(1) and (2) of the *PPTA* require the Claimants to prepare and deliver their estimated tax returns within two months from the commencement of each accounting period. The estimated returns will be on the basis of an estimated profit taking into consideration the company's previous year's production and capital expenditure and the projected production and capital

---

[412] Para 18 iii at pages 29-30. RRCSOR.
[413] At para 9.5.2 of the RPHB the Respondent refers to its earlier submissions as to the method of paying tax (actual or estimated) at page 44 of the RASOD, page 29 of the RRCSOR.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

expenditure in the current year based on a work programme. The estimated tax is then paid by monthly installment over a twelve month period starting in March of the current year until February of the following year.

13.5.36    The Respondent maintains in the RS that the current tax treatment whereby the Contract Area is treated as a single fiscal entity which has a tax liability determined by a single tax calculation does not in itself support the proposition that allowances must flow through the tax calculations.   Indeed to proceed on that assumption is to ignore relevant provisions of the law including Sections 10 and 14 of the *PPTA*, Paragraphs 6 and 7 of the Second Schedule of the *PPTA* and Section 4 of the *DOA*. Allowances flowing through the tax calculation not only disregard the position of the law but put the Respondent at an economic disadvantage.

13.5.37    The Respondent submits that this issue is not strictly a tax dispute as the resolution of the dispute one way or the other will not affect the tax liabilities of the Parties.

13.5.38    The Respondent avers that in accordance with the provisions of the law, it is entitled to ignore or amend the PPT Returns prepared by the Claimant for filing with FIRS, pursuant to the provisions of the *PPTA*.[414] In particular, the PPT Returns not having been prepared in accordance with the law, the Respondent was not bound to accept it for transmission.

(4)    *The Tribunal's Analysis*

---

[414] 5.3.2 of the RASOD.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.5.39   The Tribunal has repeatedly referred to the careful checks and balances built into the Bonga PSC. It must not be forgotten that the Respondent is, as has been found by the Tribunal, controlled by the Federal Government. In that regard the Respondent and the Federal Government must share the same intention in relation to the Bonga Field. That intention was clearly to maximize the revenue therefrom to the utmost extent permitted by the Bonga PSC and the relevant applicable legislation. This has been confirmed by Mr. Justice Bello in his judgment in the FIRS proceedings. This must have been clearly obvious to the drafters of the Bonga PSC particularly those on the Claimants' side and they crafted a contract that provided certain procedures and steps which would give the Claimants, as the Contractor, a degree of protection against any concerted efforts by the Respondent and the Federal Government to increase its revenue from the Bonga Field in excess of that which was agreed.

13.5.40   A main plank in the Respondent's argument is that they could not be a party to the submission of a PPT Return which was not in accordance with the law. It is of course common ground that neither party to the Bonga PSC would or did knowingly take steps to evade tax lawfully due, and that must be correct.

13.5.41   However tax laws are notoriously complicated and it is possible, and frequently occurs, that leading experts in this field may have differing opinions on appropriate tax treatment. The Tribunal considers that the argument that the Respondent had to submit the PPT Returns because it contended that the Contractor's view was unlawful is unavailing. It is clearly not unlawful to put in a tax return on the basis of the law and contract as the taxpayer honestly believes it to be. The arbiter of whether this view is right or wrong is FIRS, subject to any appeals.

249

The arbiter is not the Respondent because if it was it would run counter to the checks and balances that the Parties have so carefully put in place.[415]

13.5.42   The Bonga PSC is an edifice and if one of its building blocks is pulled out the building is in danger of collapse and will not work as anticipated. Similarly, if the procedures set out in the Bonga PSC are not followed as stated, or as mutually altered, then the whole structure of the agreement is in jeopardy and the checks and balances will no longer provide the protection that they were intended to provide.

13.5.43   At the end of the day the Tribunal considers that this dispute all boils down to a question of procedure and a discussion whether, by filing its own PPT Returns, and not passing on the Claimants' PPT Returns, the Respondent has again resorted to self help not provided for in the Bonga PSC.

13.5.44   To illustrate how the breach of the agreed procedure has acted to the detriment of the Claimants it is necessary to have regard to what should have happened and then compare it to what happened in fact consequent upon the Respondent's breach of contract.

13.5.45   Had the terms of the Bonga PSC been adhered to, each PPT Return would have been prepared by the Claimants and with knowledge that there was a dispute with the Respondent as to certain tax treatments. It would, as it had done previously, send a covering letter to FIRS setting out why it thought its treatment was correct. This PPT Return would then be sent to the Respondent who would then pass it on to FIRS, no doubt with a covering letter from the Respondent explaining

---

[415] See Justice Oguntade's Legal Submission referred to above at 13.5.18.

why the Claimants' PPT Return was in error and setting out its own suggestions as to the appropriate tax treatment. FIRS would then make a decision. The Respondent's letter of 6 March 2006 evidences that initially the Respondent took this approach; it later changed it.[416]

13.5.46   Whichever party was dissatisfied with the FIRS' decision would be entitled to appeal to the TAT and/or in certain circumstances apply for judicial review to the High Court. The reason why either Party could launch an appeal if dissatisfied is because the FIRS decision would necessarily involve a finding of liability for tax which would have an effect on each of the Parties.

13.5.47   If the Tribunal now compares the situation as it should have been if the terms of the Bonga PSC had been adhered to, with what happened in fact from 2007 on, one can easily see the harm suffered by the Claimants. Although the Respondent received the Claimants' PPT Returns it did not pass it on to FIRS, but instead submitted its own PPT Returns. Inevitably the Respondent's PPT Returns would make no reference to the Claimants' differing interpretations and thus FIRS would have virtually one sided PPT Returns to consider.

13.5.48   It also appears that the Respondent delayed informing the Claimants of FIRS' assessments, and may have thereby prevented the Claimants from being in a position to challenge the FIRS' assessments. The Tribunal was informed, and this was not challenged, that the Claimants are now out of time to make such a challenge.

13.5.49   If the Respondent had acted in accordance with the Bonga PSC the Claimants would have lifted on the basis of their own lifting allocation

---

[416] CB/13

and been able to submit their own PPT Returns to the Respondent for onward transmission to the FIRS as above. On this basis, they would have been able to enjoy the benefit of the bargain. The Tribunal is of the view that it was quite proper for the Respondent to comment on the Claimants' PPT Tax Returns but what it was not entitled to do, given the terms of the Bonga PSC, was to substitute its own PPT Tax Returns for those prepared by the Claimants.

13.5.50   As stated above, either Party to the Bonga PSC would have been able to appeal a decision of FIRS and if the ultimate decision went against the Claimants they would be bound, as they have always accepted, to recalculate in accordance with the ultimate decision and repay any overlifting by them.

13.5.51   Once a binding decision has been made and if it is in the Respondent's favour, absent consensual repayment by the Claimants, the Respondent would be perfectly at liberty to commence an arbitration under the Bonga PSC to reclaim the value of the Claimants' overlift.

13.5.52   It is plain from the structure of the Bonga PSC – the Parties' agreement – as well as the way that they operated it until 2007 that it was for the Claimants to prepare each PPT Tax Return, to which the Respondent attached their comments before sending both to FIRS for assessment.    However later, the Respondent abandoned the contractually agreed route and submitted its own PPT Returns.  This was a clear breach of contract.

### (5)   *The Tribunal's Decision*

13.5.53   The Tribunal accordingly grants the following relief, being a modified form of the relief sought in Paragraph 348 of the CS,  namely :



(1)　a Declaration that the Claimants, as the Contractor, have the contractual right to compute and allocate Tax Oil in accordance with their <u>initial</u> Lifting Allocation;

(2)　a Declaration that the Claimants, as the Contractor, are contractually entitled to allocate Tax Oil to the Respondent on the basis of the PPT Returns prepared by the Claimants, as the Contractor;

(3)　a Declaration that the Respondent is contractually bound to file with the FIRS only the PPT Returns prepared by the Claimants, as the Contractor, (without amendment) but with their comments attached thereto;

(4)　a Declaration that the Respondent is contractually obliged to pass on communications (including, in particular, PPT assessments and receipts for PPT paid) from FIRS to the Claimants, as the Contractor, promptly; and

(5)　a Declaration that the Respondent owes a fiduciary duty to the Claimants, as the Contractor, in respect of the payment of Tax Oil and must take all reasonable steps to protect the Claimants' interests in that respect.

**13.6      The Claimants' Sixth Claim: The Claimants' ITC Claim**

     *(1)      The Parties' Agreed Issues*

13.6.1      The Parties have agreed that the specific issues arising with regard to the Claimants' ITC Claim are whether the Claimants, as the Contractor, when preparing PPT Returns are contractually entitled, as they assert, to:

     (1)      deduct ITC as a credit from assessable tax; and

     (2)      not deduct ITC from qualifying capital expenditure;

     as jointly agreed by the Parties' tax experts.

13.6.2      Each of the Parties has confirmed that their respective tax experts have opined that the correct approach to ITC is indeed to deduct it as a credit from assessable tax (which is referred to in Section 15.3(b) of the Bonga PSC (the "*Assessable Tax*")), and not to deduct ITC from qualifying expenditure (which term is referred to in Section 4(1) of the *DOA* (the "*Qualifying Expenditure*" or the "*Qualifying Capital Expenditure*")).[417]

13.6.3      In summary, the Claimants assert that PPT liability under a Bonga PSC is based on the joint income and expenditures of the Parties to the Bonga PSC in respect of Petroleum Operations in the Contract Area, with the Chargeable Tax (i.e. the bottom line of the PPT computation) being split between the Parties. In so asserting they rely on Clause 15(3)(b) of the Bonga PSC, Section 4(1) of the *DOA* and Section 22 of the *PPTA*, as discussed further below. They submit that they are

---

[417] The Tax Experts do differ as to whether the Claimants are engaged in Petroleum Operations rendering them eligible to benefit from ITC.

254

eligible to claim ITC: (1) having incurred the Qualifying Capital Expenditure; and (2) because in any event ownership of the assets under Clause 11 of the Bonga PSC is irrelevant because ownership of the assets is vested in the single fiscal entity for the Contract Area.

13.6.4   The Claimants submit that the Respondent is in breach of Clause 15.3(b) and Article III (2)(d) of Annex B of the Bonga PSC by deducting ITC from Qualifying Capital Expenditure rather than from Assessable Tax, when preparing its lifting allocation model and the PPT Returns.

13.6.5   In summary, the Respondent submits that the Claimants are not entitled to the benefit of ITC on the grounds that they:

(1)   are not involved in Petroleum Operations as defined in Section 2 of the *PPTA* and are therefore not subject to the PPT regime; and

(2)   have not incurred any Qualifying Capital Expenditure, because they do not own, but merely *"finance"*, the assets used in the development of OML 118. The Respondent asserts that ownership of the assets is a fundamental pre-requisite to be eligible to claim ITC under Clause 6 of the Second Schedule of the *PPTA* entitled *"Annual Allowance"*.

13.6.6   The Respondent further submits that the Claimants have, in any case, misapplied ITC, which should have been offset against Qualifying Capital Expenditure rather than deducted from Assessable Tax.

(2)   *Issues Addressed in this Chapter*

13.6.7   As set out in Chapter IX above, the Tribunal, after considering the submissions of each Party, has determined that the Claimants are engaged in Petroleum Operations for the purposes of the *PPTA*.

13.6.8   In this Chapter, the Tribunal outlines the relevant provisions of the Bonga PSC, the *DOA* and the *PPTA*. It then outlines the history of the ITC legislative framework, as this has been amended several times since 1993.   Finally the Tribunal summarizes and analyzes the submissions of the Parties as to:

(1)   whether the Claimants have incurred the Qualifying Capital expenditure;

(2)   whether the Claimants are eligible to the benefit of ITC under the *PPTA*, read with the *DOA* and the provisions of the Bonga PSC; and

(3)   how ITC is to be applied under the Bonga PSC in accordance with the applicable law.

13.6.9   ITC is also the subject of the Respondent's Counterclaim, which is discussed at Chapter XIV below.

### (3)   *The Relevant Bonga PSC Provisions*

13.6.10   Clause 11 of the Bonga PSC provides for *"Title To Equipment"* and among other things says:

> *"11.1 The CONTRACTOR shall finance the cost of purchasing all equipment to be used in Petroleum Operations in the Contract Area pursuant to the Work Programmes and such equipment shall become the property of the CORPORATION on arrival in Nigeria. The*

256

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

CONTRACTOR and the CORPORATION shall have the right to use such equipment exclusively for Petroleum Operations in the Contract Area during the Term of this Contract. ...

11.2 ...

11.3 ...

11.4 Title to all lands purchased or otherwise acquired by the CONTRACTOR for the purposes of Petroleum Operations and all movable property utilized in the Contract Area and incorporated permanently in any premises, locations and structures for the purposes of Petroleum Operations hereunder shall be in the name of the CORPORATION and the CONTRACTOR. Upon termination of this Contract pursuant to Clause 3, the CORPORATION shall take possession of such lands and property and the CONTRACTOR shall hand over such lands and property within thirty (30) days.

11.5 ...

11.6 During the term of this Contract, any agreed sale of equipment, lands, fixed assets, materials and machinery acquired for the purpose of the Petroleum Operations hereunder shall be conducted by the CONTRACTOR on the basis of the highest price obtainable and the proceeds of such sale shall be credited to the Petroleum Operations."

13.6.11  Clause 15(3)(b) of the Bonga PSC provides for ITC as follows:

257

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*"The ITC rate applicable to the Contract Area shall be fifty percent (50%) flat rate for the duration of this Contract. In computing the PPT payable, the ITC shall be applicable in full to the Petroleum Operations in the Contract Area, such that the chargeable tax is the amount of the assessable tax less tax offsets of which ITC is an item. The chargeable tax so derived, shall be split between the CORPORATION and CONTRACTOR in accordance with the relevant proportion of the percentage Profit Oil split."*

13.6.12   Clause 2(d) of Article III of the Annex B of the Bonga PSC concerning *"Accounting Procedure"* provides as to the computation of ITC that:

*"The Investment Tax Credit (ITC) shall, subject to the provisions of the PPT Act as amended be fifty (50%) flat rate. In computing the PPT payable, the ITC shall be applicable in full to the Petroleum Operations in the Contract Area such that the chargeable tax is the amount of the assessable tax less tax offsets of which ITC is an item. The chargeable tax so derived shall be split between the CORPORATION and the CONTRACTOR in accordance with the proportion of the percentage of Profit Oil split".*

**(4)   *The Relevant Statutory Provisions***

13.6.13   Section 4(1) of the *DOA* provides for ITC as follows:

*"(1)   Where the Nigerian National Petroleum Corporation (in this Act referred to as "the Corporation") or the holder and the contractor have incurred any qualifying capital*

258

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> *expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried out under the terms of a production sharing contract in the Deep Offshore or Inland Basin, there shall be due to the parties in respect of the production sharing contracts executed prior to 1 July 1998, a credit (in this Act referred to as "investment tax credit") at a flat rate of 50 per cent of the qualifying expenditure in accordance with the production sharing contract terms for the accounting period in which that asset was first used for the purposes of such operations."*

13.6.14    Section 22 of the *PPTA* also provides for ITC as follows:

> *"(1)    A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax in accordance with the provision of the Production Sharing Contract.*
>
> *(2)    The investment tax credit rate applicable to the contract area shall be 50% flat rate of chargeable profit for the duration of the Production Sharing Contract.*
>
> *(3)    In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.*

259

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(4)     The chargeable tax computed under subsection (3) of this section shall be split between the Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit of oil split.

(5)     In this section —

"contract area" means the contract area as defined in the Production Sharing Contract;

"Production Sharing Contract" has the meaning assigned to it in the Deep Offshore and Inland Basin Production Sharing Contracts Act."

13.6.15   Paragraph 6.1 of the Second Schedule of the *PPTA* concerning "*Initial Allowances*" states as follows:

"Subject to the provisions of this Schedule where in any accounting period, a company owning any assets has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company as from the accounting period in which such expenditure was incurred, an allowance (in this Act referred to as "an annual allowance") at the appropriate rate per centum specified in Table 11 of this Schedule".

(5)     *The History of the ITC Legislative Framework since 1993*

13.6.16   In 1993 at the time the Bonga PSC was signed, the *PPTA Cap 354 as amended* comprised the *Petroleum Profits Tax Act 1959* and two

260

amendments – the *Petroleum Profits Tax (Amendment) (No. 2) Decree No. 24 of 1979* ("*Decree 24 of 1979*") and the *Petroleum Profits Tax (Amendment) (No. 3) Decree No. 95 of 1979* ("*Decree 95 of 1979*").

13.6.17   The *PPTA Cap 354* originally promulgated in 1959, provided for an "*Initial Allowance*" regime as follows:

> "*Subject to the provisions of this Schedule, where in any accounting period of a company, the company owning an asset has incurred in respect thereof qualifying expenditure wholly and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company for the accounting period in which that asset is first used for the purpose of such operations an allowance (in this Schedule called an "initial allowance") at the appropriate rate per cent, set forth in the Table to this Schedule, of such expenditure.*"

The Claimants assert that the effect of the above was that the taxpayer was entitled to deduct a percentage of the costs incurred from any taxable income, while it was not required to reduce its capital allowances by a corresponding amount.

13.6.18   However, the *PPTA Cap 354* was subsequently amended twice in 1979, by *Decree 24 of 1979* (on 26 June 1979) and *Decree 95 of 1979* (on 28 September 1979).

13.6.19   *Decree 24 of 1979* introduced the ITC regime and replaced Paragraph 5 of the Second Schedule to the *PPT Act 1959* with the following provision providing for ITC to be deducted from the cost of assets:

261

"5(1) — *For the purposes of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried on by it, there shall be due to that company, for the accounting period in which that asset was first used for the purpose of such operations an allowance (in this Schedule called 'investment tax credit') at the appropriate rate per cent, set forth hereunder, of such expenditure that is ...[rates of 5% to 20% depending on water depth].*

5(2)  — *For the purposes of this Act, the investment tax credit shall be deducted from the cost of the asset to arrive at the amount of the qualifying expenditure and before calculating annual allowance in the manner provided for in Paragraph 6 below.*

5(3)  — *Nowithstanding any other provisions in this Act, investment tax credit shall be a credit against tax payable and not a charge against income*" (emphasis added);

13.6.20   However, only three months later, **Decree 95 of 1979** replaced Paragraph 5 of **Decree 24 of 1979** with retrospective effect from 1 April 1977, by the following provision:

"5 — *In the Second Schedule to the principal Act — (a) for Paragraph 5 thereof, there shall be substituted the following new paragraph —*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

5.  *Subject to the provisions of this Schedule, where in any accounting period of a company, the company owning any asset has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company for the accounting period in which such expenditure was incurred, an investment tax credit for the purpose of Section 17(2)(c) at the appointment [sic] rate per centum of such expenditure as set out in Table 1 to this Schedule."*

The Claimants assert that the effect of *Decree 95 of 1979* was that ITC was only to be deducted from Assessable Tax and not from Qualifying Capital Expenditure.[418]

13.6.21   Following 1993, three decrees were made that were relevant to the application of ITC: the *Finance (Miscellaneous Taxation Provisions) (No. 2) Decree No. 31 of 1996* ("*Decree 31 of 1996*"), the *DOD*, and the *Finance (Miscellaneous Taxation Provisions) Decree No. 30 of 1999* ("*Decree 30 of 1999*").

13.6.22   The *DOA* was later enacted and implemented in substitution for the *DOD*, and in 2007 the *PPTA* became law as discussed further in paragraph 13.6.27 below.

13.6.23   *Decree 31 of 1996* provided for a petroleum investment allowance regime in place of an investment tax credit that, rather than allowing a full investment tax credit (i.e. a sum deducted from the total amount

---

[418] Second Witness Statement of Mr. Iain Petrie, Paragraph 30: TB C/10.

of tax due), provided  for a tax deduction (i.e. a sum that can be deducted in the process of calculating the amount of tax due). The Tribunal notes that the Respondent has described this as *"no more than a name change"*[419] while the Claimants dispute that it provided a less valuable benefit.

13.6.24   The *DOD* of 1999, was stated to be of effect as of 1 January 1993. Pursuant to Section 4(1) it expressly provided for an ITC regime for Bonga PSCs entered into before 1 July 1998 with ITC at a flat rate of 50% of the qualifying expenditure.  Section 4(1) of the *DOD* is in similar terms to Section 4(I) of the *DOA* set out at para 13.6.13 above.

13.6.25   Section 15 (1) of the *DOD* provides that its terms prevail over those of other enactments or laws including over the *PPTA Cap 354* as follows:

> *"The relevant provisions of all existing enactments or laws, including but not limited to the Petroleum Tax as amended and Petroleum Profit Tax Act as amended, shall be read with such modifications as to bring them into conformity with the provisions of this Decree."*

13.6.26   Section 11 of *Decree 30 of 1999* replaced Section 20 of the *PPTA Cap 354* by the following provision:

> *"20 (1) A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an*

---

[419] RSOD, Paragraph 10(vii).

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

offset against tax in accordance with the provisions of the Production Sharing Contract.

(2)    The investment tax credit rate applicable to the contract area shall be fifty percent flat rate of chargeable profit [sic][420] for the duration of the Production Sharing Contract.

(3)    In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.

(4)    The chargeable tax computed under subsection (3) of this section shall be spilt [sic] between the Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit oil split.

(5)    In this section

       'contract area' means the contract area as defined in the Production Sharing Contract;

       'Production Sharing Contract' has the meaning assigned to it in the Deep Offshore and Inland Basin Production Sharing Contracts Decree 1999".

       (emphasis added)

---

[420] The Claimants assert that this reference to "chargeable profit" is in error and should be a reference to qualifying expenditure as appears in section 4(1) of the *DOA*.

265

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.6.27   In 2007, the *Revised Edition (Laws of the Federation of Nigeria) Act 2007* (the "*Revised Laws Edition*") was passed, which included the *PPTA*. This was a revised compilation of all Nigerian statutes in force as of 31 December 2002; a draft of the Revised Laws Edition, which included the *PPTA*, was first published in 2004 by the Nigerian Law Revision Committee.

(6)   *The Claimants' Position*

(a)   *Incurring of Qualifying Capital Expenditure*

13.6.28   The Claimants assert that the Respondent's argument that the Claimants have not incurred Qualifying Capital Expenditure for ITC purposes is contrary to the terms of:

(1)   the Bonga PSC;

(2)   the *DOD* (later the *DOA*); and

(3)   the subsequent conduct of the Respondent and the Government;

all of which confirm that the Claimants are recognised as incurring the Qualifying Capital Expenditure, and are therefore entitled to certain fiscal incentives such as ITC and the benefit of capital allowances (albeit there is subsequent disagreement as to exactly how those incentives apply).

13.6.29   The Claimants assert that in fact they, as the Contractor, have incurred all the capital costs associated with the development of OML 118 (e.g. the costs of the five EPIC Contracts referred to Chapter V above).[421] The total capital costs incurred up to the start of commercial

---

[421] CSOC Paragraphs 5.10 to 5.21.

266

production of the Bonga Field in November 2005 in the exploration and development of OML 118 by the Claimants, as the Contractor, amounted to approximately US$4.3 billion.[422]  By comparison, the Respondent has incurred <u>no</u> capital expenditure at all

13.6.30  The Claimants submit that the Bonga PSC regime is a structure by which the Claimants, as Contractor, advance all funds required to develop a given block on the proviso that these can be recovered if commercial production is achieved (as the Respondent admits).  They assert that the Bonga PSC regime was put in place specifically to avoid the situation under the previous joint venture regime in which the Respondent was frequently unable to meet its share of cash calls.[423]  Thus the Claimants assert that  ITC as a credit (and not an allowance) was included as a fiscal incentive in the Bonga PSC intended to offset the effects of PPT and encourage IOCs to incur the huge capital expenditure required for deepwater exploration.[424]  It was approved as such on behalf of the Government by the Honourable Minister of Petroleum Resources.

13.6.31  The Claimants assert that fiscal incentives of similar nature have been provided for PSCs in other parts of the world.[425]

13.6.32  The Claimants submit that it was originally intended that ITC would <u>exclusively</u> benefit them as the Contractor,[426] although it was

---

[422] Para 20 CPHB.
[423] Witness Statement of Dr. Robert Jonkman, Paragraph 11: TB C/2.
[424] Letter from NNPC to SPDC of 16 April 1992 (Exhibit C-12); *Guardian* article dated 17 January 1996 (Exhibit C-8); *"Taxation of Oil and Gas in Nigeria: Prospect for Investors"*, paper dated 19 March 1998 presented at the Workshop on Oil and Gas Industry in Milan, Italy by J.K. Naiyeju, Msc. FCA, FCTI, Chairman, FIRS, pages 10-11 (Exhibit C-115); Witness Statement of Mr. Philip Turberville, Paragraph 11; Witness Statement of Dr. Robert Jonkman, Paragraphs 21 – 27; Witness Statement of Mr. Edwin Turner, Paragraphs 23, 27 and 28.
[425] Witness Statement of Dr. Robert Jonkman, Paragraph 21; TB C/2 Witness Statement of Mr. Edwin Turner, Paragraphs 14, 16 and 23 to 29. TB C/3.

267

subsequently agreed that ITC would in fact be <u>shared</u> with the Respondent.[427]   The Claimants submit that the Respondent's assertion that it alone is entitled to the benefit of ITC therefore runs counter to the negotiating history of the deepwater PSCs.

13.6.33   The Claimants further submit that in the circumstances the Respondent's arguments premised on ownership of the assets in question pursuant to Clause 11.1 of the Bonga PSC are irrelevant since ownership is vested in the single fiscal entity.

13.6.34   The Claimanats submit that the Respondent's argument is particularly surprising given that it has acted at all times as if the Claimants, as the Contractor, are entitled to tax credits/capital allowances (albeit it disagreed as to their exact application), for example:

   (1)   the Respondent has filed PPT Returns for OML 118 with FIRS for each of Years 2005 to 2010 [428] which include their interpretation as to how ITC should be applied; and

   (2)   the Respondent has previously held discussions with the Claimants, as the Contractor, in which, whilst the precise application of ITC was disputed, the Contractor's entitlement to it was never doubted.[429]

---

[426]   Witness Statement of Mr. Edwin Turner, Paragraph 23; TB C/3.
[427]   Witness Statement of Mr. Edwin Turner, Paragraphs 27 and 28; TB C/3.
[428]   Letter from NNPC to FIRS dated 26 June 2006 (Exhibit C-42); Letter from NNPC to FIRS dated 22 August2006 (Exhibit C-45); Letter from NNPC to FIRS dated 26 February 2007 (Exhibit C-46) and Letter from NNPC to FIRS dated 30 June 2008 (Exhibit C-47); Letter from NNPC to FIRS dated 25 May 2009 (Exhibit C-48); Letter from NNPC to SNEPCO dated 2 March 2009 (Exhibit C-49) and Letter from NNPC to FIRS dated 6 April 2010 (Exhibit C-50).
[429]   Letter from SNEPCO to NNPC (attaching Briefing Paper) of 14 December 2007 (Exhibit C-96).

13.6.35  The Claimants further submit that Clause 15.3 of the Bonga PSC confirms that:

    (a)    the Claimants, as the Contractor, take the benefit of ITC because it reduces the amount of PPT payable which is *"split between the CORPORATION and the CONTRACTOR"*;

    (b)    as ITC is *"applicable ... to the Petroleum Operations in the Contract Area"* and the Claimants, as the Contractor, are entitled to take the benefit of ITC, they must be involved in Petroleum Operations; and

    (c)    if the Claimants, as the Contractor, are involved in Petroleum Operations, they are therefore subject to the PPT regime (which is underlined by the fact that *"ITC shall be [calculated] in accordance with the PPT Act"*) which means they must be entitled to claim Capital Allowances.

13.6.36  The Claimants submit that Section 4(1) of the *DOD* expressly confirms that the Claimants, as the Contractor, are entitled to ITC.

13.6.37  The Claimants submit that, FIRS has:

    (1)    accepted the various PPT Returns;

    (2)    issued a PPT Assessment for 2009 [430] which accepts the principle that Capital Allowances and ITC reduce the PPT charge for the Contract Area;

---

[430] Letter from NNPC to SNEPCO appending the 2009 PPT and Education Tax Assessments (Exhibit C-107). TB F/199.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(3)   assumed in its letter of 24 May 2010 that the Claimants, as the Contractor, are entitled to Tax Credits / Capital Allowances;[431] and

(4)   has stated a position previously in accord with Claimants' approach to ITC.[432]

13.6.38   The Claimants submit that accordingly, the Respondent's argument that the Claimants, as the Contractor, are <u>not</u> entitled to the benefit of ITC and Capital Allowances must be rejected being contrary to the very premise of OML 118 governed by the Bonga PSC being a single fiscal entity with a single tax liability but is also inconsistent with:

(1)   the wording of, and intent behind, Clause 15.3 of the Bonga PSC;

(2)   the fact that the Claimants, as the Contractor, incurred the Capital Costs;

(3)   Section 4(1) of the *DOD;*

(4)   the ITC regime in place;[433] and

(5)   the various actions of FIRS as outlined in Paragraph 13.6.37 above.

(b)   *The Claimants' Approach to Calculating ITC*

13.6.39   The Claimants assert that when allocating Tax Oil they are entitled to apply the ITC as a credit against Assessable Tax rather than have it

---

[431] TB F/197; C-108/RE/12.
[432] See p 6 of the historic extract from the FIRS website, visited on 26 November 2007 (Exhibit C-97): TB F/131.
[433] Witness statement of Dr. Robert Jonkman, para 25: TB C/2.

270

deducted from Qualifying Capital Expenditure, for the benefit of all Parties.[434]   As referred to above, they rely upon Clause 15.3 of the Bonga PSC and Section 4(1) of the *DOA* (previously Section 4(1) of the *DOD*) which provide that there shall be due to the Parties a credit (ITC) at a flat rate of 50%; they also rely upon Section 12(1) of the *DOA* which provides for the split of Chargeable Tax between the Parties, and Section 22 of the *PPTA* which provides for ITC benefits for PCSs.

13.6.40   The Claimants claim that a single PPT Return is filed for the Parties with FIRS in respect of the calculation of Chargeable Tax in the Contract Area which the Claimants refer to as a *"single fiscal entity."*[435]   They assert that the determination of taxable profit for the purposes of calculating PPT liability is not the same as simply deducting Royalty Oil and Cost Oil from Available Crude Oil.

13.6.41   The Claimants illustrate their approach to the determination of taxable profit as follows:[436]

---

[434]  *See:* SCOC Chapter 11; CSOC Chapter 13; CS Chapter 11.
[435]  1st Witness Statement of Mr. Iain Petric at TB C/9, para 19.
[436]  Para 206 CS.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*



* Tax liability is shared in the same ratio as the Profit Oil ratio.

13.6.42   The Claimants submit that it is Chargeable Tax, i.e. PPT liability, that is allocated as Tax Oil to meet the liability due to the FIRS arising from the Contract Area.

13.6.43   The Claimants explain that they, as the Contractor, prepare the Tax Oil computation every month for their monthly Lifting Allocation. After year-end, they then prepare and send to the Respondent for onward filing with the FIRS an Estimated PPT Return for the year, and later a final PPT Return.

13.6.44   The Claimants, as Contractor, have always computed the PPT liability (and consequently allocated Tax Oil) on the basis that ITC is a credit against Assessable Tax and has not treated it also as a deduction against Qualifying Capital Expenditure (as the Respondent has done).

272

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.6.45   The Claimants assert that by applying ITC as a deduction from Qualifying Capital Expenditure as well as a credit against Assessable Tax in its entitlement model and the PPT Returns it prepared, the Respondent was clearly in breach of Clause 15.3 of the Bonga PSC and Section 4(1) of the *DOA*.

13.6.46   The Claimants contend that the Respondent has changed its position (from that which was understood by all the Parties in 1993) and ignored relevant commentaries by leading writers;[437] in support of this counterclaim they refer to their witnesses' evidence (e.g. Mr. Turberville, Dr. Jonkman, Mr. Turner, Mr. Petrie) and also to the Expert Tax Report of Mr. Victor Onyenkpa.[438]

13.6.47   The Claimants point out that the Respondent's approach was not supported by its own tax expert, Mr. Olaleye Adebiyi, who accepted that the Claimants' treatment of ITC was correct[439] and confirmed at the hearing:

> "Q   *(The Chairman): I think you both agree that ITC does not reduce the cost of the underlying Qualifying Capital Expenditure, but is an amount used to reduce the amount of assessable tax.*
>
> A   *(Adebiyi): That's correct, sir.* "[440]

13.6.48   The Claimants submit that the true position is that as OML 118 is a single fiscal entity, the benefit of ITC and Capital Allowances should properly flow to both the Claimants, as the Contractor, and the

---

[437] See SoR, para 11.17, at TB B/6.
[438] TB D/2, para 2.3.4.
[439] See joint tax Expert Report at TB D/1, para 6(e).
[440] Transcript, Day 4, p 65, lines 4 – 8.

273

Respondent.[441]   Whilst all Qualifying Capital Expenditure has, as a matter of fact, been incurred by the Claimants, as the Contractor, from the point of view of OML 118 as a single fiscal entity, the requirement for the Bonga Field to attract the benefits of ITC and Capital Allowances is that such Qualifying Capital Expenditure has been incurred in respect of its development irrespective of the origin of the funds.

13.6.49   The Claimants assert that the Respondent's approach, if accepted, would run counter to the very premise of the OML governed by the Bonga PSC being a single fiscal entity with a single tax liability;[442] and that the issue of whether it is the Claimants, as the Contractor, or the Respondent, who have incurred Qualifying Capital Expenditure has no bearing on the calculation of the tax liability of the block, because both benefit from ITC and Capital Allowances which both "flow through" the single tax calculation.

13.6.50   The Claimants repeat that the express terms of the Bonga PSC make it clear that the Claimants, as Contractor, are entitled to benefit from ITC. Clause 15.3 Bonga PSC states:

   "*(a)*   *The ITC shall be in accordance with the PPT Act as amended.*

   *(b)*   *The ITC rate applicable to the Contract Area shall be fifty percent (50%) flat rate for the duration of the Contract. In computing the PPT payable, the ITC shall be applicable in full to the Petroleum Operations*

---

[441]  See Chapter 4, CSDR.
[442]  The amount of PPT paid in respect of the block is divided between the Contractor and the Respondent – see sections 11(1), 11(2) and 12 *DDD.*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*in the Contract Area, such that the chargeable tax is the amount of assessable tax less tax offsets of which ITC is an item. The chargeable tax so derived shall be split between the CORPORATION and the CONTRACTOR in accordance with the relevant proportion of the percentage Profit Oil split"* (emphasis added).

13.6.51 The Claimants assert that it is significant that Clause 15.3(b) of the Bonga PSC makes no mention of ITC being off-set against Qualifying Capital Expenditure, as maintained by the Respondent.

13.6.52 The Claimants assert that if the Respondent's interpretation were correct (i.e. deducting ITC from both Qualifying Capital Expenditure and assessable tax), then, as evidenced by the Respondent's computations, the benefit of the fiscal incentive to the Claimants, as the Contractor, would effectively be halved.  The Claimants note that, if ITC were applied as the Respondent contends (i.e. deducting ITC from both Qualifying Capital Expenditure and Assessable Tax), then its economic effect would (but for the minor difference in the timing of payments due) be identical to that of the Investment Tax Allowance ("*ITA*") applicable to the post-1998 PSCs:

275

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

| | ITC the Contractor's View | ITC the Respondent's View | ITA |
|---|---|---|---|
| Asset Cost (1) | 100 | 100 | 100 |
| ITC or ITA | 50 (50% of (1)) | 50 | 50 |
| Tax Relief on ITC or ITA | 50 | 50 | 25 (i.e. 50% tax relief on ITA amount) |
| Qualifying Capital Expenditure (3) | 100 (100% of (1))* | ≈100-50 | 100 |
| Tax Relief from Capital Allowances (on Qualifying Capital Expenditure) (4) | 50 (i.e. 50% tax relief on 100% depreciation) | 25 | 50 |
| Total tax relief (i.e. (2) +(4)) | 50+50=100 | 50+25=75 | 25+50=75 |

\*   Under Nigerian law, 99% of Qualifying Capital Expenditures are allowed for Capital Allowances, however, the above calculation has been simplified for presentational and explanatory reasons to assume 100% Capital Allowances.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.6.53   If the net effect of ITC (as the Respondent contends it should apply) and ITA are the same, the subsequent introduction of ITA appears to be without purpose.

13.6.54   The Claimants assert that their approach to ITC is in accordance with Industry practice[443] and commentators' opinions.[444]

(c)   *Remedies Sought*

13.6.55   The Claimants seek the declarations at Paragraphs 349(l), (m),(n) and (o) of the CS.  The Claimants seek a monetary Award (updated to 30 November 2011) of US$917,664,000 in respect of this element of the overlift,[445] plus interest of US$159,937,063.[446]  The Respondent has not challenged the amounts being claimed in these proceedings.

13.6.56   The Claimants reiterate their request for a declaratory Award that, in calculating Tax Oil, ITC shall only be deducted from Assessable Tax and shall not also be deducted from Qualifying Capital Expenditure.

13.6.57   In addition, for the reasons set out above, the Claimants submit that the Respondent has overlifted Available Crude Oil in excess of its entitlement and the Claimants seek damages accordingly.

---

[443] As demonstrated in the PPT returns from, for example, 1991 (Exhibit C-92), 1992 (Exhibit C-93) and 1993 (Exhibit C-94); Witness Statement of Dr. Robert Jenkman, Paragraph 25; Witness Statement of Mr. Edwin Turner, Paragraphs 37 and 38.
[444] See: IRS Analysis (Exhibit C-98); p 200, I.A. Ayua, The Nigerian Tax Law (1996) (Exhibit C-99); and Paragraph 10(e) on p 37 of Tunde Oremade, Petroleum Profits Tax in Nigeria (1986) (Exhibit C-100) (where further clarification on the nature and treatment of the ITC is also provided on pages 60-61).
[445] See Annex B CPHB.
[446] See Annex D CPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

#### (7)   *The Respondent's Position*

13.6.58   The Respondent submits that as regards ITC, there are two main issues:[447]

(1)   the determination and application of ITC: whether a Party or Parties is entitled to an ITC without a requirement to depreciate the capital base before offsetting the credit against chargeable tax; and

(2)   which of the Parties is entitled to the benefit of ITC.

#### (a)   *Whether the Claimants have incurred Qualifying Capital Expenditure*

13.6.59   The Respondent argues that the Claimants have not incurred Qualifying Capital Expenditure (which would entitle them to the benefit of ITC and Capital Allowances), because the Claimants, as the Contractor, they are merely a "*financier*" of the capital assets, and the cost of the assets is incurred by the license holder, namely the Respondent, who "*pays the Contractor for it in full by an allocation of Cost Oil*". The Respondent relies upon Clauses 11.1, 11.2 and 11.5 of the Bonga PSC in support of this contention.

13.6.60   The Respondent asserts that the criteria for the determination of ITC is contained in Section 4(1) of the *DOA* which requires that a "*Qualifying Capital Expenditure*" must have been incurred and the *DOA* contemplates that both Parties have incurred an expenditure.[448]

---

[447] Para 10.1.2 of RS.
[448] Para 10.1.4 RS.

278

SNEPCO et ors v NNPC
Privileged and Confidential

13.6.61  The Respondent submits that having incurred the Qualifying Capital Expenditure, and the ownership of the asset being vested in it by the express terms of the Bonga PSC (Clause 11), the Respondent is the Party who satisfies the criteria to be entitled to the benefit of ITC.

13.6.62  The Respondent submits that the Claimants' contention that pre-contractual negotiations appear to have intended ITC to be shared by both Parties is misconceived for the following reasons:

(1)  pre-contractual negotiations are of little significance in the interpretation of the law; and

(2)  incentives were granted on assumptions that no longer exist.

13.6.63  The Respondent invites the Tribunal to refer to the case of *Farrell v Alexander*[449] where Lord Simon stated as follows:

> "In the construction of written documents including Statutes, what the court is concerned to ascertain is, not what the promulgators of the instruments meant to say, but the meaning of what they have said".

13.6.64  The Respondents assert that the Claimants have never contended that a Capital Allowance was an incentive that induced their entry into the Bonga PSC. Nevertheless the Claimants benefit substantially from the Capital Allowance on the grounds that the relief is for an abstract entity called the Single Fiscal Entity/Contract Area which is shared between both Parties in a ratio of 80% to 20% split in favour of the Claimants, as the Contractor (from May 2011 changed to a 65%/35%

---

[449]  (1997) AC 59 at 81G – see para 10.1.6 of RS.

279

split).  The Respondent submits that there is no law that supports this proposition of the Claimants.

13.6.65   Indeed, the Respondent submits that the relevant provision of the law support the opposite contention, relying on Clause 6 of the Second Schedule of the *PPTA*.

13.6.66   The Respondent further submits that a Capital Allowance is not strictly speaking an incentive. It is an allowance that is claimed once the conditions specified in the *PPTA* are met. These conditions are:

(1)     a company must own an asset; and

(2)     a company must have incurred a capital expenditure that satisfies the WEN test.[450]

Thus a company that wants to claim a Capital Allowance must satisfy the conditions of ownership of assets and have incurred the Qualifying Capital Expenditure.

13.6.67   The Respondent submits that pursuant to Clause 11 of the Bonga PSC, the ownership of all equipment to be used and all fixed assets purchased or acquired by the Claimants, as the Contractor, in petroleum operations in the Contract Area passes to the Respondent upon arrival in Nigeria. By virtue of this transfer to the Respondent, coupled with consideration having been furnished by the Respondent, the Claimants, cease to be the owner and are therefore not entitled to claim a Capital Allowance in respect of those assets.

---

[450] See Section 9.6, RPHB.

13.6.68   The Respondent asserts that a similar situation arose in the United Kingdom where the Bonga PSC Contractors would have had no right to Capital Allowance having transferred the assets to the host government. To address this HM Treasury Department introduced a new Section 64A into the ***Capital Allowance Act***[451] (***"Section 64A"***). Under the new provision, the Bonga PSC Contractors were giving what is called a deemed ownership.

13.6.69   The Respondent submits that the Explanatory Notes to Section 64A are instructive. These provide as follows:

> *"Clause 80A: Capital Allowance: Production Sharing Contracts*
>
> *2.) Under the terms of most PSCs, ownership of the machinery or plant used by the oil company generally passes at some point to the host government, although the oil company continues to use the machinery or plant to fulfil its obligations under the contract. Before Budget day, as soon as the machinery or plant ceased to belong to the oil company, it ceased to attract machinery or plant allowances, even if the company had originally purchased the assets and was continuing to use them."*

13.6.70   The Respondent submits that Section 64A addresses this problem of the PSCs by deeming the assets to belong to them, even after the transfer of ownership to host government.

---

[451] See para 11.5 RS.

281

13.6.71 The Respondent submits that the contention of the Claimants is startling in that notwithstanding that the title to assets has passed to the Respondent, and the Claimants have also recovered 100% of their costs from the Respondent, they still claim to be entitled to a Capital Allowance through the indirect fiction of a *"Contract Area"*.

13.6.72 The Respondent contends that the Claimants are submitting that wherever the word *"Company"* is used in the *PPTA*, it should be substituted for the term *"Contract Area"*. The Respondent submits that this argument is flawed for the following reasons:

(1) a statute is given its natural meaning unless it leads to an absurdity;

(2) the single line computation is an inference drawn from the Claimants' understanding of the Bonga PSC;[452] and

(3) the Claimants sought to interpret the law on a matter which it should ordinarily subject itself to the court directions.

13.6.73 The Respondent re-stated the Expert's submission in providing the rationale for the claim of an Investment Tax Credit where he stated as follows:[453]

> *"What is it saying? You cannot find a time when the two parties bought the same asset together. It can't be. But there are instances when NNPC has incurred costs on some assets, and there are instances where the contractor has incurred some costs on some assets, signature bonus is one of the key ones I*

---

[452] The Respondent contended that a double line computation may equally achieve the same purpose but said that it did not join issue with the Claimant for fear that the resolution of that question might be beyond the jurisdiction of the arbitrators.

[453] See lines 7 to 11 at page 119 of Mr. Adebiyi's oral testimony.

*can remember or pre-production capitalized expenses. So the law allows you to claim capital allowance on this one, and it becomes qualifying capital expenditure. At that point the contractor will claim ITC on its own assets, which it has done now, and NNPC will claim ITC on the asset it owns, and they combine them together, and that's what has happened. But you cannot find a single asset that you can sell for tax purposes. The law looks at each party claiming ITC on the assets it has incurred qualifying capital expenditure on.'*

13.6.74   The Respondent submits that the Capital Allowance is shared by the Contracting Parties on a ratio of a 80%-20% split (later changed to a 65%/35% split).[454] In effect, for every $1 savings achieved through the Capital Allowance, 80% is attributed to the Claimant while 20% is attributed to the Respondent. The Respondent contends that the 80% ought to be for its benefit relying on Paragraph 6 of the Second Schedule of the *PPTA*.

   (b)   *The Respondent's Approach to Calculation of ITC*

13.6.75   The Respondent submits that the allocation of Cost Oil is directly related to *"Operating Costs"* as defined under the Bonga PSC.

13.6.76   The Respondent refers to the definition of *"Cost Oil"* under Clause 1(k) of the Bonga PSC, which states it as meaning the:

   *"quantum of the Available Crude Oil allocated to the CONTRACTOR to enable it generate the proceeds to cover all operating costs as specified in the Accounting Procedure".*

---

[454] Section 9.6(g) RPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.6.77   The Respondent refers to *"Operating Costs"* as being defined under Clause 1(w) of the Bonga PSC as:

> *"expenditures made and obligations incurred in carrying out Petroleum Operations as determined in accordance with the Accounting Procedure".*

13.6.78   The Respondent asserts that pursuant to Article II of Annex B of the Bonga PSC, *"Operating Costs"* means Non-Capital Costs and Capital Costs.

13.6.79   The Respondent maintains that the current tax treatment whereby the Contract Area is treated as a single fiscal entity which has a tax liability determined by a single tax calculation does not in itself support the proposition that allowances must flow through the tax calculations. Indeed to proceed on that assumption is to ignore the relevant provisions of the law including Sections 10 and 14 of the *PPTA*, Paragraphs 6 & 7 to the Second Schedule of the *PPTA*, and Section 4 of the *DOA*.

13.6.80   The Respondent submits that a tax credit is a direct reduction in tax liability or an amount by which tax owed is reduced.   This is by contrast to a tax allowance, which is a reduction of taxable profits, tax credits are deducted from amounts due as tax payable.[455]

13.6.81   The Respondent submits that allowances flowing through the tax calculation not only disregard the position of the law but put the Respondent at an economic disadvantage.

---

[455] Para 10.1.1 RS.

284

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.6.82   The Respondent maintains that notwithstanding the current tax application, it is possible to determine the contributions from both Parties that reduce the overall tax liability of the Contract Area. That contribution must be acknowledged and accorded to the Party making the contribution before applying the profit split between the Parties, pursuant to Clause 8.1(f) of the Bonga PSC.

13.6.83   In response to the Claimants' assertion of a single line computation the Respondent had submitted that a double-line computation is an alternative way to approach the calculation of Tax Oil.[456]   However, the Respondent stated in the RS that it has not joined issue with the Claimants on the single line computation and concedes that treatment for the purposes of this arbitration.[457]   The Respondent maintains that if the practice of the single line computation continues and the provisions of the law are to be complied with, the contributions of each Party must be recognised and accorded to the Party who is contributing same before the split of profit is made.

13.6.84   The Respondent further contends that the filing of a single tax return applicable to a single fiscal entity does not prevent the Respondent from deriving its actual tax benefit. The Claimants contend on the other hand that by virtue of Section 12 of the *DOA*, it is required to file a single line tax computation applicable to a single fiscal entity and as a result will have to read Paragraph 6 of the Second Schedule to the *PPTA* in such a way that it complies with the *DOA*.

13.6.85   The Respondent's position is that it should be taking more Tax Oil, as opposed to the Contractor's position which grants more relief to the

---

[456] Para 11.4 RS.
[457] Para 11.4 RS.

285

Contract Area as set out in the table below (first prepared by the Claimants).[458]

| (8) Anal [illegible] | The Contractor's Position | The Respondent's Position |
|---|---|---|
| Asset Cost (1) | 100 | 100 |
| Investment Tax Credit (2) | 50(50% of (1)) | 50 |
| Qualifying Capital Expenditure (3) | 100 (100% of (1)) | =100-50 |
| Tax Relief from Capital Allowances (on Qualifying Capital Expenditure) (4) | 50(i.e., 50% tax relief on 100% depreciation) | 25 |
| Total tax relief (i.e. (2) +(4)) | 50+50=100 | 50+25=75 |

*Tribunal*

13.6.86  At the forefront of the Tribunal's consideration of these matters must be that the Claimants, as the Contractor, had always computed the PPT liability and thus allocated Tax Oil, on the basis that ITC was a credit against Assessable Tax and had never treated it as a deduction against Qualifying Capital Expenditure. It seems clear to the Tribunal that it was understood by everybody from 1993 onwards that this was the correct way to deal with this item. It is worth pointing out that it

---

[458] Section 4 of RPHB.

was not just the IOCs that had this view, but it was apparently shared by leading commentators on the oil industry.[459]   The Tribunal is prepared to accept the Claimants' statement that one of the principal factors which led to the commencement of this arbitration was what the Claimants considered to be the Respondent's change of position on this issue.

13.6.87   Clause 15(3) (b) of the Bonga PSC and Section 4 of the *DOA* strongly support the Claimants' position on this point. Furthermore, not only did the Claimants' tax expert agree with this approach but so also did the Respondent's tax expert – see above.

13.6.88   As to whether the Claimants incurred Qualifying Capital Expenditure, and are eligible to claim the benefit of the ITC, the Respondent relies heavily on 2 points, namely that the Claimants were mere financiers of the assets and that title to them passed to the Respondent on arrival in Nigeria.

13.6.89   However although it is true that title passed, it did not pass absolutely in the sense that the Respondent was restricted to using those assets for the purposes of the Petroleum Operations to be carried out in the Contract Area pursuant to Clause 11 of the Bonga PSC. It is noted that by a letter dated 2 November 2007 from the Respondent to the FIRS, the Respondent requested the FIRS to issue receipts to the "partners".[460]

13.6.90   The Respondent relies upon the fact that the ownership of the goods and materials passes to the Respondent upon importation to Nigeria

---

[459] CSOR, para 11.17.
[460] CB/29

287

and goes so far as to characterize the Claimants as mere financiers. With the greatest of respect this argument is unsustainable. It is perfectly plain, as the Tribunal has held, that the Claimants are carrying on Petroleum Operations on their own account and providing expertise, manpower, design, management and construction of all necessary elements of this vast project, in addition to financing the whole project at the invitation of the Government. It may be thought somewhat rich at this stage to turn matters around and attempt to deny the benefits of ITC for which the Government has throughout made clear inured to the benefit of the Claimants.

13.6.91   There is another point which makes the Respondent's position not only untenable but also unattractive. To argue now that no ITC should be deducted on this ground completely ignores the whole structure of the Bonga PSC and the legislation passed to give effect to it. It was of course known that title was going to pass to the Respondent and, if that in itself had the effect of preventing the Claimants from enjoying the benefit of ITC, one might ask why it was ever referred to in the Bonga PSC and the legislation.

13.6.92   Furthermore one cannot ignore the fact that the very change from the previously used joint venture model to the PSC model was intended to assist the Respondent and obviate the need for it to commit any funds whatsoever in the development of these risky fields. When the joint venture model was abandoned in favour of the PSC model, this effectively created a form of hybrid arrangement whereby for a larger share of potential profit the Claimants contributed the necessary financial resources and expertise to develop, at no risk to the Respondent, the natural resources contributed by the Nigerian Government through the Respondent.

288

13.6.93   The Respondent reminds the Tribunal that paragraph 6 of the Second Schedule of the *PPTA* does refer to a *"company owning any assets"* and relies on the fact, as stated above that the relevant assets are not owned by the Claimants. However, there are 2 answers to that. The first and most important is based on Section 4 of the *DOA*, set out at para 13.6.13 above.  This makes it plain that whether or not the Respondent or the Claimants, as the Contractor, in a Bonga PSC have incurred Qualifying Capital Expenditure which meets the WEN test for the purposes of petroleum operations carried out under the terms of a Bonga PSC in the deep offshore  or inland basin:

> *"there shall be due to the <u>parties</u> in respect of the production sharing contract executed prior to 1 July 1993 a credit (in this Act referred to as "investment tax credit") at a flat rate of 50 per cent of the qualifying expenditure in accordance with the production sharing contract terms for the accounting period in which that asset was first used for the purposes of such operations."* (emphasis added)

13.6.94   It is inconceivable to think that the legislature when drafting this Section could have possibly shared the Respondent's current interpretation, because by this time the Respondent was using the Bonga PSC model and the legislature would have known that under that model the assets were vested in the Respondent. It seems to the Tribunal to be unarguable. Furthermore it is not possible for the Respondent to seek support for its argument in other pieces of legislature because Section 15 of the *DOA* expressly provides that:

> *"(1)  The relevant provisions of all existing enactments or laws, including but not limited to the Petroleum Act, and the*

289

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*Petroleum Profit Tax Act, shall be read with such modifications as to bring them into conformity with the provisions of this Act.*

(2)   *If the provisions of any other enactment or law, including but not limited to the enactments specified in subsection (1) of this section, are inconsistent with the provisions of this Act, the provisions of this Act shall prevail and the provisions of that other enactment or law shall, to the extent of that inconsistency, be void.*

13.6.95   Having considered this issue very carefully and being conscious not to determine or be seen to be determining a pure issue of tax (notwithstanding its lack of binding effect as stated above), the Tribunal concludes that the stance taken by the Claimants in relation to these issues was perfectly reasonable, given the factual background to which they have alluded, the contractual terms of the Bonga PSC and the context of the applicable legislation. On the facts of this case it seems unsustainable for the Respondent to contend that the fact that the title to the assets used by the single fiscal entity are in the Respondent's name, disentitles the Claimants to the contractual right to ITC which was one of the very incentives that led them into this agreement. As to the argument that it is a credit from Assessable Tax or a deduction from Qualifying Capital Expenditure, the Claimants' stance that it is a deduction from Assessable Tax seems a reasonable stance for them to take as a matter of contract and is supported by both accounting experts. Whether or not the FIRS agrees with this treatment is a matter for another day.

290

13.6.96    Accordingly, the Claimants as a matter of contractual interpretation of the Bonga PSC are entitled to:

(1)    a Declaration that in computing the Tax Oil allocation, ITC shall only be deducted from Assessable Tax and shall not also be deducted from Qualifying Capital Expenditure;

(2)    a Declaration that in computing the Tax Oil allocation, ITC is to be applied in full in respect of the single fiscal entity that is the Contract Area as a whole and is not just a credit for the Respondent;

13.6.97    As to the Claimants' Sixth Claim concerning ITC the Tribunal awards the Claimants a monetary Award in the sum of US$917,664,000.

13.7     <u>The Claimants' Seventh Claim: The Claimants' Tax Oil Consolidation Claim</u>

      (1)    <u>*The Agreed Issue*</u>

13.7.1   The Parties' Agreed Issues states that the issue arising with regard to the Tax Oil Consolidation Claim is whether the Claimants, as the Contractor, are entitled, as a matter of contract, to consolidate OPLs 219 and 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of preparing PPT Returns for OPL 212 / OML 118.

      (2)    <u>*The Claimants' Position*</u>

      (a)    <u>*Submissions*</u>

13.7.2   The Claimants assert that when allocating Tax Oil as the Contractor, they are entitled to consolidate the costs of other OPL's. [461]

13.7.3   Clause 8 (1) (e) of the Bonga PSC provides that:

> *"The CONTRACTOR shall for PPT purposes be entitled to consolidate OPLs 212, 219, 803, 806 and 809 and any OMLs derived therefrom".*

13.7.4   The Claimants, as the Contractor, have computed PPT (and consequently allocated Tax Oil) on the basis that the costs of OPL 219 (now OML 135) and OPLs 803, 806 and 809 were included as deductions against revenue from OPL 212 (now OML 118). NNPC has not included such costs in its computation.

---

[461] *See:* CSOC Chapter 12; CSOR Chapter 14; CS Chapter 12.

292

13.7.5  The Claimants analyse the Respondent's relevant submission as being that consolidation is only permitted under the *PPTA* in respect of joint ventures and that consolidation between Bonga PSCs would require specific legislation, which does not exist. Moreover, Section 3(1) *DOA* provides that PPT must be computed only in respect of the specific single Contract Area.

13.7.6  The Claimants submit that there is nothing in the wording of Section 3(1) of the *DOA* to suggest that it intended to restrict what it submits is the Parties' existing right under Section 9(1)(c) of the *PPTA* to consolidate costs, as confirmed by Clause 8(1)(e) of the Bonga PSC, which was approved by the Government.

13.7.7  Mr. Victor Onyenkpa, the Claimants' tax expert, is of the opinion that this claim is permitted by law, as he sets out at para 2.3.5 of his report, when discussing Section 9(1)(c) of the *PPTA*. In summary, after quoting the text of Clause 8.1(e), of the Bonga PSC (as set out above), he says that the Claimants' right to consolidate is consistent with Section 9(1)(c) of the *PPTA*, pursuant to which PPT is levied on the Petroleum Operations "*of a company*", taking into account "*any one or more of its petroleum operations*" .

13.7.8  Mr. Onyenkpa states that Mr. Adebiyi, the Respondent's Expert Tax witness and he agree that pursuant to Section 9(1)(c) of the *PPTA*, a company engaged in Petroleum Operations is entitled to consolidate for PPT purposes, costs incurred in "*any one or more of its petroleum operations*" referring to para 7(h)(i) of the Joint Experts' Report.

13.7.9  Mr. Onyenkpa says that the area of contention however, is the interpretation of Section 3(1) of the *DOA* which provides that:

> *"The petroleum profits tax payable under a production sharing contract shall be determined in accordance with the Petroleum Profits Tax Act: Provided that the petroleum profits tax applicable to the contract area as defined in the production sharing contracts shall be 50 per cent flat rate of chargeable profits for the duration of the production sharing contracts."*

13.7.10 Mr. Victor Onyenkpa opines that Section 3(1) of the *DOA* expressly defers to the *PPTA* on how the tax payable is to be determined including consolidation. He opines that under Section 3, the only departure from the normal regime under the *PPTA* is the provision for a preferential PPT rate of 50% to apply to Deep Offshore Petroleum Operations, as compared with the usual PPT rate of 85%.

13.7.11 The Claimants assert that prior to this arbitration, NNPC acknowledged that such costs could properly be consolidated for PPT purposes.[462]

13.7.12 In addition, FIRS in its Operation Manual (which the Respondent's tax expert, Mr. Adebiyi, agreed was a relevant document for the calculation of PPT liability[463]) approves the deduction of such costs. It states:

> *"Consolidation of production and costs for recovery and fiscal deduction should in principle be possible within the contract area, between assets of a given block and also between blocks*

---

[462] Exhibits C-101 at TB F/66, C-102 at TB F/70 and C-103 at TB F/89.
[463] Transcript, Day 4, p 166, lines 10 – 13.

294

*NEPCO et ors v NNPC*
*Privileged and Confidential*

*attributed during the same round (as per Clause 8 of the PSC...".*[464]

(b)   *Declarations and Awards sought*

13.7.13   The Claimants seek the declarations at Paragraphs 349(p),(q) and (r) of the CS.

13.7.14   The Claimants also seek a monetary Award (updated to 30 November 2011) of US$238,648,000 in respect of this element of the overlifting,[465] plus interest of US$41,593,217.[466] The Respondent has not challenged the amounts being claimed in these proceedings.

---

[464] Exhibit C-198 at TB F/266, p 231. The Claimants' Tax expert also refers to the statement of the FIRS, in its Upstream Tax Operational Manual (section UT901.01.01, under Key Unique Provisions) as supporting the right of Claimants to consolidate for Tax Oil purposes.
[465] See Annex B of the CPHB.
[466] See Annex D of the CPHB.

(3)  **The Respondent's Position**

(a)  *Consolidation Not Permitted by Statute*

13.7.15  The Respondent submits that such consolidation is not permissible because it is not provided for in any legislation.  The Respondent contends that only Federal Legislation can grant what Clause 8.1 (e) purports to have granted the Parties under the Bonga PSC and, to the extent that the law has not made such provision, then the claim to consolidation must be rejected as invalid.[467]

13.7.16  The Respondent submits that the contention that the absence of any specific law necessarily means that an act may be permitted is a misapplication of the jurisprudential rationale that underpins the existence or non-existence of laws.[468]  In the seat of arbitration, an act remains unlawful unless permitted by law: see the case of *Manila Electric Company v. Province of Laguna* which states as follows:[469]

> "...contractual tax exemptions in the real sense of the term are those agreed to by the taxing authority in contracts..."

The Respondent also refers to the case of *Phoenix Motors Limited v. NPFMB*, where the Court of Appeal held as follows:[470]

> "If a statute is revenue based or revenue oriented, it will be of sound public policy for a court to construe the provisions of the statute liberally in favour of revenue or in favour of deriving

---

[467] Para 10, RAPJO/ASOD: TB B/4.
[468] RR.
[469] G.R 49 O.G [No. 4] 1385.
[470] NWLR (pg 272) 718 at 731.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*revenue by the Government, unless there is a clear provision to the contrary".*

13.7.17   The Respondent submits that this requirement under Nigerian law is unlike the situation in the United Kingdom [471] where an act is permitted unless otherwise prohibited by law. [472]

(b)   *Section 3(1) of the DOA*

13.7.18   Moreover, the Respondent submits that Section 3(1) of the *DOA* provides that PPT must be computed only in respect of the specific single Contract Area. The Respondent submits that to allow consolidation for Tax Oil purposes will give rise to fiscal incentives not contemplated by law. [473] The Respondent asserts that there are two distinct relationships - the contractual relations between the Claimants and the Respondent on the one hand and the relationship between the Parties and FIRS governed by law on the other hand.

13.7.19   The Respondent submits that where the contractual relationship seeks to grant allowances and benefits not supported by law such contractual provision must give way to legal obligations. It refers to Section 3(1) of the *DOA* (the terms of which are set out in para 13.7.9 above.

13.7.20   The Respondent submits that Section 3(1) of the *DOA* provides for 50% tax from the Contract Area. The Respondent submits that cost recoverability from an unrelated Contract Area will not achieve that percentage.

---

[471] The unwritten nature of its Constitution.
[472] Save for *the Bill of Rights Act, 1988 UK.*
[473] The RRLegal Reply at paras 4.4 on at pages 6-7.

297

13.7.21 The Respondent further submits that to do as suggested by the Claimants is tantamount to recovering operating Costs of non-producing fields from the revenue derived from a producing one and this would go against the very essence and the meaning of a PSC.

13.7.22 The Respondent finally submits that the relevant terms of Section 3(1) of the *DOA* are specific on the costs that can be recovered from a particular OPL. In other words, it must be the costs in respect of that OPL and related OMLS and not other costs. Therefore Clause 8.1(b) of the Bonga PSC as referred to in the Respondent's Tax Expert's Report is only re-emphasizing the position with respect to individual OPLs and must not be interpreted as allowing for the cost of a non-producing OPL to be offset against a producing one.

### (4) *Analysis of the Tribunal*

13.7.23 The Tribunal rejects the Respondent's contention that only legislation can grant what Clause 8(1)(e) of the Bonga PSC purports to grant. The Respondent freely entered into the Bonga PSC. The cases upon which the Respondent relies are clearly distinguishable from the present because they deal with claims between tax payers and the Government, whereas this Tribunal is only dealing with contractual claims between contracting Parties.

13.7.24 The Tribunal rejects the Respondent's submission that consolidation is not allowable because it is not permitted by statute. There is with respect an element of unreality in this submission, as it is quite clear that the *DOD* and the *DOA* were intended to implement the Bonga PSC regime. It would therefore be unlikely that the *DOD* or the *DOA* would run counter to provisions in the Bonga PSC, and the Tribunal concludes that unless it is bound to construe the *DOA* as in some way

298

preventing this approach, references to it are of no avail. Accordingly the Tribunal is quite satisfied that the consolidation claim is a valid claim upon the proper interpretation of the *PPTA* and the Bonga PSC.

13.7.25   The Tribunal accepts the evidence of Mr. Turbeville where he states that in exchange for Shell incurring the cost of a risky prospect in exploring onshore Gongola Basin covered by OPLs 803, 806 and 809 they would be able to set off these costs against blocks which resulted in a commercial production. This was agreed by the Government and was a compromise which demonstrated as Mr. Turbeville states *"Shell's willingness to try to help the Government meet its political obligations"*.

13.7.26   Section 9 (1) (c) of the *PPTA* brings within the net of tax all income of a company incidental to and arising from any one or more of its Petroleum Operations. As a corollary of this all expenses from such Petroleum Operations are deductible, as the tax experts have indeed said.

13.7.27   The Tribunal is in agreement with the way in which this point has been dealt with by Mr. Oenyenpenka, accounting expert for the Claimants in para 2.3.5 in his expert report dated 27 September 2011.

13.7.28   The Claimants protested the Respondent's approach to ITC by letter dated 3 October 2007.[474]

13.7.29   Furthermore the FIRS upstream manual seems to agree with this approach because it states *"Consolidation of production and costs for recovery and fiscal deduction should in principle be possible within*

---

[474] TB/27.

299

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

the contract area, between assets of a given block and also between blocks attributed during the same round (as per Clause 8 of the PSC... ". [475]

13.7.30 Accordingly the Tribunal will issue a declaration that as a matter of contract the Claimants, as the Contractor, are entitled, to consolidate OPLs 219 and 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of preparing PPT Returns for OPL 212 / OML 118.

13.7.31 Further the Claimants will be granted a monetary Award in respect of this element of the overlift of US$238,648,000 calculated up to 30 November 2011.

---

[475] Exhibit C-198 at TB F/206, p 231.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**13.8    The Claimants' Eighth Claim: The Claimants' Tax Oil Calculation Claim**

13.8.1    The issues arising as to the Claimants' Eighth Claim when deciding as a contractual matter, which costs are tax deductible when preparing PPT Returns for OPL 212 / OML 118, are whether the Claimants, as the Contractor, are entitled to:

(1)    apply the "WEN" test pursuant to Section 10 of the *PPTA*?

(2)    ignore whether or not a cost is recoverable through an allocation of Cost Oil?

(3)    deduct payments made in respect of signature bonuses?

(4)    deduct sole costs? and/or

(5)    deduct interest paid on intra-group loans?

13.8.2    The Parties have agreed that an issue has arisen as to whether for the purposes of preparing PPT Returns, the Claimants as the Contractor, are contractually entitled to deduct the full annual Capital Allowance of 20% of Qualifying Capital Expenditure in the tax year in which the expenditure is incurred.

*(1)    The Claimants' Position[476]*

*(a)    The Claimants' Submissions – Tax Deductible Items*

13.8.3    The Claimants submit that when allocating Tax Oil, as the Contractor, they are entitled to allow as tax deductions signature bonuses, sole costs, interest on intra-group loans and the Claimants' Operating Costs.

---

[476] *See:* CSOC Chapter 13; CSOR Chapter 15 ; CS Chapter 13.

301

13.8.4   The *PPTA* entitles costs that meet the WEN test (i.e. *"wholly, exclusively and necessarily incurred"*) to be deducted from revenue when computing PPT either by virtue of Section 10 of the *PPTA* (expenses) or Section 20 of the *PPTA* (Capital Allowances).[477]

13.8.5   The Claimants, as the Contractor, have computed PPT (and consequently allocated Tax Oil) on the basis that the following costs are tax deductible: (a) signature bonus; (b) sole costs; (c) interest on intra-group loans; and (d) operating costs which satisfy the WEN test.

13.8.6   The Claimants submit that the Respondent has not included such costs in its computation. It appears from their evidence at the Hearing that Mr. Mbanefo and Mrs. David-West are (and were) not even aware of the FIRS Upstream Manual which allows for such tax deductions.[478]

13.8.7   The Claimants assert that it appears to be common ground between the Parties that expenses that can be deducted from the revenue for PPT purposes are not limited to expenses which are cost recoverable under the Bonga PSC, and that the applicable test for PPT purposes is the WEN test, see:

(1)   Mr. Olaleye Adebiyi, NNPC's Expert: Joint Tax Expert Report at TB D/1, para 6(d)(i) and during the Hearing:

"*Q (Chairman): The next thing is that there's a test for tax deductibility, the WEN test; you probably both agree on that*

---

[477] All pre-production expenses are deemed to be qualifying expenditures for the purposes of Capital Allowances by virtue of Sch. 2 paras 1(2) & 2 and the *PPTA*.
[478] For Mr. Mbanefo, Transcript, Day 3, p 180, lines 3 – 12; for Mrs David-West, Transcript, Day 3, p 230, lines 2 – 16.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

*A: That's correct.*[479]

    (2)    the evidence of Mr. David Mbanefo at the Hearing;[480] and

    (3)    the evidence of Dr. Timothy Okon at the Hearing.[481]

13.8.8    The Claimants submit that the amounts they paid in respect of signature bonuses meet the WEN test and come within the definition of *"Qualifying Capital Expenditure"* pursuant to the *PPTA* as accepted by Mr. Adebyi, the Respondent's tax expert,[482] the Joint Tax Expert Report at TB D/1, para 6(d)(iii), and also at the Hearing as follows:

> *"Q (Chairman): Do you both agree that insofar as it's a single PPT return, signature bonuses will qualify as tax deductible through Capital Allowances if they have been incurred for the purposes of petroleum operations.*
>
> *A: That's correct."*[483]

13.8.9    The Claimants submit that signature bonuses are also allowed as a deduction in the FIRS Upstream Manual.[484]

---

[479] Transcript, Day 4, p 63, lines 15 – 16.
[480] Transcript, Day 3, p 176, lines 21 – 25.
[481] Transcript, Day 4, p 8, lines 18 – 22.
*Q (Sheppard): For the PPT calculation, there isn't a deduction for cost oil as such, is there? There's a deduction of allowable deductible amounts pursuant to section 10 of the PPT Act.*
*A: Correct."*
Transcript, Day 4, p 10, lines 2 – 11. "Q (Sheppard): the number that one uses in the tax calculation is not necessarily exactly the same number that may be allocated as cost oil under the contract for the purposes of that allocation? A: Yes, that's possible... there are strict rules with regards to the calculation of tax, and what is eligible and what is not eligible. It doesn't necessarily have to merge with what the contract says. It's what the PPT Act prescribed".
[482] "Q (Sheppard): Would you include it [signature bonus] now? A: Now I would include it in contractor's column, ... ". Transcript, Day 3, p 177, lines 9 – 11; p 178, lines 7 – 10; and p 179, lines 9 – 12.
[483] Transcript, Day 4, p 64, line 23 – p65, line 1.
[484] Exhibit C-198 at TB F/206, at UT 901.01.01.

303

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

13.8.10 The Claimants submit that sole costs (which the Claimants defines as being costs incidental to, but not directly incurred in the course of, Petroleum Operations) meet the WEN test and should be deductible, as accepted by the Respondent's tax expert in the Joint Tax Expert Report at TB D/1, para 6(d) and in the Hearing as follows:

> o   *"Q (Chairman): As it's a single return, sole cost and interest on intra-group loans are deductible provided they meet that test.*
>
> *A: That's correct, ...".*[485]

13.8.11 The Claimants submit that interest on loans to the Claimants from affiliate companies meet the WEN test and should also be deductible: they assert that Mr. Olaleye Adebiyi, the Respondent's Expert agrees with this too.[486]

13.8.12 The Claimants submit that FIRS has previously acknowledged that interest on intra-group loans is tax deductible (albeit capped at LIBOR).[487]

13.8.13 The Claimants do not agree that Section 10(1) of the *PPTA* caps interest on intra-group loans at LIBOR. The Claimants submit that that provision simply requires the interest rate to be a commercial one, such as by reference to LIBOR. Given that LIBOR is an inter-bank

---

[485] Transcript, Day 4, p 63, lines 18 – 22.
[486] Transcript, Day 4, p 193, lines 10 – 21. Joint Tax Expert Report at TB D/1, para 6(d)(iv)
*"Q (Chairman): As it's a single return, sole cost and interest on intra-group loans are deductible provided they meet that test.*
*A: That's correct, ...".*
*"Q (Sheppard): .... there are some things like interest on intercompany [sic] loans, which is not recoverable as cost oil... but you accept that that interest is deductible, at least up to LIBOR*
*A: Yes, when you deduct at that level too, because that's section 10 deduction. Section 10 deductions cover interest".*
[487] Exhibit C-104 at TB F/51.

304

SNEPCO et ors v NNPC
*Privileged and Confidential*

rate and commercial entities lend at rates above LIBOR, and given that there are several LIBOR rates (such as 1 month, 3 months, 12 months etc.), it is submitted that it cannot have been the intention that LIBOR alone should be a cap. In any event, the Claimants assert that this illustrates an issue on which the Claimants have taken a reasonable position and is one that should be decided by the TAT and the Nigerian courts instead of by the Respondent.

13.8.14   The Claimants also assert that some expenses that the Respondent has excluded for the purposes of cost recovery and tax deductibility meet the WEN test – the main example of such costs being the Bonga Main project costs.[488]

*(b)   Relief Claimed as to Tax Deductibles*

13.8.15   The Claimants seek the declarations at Paragraphs 349(s), (t) and (u) of the CS.

13.8.16   The Claimants seek a monetary Award (updated to 30 November 2011) of:

(1)   Signature Bonus – US$48,874,000;

(2)   Sole Costs – US$101,768,000;

(3)   Interest on intra-group Loans – US$643,990,000; and

(4)   Operating Costs – US$532,235,000,

---

[488] Para 163 CPHB

in respect of this element of the overlift,[489] plus total interest of
<u>US$231,255,896</u>.[490]

13.8.17   The Claimants assert that the Respondent has not challenged the
amounts being claimed in these proceedings.

    *(c)*    <u>*The 20% Capital Allowance Issue*</u>

13.8.18   The Claimants also assert that when allocating Tax Oil they are
contractually entitled to allow a 20% Capital Allowance in the First
Year.[491]

13.8.19   The Claimants assert that Section 20 of the *PPTA* together with its
Second Schedule, para 6, allows Capital Expenditure to be deducted
from revenue when computing PPT as an annual allowance at the rate
specified in Table II. Table II prescribes the rate to be 20% in each of
the first four years and 19% in the fifth year. (The Claimants assert
that the reference to 19% in Year 6 is clearly a mistake).

13.8.20   The Claimants submit that they have computed PPT (and
consequently allocated Tax Oil) on the basis that the full 20% may be
deducted in the Year that the asset in question was acquired, (provided
also that the asset was in use at the end of the Year).

13.8.21   The Respondent has argued that the Qualifying Capital Expenditure
(or 99% thereof) must be spread over 60 months. Mr. Adebiyi's
argument that the *DOA*, when it refers to "*actual*" PPT, justifies an

---

[489] See Annex B CPBH.
[490] See Annex D CPBH.
[491] *See:* CSOC Chapter 13 TB B/3; CSOR Chapter 15 TB B/6; CS Chapter 14.

exception to the norm,[492] is described as being "*unpersuasive*" by the Claimants.

13.8.22   The Claimants have submitted that their interpretation as Contractor, accords with Table II, which expressly provides that 20% shall be allowed in the "First Year", and "Year" must be a reference to the tax year, which runs from January to December (Section 2(a) of the *PPTA*). For tax purposes, 20% of the costs are deductible whether the asset was bought on 1 January or 31 December of that year.

   (d)   *Relief Sought*

13.8.23   The Claimants seek the declarations at Paragraphs 349(v),(w) and (x) of the CS.

13.8.24   The Claimants seek a monetary Award (updated to 30 November 2011) of US$16,746,000 in respect of this element of the overlift,[493] plus interest of US$2,918,641.[494]   The Claimants assert that the Respondent has not challenged these claimed amounts.

   (2)   *The Respondent's Position*[495]

   (a)   *Tax Deductability of Cost Oil items*

13.8.25   The Respondent submits that both tax experts concluded that the test to determine whether or not certain cost items are tax deductible is the "*WEN*" test as provided in Section 10 of the *PPTA*.[496]   The Respondent contends that the interpretation of the tax legislation that has an impact on the tax payable is a matter that goes beyond the

---

[492] Transcript, Day 4, p 90, line 9 – p 95, line 18.
[493] See Annex B to CPHB.
[494] See Annex D hereto to CPHB.
[495] RPHB at para 9.6(b)(i).
[496] "Wholly, Exclusive and Necessary".

307

jurisdiction of the Tribunal. Furthermore, that the FIRS had stated its position in a letter[497] which will create an absurdity such that even if this Tribunal were to decide the question, the FIRS will nevertheless be in a position to take an entirely different view.

13.8.26   In Paragraph 25 of the RRCSOR the Respondent submits that the current treatment of tax does not make itself easily susceptible to tax deductibility with regards to signature bonus, interest on loans or sole cost. The Claimant is not entitled to signature bonuses, interest on loans or sole costs.  The Respondent denies that a refusal to allow these items amounts to a policy change.

13.8.27   The Respondent has relied upon the averments in its pleadings regarding tax deductibility of these items.[498]  It submits that its submissions reflect that these tax items are not lawfully deductible.

(b)   *Signature Bonus*

13.8.28   As regards its treatment of the signature bonus, the Respondent asserts that it has acted in accordance with the law as dictated by the FIRS. To that extent, any other interpretation will be contrary to the taxing authority's position. In a letter written by the FIRS to the Group Managing Director NNPC dated 24 May 2010, in response to an enquiry as to how signature bonuses should be treated, the FIRS states as follows:

> "*It is trite law that accounting profit is not the same as taxable profit. By similar token, cost recoverability is not conterminous (sic) with tax deductibility. In effect, what is not cost*

---

[497] Letter from FIRS to NNPC dated 24 May 2010 TB F/197 C-108/RE 12B/10.
[498] Section 11 of the RASOD TB B/4 and Para 17 of the RRCSOR – see section 21 generally TB B/9

SNEPCO et ors v NNPC
Privileged and Confidential

*recoverable cannot be tax deductible. To this extent therefore, any cost that the contractor cannot recover from the Concessionaire cannot be tax deductible for purposes of determining the PPT payable on the Contract Area. This position holds true in respect of signature bonuses, loan interest and Non-Operator Costs.*

13.8.29   The Respondent contends that if the Claimants disagree with this position, the procedure by which the Claimants challenge the interpretation is contained in the ***FIRS Act.***[499]

(c)   <u>Interest on Loans</u>

13.8.30   The Respondent contends that interest on loans is not recoverable if it does not satisfy the provisions of the Bonga PSC and the ***PPTA***. The Respondent refers to Clause 7.1 (o) of the Bonga PSC,[500] and Annex B, Article II, Paragraph 1 (h) of the Bonga PSC.[501]

13.8.31   The Respondent contends that Clause 7.1 (o) of the Bonga PSC stipulates the criteria for determining whether or not a particular cost will be considered as interest. If it is considered as interest, the Respondent admits/concedes that it is the ***PPTA*** that determines whether it is tax deductible. Section 10 (1) of the ***PPTA*** allows for the deduction of interest incurred upon any money borrowed for the purpose of Petroleum Operations where the FIRS is satisfied that interest was payable on capital employed in carrying out its petroleum

---

[499] Sections 1 and 11 of the 5th Schedule to the *Federal Inland Revenue Service (Establishment) Act*, No. 13, 2007.
[500] *"In accordance with this Contract, the CONTRACTOR shall; o. Have the right to finance Petroleum Operations from external sources under terms and conditions approved by the CORPORATION."*
[501] *"Non-capital Costs mean those Operating Costs incurred that are chargeable to the current year's operations. Non-capital Costs include, but are not limited to the following: h. Interest on loans used to finance Petroleum Operations provided the terms of such loans were with the approval of the CORPORATION, and not higher than the prevailing commercial rates".*

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

operations. The Respondent relies further upon Section 10(1)(f) of the *PPTA* which it says states as follows:

> "*In computing the adjusted profit of any company of any accounting period from its petroleum operations, there shall be deducted all outgoings and expenses wholly, exclusively and necessarily incurred, whether within or without Nigeria, during that period by such company for the purpose of those operations, including but without otherwise expending or limiting the generality of the foregoing....sums incurred by way of interest upon any money borrowed by such company where the Board is satisfied that the interest was payable as capital employed in carrying on its petroleum operations.*"

13.8.32   The Respondent submits that Section 10 of the *PPTA* is the operative section that triggers tax deductibility as regards interest. Section 7.1 of the *DOA* spells out the criteria of what is interest for the PPT to become operative. The Respondent contends further that where the criteria are not satisfied pursuant to the Bonga PSC, it is not considered interest for the PPT purposes. The Respondent asserts that this is the position here. Furthermore, the Respondent relies on FIRS' interpretation as to the treatment of interest and any dispute as regards that treatment should be resolved against FIRS at the TAT.

Sole Cost

13.8.33   The Respondent relies on its arguments above as to the basis why it asserts that Sole Cost should not be included in Tax Oil.

13.8.34   The Respondent seeks a Declaration that each OPL is ringfenced and that the Claimants cannot recover the operating costs of OML 135 and

310

*NNEPCO et ors v NNPC*
*Privileged and Confidential*

OPL's 803, 806 and 809 or any other from OML 118, pursuant to para 12.10 of the RASOD.

13.8.35   The Respondent asserts that the averments of the Claimants' Reply[502] that the FIRS letter dated 24 May 2010 (in which it confirms that signature bonuses, loan interest and sole costs are not tax deductible) amounts to a change in policy, are denied.

(d)   Timing for 20%[503]

13.8.36   As described above the Respondent asserts that the Qualifying Capital Expenditure (or 99% thereof) must be spread over 60 months. Mr. Adebiyi opines that the *DOA* when it refers to "*actual*" PPT, justifies an exception to the norm.[504]

13.8.37   The Respondent avers that the object of recoverability of cost being spread over a period of time is for the purpose of allowing for a margin that could be subject to taxation. The Respondent submits that were the Claimants to be allowed to recover all their costs e.g in the first year of discovery of oil, it is likely that there will be little or no revenue left for taxation or profit. In an extreme circumstance, the recoverable cost of the Claimants, as the Contractor, may exceed the value of the Available Crude Oil after the allocation of Royalty Oil, thus creating a situation where, in that year, there is then no revenue left for taxation or profit. To avoid this situation, recoverability of cost is spread over a five year period as provided in the Bonga PSC and, the *PPTA*.

---

[502] See CR at paras 18.23 to 18.30.
[503] See section 11B at P54 – RAPJOASOD TB B/4.
[504] Transcript, Day 4, p 90, line 9 – p 95, line 18.

13.8.38   The Respondent says that the method by which cost is recovered over a period of time is referred to as the *"amortization period"*. The Respondent avers that the accounting analysis used in determining recoverable cost is set out in Annex B of the Bonga PSC. Annex B deals with the recoverability of Non-Capital Costs (which are Operating Costs incurred during the current accounting year of the Bonga PSC) and Capital Costs (are expenditures which normally have a useful life beyond the year they were incurred). The Respondent however concentrates on the timing of recoverability of Capital Costs in this section.

13.8.39   The Respondent submits that Capital Costs are a part of the Operating Costs which the Claimants, as the Contractor, are meant to recover pursuant to the *DOA* and Clause 8 of the Bonga PSC. The timing of the recoverability of Capital Allowances is dealt with pursuant to Article 1V (2), Annex B, of the Bonga PSC which relevantly provides.

   *"Amortization of such costs shall be in accordance with the method prescribed under the second schedule of the PPTA."*

13.8.40   The Respondent submits that the Second Schedule to the *PPTA* states the appropriate Capital Allowance to which a company subject to that Act is ordinarily entitled. Strictly speaking, under a Bonga PSC, a Contractor is not entitled to a Capital Allowance, rather a Contractor is entitled to recover its capital costs using the same method that Non-PSC petroleum operators use pursuant to the provisions of the *PPTA*.

13.8.41   The Respondent submits that in computing the costs to be recovered, a Contractor is treated as if it is entitled to an allowance pursuant to the *PPTA*. It is this treatment that has led to a divergence between the Claimants and the Respondent regarding the timing.

312

13.8.42  The Respondent submits that recoverability of Capital Costs is on the basis of amortization as prescribed by the Second Schedule of the *PPTA*. Paragraph 6 of the Second Schedule of the *PPTA* gives the Claimants, as the Contractor, the right to recover 20% of Capital Expenditure that it incurs in an Accounting Year. The Respondent acknowledges that this may give the impression that the Claimants can claim 20% of the Capital Costs that it incurs in a year. However, Article IV (5b)(2) of Annex B of the Bonga PSC, states specifically that the Claimants shall claim in equal instalments over a 5 year period. According to the accounting formula in the Bonga PSC, all allocation is to be done on a monthly basis; consequently, the Claimants, as the Contractor, are required to charge their recoverable Capital Costs in a given year on a pro-rata basis, such that every month they can claim 1/12 of the 20% of the recoverable Capital Costs.

13.8.43  The Respondent's contention that recoverability of costs are only available as from the month in which the relevant expenditure is incurred, over 59 months, is predicated on the following provisions of the law:

(1)  Article IV (5b) (2), Annex B of the Bonga PSC;

(2)  The method prescribed in Para 6.1 of the Second Schedule of the *PPTA* which provides as follows:

> *"Subject to the provisions of this schedule, where in any accounting period, a company owning any assets has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that*

313

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

company *as from the accounting period* in which such expenditure was incurred, an allowance (in this Act referred to as " an annual allowance") at the appropriate rate per centum specified in table 11 of this schedule."[505] (emphasis added)

(3)   *"Accounting Period"* as defined under **Section 12 of the PPTA** as follows:

"a.   *A period of one year commencing on 1 January and ending on 31 December of the same year; or*

b.   *Any shorter period commencing on the day the company first makes a sale or bulk disposal of chargeable oil under a programme of continuous production and sales, domestic, export or both and ending on 31st of December of the same year;*

c.   *any period of less than a year being a period commencing on 1 January of any year and ending on the date in the same year when the company ceases to be engaged in petroleum operations;*

d.   *and in the event of any dispute with respect to the date of the first sale of chargeable oil above or with respect to the date on which the company ceases to be engaged in petroleum operation, the*

---

[505] The Respondent contends that the words "*as from the accounting period*" do not necessarily mean recovering the cost within an accounting period that commences on the 1st January and ending on the 31st December such that the total percentage recovered must fit within stipulated period.

314

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

> *Minister of Petroleum Resources shall determine*
> *the same and no appeal shall lie therefrom."*

13.8.44  The Respondent contends that the recoverability of costs should be on a monthly basis on the grounds that:

(1)  it makes practical sense to collect costs on a monthly basis as oil is allocated and lifted on a monthly basis;

(2)  the relevant provision in the Bonga PSC dictates that costs be recovered in equal installments over a five year period. This does not necessarily equate to five equal annual instalments. Monthly instalments accords more weight to the structure and performance of the contract pursuant to a PSC; and

(3)  the reference to the method prescribed under the Second Schedule of the *PPTA* particularly Table 11, is only to indicate the appropriate per centum through which the Capital Costs would be reimbursed to the Claimants, as the Contractor, and nothing more;

13.8.45  Lastly, the Respondent submits that when put side-by-side Paragraph 6(1) of the Second Schedule to the *PPTA* and Section 9 of the *DOA*, it is discovered that the operating phrase *"as from the accounting period"* does not mean a period beginning from January 1 of the relevant year. Rather, it simply means that such benefits can be claimed as from any such accounting period and not for a calendar year beginning from January 1 to 31 December.

### *(3)   Analysis of the Tribunal*

13.8.46   The Tribunal has found this Tax Oil Calculation claim to be the most difficult. The Tribunal has to remain faithful to its earlier observation that it can only decide contractual issues and should not make determinations on tax issues. The Tribunal feels that it requires further submissions on these 5 heads of claim in the light of the way that the Tribunal has expressed itself earlier in this Award.

13.8.47   If the Tribunal can be persuaded that one or more of these items can be dealt with on a contractual basis then it will consider granting relief. Alternatively, this may be covered by the Stabilization Claim. However, the Tribunal thinks it only fair to give both Parties an opportunity to comment on this head of claim in the light of what the Tribunal has already ruled.  The Tribunal has particular problems as stated above with the interest calculation on the intra group loans which if allowable may need to be recalculated. Similarly it has had difficulties with the lack of evidence regarding the sole costs.  As the Parties are going to have to come back to the Tribunal to deal with updating of claims, costs and interest the Tribunal sees no hardship in requiring these further submissions to be made when, if at all, the Parties are permitted to do so.

SNEPCO et ors v NNPC
*Privileged and Confidential*

13.9    The Claimants' Stabilization Claim with Remedies and Interest

(1)    *The Agreed Issues*

13.9.1   The Parties have agreed that the issues arising as regards the Claimants' Stabilization Claim are:

(1)    have the Claimants, as the Contractor, properly triggered the provisions of Clause 19.2 Bonga PSC;

(2)    does a change in application by the Respondent and/or the FIRS of e.g. ITC, timing of Capital Allowances, the tax deductibility of certain costs and the consolidation of Operating Costs for the purposes of calculating PPT liability, amount to a change in policy;

(3)    if yes, what modification to the Bonga PSC is appropriate; and

(4)    whether an event has occurred in the performance of the Bonga PSC suggesting an entitlement to the Claimants, as the Contractor, to trigger the provisions of Clause 19.2?

13.9.2   Clause 19(2) of the Bonga PSC provides as follows:

*"In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies, pertaining to the Contract introduced by any Government department or Government parastatals or agencies occurs subsequent to the Effective Date of this Contract which materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR, the Parties shall use their best efforts to agree to such modifications to this Contract as will compensate for*

317

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

the effect of such changes. If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 hereof. Following arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination."

(2)   *The Position of the Claimants*[586]

13.9.3   As an alternative and/or additional claim to the Claimants' primary claim that the Respondent has breached its contractual obligations, the Claimants submit that there have been changes in laws or policy triggering the Contractor's rights to a modification of the Bonga PSC *"as will compensate for the effect of such changes"* pursuant to Clause 19.2 Bonga PSC.[507]

13.9.4   The Claimants' assert that changes in policy have been introduced by an agency of the Government (the FIRS) and applied by a parastatal (the Respondent) through, *inter alia*:   the Respondent's own entitlement model and Lifting Allocation; the PPT Returns prepared by the Respondent, FIRS' PPT Assessments rendered on the basis of the PPT Returns prepared by the Respondent; and FIRS' letter of 24 May 2010.[508]   Such changes in policy have been used by the Respondent to support the lifting of Available Crude Oil other than in accordance with the Claimants' Lifting Allocation under the Bonga PSC.

---

[586] *See:* CSOR Chapters 18 and 19 TB B/6; CS Chapter 15.
[507] Para 174 CPHB.
[508] Para 175 CPHB.

318

13.9.5    The Claimants further assert that the changes in policy relate to:

(1)    ITC;

(2)    consolidation of Operating Costs from other OPLs / OMLs for PPT purposes;

(3)    tax deductibility of all Operating Costs that meet the WEN test; and

(4)    the timing of Capital Allowances.

13.9.6    The areas of agreement between the Parties' respective tax experts on issues (1) to (3) in Paragraph 13.9.5 above, are set out in the previous Chapters of this Partial Award.

13.9.7    The Claimants submit that nevertheless, FIRS has issued PPT assessments accepting the Respondent's computation.[509]    The Claimants submit that there has been no supervening change in law that would require such different interpretation. If not attributable to a change in law, such a change in application of the law must be due to a change in policy. Such change in policy materially and adversely affects the Contractor's rights, obligations and economic benefit.

13.9.8    The Claimants submit that additionally, the Respondent has, in the context of its counterclaim, developed further arguments, namely that the Claimants are not entitled to the benefit of ITC or Capital Allowances at all. The Respondent has expressly acknowledged that this constitutes a further change in its position. Again, absent any

---

[509] Para 179 CPHB.

319

supervening change in the law, such interpretation must also be due to a change in policy.

13.9.9   The Claimants assert that the material and adverse effect caused by these changes in policy as at 30 September 2010 was quantified at US$2.459 billion and as at 30 November 2011 was quantified at US$2.499 billion.[510]

13.9.10   The Claimants seek the Declarations and Award at Paragraph 350 of the CS namely:

(1)   a Declaration that there have been changes in laws or policy that materially and adversely affect the rights, obligations and economic benefits, of the Claimants in their capacity as the Contractor, in relation to the following matters:-

(i)   ITC;

(ii)   consolidation of costs from other OPLs;

(iii)   tax deductibility of:-

(a)   signature bonus;

(b)   sole costs;

(c)   interest on Intra-Group Loans; and

(d)   Operating Costs; and

(iv)   timing of Capital Allowances;

---

[510] See Annex C, CPHB.

(2)    a Declaration that the Claimants, as the Contractor, are entitled to a modification to the Bonga PSC as will compensate for the effect of such changes; and

(3)    an Award modifying the Bonga PSC such as to compensate for such past and possible future changes.

13.9.11    The Claimants recognise that if the Tribunal is minded to make a monetary Award requiring the Respondent to repay any overlift, the Tribunal may not be minded also to make an Award under Clause 19.2 of the Bonga PSC. Nevertheless, the Claimants state that they invited the Tribunal to make an Award that any attempt by the Respondent and/or FIRS in the future to reinterpret their entitlement to (1) ITC as a tax credit (only); (2) consolidation of costs from other OPLs / OMLs for PPT purposes; (3) tax deductibility of all costs that meet the WEN test; (4) timing of Capital Allowances; and also (5) ITC and Capital Allowances as part of a single line computation of PPT; would constitute changes in policy necessitating modification to the Bonga PSC such that the Claimants may recover a greater allocation of Profit Oil to compensate them for such changes.

13.9.12    The Claimants addressed some of the other arguments NNPC has made.[511]

13.9.13    The Claimants assert that the Respondent cannot seriously pursue its argument that the Bonga PSC cannot be integrated with Nigerian tax law, given:

---

[511] *See:* CSOR Chapter 6 TB B/6.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(1)    the Claimants' assertion that it is clear that the Nigerian Government thought that the 1993 PSCs were valid and enforceable, and the new fiscal arrangements that were needed were given legislative force by the *DDA* (amending the *PPTA*);

(2)    no support for such argument is provided by the Respondent's own tax expert; and

(3)    in any event, the Respondent is estopped and / or out of time (see CSOR).

(3)    *The Respondent's Position*[512]

13.9.14   The Respondent formulate the Claimants' position as being that the change of policy alleged was introduced by FIRS, an agency of the FGN (the Federal Inland Revenue Service) and that the Respondent, described as a parastatal of FGN, has used the same to support an overlift of the Available Crude Oil and to increase the FGN's tax income.[513]  The Claimants base their claim principally on a letter written by FIRS, to the Respondent, dated 24 May 2010,[514] in which FIRS confirms its position as regards the interpretation to be placed on provisions of tax laws applicable in the context of petroleum operations[515], including the treatment of ITC, tax deductibility of items not recoverable as costs, timing of Capital Allowances, and consolidation of other OPL's (in this instance with OPL 212), etc. FIRS' letter, the Claimants say, confirms the policy change and consequently its entitlement to a stabilisation claim pursuant to Section 19.2 of the Bonga PSC.

---

[512] See Section 10 of RPHB.
[513] CSOR Clause 18.5 at p.132.
[514] Exhibit C-108 RE-12 TB: F/197.
[515] *PPTA Cap 354; DOD.*

13.9.15   The Respondent contends that this claim is misconceived and it invites the Tribunal to dismiss it.  The Respondent's position is that even if there were a valid claim (which is denied), the same could only be a claim against the tax authorities (the FIRS) to the TAT set up to deal with Tax disputes;[516] FIRS of course is not a party to this dispute. Neither the TAT (nor the Federal High Court[517]) has made a determination in respect of the provisions in contention and consequently the claim to a change in policy and stabilisation is premature and speculative.

13.9.16   The Respondent submits that it is perhaps in recognition of this that the Claimants have now expressed this claim in the alternative; contending that it is only in the event of the Tribunal finding against them (in their interpretation of the (tax) laws, and in preparation of the PPT Returns), that they are entitled to a stabilisation claim.[518]  It has requested the Tribunal to modify the contract *"...to compensate [it] for the present effect of the changes in policy and for any future effects which arise".[519]*  The Respondent's view, however, is that this represents an attempt to blow hot and cold at the same time. Either the Claimants say there has been breach of the contract or there has not.

13.9.17   The Respondent respectfully submits that in considering this issue, the questions the Tribunal will have in its mind include among others:

[516] Section 11 (1) and (2) of the 5th Schedule of the *Federal Inland Revenue Service Act* No 13, 2007.
[517] By virtue of powers reserved to the FHC under the Constitution of the Federal Republic of Nigeria, section 251.
[518] See page 84, line 11, transcript of hearing 17 November 2011, *"the Claimants' [sic] claim for stabilisation is brought without prejudice to its contractual claim and it's an alternative to its claims in respect of tax oil liftings...".*
[519] Paragraph 19.1, SOR page 152; also line 17, page 91, Transcript of hearing dated 17 November 2011.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(1)     the interpretation to be placed on FIRS' letter dated 24 May 2010. In other words, whether its contents constitute a policy change as alleged, entitling the Claimants to the relief sought;

(2)     whether, on a proper construction of the Claimants' Stabilisation claim, the same does not in fact invite the Tribunal to make a determination regarding fundamental tax policy administration; and

(3)     flowing out of the above, whether the dispute is in fact not a dispute between the Claimants (the tax payer) and the FIRS (the tax receiving authority) and one in respect of which this Tribunal is without powers to make a determination, FIRS not being a party to the dispute.

13.9.18   The Respondent has made it clear that it is not aware of any policy change; the Parties' obligations remain as when the contract was entered into in 1993. FIRS letter of 24 May 2010 merely confirms an interpretation to be given to fiscal provisions relevant to ITC treatment, timing of Capital Allowance, and others; in other words, the fiscal regime applicable to OPL 212. Being the tax authority, it falls to FIRS' remit to do so. That does not equate to a change in law and/or policy. The law has not changed, it remains the same unaltered. Assuming, without conceding, that FIRS had put a different interpretation, effectively withdrawing from an incorrect interpretation that will not amount to a change in policy. At any rate it requires a court of competent jurisdiction to answer that question.

13.9.19   The Respondent further contends that expressing the claim in the alternative does not avail the Claimants. In fact, the Respondent

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

respectfully submits that it presents another reason why the Tribunal
should dismiss the claim.

13.9.20   The Respondent submits that although the Claimants state that they do
not seek a tax determination, contending that their invitation (to the
Tribunal) is merely for an interpretation of the Bonga PSC, implicit
however in their request is in fact a request to make a pronouncement
on whether there has been a change in policy which will ultimately
affect tax liability. The resolution of a dispute that possibly leads to a
pronouncement in a change in status for every tax payer in a Bonga
PSC regime is one that purports to give an arbitrator the right to
deliver an award in rem. Submitting a stabilization request to this
Tribunal under these circumstances effectively seeks a determination
as to which of the Parties (as between the Claimants and the FIRS) has
correctly interpreted tax laws in the preparation of the PPT returns and
payment of tax, and ultimately seeks a determination whether that
interpretation amounts to a change in policy.   These are matters
exclusively preserved for the Federal High Court.

13.9.21   The Respondent submits that FIRS is the legally constituted authority
to interpret tax laws,[320] as they apply to Petroleum Operations, and
specifically as they apply to the Bonga PSC.  Where a party is
unhappy with and disputes a FIRS interpretation, its recourse as
regards that issue is to the TAT (on issues of facts and assessments),
or to the Federal High Court (on issues of law), not to this Tribunal
which, as the Parties are aware, does not have the jurisdiction to
determine tax issues. A Tribunal is not a court and it would be
contrary to public policy to permit it to determine issues of public law

---

[320] Section 11 (1) and (2) of the *Federal Inland Revenue Service Act* No 13, 2007.

325

and in particular, a tax dispute,[521] resulting from an alleged policy change.

13.9.22  The Respondent submits that the point of the above is perhaps best accentuated by the Claimants' own tax expert's comments (made in the course of the oral hearing) disagreeing with FIRS's interpretation on the issue as regards cost recoverability.[522] Rejecting the conclusion that an item that is not cost recoverable cannot be tax deductible, in response to additional questions Mr. Onyekpa observed as follows:

> "*Q.   Do you agree that an item that is not cost recoverable is also not tax deductible?*
>
> *A.    Of course not.*
>
> *Q.    You don't agree with that?*
>
> *A.    No, I don't agree with that.*
>
> *Q.    Correct. The respondent, following the tax expert's advice, also doesn't agree with that. I'm now telling you that. So you both don't agree with the position held by the Tax Office.*
>
> *A.    That's correct.*
>
> *Q.    So from your experience, and I want you to help us, what happens next, where you both don't agree with the tax authority's position? What would normally happen?*

---

[521] The Respondent has set out its arguments as regards arbitrability and Jurisdiction both in the RSOD and the RS.
[522] Page 140 – 142 of the Transcript of the hearing dated 21 November 2011.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

A.  *What will typically happen is that the taxpayer will file his tax returns based on what he believes is the correct way to do it, and having done that, the tax office has a chance to review the tax returns as filed by the taxpayer. He may agree with it, and issue an assessment, or he may disagree. And usually when they disagree, you then go into discussion as to what should be the appropriate treatment.*

Q.  *So on this particular point, you both jointly disagree with the tax office. That's the point I'm trying to make. That's a correct statement. You both jointly disagree with the tax office.*

A.  *Yes."*

13.9.23   The Respondent submits that Mr. Onyekpa's comments make it clear the Claimants' dispute is with FIRS, not the Respondent, and that being the case, it should take the same before the TAT. Looking at the substance of the relief claimed here (to make a pronouncement as to the correctness of the Claimants' PPT returns), the Respondent respectfully invites the Tribunal to dismiss this claim. The Tribunal does not have the jurisdiction to make a tax determination which is what the Claimants are indirectly asking this Tribunal to do.

13.9.24   Specifically as regards the Claimants' comments concerning the Respondent's treatment of ITC, timing of Capital Allowance, tax deductibility, of certain costs, consolidation of OPL's for tax purposes, which the Claimants also say evidences their claim to a policy change, the Respondent refers to its pleadings and its skeletal arguments showing the contractual and legal basis in support for its treatment of

327

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

those items.[523]  The Lifting Allocation of the Available Crude Oil is not a matter only for the Contractor's computations.   The computations must be done to achieve legal compliance; that is to say the interpretation of the relevant fiscal legislations, the *PPTA*, and the *DOA* among others.

13.9.25   The Respondent maintains that this Tribunal lacks the jurisdiction to entertain the Stabilization Claim. In the event that the Tribunal exercises its jurisdiction the Respondent respectfully invites the Tribunal to hold that there has not been a policy change by the Government, or at all, so as to affect the rights and obligations, or the economic benefits of any of the Parties as regards the Bonga PSC. The issue is an interpretative one (the correct interpretation to be given the tax provisions in contention), and one that falls to FIRS to take a position, which it has done.[524]   Assuming without conceding, that FIRS may have been wrong in its interpretations, it is open to the Claimants to challenge the same.    That said, an interpretation, however wrong it might be, does not amount to a change in policy. The Respondent invites the Tribunal to so hold.

13.9.26   The Respondent invites the Tribunal to dismiss the Stabilisation Claim. The Respondent submits that the Claimants have failed to show any change in policy necessary to trigger the operation of Section 19.2 of the Bonga PSC and even if there is, which is denied, the claim is beyond the jurisdiction of this Tribunal.

---

[523]  Chapter 23 of the RSOD at page and in its skeletal arguments for its arguments as to the legal basis on which it has prepared its own entitlement model and with the lifting allocations.
[524]  As confirmed in its letter of 24 May 2010 *"Section 59 (2) of the Federal Inland Revenue Services (Establishment) Act No 13 2007 stipulates that the Tax Appeal Tribunal shall have power to settle disputes arising from the operations of the Act and under the first schedule to the Act. In other words before the TAT for adjudication"*.

328

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

**(4)**    *The Analysis of the Tribunal*

13.9.27   The Tribunal notes the Claimants' letter dated 4 October 2010 asking the Respondent to negotiate under Section 19 of the Bonga PSC[525] and the Respondent's letter in reply dated 8 November 2010 declining to do so.[526]

13.9.28   Bearing in mind the way in which the Tribunal intends to rule in this case and the way in which the Stabilization Claim has been put by the Claimants, the Tribunal proposes to make no decision on this claim at this stage but to the give the Claimants a chance to digest this Partial Award and to revert within four weeks of the date when the Parties are permitted to make further submissions without breach of the Injunction as to whether it still maintains this claim and why. The Respondent, will, of course, be given every opportunity to comment on the Claimants' position.

---

[525] CB/47
[526] CB/48

## CHAPTER XIV   THE RESPONDENT'S COUNTERCLAIMS

14.1   The Respondent asserts that the Counterclaim has been made in the event that the Claimants' assertion that its Claims are arbitrable is upheld.

14.2   As the Tribunal stated in para 11.14 above, the Counterclaim is largely a mirror image of the Respondent's defences to the Claims. Obviously if the Respondent is correct that the Claimants were not involved in Petroleum Operations then they would not be entitled to ITC and it would follow that adjustments would have to be made to correct this position. This would be favourable to the Respondent. The same applies to the issue relating to the ownership of the assets. Unfortunately for the Respondent, the Tribunal has not decided these points in its favour and the whole foundation for its Counterclaim falls away.

14.3   The Tribunal is perfectly satisfied that it would have jurisdiction to deal with the Counterclaim, if its factual basis had been established.

14.4   There was a lot of discussion about the single line format but the Tribunal does not think that this takes the matter any further.

14.5   The Tribunal agrees that there is no longer a basis for the Counterclaim in the light of the way in which the other issues have been determined by this Tribunal.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER XV   DISPOSITIVE

15      HAVING CONSIDERED ALL THE EVIDENCE AND SUBMISSIONS PRESENTED TO IT, AND SATISFIED THAT IT HAS JURISDICTION TO DEAL WITH THE CLAIMS HEREIN, THE TRIBUNAL AWARDS, ORDERS AND DIRECTS THAT:

(1)     As to the Claimants' First Claim being the Claimants' Lifting Allocation Claim the Tribunal grants the following relief, being a modified form of the relief sought in Paragraph 347 of the CS, namely:

(a)     a Declaration that the Bonga PSC provides that the Claimants, as the Contractor, have the initial right to determine the Lifting Allocation;

(b)     a Declaration that the Respondent's liftings must not exceed the Lifting Allocation as initially determined by the Claimants, as the Contractor (unless otherwise agreed);

(c)     a Declaration that the Respondent has breached, up to and including 30 November 2011, the Bonga PSC, by lifting Available Crude Oil that exceeds its Lifting Allocation as initially determined by the Claimants, as the Contractor).

(2)     As to the Claimants' Second Claim being the Claimants' First Tax Oil Issue and the Claimants' Second Tax Oil Issue, the

331

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Claimants, as a matter of contract, are entitled to a Declaration that:

(a) unless and until a cost is raised as an exception by the Respondent and resolved against the Claimants, as the Contractor, pursuant to the Bonga PSC's prescribed procedures, the Claimants, as the Contractor, are entitled to recover as Cost Oil all Operating Costs (as defined in the Bonga PSC) incurred in OML 118 that are recorded in their books and accounts from the Available Crude Oil produced from OML 118;

(b) the Respondent has breached the Bonga PSC by not allowing the Claimants, as the Contractor, to recover such costs as Cost Oil; and

(c) the Respondent cannot raise any "exceptions" in relation to Year 2007.

(3) In respect of the <u>Second Cost Oil Issue</u> the Tribunal orders the Respondent to pay the Claimants the principal sum of <u>US$102,207,000</u> [527] in respect of this element of the total overlift.

(4) As to the <u>Claimants' Third Claim</u>, being the Cost Oil Consolidation Claim, the Claimants as a matter of contract are entitled to:

(a) a Declaration that the Claimants, as the Contractor, are entitled to recover Operating Costs (as defined in the

---

[527] This figure and all subsequent figures are as at 30 November 2011 as set out in Annex B to the CPHB.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

Bonga PSC) incurred in OML 135 and OPLs 803, 806 and 809 from the Available Crude Oil produced from OML 118;

(b) a Declaration that the Respondent has breached the Bonga PSC by not allowing the Claimants, as the Contractor, to recover such costs as Cost Oil;

(5) In respect of the Claimants' Third Claim the Tribunal orders the Respondent to pay the Claimants the principal sum of US$71,828,000;

(6) As to the Claimants' Fourth Claim being the Royalty Oil Claim, the Tribunal holds that the Claimants as a matter of contract are entitled to:

(a) a Declaration that unless and until the Royalty rate has been determined in accordance with s. 61(2)(b) of the *Petroleum (Drilling and Production) Regulations*, Royalty Oil shall be computed on the basis of a royalty rate of 1%;

(b) a Declaration that the Respondent has breached the Bonga PSC by not allowing the allocation of Royalty Oil on the basis of a royalty rate of 1%; and

(c) a Declaration that the Respondent owes a fiduciary duty to the Claimants in respect of the payment of Royalty Oil and must take all reasonable steps to have it determined that the applicable royalty rate is 1%.

333

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(7)   In respect of the <u>Claimants' Fourth Claim</u>, the Tribunal orders the Respondent to pay the Claimants the principal sum of US$86,585,000.

(8)   As to the <u>Claimants' Fifth Claim</u> being the Claimants' PPT Returns Claim, the Tribunal grants the following relief, being a modified form of the relief sought in Paragraph 348 of the CS, namely :

   (a)   a Declaration that the Claimants, as the Contractor, have the contractual right to compute and allocate Tax Oil in accordance with their initial Lifting Allocation;

   (b)   a Declaration that the Claimants, as the Contractor, are contractually entitled to allocate Tax Oil to the Respondent on the basis of the PPT Returns prepared by the Claimants, as the Contractor;

   (c)   a Declaration that the Respondent is contractually bound to file with the FIRS only the PPT Returns prepared by the Claimants, as the Contractor, (without amendment), but with their comments attached thereto;

   (d)   a Declaration that the Respondent is contractually obliged to pass on communications (including, in particular, PPT Assessments and receipts for PPT paid) from the FIRS to the Claimants, as the Contractor, promptly; and

   (e)   a Declaration that the Respondent owes a fiduciary duty to the Claimants, as the Contractor, in respect of the calculation and the payment of Tax Oil and must take all

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

reasonable steps to protect the Claimants' interests in that respect.

(9) As to the <u>Claimants' Sixth Claim</u> being the Claimants' ITC Claim, the Claimants as a matter of contractual interpretation of the Bonga PSC are entitled to:

    (a)    a Declaration that in computing the Tax Oil allocation, ITC shall only be deducted from Assessable Tax and shall not also be deducted from Qualifying Capital Expenditure;

    (b)    a Declaration that in computing the Tax Oil allocation, ITC is to be applied in full in respect of the single fiscal entity, that is the Contract Area as a whole, and is not just a credit for the Respondent;

(10) With respect to the <u>Claimants' Sixth Claim</u>, the Tribunal orders the Respondent to pay the Claimants the principal sum of <u>US$917,664,000</u>.

(11) As to the <u>Claimants' Seventh Claim</u> being the Claimants' Tax Oil Consolidation Claim the Tribunal:

    (a)    makes a Declaration that as a matter of contract the Claimants, as the Contractor, are entitled to consolidate OPLs 219 and 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of preparing PPT Returns for OPL 212 / OML 118;

    (b)    orders the Respondent to pay the Claimants the principal sum of US$238,648,000.

335

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

(12) As to the <u>Claimants' Eighth Claim</u> being the Claimants' Tax Oil Calculation Claim, the Tribunal makes no decision on it at this stage.

(13) As to the <u>Claimants' Stabilization Claim</u>, for the reasons set out in paragraphs 13.9.27 and 13.9.28 above the Tribunal makes no decision on this claim at this stage, but gives the Claimants a chance to consider this Partial Award and to revert within four weeks of the date upon which the Claimants are permitted to make any further submissions in this arbitration as to whether it still maintains this claim and why. The Respondent, will, of course, be given every opportunity to comment on the Claimants' position.

(14) As to the **COUNTERCLAIM**, the Tribunal dismisses the Respondent's counterclaim for the reasons set out in this Partial Award.

(15) As to **INTEREST**, due to the fact that the Claimants have not had an opportunity to update their monetary claims and the interest claimed thereon (due to the Injunction), this award is a Partial Award. The Tribunal has decided not to deal with any of the claims for interest until they have been updated and reworked in the light of the Tribunal's ruling, particularly with regard to the LIBOR issue. For the avoidance of doubt this interest claim refers to pre award interest. The Parties will also be invited to make submissions on post award interest (if any) in due course.

(16) As to **COSTS** it is plain from this Award that the Claimants have been substantially successful in this arbitration. The

336

general, but not invariable, rule is that costs follow the event. The Tribunal considers that the Respondent should pay the Claimants' reasonable costs reasonably incurred. There is no evidence as to the Claimants' costs incurred due to the terms of the Injunction, and the only figure that the Tribunal has is the amount that the Claimants have paid to the Permanent Court of Arbitration. Accordingly the Tribunal reserves all questions of costs.

(17)  The Tribunal reserves to a later award any claims that have not been expressly dealt with in this Partial Award.

(18)  All sums ordered to be paid pursuant to this Partial Award shall be paid or otherwise satisfied within 10 days of the date when the Parties are permitted to proceed further in the circumstances, or are no longer bound by the terms of the jurisdiction.

*SNEPCO et ors v NNPC*
*Privileged and Confidential*

## CHAPTER XVI  AWARD

16      This Award has been signed by Mr. Rowley and Mr. Kaplan because
        Mr. Mahmoud, whilst agreeing with some of this Partial Award, does
        not agree with everything, and will submit his own dissenting Partial
        Award.

Dated this  30ᵗ  day of  May      of 2013 in Abuja, Nigeria

### The Arbitral Tribunal

Arbitrator

Mr. William Rowley Q.C.

Chairman of the Arbitrator Tribunal

Mr. Neil Kaplan CBE QC

338