# EXHIBIT 1

# Part 4 of 4

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

Nigerian Arbitration and Conciliation Act 2004

Schedule 1 Arbitration Rules

## (1) SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LTD

## (2) ESSO EXPLORATION AND PRODUCTION NIGERIA (DEEPWATER) LTD

## (3) NIGERIAN AGIP EXPLORATION LTD

## (4) TOTAL E & P NIGERIA LTD (FORMERLY KNOWN AS ELF PETROLEUM NIGERIA LTD)

-versus-

## NIGERIAN NATIONAL PETROLEUM CORPORATION

---

### DISSENTING OPINION AND PARTIAL AWARD

---

MR. J. WILLIAM ROWLEY QC
MR. A.B. MAHMOUD SAN
MR. NEIL KAPLAN CBE QC SBS
PRESIDING ARBITRATOR –

MS. KIM M. ROONEY
- SECRETARY TO THE TRIBUNAL –

SEAT OF ARBITRATION – ABUJA, NIGERIA

MAY 2013

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

### DISSENTING OPINION AND PARTIAL AWARD

### OF

### A.B. MAHMOUD, SAN, OON, FCIArb

**Contents**

1.  INTRODUCTION ................................................................. 2

2.  THE BASIC PREMISE OF MY DISSENT ................................. 6

3.  RESPONDENT'S JURISDICTIONAL CHALLENGE AND
    CHARGE OF ILLEGALITY ................................................... 13

4.  OVERVIEW OF CLAIMS, DEFENCES COUNTERCLAIM AND
    THRESHOLD ISSUES ......................................................... 24

5.  JURISDICTION AND ARBITRABILITY OBJECTIONS ............... 25

6.  INDIVIDUAL CLAIMS ......................................................... 26

    6.1.  Lifting Allocation .................................................... 26

    6.2.  Cost Oil and Consolidation of OPLs ........................... 42

    6.3.  Royalty Claim ......................................................... 53

    6.4.  The Claimants' Tax Oil Claims .................................. 63

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(1)   PPT Returns Claims ................................................................. 67

(2)   The Investment Tax Credit Claim .......................................... 75

(3)   Tax Oil Consolidation Claim ............................................... 100

(4)   Tax Oil Calculation Claim .................................................. 102

6.5.   The Claimants' Stabilization Claim ............................................ 102

7.   THE RESPONDENT'S COUNTERCLAIM ............................................. 106

8.   DISPOSITIVE ........................................................................ 108

## 1.    INTRODUCTION

1.1.    I have had the benefit of reading, in draft form, the very detailed and well
written Partial Award of my co-arbitrators in this very complex and
important arbitration involving the major oil companies in Nigeria on the
one hand, and the Nigerian National Petroleum Corporation ("**NNPC**" or the
"**Corporation**") on the other, as Claimants and Respondent respectively. I
commend our very able Chairman, Mr. Neil Kaplan QC and my co-arbitrator,
Mr. William Rowley QC, for the very meticulous manner in which they
have combed through the myriad of issues in the pleadings, the evidence and
legal submissions of counsel and set out very clearly the views of the
majority of the members of the Tribunal in this dispute.

1.2.    The award of the majority members of the panel, followed extensive
deliberations by the Tribunal, after the submission of the parties' respective
post-hearing briefs. The views and conclusions followed the very keen,
careful and unhindered deliberations of the panel.  I am in broad agreement
with the substance of Chapters I to Chapters IX of the majority Award, even
if I would have used different wordings for some of the narratives. I adopt
these parts of the majority Partial Award which should be read, save as
herein clarified or modified, as my views and as part of my own Partial
Award.

1.3.    Regrettably, I am unable to agree with the majority members of the panel on
certain key issues.  These, in my respectful view, would have important

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

bearing on some of our findings and conclusions and thus ultimately on the award of the Tribunal.

1.4.   I will attempt in this introductory part to set out the basic premise and principles of my dissenting opinion.   In the subsequent parts, I will, in greater detail deal with the substance of my dissent and then attempt to treat the substantive matters in dispute between the parties.

## 2.   THE BASIC PREMISE OF MY DISSENT

2.1.   I begin by cautioning myself that notwithstanding the high profile nature of this arbitration, the international composition of the panel and of the respective parties' legal teams, this arbitration involves Nigerian domestic entities, albeit in the case of the Claimants, the domestic entities are also subsidiaries of major International Oil Companies ("IOCs"). The arbitration thus remains a domestic arbitration in the context of the Nigerian Arbitration and Conciliation Act Cap. A18 Laws of the Federation of Nigeria (the "Act"). Arbitration under the Act is international if it falls within definition contained in Section 57(2) of the Act.  The parties are in agreement that this arbitration, involving as it does only domestic entities and with the seat of arbitration in Nigeria, does not fall within that definition.

2.2.   The dispute between the parties is in the context of an on-going very profitable relationship for both sides.   The Production Sharing Contract dated 19th April 1993 (the "Bonga PSC" or the "Contract") relating to deep offshore Oil Prospecting Licence ("OPL 212") which is now known as Oil Mining Lease 118 ("OML 118") [1] was entered into between the First Claimant ("First Claimant" or "SNEPCO") and the Respondent (with the other Claimants later being assigned an interest in it) [2] The producing field in OML 118 is referred to as the "Bonga Fields" or "OML 118". [3]  The term

---

[1]   Para 11 of the Parties' Agreed List of Non-Contentious Facts dated 4 November 2011 (the *"Parties' Agreed Non-Contentious Facts"*).
[2]   Para 1.4 of the Claimants' Statement of Claim dated 16 April 2010 (the *"CSOC"*) and para 1.1 of the Respondent's Preliminary Objection/Amended Statement of Defence (the *"RAPO/SOD"*) dated 26 April 2011.
[3]   Para 11 of the the Parties' Agreed Non-Contentious Facts.   A map showing the location of OML 118 is contained in Ex C-2.

of the Bonga PSC is thirty (30) years effective from 19th April, 1993. It may be extended at the option of the parties[4]. If it runs its normal course, it will thus not terminate at least until 2023. The Bonga Fields, to which this dispute relates, are among the most productive deep sea oil fields in Nigeria. Although the majority view and indeed the Claimants have correctly characterized the exploration and the venture as most risky, technically challenging and capital intensive, yet they have been extremely commercially successful. Added to this is the fact that the commercial assumptions on which the transaction was based appear to have favourably changed since oil was first struck. The pricing assumption of the Bonga PSC, for instance, was on the basis of no more than $20 US a barrel. *The Deep Offshore and Inland Basin Production Sharing Contracts Act Cap D3 Laws of the Federation of Nigeria* (the "DOA") provides that if, at any time, the price of crude oil exceeds US$20 a barrel, the provisions of the Act shall be subject to review. For the most part, since the oil finds, the price has been above US$80 and often well in excess of US$100 a barrel. There is no evidence before the Tribunal that this mandatory provision of the law has been triggered.

2.3.   But the relationship between the parties, in particular between the 1st Claimant (and its related companies) and the Respondent, goes beyond the Bonga PSC. The 1st Claimant's related or parent company in Nigeria, the Shell Petroleum Development Company of Nigeria Limited ("SPDC"), the successor to Shell D'Arcy, has operated in Nigeria since 1938. It has substantial interests in Nigeria's oil and gas sector. It currently has extensive petroleum operations in Nigeria including joint venture

---

[4]   Clause 3.1(a) and 3.1(b) of the Bonga PSC

arrangements with the Respondent both onshore and in the shallow offshore. In short, there is much at stake between the parties.  It is clear from the conduct of the parties and all the facts presented before the Tribunal that the parties value their existing commercial relationship and will likely remain in this relationship for many years to come regardless of the outcome of this arbitration.

2.4.   In my view, the structure of the Bonga PSC contains in-built mechanisms in the contractual provisions, which enable the parties to mutually redress any grievances and adjust their respective commercial benefits on an on-going basis.

2.5.   The relationship between the parties appears to have broken down largely on account of the varying understanding or interpretation of the key contractual and statutory provisions that govern, or that have a bearing, on the Contract. Each party is clearly seeking an interpretation that maximizes its commercial benefits from the relationship.

2.6.   The Bonga PSC, as is correctly described in the majority Partial Award, "… *was a carefully crafted and negotiated contract.  It has built-in checks and balances*"[5].  But the majority are also right when they describe the Bonga PSC as "…*an edifice and if one of its building blocks is pulled out the building is in danger of collapse and will not work as anticipated. Similarly, if the procedures set out in the Bonga PSC are not followed as stated, or as mutually altered, then the whole structure of the agreement is in jeopardy*

---

[5]   See Para. 13.1.71 of the Majority Partial Award at page 200

*and the checks and balances will no longer provide the protection that they were intended to provide."[6]*

2.7.   The role of the Tribunal in this arbitration, in my view, is to assist the parties to determine the correct interpretation of these key contractual provisions and get the parties back on track and enable them utilize the agreed contractual mechanisms to redress or adjust their respective oil takings based on correct interpretation of the contractual provisions. To borrow the majority's metaphor, to put back all the building blocks exactly where they were designed to be to enable the edifice remain in place.

2.8.   It is on this premise, I believe that the Claimants in the Claimants' Post Hearing Brief (the "CPHB") at paragraph 62 urged the Tribunal as follows:

> *"If the Tribunal agrees with the Claimants that NNPC must lift Available Crude Oil in accordance with the Contractor's Lifting Allocation and can raise any grievance about its computation by pursuing other procedures, the Tribunal need not decide in this arbitration whether the Contractor was right or wrong in respect of each of the disputed elements (except in relation to costs incurred under other PSCs being allocated as Cost Oil, which can finally be determined in these proceedings-See Chapter IV below). Nevertheless, to assist the Parties, the Claimants invite the Tribunal to conclude in respect of each of the disputed elements of the Lifting Allocation*

---

[6]   See Para 13.4.42 at page 268 of the Majority Partial Award

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

*computation that the Contractor's approach was justified (or, at least, was not unreasonable)."[7]*

2.9.   It appears from the foregoing, that the Claimants will be content with an Award that deals largely with the correct interpretation of the contractual (and statutory) provisions that will guide the parties to then adjust their respective positions, and using the inbuilt contractual mechanisms, to adjust their respective oil takings, including any possible previous shortfalls or over lifts from the Bonga Fields.

2.10.  This appears to me to be a safe approach to take in the context of the formidable jurisdictional challenge taken by the Respondent on account of whether a determination of all or some of the claims will not amount to a tax determination which may then propel the Tribunal in a trajectory of tax adjudication thereby slipping outside the scope of its jurisdiction and usurping the role of the Federal Inland Revenue Service ("FIRS") or the Tax Appeals Tribunal ("TAT") or even the Nigerian courts.

2.11.  The Structure of the Bonga PSC, in my respectful view, is intricately interwoven with tax issues.  Royalty and Taxation, in the form of Petroleum Profit Tax ("PPT") are the only mechanisms by which the Federal Government of Nigeria, through the NNPC, takes its benefit from the PSCs. An arbitration which does not take account of this and renders an Award which fails to sufficiently distance itself from what may even remotely be viewed as tax determination risks being challenged and set aside in the context of a domestic commercial arbitration.

---

[7]   See Claimants' Post Hearing Brief dated 12 January, 2012, Para. 62. Page 13

2.12. A major feature of this transaction is that statutory provisions have been used to reinforce the contractual relationship of the parties. On March 23, 1999 the Federal Military Government of Nigeria promulgated the *Deep Offshore and Inland Basin Production Sharing Contracts Decree No. 9 of 1999* (the "**DOD**"). This was two months before the handover of power to civilian administration in May 1999. This Decree was later amended by the the DOA. In the context of the political uncertainties of Nigeria and consequent policy instability, it is not unlikely that this was seen as a strategy for mitigating country risk and giving the bargain of the parties long term security. This however, cannot be without its own risks jurisprudentially. The terms cannot be construed purely as contractual. In context of the Bonga PSC, the contractual terms, the bargain of the parties, must also be construed within the context of the statutory provisions. Neither the parties nor the Tribunal can pretend that the statutory provisions do not exist or do not mean more than what the contract terms say. By way of illustration, the Bonga PSC provides that in the valuation of the available crude, the parties shall use the "Realizable Price". Now, this is equally what the DOA and the Petroleum Profit Tax Act Cap P13 LFN 2004 ("**PPT Act Cap. P13**") provide. In my view, if this was purely a contractual term, the parties can by their conduct waive compliance. However, having clothed it with statutory authority, the parties in my view cannot waive compliance. They are under a legal duty to comply.  I will come back to this later in dealing with the challenge of illegality.

2.13. One final point on these introductory matters; so much is at stake in this dispute. Clearly much effort has gone into the preparation of the case for both sides. Impressions have been created to one degree or the other in the

mind of the Tribunal, on quality of legal presentations, quality of the witnesses etc. However, I warn myself that the duty of the Tribunal is to go beyond these and determine the real issues in dispute on the basis of the intentions and bargains of the parties as expressed in the contractual provisions.

2.14. Now to more substantive matters: I intend in the subsequent paragraphs to deal with the jurisdictional challenge and the charge of illegality by the Respondent.

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

### 3.   RESPONDENT'S JURISDICTIONAL CHALLENGE AND CHARGE OF ILLEGALITY

3.1.   The majority Partial Award has, in my view adequately dealt with the jurisdictional challenge and the allegation of illegality by the Respondent. I agree with the conclusions reached. However, I disagree with some of the reasoning. I will, in the following paragraphs, set these out particularly as they shed more light on my approach to this arbitration.

3.2.   First, let me deal with the question of the jurisdiction of the Tribunal. The Respondent has mounted a strong and spirited argument challenging the Tribunal's jurisdiction to hear and determine this dispute. Stripped of all sophistry, the Respondent's position, as I understand it, simply put, is that though couched as a contractual dispute, the dispute is about taxation. It should go either to the TAT or to the Federal High Court. It is contrary to Nigerian domestic law and public policy to allow tax matters to be decided by private arbitral Tribunals.

3.3.   In the context of the present jurisdictional challenge, three cardinal points stand out. First, is the contractual agreement to refer matters in dispute to arbitration, which is the agreement to arbitrate. This is based on the principle of party autonomy which espouses the rights of the parties to submit their disputes to arbitration. This principle forms part of the Nigerian domestic arbitration law. It is the foundation upon which the Tribunal derives its mandate from the parties. In this arbitration, this is encapsulated in Clause 21, the Arbitration Clause, in the Bonga PSC. The second is the reference of

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

actual disputes, when and if they arise, to an arbitral tribunal.
Notwithstanding an agreement to arbitrate contained in the contract, the
actual dispute, the subject matter that is submitted to the arbitral tribunal
must constitute or fall into the general category of matters that are arbitrable.
Put differently, the subject matter of the reference must not fall within the
limitations or restrictions imposed by domestic law or public policy on
matters that are arbitrable.  Thirdly, though the subject matter generally
referred may be arbitrable and the tribunal will be legally empowered to
embark on the process, yet it may not be able to grant certain reliefs that
may be claimed by the parties.  These may fall outside its competence as an
arbitral tribunal.

3.4.   In the arguments before the Tribunal, it appears to me that though the
Respondent was sufficiently conscious of the two planks of the jurisdiction
of the arbitral Tribunal, first the general agreement to arbitrate, and the
second, the subject matter arbitrability, it did not address its mind
sufficiently to the distinction between the matters in dispute (or the general
nature of the dispute) and the reliefs being claimed. The Respondent urges
the Tribunal to '*assign to the dispute its true character*' or what it calls '*re-
characterisation*' of the dispute. It attempts to do this by looking at the
reliefs sought. The reliefs according to the Respondent fall into two
categories: First, "*An alleged breach of contractual obligations which
directly challenges the fiscal regime as contained in the Petroleum Profit
Tax Act*". Secondly, those that "*present itself in a more subtle challenge to
the tax incidences of both parties such that a dispute on the quantum of cost
oil allocated to each party automatically diminishes or increases tax*

*liabilities thus raises a dispute or controversy in the Petroleum Profit Tax Act".*

3.5.   As rightly observed in the majority Partial Award, the arguments of the Respondent on the jurisdictional challenge have been modified in the course of the Hearing, with the Respondent conceding that certain matters are indeed arbitrable, including, for instance, its counterclaim.

3.6.   Now, when in the majority Partial Award, the Tribunal asks the question, *'the Tribunal fails to see how anything the Tribunal says in ruling on "a difference or dispute... concerning the interpretation or performance of a contract" can amount to any fetter on FIRS in the exercise of its statutory power to gather in tax due'* it appears that the majority miss the point. A Claimant can in a pretended exercise of the right under clause 21 of the Bonga PSC, formulate a dispute which under domestic law may be unarbitrable.   It may also confront the Tribunal with reliefs which the Tribunal may be unable to grant because they fall outside its competence to do so. Making this distinction clear is in my view, useful in the treatment of the jurisdictional objection.

3.7.   It is not in dispute that the contract between the parties contains an arbitration clause. The next question, is does the subject matter of the dispute at hand fall within the scope of arbitrable disputes? The third question must be, is the Tribunal competent to grant all or any or the reliefs or remedies sought? There is in my view a distinction between the general subject matter of the dispute presented by the parties and the remedies or reliefs sought by the parties.  The Tribunal must caution itself that in a matter such as this, where in its own words *"it is inevitable that the subject*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*of tax has to be considered because that is the way in which the whole Bonga PSC has been constructed,"* that no relief or remedy it grants amounts to a tax determination and that its enquiry and determination are limited to contractual interpretation of the Bonga PSC.

3.8.   In determining the subject matter arbitrability, the Tribunal must look at the Notice of Arbitration which sets outs the general nature of the dispute, it must then look at Claimants' pleadings and then the reliefs sought.  I am satisfied that from the Notice of the Arbitration dated 23 September 2009 issued by the Claimants (the "NOA") and the Claimants' Statement of Claim dated 16th April, 2010 (the "CSOC"), that the general nature of the dispute referred to arbitration is contractual. Briefly stated, the Claimants allege that by the terms of the Bonga PSC, the Contractor (i.e. the Claimants represented by the Operator) (the **"Contractor"**) has the sole right and responsibility for determining the Lifting Allocation pursuant to which the Royalty Oil, Cost Oil, Tax Oil Profit Oil shall be determined and allocated between the Contractor and the Respondent. It contends that the Respondent is in breach of the Bonga PSC in ignoring the Contractor's Lifting Allocation. The second major plank of the dispute is that the Claimants contend that the Bonga PSC gives the Contractor the right to prepare the PPT Returns which it submits to the Respondent for onward filing at the FIRS without amendment.  In refusing to lift according to the Contractors Lifting Allocation and instead preparing its own Lifting Allocation and, secondly, in refusing to file the PPT Returns prepared by the Claimant and filing its own PPT Returns, the Respondent has acted in breach of the Bonga PSC.  Now arising from these alleged breaches are overlifts in respect of which the Claimants seek certain declaratory and monetary Award of the

Tribunal to correct and put back the parties to their respective economic and commercial positions.

3.9.   I agree that the Tribunal has the right to determine whether the Claimant is right in its understanding and interpretation of these contractual provisions, and also to consider the consequences of any alleged breach by the Respondent if any.  The matter of construing these contractual provisions is not a matter that can be referred to the TAT or indeed the Federal High Court.  The parties have agreed that the appropriate method of resolving this is by reference to arbitration. This Tribunal has the jurisdiction to do so.  In the course of so doing, the Tribunal must remain mindful of the manner the Bonga PSC is structured, interwoven with tax matters and the Tribunal must endeavor not to delve into tax determination.

3.10.   Turning to the question of illegality, the majority Partial Award has reviewed adequately the parties' respective positions on the Respondent's allegation of illegality[8]. In sum, the Respondent argues that the parties failed to agree or establish a realisable price as required by law. This it contends was in breach of the PPT Act Cap. P 13.  In failing to establish a realisable price as defined by the Bonga PSC (the "**Realisable Price**"), the parties had failed to carry out their legal obligation of filing the PPT Returns in accordance with the provisions of the law thereby failed to ensure that actual and accurate taxes were paid. The Respondent then contends that the Bonga PSC was legally and properly entered. However, in the course of its implementation by the parties, an illegality has occurred.  It urges the

---

[8]   See Chapter XII of the Partial Award from paragraphs 12.1 to 12.40; pp 149 to 165.

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

Tribunal not to enforce contractual obligations that will amount to a breach of the law.

3.11. The Respondent's logic is as follows: The primary obligation to prepare the PPT Returns is on the Claimants. However, the Respondent has also a legal obligation to ensure a *general compliance with the law*. The Claimants had prepared the PPT Returns in disregard of the law (by failing to establish and use a realisable price) and seek a relief from the Tribunal that the Respondent must be contractually compelled to file such returns. It argues that the contractual provisions of the PSC cannot be enforced. To do so will amount to a breach of the Sections 51 and 52 of the PPTA which attracts penal sanctions.

3.12. The Claimants admit not using the realisable price when allocating Available Crude Oil. They contend however, that they are not at fault. They assert that they rejected the Respondent's proposal to use the Official Selling Price (the "OSP") because it was not objective and transparent and was determined solely by the Respondent. The Claimants further contend that both parties in effect had waived the requirement to apply the Realisable Price whilst negotiations were on going. This, the Claimants maintain was accepted by the Respondent. Both parties seem to admit that negotiations are still ongoing to reach an agreement on this. The Claimants also submit that the Parties can amend the Allocation model and historic PPT Returns once a valuation method was agreed.

3.13. In addition, the Claimants maintain that the net impact of failure to use Realisable Price on liftings was *de minimis;* as to 30th November, 2011 was at most US$21.762 Million. They undertake to make any adjustments to

their lifting Allocation model once a formula to determine Realisable Price methodology was agreed with the Respondent. The Claimants deny that the parties' conduct amount to illegality or breach of contract. They assert that since the Respondent had in its entitlement mode not used an agreed price, any breaches in this context must be deemed to be mutual.

3.14.   Now, the analysis of the issues in the majority Partial Award is contained in Paragraphs 12.41 to 12. 56 of the majority's Partial Award.[9]   The majority took the view that the DOA was intended to give effect to the PSC. Section 13 of the DOA merely mirrors the Bonga PSC with regards to *"Realisable Price"*. The section assumes an agreement or a determination and does not deal with any interim situation.   The parties, according to the majority, appear to have waived the application in the interim and there is nothing illegal about it. The majority also reasoned that the Respondent's Lifting Allocation model, which also formed the basis of the Respondent's PPT Returns, was not based on an agreed or determined *"Realisable Price"*.   It was accordingly nonsensical to suggest that either party had broken the law. The majority stated that *"The Claimants' calculation put the total impact as at November 30, 2011 at US$21.762 Million which is about 0.6999% of the total amount of the alleged overlift by the Respondent of US$3,109,107.782."* The majority therefore proposes to deduct $25 Million from the Claimants claim so as to ensure that the *"Respondents contentions are fully respected"* and thus it was no longer necessary to decide the issue

---

[9]   See pages 164 to 171 of the Majority Award

*of the application of the common law doctrine of "de minimis" as argued by the Claimants[10]".*

3.15. The majority came to the conclusion that the parties have waived present compliance with the *"Realisable Price"* provision in the Bonga PSC. They concluded that there was no illegality involved and once the Realisable Price has been agreed or determined, it will be applied retrospectively and so will then be brought with the terms of the Bonga PSC.

3.16. Now, Section 13(1) of the DOA provides as follows:

> *"The realisable price as defined in the production sharing contracts established by the Corporation or the holder in accordance with the provisions of the production sharing contract, shall be used to determine the amount payable on royalty and petroleum profit tax in respect of crude oil produced and lifted pursuant to the production sharing contract"*

3.17. This section of the law in my view imposes a duty on the parties to determine the Realisable Price, albeit in accordance with the terms of the Bonga PSC. Section 13(1) of the DOA further directs that it is that price that shall be used in the payment of royalty and PPT. The operative word used there is *"SHALL"*. This is mandatory. It does not permit a waiver. In other words, the parties cannot by their conduct or otherwise waive the provisions of a statute especially one that has clear bearing on taxation and payment of Royalty to the State.

---

[10] See paragraph 12.58 of the majority Partial Award

3.18. Now does the failure by the parties to make use of the Realisable Price make the contract illegal and unenforceable? I think not. The Contract clearly is not *ex facie* illegal. It is a valid contract duly and properly entered by the Claimants and the Respondent. Failure to comply with the provisions of a statute in the performance of the Contract may give rise to sanctions or penalties against the party or parties in breach, but that failure in itself does not, *ipso facto* render the contract illegal and unenforceable. This matter, it appears to me, is well settled in Nigerian Jurisprudence. The Nigerian Supreme Court has held in several cases that a contract that is not *ex-facie* illegal or offend public policy will be enforced by the Courts. See UBN v. **Odusote Bookstores Ltd. (1995) 9 NWLR pt. 421, 551; Ogwutu v. Coop. Bank of E.N. Ltd (1994) 8 NWLR (pt. 365) 685.**

3.19. In the case of **West Construction Co. Ltd v. Batalha Vol. 7 M.J.S.C 184** counsel to the Appellant, Mr. A. O. Eghobamien, raised similar arguments on behalf of the Appellant, pleading illegality in an action for the enforcement of a contract. The Respondent had sued the Appellant claiming arrears of unpaid salaries and wages at the High Court in Benin. The Appellant had raised the defense of illegality arguing that the contract was in breach of Sections 8 and 34 of the Nigerian Immigration Act as the Respondent was employed without a work permit as required by that Act and secondly payment to him of salaries in cash in foreign currency breached the Central Bank Act. The High Court upheld the plea and dismissed the action. On Appeal to the Court of Appeal, the decision was set aside and the contract held enforceable. On further Appeal to the Supreme Court, the court rejected the plea of illegality. It held that the claims were primarily contractual and *ex facie* not illegal. Any breach of the Immigration

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

Act or other Banking Regulations for which sanctions existed could be pursued without impugning the contract.   The court held that *"the sanction prescribed (for infringing the Immigration Act) was deportation from the Country.  It does not prescribe for the nullification of contracts such as in the instant case."*

3.20.   In my humble view, the Bonga PSC was a contract lawfully entered into by the parties.  It is not *ex facie* illegal.  It is enforceable legally.  If the parties acted otherwise than in accordance with their legal duties under a statute bearing on the relationship, this conduct may very well give rise to a sanction or punishment. But that clearly is not a matter for this Tribunal. It does not affect the legal validity of the Bonga PSC.

3.21.   Indeed the Bonga PSC provides a remedy for this kind of situation in Clause 3.2 (b).  That Clause provides in part that if a court of competent and final jurisdiction finds that the Contractor willfully violated any Nigerian laws and regulations governing Petroleum Operations (as defined therein), financial transactions and/or commercial operations during the term of the Contract, and such violations adversely affect the Contractor's interest under this Contract in a substantial manner, and the Contractor has failed to remedy same within a reasonable period following the Court finding, then the Corporation may terminate the Contract.

3.22.   The common law doctrine of *'de minimis'* in my view has no application here.  First, when a statute imposes an obligation, it is irrelevant whether its consequence may in fact be minimal.  In any event, the impact could change over time. In this instance, the premise that is factual basis of its application in the majority award, are based on assumptions.  US$21.762 Million, if this

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

was money that could go into the coffers of the state as tax, cannot be considered infinitesimal.

3.23.  I therefore come to the conclusion that the duty imposed under Section 13(1) of the DOA on the parties cannot be waived. However, the failure to use the *"Realisable Price"* does not *ipso facto* render the Bonga PSC illegal. The parties must determine the *"Realisable Price"* in accordance with the provisions of the PSC and apply that retrospectively to ALL PPT Returns filed. The Lifting Allocations shall be adjusted accordingly.

4. **OVERVIEW OF CLAIMS, DEFENCES COUNTERCLAIM AND THRESHOLD ISSUES**

4.1.   Chapter XI of the majority Partial Award provides an overview of the Claims, Defences and Counterclaim of the parties. I agree with this summary and adopt the same. It should be read as part of my views set out in this dissent.

4.2.   The Parties have submitted an agreed list of issues to be determined by the Tribunal[11]. Strictly speaking, this is not an *'Agreed List of Issues'*. The list does not contain issues jointly formulated and agreed upon by the parties as being the issues that arise for determination. Rather, the list contains issues formulated separately by the parties under broad subheads. I propose to deal with these issues. Under each broad head, I will, having regards to the pleadings and submissions of the parties, either adopt the issues as formulated by one or both of the parties, or formulate the issues as I understand them.

---

[11]   See the Agreed List of Issues To Be Determined dated 4th November, 2011

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

## 5.   JURISDICTION AND ARBITRABILITY OBJECTIONS

5.1.   With regards to the Respondent's Jurisdiction and Arbitrability Objections, 3 issues in all were formulated. Issues 1 and 2 were formulated by the Respondent and No. 3 was formulated by the Claimants. I have already dealt with the jurisdiction of the Tribunal. I have ruled that the main character or subject matter of the dispute is contractual. I have ruled too, that given the nature of the Bonga PSC, interwoven as it is with tax issues, the Tribunal must warn itself and ensure that in making any award or granting any relief or remedy, it avoids getting into tax determination.

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

6.      **INDIVIDUAL CLAIMS**

6.1.    **Lifting Allocation**

6.1.1.  Under the broad heading of Lifting Allocations the parties submitted 8 issues for determination. The Claimants formulated issues Nos. 4, 5, 6, and 7; whilst the Respondent formulated issues Nos. 8, 9, 10 and 11. Having regards to the pleadings of the parties I prefer the formulation by the Claimants as being the issues that appropriately arise for determination on the question of Lifting Allocation. I propose therefore to deal with the matter on the basis of the Claimants' formulation.

6.1.2.  Issue No. 4 formulated by the Claimant reads thus:

> *Does the Bonga PSC confer on the Contractor the exclusive right to determine the parties Lifting Allocation from the Available Crude Oil produced by the OML 118?*

6.1.3.  The majority Partial Award deals extensively with the evaluation of the respective parties' positions on this. This is contained in the majority Partial Award in paragraphs 13.1 to 13.1.81[12]. I will attempt a brief summary of the parties' respective positions for the purpose of the readability of this dissent. But I have no quarrel with the summation of the majority.

---

[12] See pages 175 to 204 of the majority Partial Award

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

6.1.4.   The Claimants case is built on their understanding and interpretation of the Bonga PSC. The Claimants, as the Contractor, contend that it has the exclusive, sole right to determine the Lifting Allocation of available crude and the Respondent must lift according to this Lifting Allocation. They assert that the Contractor had determined the Lifting Allocation every month since the start of commercial production in November 2005. However, from September 2006 the Respondent had ignored the Contractor's Lifting Allocation and had lifted oil on the basis of its own Lifting Allocation Model. The Claimants assert that the Respondent is in breach of the Bonga PSC in disregarding the Claimant's Lifting Allocation and lifting instead in accordance with its own allocation model. They further assert that the Contractor has since September 2006 lifted Available Crude Oil in volumes vastly in excess of its entitlement. As at November 2011, the value of the Respondent's overlift was put at US$3.13 billion, which the Claimants claim in this arbitration plus interest.

6.1.5.   The Respondent on the other hand contends that it is a total misconception for the Claimants to assert it was solely entitled to determine the Lifting Allocation with total disregard to the Respondent.[13] It would have been rather awkward, according to the Respondent, *'if the Contractor could have made forecast allocation without being subjected to any control whatsoever unless it proceeds to arbitration'*[14]. The Respondent maintains that it retains control over the Lifting Allocation indirectly by having the right to approve the historical allocation. It does

---

[13]   See para 6.3. iii ; page 26 of the Respondent's Post Hearing Brief (the "RPHB")
[14]   Para 6.3.iii page 27 of the RPHB

this through the mechanism of approval of the *'proceeds imbalance'* which is a critical input in the forward-looking or future allocation. It therefore maintains that the Estimated Lifting Allocation is predicated on the approval of the Respondent. The Respondent then argues that the parties had by their conduct abandoned the allocation procedure set out in Annex C to the Bonga PSC. It contends further that Claimants had waived any right to determining the Lifting Allocation because the Claimants had continued to comply with the Respondent's nomination, notwithstanding any objections raised at the monthly curtailment meeting, which in any event had the particular purpose of ensuring compliance with the OPEC Regulations. It argues that any lifting nominations over and above each Estimated Lifting Allocation by the Respondent must have been carried out to reduce the Proceeds Imbalance.

6.1.6.  The Claimants reject the Respondent's submission that they had waived any rights regarding the Lifting Allocation.

6.1.7.  The Bonga PSC contains provisions for dealing with differences between the parties. Clause 6.4(d) empowers the Management Committee established under Clause 6 ("MACOM") to attempt to resolve any dissents failing which it may be referred to an independent qualified expert to advise. Article IV. para. 4 of Annex C of the Bonga PSC also provides for a procedure for resolving any disagreement in the reconciliation of Lifting Allocation by the parties. And paragraph 5 of the same Article provides for auditing of *'all Lifting and actual liftings at the end of each calendar year by a mutually acceptable independent*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*auditor'.*  The parties admit that none of these procedures was used before triggering this Arbitration.

6.1.8.   Now the analysis of the majority in their Partial Award is contained in paragraphs 13.1.70 to 13.1.81.  The majority took the view that the Bonga PSC clearly affords to the Claimants, as Contractor, the initial right to determine the Lifting Allocation.  The rationale according to the majority is obvious.  The Bonga PSC contains checks and balances. The responsibility for preparing the monthly Lifting Allocation was given to the Contractor to allow the *'vital monthly activity'* to be carried smoothly as it obviously cannot be carried out by a committee.  This important activity, according to the majority, was to get the oil flowing into the international market for the benefit of both parties.   The majority, however, also agree that the right to determine the Lifting Allocation was neither exclusive nor final.  The Bonga PSC makes provision for dealing with any differences.   If the Respondent was unable to approve the Lifting Allocation notified by the Claimants it must discuss and attempt to agree the matter with the Claimants as the Contractor.  The Tribunal referred to Clause 6 of the Bonga PSC, the role of MACOM and the dispute resolution mechanism provided for in Clause 6.4 (d) of the Bonga PSC, although no evidence before the Tribunal that any binding advice pursuant to this clause was ever given. The majority rejected the argument that the Bonga PSC has, by reason of any disagreement on the Lifting Allocation, broken down, or has become unenforceable in whole or in part.  It also rejected the Respondent's contention that the Claimants had waived their rights under the Bonga PSC as regards the Lifting Allocation.

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

6.1.9.   Now, the dispute regarding the Lifting Allocation is the fulcrum of the disagreement between the parties. A resolution of the various issues in contention must proceed from a determination of this point. The answer to this in my view, lies in a careful examination of the provisions of the Bonga PSC. What really does the Bonga PSC say regarding the Lifting Allocation? Are the Claimants correct in their understanding that they have the '*exclusive, sole*' right to determine the Lifting Allocation? Is the Respondent right to disregard the Contractor's Lifting Allocation and lift according to its own Lifting Allocation model?

6.1.10.   The Bonga PSC, as rightly observed by the majority, is a carefully negotiated and structured contract. It has built-in checks and balances and mechanisms for redressing grievances before they escalate to a dispute. The Bonga PSC has 23 Clauses. The governing terms of the contract are set out clearly in these clauses. The Scope, the Term and the Rights and Obligations of the parties are set out in these clauses, as well as the mechanism for administering or overseeing the execution of the contract. A Management Committee (defined above as "**MACOM**"), comprising equal number of the representatives of the Contractor and the Corporation is vested with the responsibility of 'providing orderly direction of all matters pertaining to the Petroleum Operations and Work Programme'. The modalities for the work of MACOM are set out in considerable detail and are obviously structured to give the parties equal opportunity to participate in both the operational and commercial administration of this very complex project.

6.1.11.   Attached to the main contract are five Annexes marked A to E.   These deal with procedural details. The Annexes obviously form part of the Contract, but it is clear that their provisions are subordinate to the main contractual provisions. Annex C, for instance, in Article 1 para. 4 provides as follows: "*In the event of a conflict between the terms of this Procedure and the Contract, the terms of the Contract shall prevail*". Each of the annexes contains similar provisions.

6.1.12.   Now, having carefully reviewed the structure, the wordings and the scheme of the Bonga PSC, I find any notion of unilateral determination or decision by either party quite startling. In particular, that the Bonga PSC will carefully construct a scheme of overseeing the conduct of petroleum operations, with built-in checks and balances, yet leave the vital final commercial task of allocation of crude oil '*exclusively and solely*' to be determined by one of the parties, and that any disagreement must be a matter for dispute resolution, is clearly not in accord with any logic or commonsense.

6.1.13.   In my view a clear reading of the terms of the Bonga PSC, and taking all the provisions as a whole, will show that vital task of the Allocation of Crude to the parties is jointly vested in the parties.   The relevant governing provisions that bear this out are as follows:

(1)   Clause 2 defines the "*Scope of the Contract*". It provides as follows in sub-Clause 2.2:

"*During the term of this Contract the total Available Crude Oil shall be allocated to the Parties in accordance with the*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*provisions of Clause 8, the Accounting Procedure (Annex B) and the Allocation Procedure (Annex C)"*

(2) Clause 8 deals with *"Recovery of Operating Costs and Crude Oil Allocation"*. It provides in part as follows:

> 8.1.   *The allocation of Available Crude Oil shall be in accordance with the Accounting Procedure (Annex B), the Allocation Procedure (Annex C) and this Clause 8 as follows:*
>
> > (2)   <u>*Royalty Oil shall be allocated to the CORPORATION*</u> *in such quantum as will generate an amount of Proceeds equal to the actual Royalty payable during each month and the Concession Rental payable annually;*
> >
> > (3)   <u>*Cost oil shall be allocated to the CONTRACTOR*</u> *in such quantum as will generate an amount of Proceeds sufficient for recovery of Operating Costs in OPLs 212, 219, 803, 806 and 809 and any OMLS derived therefrom. All operating Costs expended in US Dollars will be recovered in US Dollars through Cost Oil Allocations.*
> >
> > (4)   <u>*Tax Oil shall be allocated to the CORPORATION*</u> *in such quantum as will*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *generate an amount of Proceeds equal to the*
> *actual PPT liability payable during each month.*

    *(5)*  ...

    *(6)*  ...

    *(7)*  ...

6.1.14. Now, I have added the underlining in the above provisions for the purpose of emphasis. In my view a reading of these provisions shows clearly that the parties bear joint responsibility in the allocation of crude oil from the Bonga PSC.  The grammatical structure of the opening sentences of sub-Clauses of Clause 8.1 clearly supports this conclusion:

> "*(a)* *Royalty Oil shall be allocated to the CORPORATION...;*
>
> *(b)* *Cost oil shall be allocated to the CONTRACTOR...;*
>
> *(c)* *Tax Oil shall be allocated to the CORPORATION...;*"

This clause does not say that either the Contractor or Corporation shall do the allocation. Unless it was possible to suggest that an independent third party would do this, the only logical conclusion is that it would be done jointly by the parties. If it was intended that one of the parties would bear the responsibility for determining the lifting Allocation, it is clear that different wording would have been used.  Contrast this for instance with the wording of Clause 2.3 following immediately after Clause 2.2 of the Bonga PSC quoted above.

Page 33 of 113

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> "2.3.   *The Contractor shall provide funds and bear the risk of Operating Costs required to carry out Petroleum Operations and shall therefore have an economic interest in development of Crude Oil deposits in the Contract Area.*"

6.1.15.   Again Clause 7 of the Bonga PSC sets out the *"Rights and Obligations"* of the Parties.  These are fairly detailed. It is not stated anywhere in relation to any of the parties that one of them has the right to determine the Lifting Allocation, much less exclusively or solely.  But it will be useful to set out some of the provisions in Clause 7 of the Bonga PSC.

6.1.16.   In relation to the Contractor, Clause 7.1 provides amongst other things:

> "7.1.   *In accordance with this Contract, the CONTRACTOR shall:*
>
> (1)   *Provide all necessary funds for payments of Operating Costs...*
>
> (2)   ...
>
> (3)   *Prepare Work Programmes and Budgets and carryout approved Work Programmes in a good and ...*
>
> (4)   ...
>
> (5)   ...
>
> (6)   ...
>
> (7)   ...

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(8)   *Prepare estimated and final PPT returns and submit same to the Corporation on a timely basis in accordance with the PPT Act;*

(9)   *Have the right to lift in accordance with Annex D and freely export and to retain abroad the receipts from the sale of <u>Available Crude Oil allocated to it hereunder;</u> (emphasis added)*

(10)   ...

(11)   ...

(12)   ...

(13)   ...

(14)   ...

(15)   *Have the right to finance Petroleum Operations from external sources under the terms and conditions approved by the CORPORATION; and*

(16)   *Not exercise all or any rights or authority over the Contract Area in derogation of the rights of the Corporation."*

6.1.17.   Clause 7.2 of the Bonga PSC sets out the rights and obligations of the Corporation in a similar fashion. This clause does not allocate the right to determine the Lifting Allocation to any of the parties.

Page 35 of 113

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

6.1.18.  Now, this takes us to the Annex C to the Contract dealing with Lifting Allocation.  It is instructive that the Article 1 begins with an affirmation of the rights of the parties to allocate Available Crude.  This is what it states:

> " 1. This Allocation Procedure ("this Procedure") sets out the methods for allocation of Available Crude Oil from the Contract Area and _the Parties shall allocate all lifting of Available Crude Oil in accordance with this Procedure and the Contract._"

6.1.19.  Now, obviously if I am right in my understanding that the allocation is vested jointly in the parties, the question remains how does the contract envisage it should be done in practical terms?  Now before I go into that I will like to say that several terms and phrases have been used repeatedly in the submission of counsel which are not found in the contract.  For instance, the phrase "*Contractor's Lifting Allocation*".  I have not seen anywhere in the contract where this is used.  So also the terms '*exclusive*' or '*sole*' right, although this was admitted by Claimants as being a necessary inference to be drawn from the contract provisions.  Again in my view there is a world of difference between determining the Lifting Allocation and for instance '*advising or notifying*' the parties or indeed the Corporation of the '_Estimated Lifting Allocation_' which is the language used in paragraph 3 of Article III of Annex C. '*Determination*', in my view, connotes a decision or a ruling that carries some notion of finality at least until legitimately challenged or set aside.  The Contract's provisions clearly do not vest any right of determination of the Lifting Allocation in either the Contractor or the Corporation.

6.1.20.   The Lifting Allocation in my view is a process.  It comprises several elements and tasks over a given period. The various elements of this process consist of:

    (1)   The Contractor advising the Parties on or before September 30 of every year of its forecast of the Available Crude oil to be produced by grades during each month of the first six (6) months of the next ensuing year:  see Annex C, Art. III para 1;

    (2)   The Contractor advising the Corporation on or before March 31 of every year of its forecast of Available Crude Oil to be produced by grades during the each month of the six (6) months commencing July 1, of the year: see Annex C, Art. III para 2;

    (3)   The Contractor notifying of the Corporation of the estimated Lifting Allocation which can be produced and made available for disposal during the forecast quarter.  This is to be done 35 days before the commencement of production and thereafter every thirty-five days prior to the beginning of the Forecast Quarter: See Annex C, Art. III. Para 3;

    (4)   The use of the Realisable Price in the preparation of the Estimated Quarterly Lifting Allocation by the Contractor: see Annex C, Art. III para 5;

    (5)   The computation of the Proceeds Imbalance and approval of this by the Corporation: see Annex C. Art. IV para 1;

(6)   Reconciliation and Adjustment of the Lifting Allocation: see Annex C. Art. IV; para 4 and

(7)   Audit by an Independent mutually appointed auditor: see Annex C Art. IV. para 5.

6.1.21.   The process of determining the Lifting Allocation in my view comprises a series of actions spanning over a period, with both parties playing various roles, at the end of which the quantum and value of crude oil that each party is entitled to is eventually determined. The process comprises four fairly distinct elements: Forecast and estimation; nomination and lifting; valuation; reconciliation, adjustments and audit.   It is the cumulative outcome of this over a given period that results in the actual determination of the Lifting Allocation over that period.  Aspects of this process are carried out either by individual parties (e.g. forecast, estimation), or jointly (e.g. adjustment and audit). In the case of nomination and lifting, each party performs the same task but independently.   Now, that one party has the responsibility to perform or conduct one aspect of this process does not to my mind translate to *'exclusive or sole right'* to determine the Lifting Allocation. This is consistent with the scheme of checks and balances in the entire Contract. It is also consistent with the practical nature of the Petroleum Operations which is of drilling, winning, storing, lifting and valuing of petroleum on a continuous basis. This is also consistent with the understanding conveyed by Mr. Iain Petrie, a witness for the Claimant, under cross-examination.

> *"Mr. Petrie:   The allocation system is constantly being...you know, what feeds into it at the beginning are estimated volumes, estimated prices, estimated inputs. Once actuals are known, everything is adjusted...[15]*
>
> *...The Allocation mechanism starts with estimated inputs for forward looking-actions, prices, volumes, et cetera, which aren't known, and then when those factors are known, those are put into the allocation model[16]."*

6.1.22.   It is important to emphasize the difference between the position of the Claimants that of the majority members of the Tribunal, and my understanding set out above.   The Claimants maintain that they have the exclusive sole right to determine the Lifting Allocation and that the Corporation must lift in accordance what it calls the '*Contractor's Lifting Allocation*'.   If the Respondent disagrees with this, then it must resort to arbitration.   The Tribunal majority's position is slightly different. This is set out in paragraph 13.1.75 of the majority Partial Award:

> *"It is clear to the Tribunal that the Bonga PSC affords to the Claimants, as the Contractor, the initial right to determine the Lifting Allocation. The Respondent is correct however in maintaining that such right is neither exclusive nor final.   The Bonga PSC itself makes provision for dealing with any differences. If the Respondent feels unable to approve a lifting Allocation*

---

[15] See Evidence of Mr. Iain Petrie, Transcript, Day 3, page 67, lines 11-14.
[16] See Evidence of Mr. Iain Petrie, Transcript, Day 3, page 69, lines 4 -7.

> *notified by the Claimants it must discuss and attempt to agree the*
> *matter with the Claimants, as the Contractor.  The Tribunal has*
> *referred to Clause 6 of the Bonga PSC, the role of MACOM and*
> *the dispute resolution mechanism provided for in Clause 6.4 (d) of*
> *the Bonga PSC (See Chapter V above).  There was no evidence*
> *before the Tribunal that any binding advice pursuant to this clause*
> *was ever given. Ultimately, if agreement cannot be arrived at then*
> *there is a dispute concerning the "interpretation or performance*
> *of the contract" and thus either party may refer the dispute to*
> *arbitration."*

6.1.23.   The Claimants seem to suggest that they have the right to determine the Lifting Allocation, exclusively and solely. If the Respondent disagrees with them, it can resort to arbitration under Clause 21 of the Bonga PSC. The majority members of the Tribunal hold a slightly different view. According to them, the Claimant initially determines the Lifting Allocation. The Respondent can disagree with that.  If it does, *'it must discuss and attempt to agree'* with the Claimants or take advantage of dispute resolution mechanism under the Bonga PSC Clause 6.4(d) for a binding advice of an independent expert, or then resort to arbitration under Clause 21.

6.1.24.   I think both are a misrepresentation of the provisions of the Bonga PSC. Responsibility for determining the Lifting Allocation, by the governing terms of the Bonga PSC, vests jointly in the parties. The process consists in series of actions/steps set out in Annex C of the Bonga PSC with both parties acting, in some cases individually, and in some jointly.  The

outcome of this process leads to the Determination of the Lifting Allocation.

6.1.25. Having arrived at this conclusion, I must then answer in the NEGATIVE, the Claimants issue No. 4, that is: *Does the Bonga PSC confer on the Contractor the exclusive right to determine the parties' Lifting Allocation from the Available Crude Oil produced from OML 118?*

6.1.26. Now Claimants Issue No. 5 is formulated thus:

> *Is the Respondent in Breach of the PSC by not complying with the Contractor's Lifting Allocation?*

6.1.27. The answer to this follows logically from my resolution of Issue No. 4. Since the PSC does not vest in the Contractor the right exclusively to determine the Lifting Allocation, the Respondent could not technically be in breach of the Bonga PSC by '*not complying with the Contractor's Lifting Allocation*'. But I must also add, and it follows from my analysis in the preceding paragraphs, that the Respondent does not have the right under the PSC to unilaterally determine the Lifting Allocation. Therefore, neither the position of the Claimants, that it could exclusively determine that Lifting Allocation, nor that of the Respondent, that it could lift according to its own Lifting Allocation Model, is correct.

6.1.28. Where then does this leave us? The parties must in my opinion, go back to the framework and procedures set out in the Bonga PSC as analysed in this Partial Award. I believe, faithfully implemented, it gives the parties a fair mechanism for dealing with the vexed issue of determining the Lifting Allocation. The Lifting Allocation, is clearly central to the

commercial structure of the PSC. Given the overall structure of PSC, it could not have been left solely and exclusively for one party to determine. If differences arise, as they inevitably would, the PSC has made ample provisions for resolving these even before the last resort to arbitration.

6.1.29.   Issue No. 6 is formulated thus by the Claimant:

*Has the Respondent over lifted cargoes in excess of its entitlement?*

6.1.30.   Now having come to the conclusions that I have, it will be practically impossible for the Tribunal on the basis of the evidence before it to make this determination.

6.1.31.   Issue No. 7: Are the Claimants entitled to Compensation for the Respondent's breach and in what amount? Now, the Respondent's breach referred to here is based on the formulation of the Claimants' issue No. 5. I have already resolved that issue against the Claimants. Although it still leaves the question whether the Respondent (and indeed the Claimants) have over lifted beyond their contractual entitlement. Again I will come back to this point later in this Award.

6.2.       **Cost Oil and Consolidation of OPLs**

6.2.1.     Three issues have been formulated by the Claimants on these heads of claim. These are issues Nos. 12, 13 and 14. The issues are formulated thus:

*"12.   Is the Contractor entitled to be allocated such quantum of Available Crude Oil as will generate an amount or proceeds*

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

sufficient for the recovery of *all* Operating Costs it has incurred in the development of OPL 212 / OML 118?

13.   Is the Contractor entitled to be allocated such quantum of Available Crude Oil under OPL 212 /OML 118 as will generate an amount of proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 219 and OPLs 803, 806 and 809?

14.   Are such Operating Cost to be those recorded in the Contractor's books and accounts?"

6.2.2.   These issues are considered and dealt with in the majority Partial Award in paragraphs 13.2 to 13.3.49.

6.2.3.   The Claimants position is simply that, by the terms of the Bonga PSC, they have the right and responsibility to compute the amount of Cost Oil. They rely on Annex B, Art. IV. para 5(b). They maintain that the Operating Costs for the purposes of Cost Oil are those Non-Capital Costs and Capital Costs recorded in the books and accounts of the Claimants, as the Contractor. They maintain that though under Clause 13.1 of the Bonga PSC the Corporation is entitled to participate in the preparation of the books and accounts of the Contractor, and for that purpose shall attach its officials to the Contractor, it is not the Contractor's fault that the Respondent did not do so. The Respondent should not also rely on its failure to exercise a contractual right to frustrate the claimant.   The Claimants also acknowledge the Respondent's right to audit the books and accounts pursuant to Clause 13.2 of the Bonga PSC. They however

maintain that such rights must be exercised within two years following the end of the year in question. And in any event, an exception to the audit must first be raised within 90 days of the end of such audit. Failure to give such written notice within such time shall establish the correctness of the books and accounts.

6.2.4.   The Respondent, on the other hand, maintains that the Claimants could recover costs in the Books and Accounts of the Claimants pursuant to Article IV, Annex B of the Bonga PSC, but they maintain that such books and accounts must be prepared jointly with the Respondent pursuant to Clause 13.1 of the Bonga PSC. They maintain that the Claimants failed to follow the procedure set out in the Bonga PSC regarding the preparation of accounts. To the extent that the accounts were not prepared jointly, they are not accounts prepared in accordance with the Bonga PSC. They maintain that the accounts are not valid or binding on them.

6.2.5.   It is clear to me that part of the checks and balances of the Bonga PSC is that the parties intended that the Corporation will participate in all aspects of the Petroleum Operations and Work Programme under the Bonga PSC. The parties also intended that the Corporation would participate in the preparation of the books and accounts of the Contractor. This intention of the parties is reflected in the following provisions:

"7.2. *In accordance with this Contract, the CORPORATION shall:*

(a) ...

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(b)   With its professional staff attached pursuant to Clause 12.4, work jointly with the CONTRACTOR's professional in the CONTRACTOR's Exploration, Petroleum Engineering, Facilities/Materials and Finance Departments;

12.4.   Competent professionals of the CORPORATION shall be attached to work with the CONTRACTOR from time to time and such officials and the CONTRACTOR's officials shall not be treated differently with the regard to salaries and other benefits.

12.5.   Costs and expenses incurred in the recruitment and training of Nigerian personnel shall be included in Operating Costs.

13.1.   *Books and Accounts*

The CONTRACTOR shall be responsible for keeping complete books of accounts consistent with modern petroleum industry and accounting practices and procedures. The statutory books and accounts of this PSC shall be kept in Naira and U.S. Dollars. All other books of accounts as the operator may consider necessary shall be kept in columnar form in both Naira and U.S. Dollars. Officials of the CORPORATION and the CONTRACTOR shall have access to such books and accounts and officials of the CORPORATION attached to the CONTRACTOR

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*pursuant to Clause 12.4 shall participate in the preparation of same."*

6.2.6. Clearly Clause 7.2(b) of the Bonga PSC gives the Corporation the right to work jointly with the staff of the Contractor and participate in the *"in the CONTRACTOR's Exploration, Petroleum Engineering, Facilities / Materials and Finance Departments"*.

6.2.7. The majority construe these provisions to mean no more than the Bonga PSC permitting '*...the Respondent to have access to the Contractor's books and accounts'* but that this does not '*form a condition precedent nullifying the books and records if access is denied or not taken up.*'

6.2.8. I construe the provisions as going beyond the question of access which may, or may not, be taken up by the Respondent. As rightly observed by the majority members of the Tribunal, parties enter into a contract with the expectation that the terms and provisions of the contract will be faithfully observed and adhered to. When Clause 13.1 of the Bonga PSC provides that *"...officials of the CORPORATION attached to the CONTRACTOR pursuant to Clause 12.4 shall participate in the preparation of same"*, this to me represents a commitment and an agreement of the parties. Both parties have a joint obligation to ensure that appropriate mechanisms are put in place to meet this expectation of the parties.

6.2.9. The evidence of Mr. John Koop[17] is cited in support of the assertion that it was the Respondent's failure to mobilize its own staff to the Claimants

---

[17] Transcript, Day 1, p 208, lines 12-16

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

that led to the non-compliance with Clause 13.1. However, the totality of Mr. Koop's evidence appears to me to support the view that the parties failed to take steps to implement this important requirement of the Contract. This was the exchange with Mr. Koop:

"THE CHAIRMAN:    *Did anybody ever ask to be attached or participate*

A. (Mr. Koop):    *We had...originally we did have NNPC people attached to the contractor. They left the contractor around 2003. Mr. Keith Lewis may have provided information, but since then there has been nobody from NAPIMS or NNPC assigned to the Contractor.*

MR. MAHMOUD:    *To your knowledge, has this issue been brought to the attention of the Respondent by your Company, by the Corporation (Sic Contractor?)*

A:    *That there was nobody attached to the...*

MR. MAHMOUD:    *No, that the accounts need to be prepared in accordance with clause 13.1 and we don't have anybody attached to the (sic from) Corporation, can you send somebody?*

> A:  *I can't—I can't—probably Mr. Patrick Whittome or may be Mr. Edzard Van Loon would be able to give you that information. To the best of my knowledge, there was no such request from us[18]."*

6.2.10.   In my view, the correct position appears to be that both parties failed to take adequate steps to ensure that the provisions of the contract were adhered to.

6.2.11.   There is another reason why I think the majority of the Tribunal may not be right on this. *"Operating Costs"* as defined in Clause 1 (w) of the Bonga PSC mean *"expenditures made and obligations incurred in carrying out Petroleum Operations as <u>determined in accordance with the Accounting Procedures</u>".* There is nothing in the Accounting Procedures that suggests that these costs are to be solely determined by the Contractor. Indeed Article I. 2 provides as follows:

> <u>*"Accounts and Statements*</u>
>
> *"CONTRACTOR's accounting records and books <u>shall be kept as provided under Clause 13.1 of the contract</u>..."*

6.2.12   Now the question is, if they have not been kept as provided under Clause 13.1 of the Bonga PSC, could it be said that the Operating Costs have been determined in accordance with the Accounting Procedure?

---

[18] Transcript Day 1, page 208, lines 10 -23; page 209 lines 1-2;

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

In my view '...*kept as provided under Clause 13.1*' appears to emphasize the significance the parties placed on the joint obligation provided for in that Clause. Had this been faithfully complied with, it would have removed all areas of differences in this vital area which obviously further fuelled the failure of the parties to adhere to the Lifting Allocation procedure.

6.2.13   There is evidence that MACOM had initially operated more or less as provided for in the Contract. However, its meetings became less frequent, and there is a suggestion that this was largely the fault of the Respondent. I am prepared to read this in the context of the overall breakdown of the relationship between the parties following disagreements including in the vital area of the responsibility for Lifting Allocation.

6.2.14   Now, in the light of this reasoning and as a matter of practical approach to rectifying the relationship between the parties in the context of an ongoing profitable transaction I will answer the issues Nos. 12 and 14 as follows (I will come back to issue No. 13 later):

> "*Issue No. 12. Is the Contractor entitled to be allocated such quantum of Available Crude Oil as will generate an amount or proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 212 / OML 118?*
>
> *Issue No. 14.   Are such Operating Cost to be those recorded in the Contractor's books and accounts?*"

6.2.15    My answer to both is "*YES*"; as matter of contractual interpretation, the Contractor is entitled to be allocated such quantum of Available Crude Oil as will generate an amount or proceeds sufficient to recover all Operating Costs it has incurred in the development of OPL 212 / OML 118. Such Operating Costs are those prepared and recorded in the books and accounts of the Contractor in accordance with the terms of the Bonga PSC. However, I hold the view that the parties have not complied with these terms and I accordingly direct that the terms should henceforth be fully complied with and adhered to. With regards to previous Operating Costs the parties should utilize the built in mechanisms for the review of the Operating Costs up to and including 2007. All exceptions should be addressed and resolved as provided for in the Contract. The Lifting Allocation Model should be adjusted historically to accommodate any corrections

6.2.16    Now with regards to issue No. 13 relates to the (so-called Third Costs Oil Issue) recovery of The Costs Oil Consolidation Claim. The issue is framed as follows:

> "*13. Is the Contractor entitled to be allocated such quantum of Available Crude Oil under OPL 212 /OML 118 as will generate an amount of proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 219 and OPLs 803, 806 and 809?*"

6.2.17    The Claimants' case on this point, as I understand it, is that they are by Clause 8.1(b) of the Bonga PSC entitled to be allocated such quantum as will generate an amount of proceeds sufficient for the recovery of

Operating Costs in OPLs 212 and 219 (now OML 135), 803, 806 and 809. They assert this as a matter of contractual interpretation, and is in consonance with the understanding of the position by the Department of Petroleum Resources and place reliance on Exh. C136 at TB F/71 a presentation by Mr. E.K. Bekke in February 2006.

6.2.18   The Respondent disagrees with this position. They argue that the costs generated in an unrelated contract area should not be recoverable from resources generated in another area. This, the Respondent contends, goes contrary to the very nature of PSCs in general, by which the Contractor agrees to bear the exploration risk and recover its costs if oil is found in commercial quantities. According to the Respondent, the Bonga PSC relates to the license for one Contract Area. The PSC defines that contract in Annex A and contends that it is ring-fenced for purposes of cost recoverability. The Respondent relies on Section 8 of the DOA and argues that the Section does not grant cost consolidation. They contend that the enumeration of the OPLs in Clause 8.1(b) must be read separately as the Clause made no reference to consolidation. To allow consolidation will be to grant a fiscal incentive not allowed or contemplated by law.

6.2.19   The analysis of the Tribunal on this point is contained in paragraphs 13.3.27 to 13.3.49 of the majority award. I am in general agreement with the majority on the conclusions reached on this issue. First, of course, that the Claimants are engaged in Petroleum Operations. Secondly, I have reviewed the wordings of Clause 8.1(b) of the Bonga PSC very carefully. It is difficult to come to any other conclusion than

what the clause conveys very clearly that Cost Oil shall be allocated to the Contractor in such quantum as will generate an amount of proceeds sufficient for recovery of Operating Costs in OPLs 212, 219, 803, 806 and 809 and any OMLs derived therefrom.  The words here must be given their plain and ordinary meaning.   I cannot construe them disjunctively as was urged on the Tribunal by the Respondent.

6.2.20    It may well be that by allowing cost recovery in unrelated Contract Area from the yields of another the parties have deviated from the very nature and essence of Production Sharing Contracts which is the acceptance by the venturer to bear the risk of exploration and to recover costs only if oil is found in commercial quantities.  But this in my view is a matter of negotiations and agreement between the parties. I am persuaded that both the DPR and the FIRS are well aware of this deviation even if at all it was such.   I concede there may be some ambiguity regarding the possible construction of the Section 3.1 of the DOA. But I am prepared to go with the interpretation that gives the effect to what appears to be a clear bargain of the parties.

6.2.21    I therefore answer *"YES"* to issue No. 13 on the Agreed List of Issues that is, *the Contractor is entitled to be allocated such quantum of Available Crude Oil under OPL 212 /OML 118 as will generate an amount of proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 219 and OPLs 803, 806 and 809?* However, this is also subject to such Operating Costs being properly reviewed and all exceptions resolved, as I earlier directed in resolving issues Nos. 12 and 14 above.

6.3.    **Royalty Claim**

6.3.1.   Four (4) issues have been formulated by the parties in the Agreed List of Issues submitted to the Tribunal in relation to the Claimants Royalty claims. These are issues Nos. 15 and 16 formulated by the Claimant and issues Nos. 17 and 18 formulated by the Respondent. Again, I prefer the formulation of the Claimants, and propose to deal with the claims on the basis of the issues as formulated by the Claimants. The issues are as follows:

> *"Issue No. 15:  Is the Contractor entitled to compute and allocate Royalty Oil to the Respondent on the basis of a Royalty rate of 1% pending resolution of the disagreement with DPR?*
>
> *Issue No. 16.  Is the Respondent in breach of a duty to:*
>
> > *(a)   Set out the Contractor's position regarding the applicable Royalty rate with the DPR; and, in the event the Contractor disagrees with the DPR's assessment*
> >
> > *(b)   Resolve such disagreement with the DPR through arbitration?"*

6.3.2.   The Claimants' Royalty Claim is dealt with in the majority award at paragraphs 13.4 to 13.4.52. The issue in dispute is what is the applicable rate?

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

6.3.3.   Claimants insist that 1% royalty rate should apply subject to satisfactory resolution of the matter in accordance with the terms of the Bonga PSC and the applicable regulations.   They contend that it was agreed at a meeting in June 2006 that "*...an interim 1% royalty rate would be utilized for payment until an agreement is reached at which time an adjustment will be made as supported by the Petroleum Act.*"   A letter dated 27th June 2006 confirming this agreement was sent to the Group General Manager of NAPIMS by the Managing Director of SNEPCO.   However, the Claimants allege that the Respondent has been calculating Royalty Oil at the rate of 1.75%.   How this rate was arrived at has not been explained to the Claimants by the Respondent or the DPR.

6.3.4.   The Claimants contend that the Respondent is their agent in respect of Royalty payments to the Government.   By accepting the royalty rate of 1.75% and failing to seek satisfactory clarification from the DPR has failed to assert and maintain the correct contractual position and was in breach of the Bonga PSC.

6.3.5.   The Claimants assert that they could demonstrate that the proper rate payable was in fact 0.9974% using either of the two methods discussed with the DPR.   However, the DPR failed to explain how it arrived at 1.75% and the Respondent has not produced any evidence to show that it had challenged DPR's purported calculation of 1.75%.

6.3.6.   The Respondent disagrees with the Claimants.   It argues that being the license holder it is required under the Petroleum (Drilling and Production) Regulations, Section 61.2, to pay what it considers to be the Royalty Rate. If the Claimants disagree with the Respondent's (NNPC's) assessment of

the rate, this may be settled in one of three ways; either by agreement, arbitration or otherwise. The Respondent further contends that the parties agreed to refer the matter to the DPR and the DPR has resolved the matter by determining the rate payable was 1.75%. It was open the Claimants '*to challenge the determination of DPR's pronouncement through available procedure, i.e. judicial review*'.

6.3.7.   The majority members have in the majority Partial Award reviewed the contention of both parties very carefully. The decision of the majority hinges on the conclusions that the Claimants were left in a difficult position caught in between '*two Government Agencies*'. Neither the Respondent nor the DPR were willing to explain why the agreed interim rate of 1% was jettisoned nor how they arrived at the 1.75% as the royalty rate. The majority members also rejected the Respondent's contention that the parties had agreed to refer the matter to the DPR for determination and found '*no evidence whatsoever that the Claimants so agreed.*' The majority also came to the conclusion that the only material placed before the Tribunal as to the appropriate Royalty rate was in the analysis presented by the Mr. Koop at the 26 June 2006 meeting. This showed the rate would be 0.8562% applying the DPR preferred method. However, the Contractor's counter-proposal, as to the method of the calculation, will have arrived at a royalty rate of 0.9974% which is close to the 1% agreed interim figure.

6.3.8.   The majority members noted in the majority Partial Award that the "*Tribunal cannot but observe that the DPR and the Respondent are Government entities.... to find otherwise would add a veneer of unreality*

to this case." It added that Respondent cannot "...*leave the Claimants in limbo caught between two Government entities sharing the same objective, namely, the highest rate that can be achieved without recourse to any conclusionary mechanism.*" I find the negative inference drawn by the Tribunal to be unjustifiable and not supported by any evidence before the Tribunal. Regardless of the view taken of the DPR and the Respondent being government agencies that does not *ipso facto* lead to an inevitable conclusion that the two agencies are acting in concert against the interest of the Claimants. It is not in doubt that the DPR, at the time part of the Ministry of Petroleum Resources, was acting in a capacity of Regulator. The parties themselves in the Bonga PSC recognize that the regulator (The Ministry of Petroleum Resources) retained some capacity to act independently of both parties. That is why sometimes reference is made to the Minister in the Bonga PSC to determine matters of disagreement between the parties: see, for instance, Clauses 5.1; 9.1; 9.2; or even Annex C Art. IV para 4 of the Bonga PSC. In each of these clauses the parties give the Ministry of Petroleum Resources a role of deciding some matters in disagreement between them. In my view this is an indication that the parties accept that the Ministry retained some capacity to act professionally and impartially. In the absence of evidence that the DPR is colluding with Respondent in an unprofessional manner, I am not prepared to draw a negative inference by virtue of the fact that both the Respondent and the DPR are in some way connected with the Government and therefore must necessarily share in some unwholesome objective against the Claimants' interests.

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

6.3.9.    The majority Tribunal members also have taken the view that the Respondent is in fact the agent of the Claimants and is bound by an obligation to have regard to the Claimants' interests when negotiating with the DPR with regard to the appropriate royalty rate. A careful review of all that has been presented to the Tribunal, in my view, in fact shows that Claimants were in direct communication and discussion with the DPR on the matter of the Royalty rate. This is borne by the evidence of Mr. Koop before the Tribunal. I reproduce the relevant parts of Mr. Koop's evidence:

> "12.    I was involved in discussions with NNPC on the appropriate Royalty rate payable in relation to the Bonga field. The PSC provided for varying levels of Royalty according to the depth at which petroleum operations were to be conducted. The Bonga field fell into two different depth categories, with the majority of the field located deeper than 1000 meters. On 26[th] June 2006, I together with representatives from Bonga Co-venturers, gave a presentation to NNPC and DPR of our assessment of how Royalty should be calculated in these circumstances.

> 13.    At the meeting of 26 June, the claimants agreed with DPR and NNPC we should continue to consult in order to agree the appropriate royalty rate to be used. We agreed that we would calculate entitlements using an interim figure of 1% royalty. We agreed to this on a temporary basis, even though 1% was clearly a higher amount than the figure of

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

0.8562%, which reflected the calculation method preferred by DPR.

14. The day after the meeting, I confirmed to NNPC and DPR by letter from our MD our understanding of this meeting.

15. On 13 July, I received a call from Dr. I.O. Walker from the DPR in which he suggested that we negotiate a goodwill amount above the calculated rate, we would get closer to the government expectation of 2%. I commented that the Bonga consortium would pay what is due, but that we would not entertain an arbitrary top-up.

16. I met with Dr. Walker on 17 July and explained to him that the consortium's view was that Royalty calculation needed to be field specific and not one number for the whole licence, as was the method advanced by DPR. Dr. Walker was of the view that using the footprint of the Bonga field to calculate an average royalty for the field would be within the regulations and that he expected the resulting rate to be between 1.5% and 2%. Our own internal calculation had shown the resulting rate to be just under 1%.

17. It was my impression that DPR was working towards a set number and this was confirmed when on 7 August we received a letter from DPR stating that the Royalty was to be 1.75% but without any explanation on how that number was arrived at."

Page 58 of 113

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

6.3.10.    The letter referred to in paragraph 17 of the written statement of Mr. Koop is Exh. C-149. It is on the letter headed paper of Ministry of Petroleum Resources (Petroleum Resources Department). I set it out below:

> *"The Managing Director*
> *SNEPCO*
> *NAL Towers*
> *20 Marina*
> *P.M.B. 2418, Lagos*
>
> *Dear Sir,*
>
> <u>*RE: ROYALTY PAYMENT ON BONGA*</u>
>
> *We refer to your letter with reference SNEPCO-MD-2006-00091 of 27ᵗʰ June 2006 and our various meetings on the above subject matter.*
>
> *Please be informed that following our consultations with other government agencies and yourself, the Royalty Rate payable for Bonga production is 1.75%.*
>
> *Please note also that the above rate will apply pending the conclusion of our on-going discussions with you.*
>
> *Thank you.*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

A.O. Chukwueke

CC:      GMD NNPC

         GGM NAPIMS

         GGM COMD"

6.3.11.  Now the conclusion I draw from the foregoing is that SNEPCO, the First Claimant, along with its co-venturers, was in direct discussions with the DPR. They made direct presentations to DPR on the issue of royalty rate. They had held *'various meetings on the subject matter'*. After consultations with other agencies and the Claimants, DPR communicated its decision direct to the Managing Director SNECPO vide letter of 7th August 2006.  Even after this letter, SNEPCO maintained high-level contact with top DPR personnel and other agencies until it became clear that DPR was not about to change its position.  Now in my view, SNEPCO cannot at this stage claim that no reasons were given for DPR's decision.  Indeed it was clear that DPR had proposed a method of working out the royalty rate. This could be discerned from the deposition of the Mr. Koop where he said:

> "...*the consortium's view was that Royalty calculation needed to be field specific and not one number for the whole licence, as was the method advanced by DPR. Dr. Walker was of the view that using the footprint of the Bonga field to calculate an average royalty for the field would be within the regulations*

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

*and that he expected the resulting rate to be between 1.5% and 2%."*

6.3.12.   The consortium wanted a royalty calculation that was *'field specific'*. DPR had proposed a method of *"one number for the whole licence"* arrived at using the *'footprint of the Bonga field'* to calculate an average rate which will bring it to between 1.5% and 2%. The interim figure announced by DPR pending conclusion of discussions, *vide* its letter quoted above, was indeed within that range. That DPR did not use a method acceptable to the Claimant does not make its own method arbitrary or less rational.

6.3.13.   The majority members of the Tribunal rejected the contention of the Respondent that the parties agreed to refer the matter to DPR, saying that there was no evidence whatsoever that the Claimants so agreed. I think whether the parties agreed to refer the matter to DPR was irrelevant. The conduct of the parties suggest in fact that the matter had one way or the other been placed before the DPR, as is clear from the testimony of Mr. Koop. The Claimant had made presentations to the DPR (and NNPC) they had held various meeting and had consultations (letter of 7th August, 2006 Exh C-149). Now, that the decision had gone contrary to the expectation of the Claimants, they cannot go back and heap the blame on the Respondent under the notion of an agency relationship. The evidence indeed suggests that they took a direct and lead role in the discussions with DPR. They also maintained contact after the decision of DPR. Now, if they were unhappy, they could have escalated matters, as advised by Mr. Adeyamo. The attention of the Tribunal has not been drawn to

any formal protest by the Claimant either to DPR, or to the Respondent, for instance, requesting the Respondent to declare a formal dispute.

6.3.14.   I accept the reasoning of the majority that the Tribunal is not seized of any dispute between any of the parties and DPR regarding the royalty rate as such. But I am satisfied on the evidence and the law that the royalty rate of 1.75% is neither arbitrary nor capricious. The Claimants were clearly unhappy with the outcome of their discussions with DPR. But they cannot at this stage hide under agency principle and accuse the Respondent of breach of the Bonga PSC. I think this claim lacks merit and ought to be refused.

6.3.15.   I therefore propose to answer the issues relating to Royalty dispute as follows:

> "*Issue No. 15. Is the Contractor entitled to compute and allocate Royalty Oil to the Respondent on the basis of a Royalty rate of 1% pending resolution of the disagreement with DPR?*" I answer "*No*" to this issue. The DPR has made a determination. I am not persuaded that this was made illegally, or capriciously or arbitrarily.

> "*Issue No. 16. Is the Respondent in breach of a duty to: (a) Set out the Contractor's position regarding the applicable Royalty rate with the DPR; and, in the event the Contractor disagrees with the DPR's assessment; (b) Resolve such disagreement with the DPR through arbitration?*" I answer "*No*" to this sub-issue (a); I am satisfied that the Contractor was in direct negotiation and

consultation with the DPR. The Corporation had no duty to put forward the Contractor's position to the DPR beyond what the Contractor had itself done directly; With regards to sub-issue (b) I am satisfied that ample avenues exist through the mechanism of MACOM or arbitration to resolve this matter.   There is no evidence that these have been pursued or exhausted.

6.4.     **The Claimants' Tax Oil Claims**

6.4.1.    In the Agreed List of Issues, the parties have submitted 19 issues for determination in relation to this head of claim. Eight of these issues numbered 19 to 26 were formulated by the Claimants. Issues numbered 27 to 36 where formulated by the Respondent. I set out these issues below:

   *"CLAIMANTS' ISSUES*

   19.    *Does the Bonga PSC confer on the Contractor the exclusive right to prepare the PPT Returns in respect of OPL 212 / OML 118 that are to be filed with the FIRS without amendment by the Respondent?*

   20.    *Is the Contractor entitled to allocate Tax Oil to the Respondent on the basis of such PPT Returns?*

   21.    *Is the Contractor entitled to consolidate OPLs 219, 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of preparing PPT Returns for OPL 212 / OML 118?*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

22. For the purposes of deciding which costs are tax deductible when preparing PPT Returns for OPL 212 / OML 118, is the contractor entitled to:

   a.   Apply the "WEN" test pursuant to s. 10 of PPT Act;

   b.   Ignore whether or not the cost is recoverable through an allocation of Cost Oil?

   c.   Deduct payments made in respect of Signature Bonuses?

   d.   Deduct sole costs? and/or

   e.   Deduct interest paid on intra-group loans?

23. For the purposes of deciding the application of ITC when preparing PPT Returns, is the Contractor entitled to:

   a.   Deduct ITC as a credit from assessable tax?; and

   b.   Not deduct ITC from Qualifying Capital Expenditure?

   as jointly agreed by the parties Experts on Nigerian Tax.

24. For the purposes of preparing PPT Returns, is the Contractor entitled to deduct the full annual Capital Allowance of 20% of Qualifying Capital Expenditure in the tax year in which the expenditure is incurred?

25. Are the Contractor and the Respondent jointly entitled to the benefit of all such deductions, Capital Allowances and ITC

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*(including not only exploration and development costs, but also financing, Sole Costs and other costs)?*

26.    *Is the Respondent under a duty promptly to pass on PPT Assessments and other Correspondence received from the FIRs to the Contractor?*

*RESPONDENT'S ISSUES:*

27.    *Whether the contractual obligations to prepare PPT Returns inherently comprises an obligation to ensure compliances with the provisions of the law;*

28.    *Whether the Claimants are under an obligation to prepare the PPT Returns in accordance with the law notwithstanding the contractual provisions of the PSC;*

29.    *Whether the parties absent an express provision of the law are entitled to arrogate to themselves incentives that amount to fiscal incentives;*

30.    *If '29' above is answered in the negative, whether the parties can by agreement consolidate OPLs 803, 806, 809 and OML 118 for tax purposes;*

31.    *Is the Respondent entitled to object to the PPT Returns prepared by the Contractor the same not having been prepared in accordance with the law?*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

32. *A determination as to the consequences (in law and for the contract) of not using a RealisablePrice in valuation of the Available Crude Oil in computing the PPT Returns;*

33. *A determination of the party who has incurred a Qualifying Capital Expenditure;*

34. *Whether Capital Allowance is for the benefit of the party owning an asset and incurs in respect thereof qualifying Capital Expenditure;*

35. *Whether Investment Tax Credit is due only to the parties who have incurred qualifying Capital Expenditure;*

36. *Whether the unequal contribution in reducing the overall tax liability by both parties operating within the Contract Area ought not to be acknowledged and accorded to the party making the contribution prior to the agreed profit spit (i.e. 80%-20% Contractor-Corporation)."*

6.4.2.   The majority of the Tribunal treated these issues under the following sub-headings:

(1)   PPT Return Claim;

(2)   ITC Claim;

(3)   Tax Oil Consolidation Claim; and

(4)   Tax Oil Calculation Claim.

Page 66 of 113

(1)    PPT Return Claims

6.4.3.    **The issues relating to the PPT Return Claim are the Claimants'**
**issues Nos. 19 and 20.   The Respondent, on the other hand, has**
**formulated issues Nos. 27 and 28.** The parties' respective positions have
been adequately summarized in the majority Partial Award.   These are
contained in paragraphs 13.5.4 to 13.5.38 therein.  I will attempt to set
this out very briefly for the purpose of making this dissent readable.
Otherwise I have no issue with the majority Partial Award on this.

6.4.4.    Briefly, the Claimants contend that under the Bonga PSC, they, as the
Contractor, have the sole right to prepare the PPT Returns.  These returns
are to be passed to the FIRS without amendment by the Respondent.
They also assert that they are contractually entitled to allocate to the
Respondent the Tax Oil on the basis of such PPT Returns.  They place
reliance on Section 7.1 (h) of the Bonga PSC, as well as Annex B. Art.
III. Para 2(e) of the Bonga PSC.  They also rely on Clause 8.1 (c) of the
Bonga PSC to buttress the point that the Tax Oil is to be allocated to the
Respondent in such quantum as will generate an amount of Proceeds
equal to the actual PPT liability payable during each month.

6.4.5.    The Claimants assert that the right to exclusively prepare the PPT
Returns is part of the checks and balances against the Respondent
seeking to increase the tax take by the Nigerian Government. They
contend further that there is no express provision in the Bonga PSC
permitting the Respondent to amend the PPT Returns.  The Claimants
assert that they have however, in breach of the Bonga PSC, been doing
that, as confirmed by Mr. David Mbanefo and Mrs. Juliet David-West.

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

The Claimants assert that the Respondent can file objections or raise issues in covering letters, but cannot amend the PPT Returns.

6.4.6.   The Respondent, on the other hand, contends that they are not under contractual duty to file PPT Returns as prepared by the Claimants that are wrong or prepared contrary to Law. Their position, simply put, is that the Contractor has a duty under the terms of the Bonga PSC to prepare and forward the PPT Returns to the Corporation; however the Corporation has an overriding legal duty to ensure that the inputs in the PPT Returns are in accordance with Nigerian Law. They assert that if there is a deliberate attempt to derogate from the law, as the Claimants have done, the Respondent can amend the PPT Returns. They contend that the Claimants have acted contrary to law, as they are in breach of Section 9 of the PPT Act Cap. P13 , and refer to Sections 9, 11, and 13 in relation to Allocation of Tax Oil, Payment of Royalty and use of the Realisable Price, in determining royalty and PPT respectively.

6.4.7.   The majority members of the Tribunal begin their analysis of the issues by reminding themselves that the Respondent is controlled by the Federal Government. They reason that:

> *"In that regard the Respondent and Federal Government must share the same intention in relation to the Bonga Field. That intention was clearly to maximize the revenue therefrom to the utmost text permitted by the Bonga PSC and the relevant applicable legislation. This has been confirmed by Mr. Justice Bello in his judgment in the FIRS proceedings. This must have been clearly obvious to the drafters of the Bonga PSC particularly*

> *those on the Claimants' side and they crafted a contract that*
> *provided certain procedures and steps which would give the*
> *Claimants, as Contractor, a degree of protection against any*
> *concerted efforts by the Respondent and the Federal Government*
> *to increase its revenue from the Bonga Field in excess of that*
> *which was agreed."*

6.4.8.   With great respect to my co-arbitrators, I find this reasoning flawed. There is no basis for drawing any negative inference simply on account of the relationship of the Respondent and the Government of Nigeria, unless this is supported by evidence before the Tribunal. It must be totally presumptuous to assume that the Federal Government will have any cynical intention with the Respondent of taking anything beyond its contractual entitlements, any more than it will be to assume that the Claimants will be interested or colluding to maximize their profits beyond their contractual entitlement. Every statutory agency, including FIRS is in a way linked to the Federal Government of Nigeria. But I do not think this necessarily translates into inability by those agencies to perform their functions, or to act in a professional and independent manner that properly protects citizens (including corporate citizens such as the Claimants) under the law. I am totally in agreement that the Bonga PSC has been carefully crafted to accord both parties equal protection. I have reviewed and commented on this in my consideration of the arguments relating to the Claimants *'exclusive sole right'* to determine the Lifting Allocation. I have ruled that a clear and dispassionate reading of the Bonga PSC does not admit of any notion of sole or unilateral determination by either the Contractor or the Corporation. Indeed, the

Page 69 of 113

essence of the structure of the Bonga PSC is to maintain a delicate equilibrium between the parties. It does not make sense to me to suggest that the Bonga PSC so carefully crafted will give, as is contended by the Contractor, the exclusive sole right to determine the Lifting Allocation and also the exclusive right to prepare the PPT Returns, which must be filed by the Corporation without any amendments. Where then lies the check and balance?

6.4.9.   A careful review of the contractual terms indeed shows there was no intention expressed in the contract to grant the Contractor the exclusive right to prepare the PPT Returns. First, the structure of the Contract is that the parties intended and agreed that professional staff of the Corporation were to be embedded in the Contractor's offices (Clause 12.4 of the Bonga PSC). They were to participate in the preparation of the <u>books and accounts</u> maintained by the Contractor under Clause 13.1 of the Bonga PSC. I am prepared to conclude that it is reasonable inference that the right to participate in the preparation of the books and accounts of the Contractor will include preparation of the PPT Returns, which must derive from the books and accounts.

6.4.10.   The Bonga PSC provides in Clause 7.1. that

   *"In accordance with this Contract, the CONTRACTOR shall:*

   ....

   ...

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(h)     *Prepare estimated and final PPT returns and submit same to the CORPORATION on a timely basis in accordance with the PPT Act;"*

6.4.11.    If indeed it is the intention of the parties, that the Corporation was to have no right of any input in the PPT Returns, the Bonga PSC may have as well provided that the PPT Returns would be prepared and filed with the FIRS directly by the Contractor.  By requiring that the Contractor shall submit same to the Corporation, the necessary inference is that the Corporation has the right to examine the PPT Returns against both the contractual terms and indeed against its own views or understanding of the tax laws. If there were discrepancies or differences I would assume that the parties expected these to be resolved within the context of the MACOM mechanisms as set out in Clause 6 of the Bonga PSC, before the point to which a party will have to make an exception with the FIRS.

6.4.12.    Indeed the functions of MACOM as set out in Clause of the Bonga PSC include:

> *"6.1.*
>
> *...*
>
> *Settlement of unresolved audit exceptions arising from audits as provided in Clause 13.2 of this Contract;*
>
> *Ensuring that the CONTRACTOR implements the provisions of the Accounting Procedure (Annex B), the Lifting Procedure (Annex D), and the Procurement and Project Implementation Procedure*

*(Annex E) and all amendments and revisions there to as agreed by
the Parties."*

6.4.13.  Now, if the MACOM is empowered to oversee the implementation of the
provisions of the Accounting Procedure (Annex B of the Bonga PSC)…
including ensuring all amendments and revisions thereto as agreed by
the Parties, it seems illogical and futile for the Contractor to suggest that
any responsibility being discharged under the Accounting Procedure
(Annex B) is its exclusive domain or its sole right and responsibility.

6.4.14.  It is suggested that the Respondent's witnesses, especially Mrs. Juliet
David-West, has confirmed that the Respondent has acted in breach of
the Bonga PSC.  I have reviewed the testimony of Mrs. David-West
carefully.  My understanding of her testimony under cross –examination
is that she believed the Corporation, NNPC, has the right to review the
PPT Returns and amend them to conform with the contractual terms and
the law.  This is what transpired under cross-examination by Mrs.
Adekoya:

> *"Q:  So when the contractor then sent its own prepared PPT
> Returns, you didn't file them?*
>
> *A:  No.*
>
> *Q:  Could you please just look at the PSC.  Could you just look
> at the document. Flip through and tell me where the PSC
> grants the respondent the right to file its own PPT Returns?*

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

A:   I'm familiar with the PPT...the PSC.   The contractor is to file returns through the Respondent.

Q:   Yes. We have agreed that.

A:   Yes.

Q:   We have agreed that the contractor sent you PPT Returns. That initially respondent would file those returns with an objection letter. Correct?

A:   Yes.

Q:   We have agreed that when you came on board, you changed that position. You filed PPT Returns prepared by NNPC.

A:   I filed PPT Returns based on the entitlement the liftings that have been done in the past, based on NNPC's model, to bring the books to order, because liftings were not recognized in the NNPC book of accounts.

Q:   But there's nowhere in the PSC that grants you that right?

A:   Article 4 grants NNPC the right to review, to review and then before approval ...review and approve. Article 4 of the PSC.

Q:   To review and approve the PPT Returns?

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*A:      Everything. The PPT — the monthly accounting analysis. It says Schedule B1 and B2 contend the PPT royalty returns— including entitlement.*

*Q:      Is it your position before this Tribunal that the filing of separate, independent NNPC prepared PPT Returns are the review, as opposed to the objection that is attached to the contractors returns?*

*A:      Let me just explain to you, the objections have been there. But even the contractor's returns were not recognized in NNPC's book of accounts, as my duty is to bring whatever that has been lifted in line with the tax returns. And that is what I did. Just to put the records in the right perspective."*

6.4.15.   What I make from this exchange is that there is a fundamental disagreement between the parties, first as to Lifting Allocation, and then secondly as regards the PPT Returns. The Contractors had maintained the sole right to determine the Lifting Allocation which the Corporation objected to. The Contractor contends it has the right to prepare the PPT Returns which the Corporation must file without amendment which the Corporation objects to. It prepared its PPT Returns to bring it in line with the Lifting Allocation and actual liftings.

6.4.16.   I have ruled that the determination of the Lifting Allocation is vested jointly in the parties. I have also ruled that neither party can do this exclusively under the contract. I have also ruled that the Contractor's right to prepare the PPT Returns, read in the context of all provisions of

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

the Bonga PSC is not a sole right. The Corporation is entitled to participate and also to review against contractual provisions as well as its understanding of the law. Any differences should be mutually resolved, or through the MACOM mechanism, failing which the FIRS should determine these.

6.4.17.    The foregoing disposes of the Claimants' Issues Nos. 19 and 20 to which I both answer "*No*". The Contractor does not have sole right to prepare the PPT Returns. This right is subject to the Corporation's right to participate in the preparation and review the Returns in line with its understanding of contractual terms and the laws. The parties are to resolve all differences mutually or through MACOM. The Respondent is entitled to be allocated Tax Oil, not on the basis of PPT Returns solely prepared and determined by the Contractor, but prepared in accordance with terms of the Bonga PSC which I have set out above.

6.4.18.    Now, this in my view resolves Respondents issues Nos. 27 and 28. I have determined the procedures prescribed by the Bonga PSC. The parties should observe these procedures.

(2)    The Investment Tax Credit Claim

6.4.19.    The Investment Tax Credit ("**ITC**") claims are perhaps the most difficult aspects of this arbitration. Aside from the usual complexity of taxation issues, matters are compounded by the complex and confusing history of the relevant statutory provisions in Nigeria.

6.4.20.    The majority Partial Award has set out in detail the history of the relevant statutory provisions (paras. 13.6.13 to 13.6.27) and also the

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

summary of the parties' respective positions (see paras. 13.6.28 to 13.6.85). I am in general agreement with this summary. I will however elaborate further in the course of my consideration of the issues under this head of claim.

6.4.21. The crux of the dispute here, as I understand it, is: are both parties jointly, or the Respondent only is, entitled to claim ITC and how is the ITC to be calculated and applied?

6.4.22. The ITC appears central to the Bonga fiscal regime. It is also a matter over which the parties have profound disagreement. According to the Claimant, the disagreement over the ITC is one of the principal factors in the commencement of this arbitration.

6.4.23. The Claimants assert that they are entitled to the fiscal incentives under the Bonga PSC including the ITC and capital allowances. They assert that they, as Contractor, have incurred all the capital costs associated with the development of the OML 118. They contend that their position is supported by the clear provisions of the Bonga PSC, the DOD (DOA) as well as the conduct of the Respondent. The Claimants contend that the ITC was part of the fiscal incentive negotiated and included in the Bonga PSC and was intended to offset the effects of PPT and encourage investment by the oil companies in the very risky and capital intensive deep-water exploration. They contend that the argument of the Respondent on the ownership of the assets is incorrect as the ownership of the asset is vested in the *'single fiscal entity'* and the ITC is granted for *'petroleum operations in the Contract Area'*.

6.4.24.  The Respondents on the other hand contend that they alone are entitled to the benefit from the ITC. First, they contend that the Claimants have not incurred Qualifying Capital Expenditure, as the cost of the capital assets is incurred by the license holder who pays in full by an allocation of cost oil. They contend that the assets are, by virtue of Clause 11.1 of the Bonga PSC, owned by the Corporation on arrival in Nigeria. In any event, the Claimant recovered in full the cost of the assets as part of the allocation of Cost Oil.

6.4.25.  I would have had no difficulty if the dispute was merely one of determination of incidence of tax (or benefit of fiscal incentive in the form of tax credit), and a contractual determination on whom the incidence of taxation would fall, or who is entitled to the benefit of the tax credit: the Contractor, the Corporation or both? .

6.4.26.  It is clear to me that the parties had negotiated the ITC and had intended that the Claimants as Contractor would benefit from it. There is evidence that ITC was a major issue in the negotiation and it was understood by the parties that both parties (and at least the Contractor) would benefit.

6.4.27.  It is however doubtful that the parties paid any attention to the legal consequences of the statutory provisions regarding the definition of ITC and the legal basis of the entitlement to ITC.

6.4.28.  It appears to me that the question must first be asked: is the ownership of the relevant asset under Nigerian law, the statutory basis of the ITC claim? If the answer is the positive, then the next relevant question will then

follow: under this PSC, in whom, the contractor, the corporation or the 'single fiscal entity' is the ownership of the assets vested?

6.4.29. In my opinion the view that statutorily, the law intends that the basis for the claim for ITC is ownership of the assets is not in doubt. The Tribunal majority have gone around this statutory assumption by taking the view that title to the assets "did not pass absolutely in the sense that the Respondent was restricted to using those assets for the purposes of the Petroleum Operations to be carried out in the Contract Area"[19].

6.4.30. It is clear from an examination of the relevant statutory provisions that the answer to the first question must be in the positive. Now the PPT ACT CAP. P13, as amended, is the governing statute for the purposes of the ITC. The PSC itself confirms so in clause 15.3(a) it is clearly states that "The ITC shall be in accordance with the [PPT ACT CAP. P13] as amended".

6.4.31. Section 22 of the PPT ACT CAP. P13 makes provision for the entitlement to an "ITC Allowance" by a crude oil producing company that has entered into a PSC with NNPC. This is what the section says:

> *'A crude oil producing company which has executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax in accordance with the provision of the Production Sharing Contract'.*

---

[19] See Para. 13.6.89 of the majority Partial Award

6.4.32.  The method of calculating the Investment Tax Credit and the Capital Allowance has been defined in the Schedule to the PPT ACT CAP. P13. The Schedule has undergone series of amendments, often with confusing sets of wording.  I will attempt to navigate through this.

6.4.33.  The Petroleum Profit Tax Ordinance No. 15 of 1959 had enacted an *'initial allowance'* regime. Paragraph 5 and 6 of the 2nd Schedule to the Ordinance[20] provided as follows:

"5.   Subject to the provisions of this Schedule, where, in any accounting period of a company, the company owning any asset has incurred in respect thereof qualifying expenditure wholly and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company for the accounting period in which that asset is first used for the purposes of such operations an allowance (in this Schedule called an "initial allowance") at the appropriate rate per cent, set forth in the Table to this Schedule, of such expenditure.

6(1)   Subject to the provisions of this Schedule, where, in any accounting period of a company, the company owning any asset has incurred in respect thereof qualifying expenditure wholly and exclusively for the purposes of petroleum operations carried on by it, whether or not an initial allowance may be due to it in respect of that

---

[20]  It should be noted that following independence in 1960, All Ordinances which were laws passed by the Colonial administration were now deemed Acts of the Nigerian Parliament and called "Acts"

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *qualifying expenditure, there shall be due to that company for each accounting period in which that asset was used for the purposes of such operations, an allowance (hereinafter called "an annual allowance") at the appropriate rate per cent specified in sub-paragraph (2), of the residue of such expenditure at the end of the accounting period:*
>
> *Provided that where the accounting period is a period of less than one year any such allowance for that accounting period shall be proportionately reduced.*
>
> *6(2)    ... "*

6.4.34.   This Act was first amended by the Petroleum Profits Tax (Amendment) Decree No. 22 of 1970.  This amendment was not material to ITC. However, the Act was further amended by the Petroleum Profits Tax (Amendment) (No. 2) Decree No. 24 of 1977. Amongst other things, this amendment substituted the following new paragraphs in place of previous paragraphs 5 and 6 in the Second Schedule to the Act:

> *"5(1)    For the purpose of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried on by it, there shall be due to that company, for the accounting period in which such asset was first used for the purposes of such operations, an allowance (in this*

Schedule called "investment tax credit") at the appropriate rate per cent, set forth hereunder, of such expenditure, that is-

(a)    for land operations- 5 per cent;

(b)    for offshore operations in areas up to an including 100 meters of water depth- 10 per cent;

(c)    for offshore operations in water depth beyond 100 meters and up to 200 meters-15 per cent; and

(d)    for operation in areas beyond 200 meters- 20 per cent.

5(2)   For the purposes of this Act, the investment tax credit shall be deducted from the cost of the asset to arrive at the amount of qualifying expenditure and before calculating the annual allowance in the manner provided for in paragraph 6 below.

5(3)   Notwithstanding any other provisions in this Act, investment tax credit shall be a credit against tax payable and not a charge against income;

6(1)   Subject to the provisions of this Schedule, where in any accounting period of a company, the company owning an asset has incurred in respect thereof qualifying expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried on by it, there

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*shall be due to that company for the accounting period in which the asset was first used for the purpose of such operation an allowance (in this Schedule called "an annual allowance") at a rate which would enable the asset to be amortized in five equal annual installments".*

6(2)    *Notwithstanding the provisions of sub-paragraph (1) above, there shall be retained in the books, in respect of each asset, one per cent of the initial cost of the asset which may only be written off in accordance with sub-paragraph (3) below."*

...*"*

6.4.35.   Now, reading the provision of Section 22 and the above paragraphs of the Second Schedule, I am satisfied the claim for ITC and Capital Allowance under the law was linked to the ownership of the asset in respect of which Qualifying Capital Expenditure or Qualifying Expenditure had been incurred.   Although paragraph 5 of the Second Schedule did not expressly mention ownership, it is clear reading paragraph 5 and 6 together, that ownership of the asset was the underlying assumption for the entitlement to the claim of ITC by a crude oil producing company.

6.4.36.   Within three months after the 2nd Amendment of PPT Act, No. 15 of 1959, another amendment came into force in September 1979. This was the **Petroleum Profits Tax (Amendment) (No. 3) Decree No. 95 of 1979**. This Amendment substituted amongst other things Paragraphs 5 and of the Second Schedule which read as follows:

"5        Subject to the provisions of this Schedule, where in any
          accounting period of a company, the company owning
          any asset has incurred in respect thereof qualifying
          expenditure wholly, necessarily and exclusively for the
          purposes of petroleum operations carried on by it, there
          shall be due to that company for the accounting period in
          which such expenditure was incurred, an investment tax
          credit for the purposes of section 17 (2)(c) at the
          appointed rate per centum of such expenditure as set out
          in Table 1 to this Schedule"

6(1)      Subject to the provisions of this Schedule, where in any
          accounting period, a company owning any asset has
          incurred in respect thereof qualifying expenditure wholly,
          necessarily and exclusively for the purposes of petroleum
          operations carried on by it, there shall be due to that
          company as form the accounting period in which such
          expenditure was incurred an allowance (thereafter in this
          Act referred to as "annual allowance") at the
          appropriate rate per centum specified in Table II of this
          Schedule.

6(2)      Notwithstanding the provisions of sub-paragraph (1) of
          this paragraph, there shall be retained in the books, in
          respect of each asset one per cent of the initial cost which
          may only be written off in accordance with sub-
          paragraph (3) below.

                                                    Page 83 of 113

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

...

..."

6.4.37.   The **Finance (Miscellaneous Taxation Provisions) No. 2 Decree 31 of 1996** came into force on 1st January, 1995. That Decree introduced further changes to the Petroleum Profits Tax Act. Amongst other things paragraph 5 of the Second Schedule was further amended by substituting for paragraph 5 the following new paragraph:

> *"5(1)   For the purposes of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying capital expenditure wholly, exclusively, and necessarily and reasonably, for the purpose of petroleum operation carried out by it, there shall be due to that company, for the accounting period in which that asset was first used or, for purposes of such operation, an allowance (in this Schedule called "Petroleum Investment Allowance") at the appropriate rate per cent set forth in Table 1 to this Schedule of such expenditure.*

> *5(2)   For the purpose of this Act, the Petroleum Investment Allowance shall be added to the annual allowance under paragraph 6 of this Schedule and shall be subject to the same rules under this Act."*

6.4.38.   The **Finance (Miscellaneous Taxation Provisions) Decree No. 30 of 1999** was passed in May 1999 and became effective from 1st of January,

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

1999.  This Decree introduced further substantial changes to Petroleum Profits Tax Act.  Section 7 of the Decree provided as follows:

> "7.    *The principal Act is amended by substituting for the words "investment tax credit" whenever they occur in the principal Act, except in Section 20, the words "petroleum investment allowance"."*

6.4.39.   The Decree also introduced an amendment to Section 20 of the "Principal Act" and substituted it with the following new Section:

> "20(1)   *A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax in accordance with the provisions of the Production Sharing Contract.*
>
> 20(2)    *The investment tax credit rate applicable to the contract area shall be fifty per cent flat rate of chargeable profit for the duration of the Production Sharing Contract.*
>
> 20(3)    *In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> 20(4)  *The chargeable tax computed under subsection (3) of this section shall be split between the Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit oil split.*
>
> 20(5)  *In this section –*
>
> *"contract area" means the contract area as defined in the Production Sharing Contract;*
>
> *"Production Sharing Contract" has the meaning assigned to it in the Deep Offshore and Inland Basin Production Sharing Contracts Decree 1999."*

6.4.40.  Sub-paragraph (3) of Paragraph 5 of the Second Schedule was deleted by Section 12 of the Decree.

6.4.41.  It should be noted that since the 2nd Amendment to the Petroleum Profit Tax Ordinance No. 15 of 1959, by Decree No. 24 of 1979, which first introduced the investment tax credit regime, there has been two major reviews and re-enactment of Nigerian Statutes. First was in 1990, prior to the signing of the Bonga PSC in 1993. The second took place in 2004. The 1990 compilation re-enacted the petroleum profit tax law as **Petroleum Profit Tax Act Cap 354, Laws of the Federation of Nigeria 1990.** The second compilation in 2004 re-enacted the petroleum profit tax law as **Petroleum Profit Tax Act Cap. P13 laws of the Federation of Nigeria.** This was the first loose-leaf edition and hence the year of compilation was dispensed and no longer formed necessary part of the

citation of enactments. These reviews and respective re-enactment were expected to capture the state of Federal Statutes as at the time of the review and re-enactment.

6.4.42.   It is important I think to set out the texts of the relevant provisions of both **Cap 354 Laws of the Federation of Nigeria 1990 ("Cap 354")** as well as the texts of the relevant provisions of the **PPT Act Cap. P13 Laws of the Federation of Nigeria.**

6.4.43.   Cap 354 provides in Paragraph 5 and 6 of the Second Schedule as follows:

> "*5(1)     For the purposes of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried on by it there shall be due to that company, for the accounting period in which that asset was first used for the purposes of such operations, an allowance (in this Schedule called "investment tax credit") at the appropriate rate per cent, set forth in Table 1 to this Schedule, of such expenditure.*
>
> *5(2)     For the purposes of this Act, the investment tax credit shall be deducted from the cost of the asset to arrive at the amount of qualifying expenditure and before calculating the annual allowance in the manner provided for in paragraph 6 of this Schedule.*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

5(3)    *Notwithstanding any other provisions in this Act, investment tax credit shall be a credit against tax payable and not a charge against income.*

6(1)    *Subject to the provisions of this Schedule, where in any accounting period, a company owning any assets has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due that company as from the accounting period in which such expenditure was incurred, an allowance (thereafter in this Act referred to as "an annual allowance") at the appropriate rate per centum as specified in Table II of this Schedule.*

6(2)    *Notwithstanding the provisions of sub-paragraph (1) of this paragraph, there shall be retained in the books, in respect of each asset 1 per cent of the initial cost asset which may only be written off in accordance with sub-paragraph (3) of this paragraph.*

6(3)    *Any asset or part thereof in respect of which capital allowances have been granted may only be disposed of on the authority of a Certificate of Disposal issued by the Minister or any person authorised by him.*

        *...*

        *... "*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

6.4.44.   The **PPT Act Cap. P13** incorporates the text of Section 20 introduced by the **Finance (Miscellaneous Taxation Provisions) Decree No. 30 of 1999** which is set out above.   In addition contains the following paragraphs 5 and 6 in the Second Schedule:

> "5(1)   *For the purposes of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried out by it, there shall be due to that company for the accounting period in which that asset was first used or for the purposes of such operations, an allowance (in this Schedule called "Petroleum Investment Allowance") at the appropriate rate per cent, set forth in Table 1 to this Schedule, of such expenditure."*

The text of paragraph 6 to the Second Schedule in Cap 354, with very slight (not material) modification is retained by PPT Act Cap. P13.

6.4.45.   An examination of the complex history of the PPT Act Cap. P13 would reveal amongst other things that Nigeria has oscillated between an *'Initial Allowance'* regime (1959); to *'Investment Tax Credit'* ("ITC") (1979), to *Investment Tax Allowance* (1979) ("ITA") *'Petroleum Investment Allowance'* ("PIA") (1996).   However, for PSCs, ITC has been specifically provided for in the DOD which was signed into law by Military Head of State General Abdulsalami Alhaji Abubakar on 23rd March, 1999.   Barely two months later, the **Finance (Miscellaneous Taxation Provisions) Decree No. 30 of 1999,** was signed into law on

Page 89 of 113

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

10th May, 1999.  This brought into force Section 20 of Cap 354 now Section 22 under PPT Act Cap. P13.

6.4.46.   An examination of these provisions, whether in relation to <u>Investment Tax Credit</u> or the <u>Capital Allowance</u> regime shows that the ownership of the Assets by the company that has incurred the qualifying capital expenditure is the underlying assumption of the statutory regime. It is the ownership of the assets that entitles the crude oil producing company to claim the ITC.

6.4.47.   In my view Section 22 of the PPT Act Cap. P13 entitles the crude oil producing company to claim ITC. However that claim in hinged on a Qualifying Capital Expenditure and is calculated as provided for in the Second Schedule of the Bonga PSC. "Qualifying Expenditure" is defined in paragraph 1 (1) of the Second Schedule and it means amongst other things: (a) capital expenditure (hereinafter called *"qualifying plant expenditure"*) incurred on plant, machinery or fixtures;

6.4.48.   Paragraph 1(2) provides further:

> *"For the purposes of this interpretation of qualifying expenditure, where expenditure is incurred by a company before its first accounting period and such expenditure would have fallen to be treated as qualifying expenditure (ascertained without the qualification contained in the foregoing proviso) if it had been incurred by the company on the first day of its first accounting period, and—*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(a)   *that expenditure is incurred in respect of an asset owned by the company then such expenditure shall be deemed to be qualifying expenditure incurred by it on that day; or...*

(b)   *... "*

6.4.49.   Now, my understanding of this is that the legal regime for ITC and ITA is predicated on the ownership of an asset in respect of which a qualifying capital expenditure has been incurred.

6.4.50.   The question then is, has this requirement (or underlying assumption) been changed or altered by the provisions of the DOD No. 9 of 1999 ("**DOD**"), now the DOA? As has rightly been noted, the provisions of DOA (and the DOD) prevail over those of the PPT Act Cap. P13 in the event of any inconsistency or conflict.  Section 1 of the DOA provides as follows: *"Notwithstanding anything to the contrary contained in any other enactment or law, the provisions of this Decree shall apply to all Productions Sharing Contracts as defined in Section of this Decree".*

6.4.51.   Furthermore, Section 15. of the DOA provides as follows:

"*(1)   The relevant provisions of all existing enactments or law, including but not limited to the Petroleum Act, as amended, and the Petroleum Profit Tax Act, as amended, shall be read with such modifications as to bring them into conformity with the provisions of this Decree.*

*(2)   If the provisions of any other enactment or law, including but not limited to the enactments specified in subsection (1)*

*of this Section, are inconsistent with the provisions of this Act, the provisions of this Act shall prevail and the provisions of that other enactment or law shall, to the extent of that inconsistency, be void".*

6.4.52.   The relevant provision of the **DOA** in the relation to the ITC and ITA is Section 4.  This provides as follows:

*"4(1)  Where the Nigerian National Petroleum Corporation (in this Act referred to as "the Corporation") or the holder and he contractor have incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried out under the terms of the production sharing contract in the Deep Offshore or Inland Basin, there shall be due the parties in respect of the production sharing contracts executed prior to 1 July 1998, a credit (in this Act referred to as "investment tax credit") at a flat rate of 50% of the qualifying expenditure in accordance with the production sharing contract terms for the accounting period in which that asset was first used for the purposes of such operations."*

*"(2)  In respect of parties who executed production sharing contracts after 1 July 1998, there shall be due to such parties an allowance (in this Act referred to as an "investment tax allowance") at a flat rate of 50% per cent of the qualifying expenditure in accordance with the provisions of existing applicable legislation for the accounting period*

Page 92 of 113

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *in which that asset was first used for the purposes of such operations."*

6.4.53.   In my view this provision of Section 4 of the DOA set out above primarily seeks to establish two different regimes of incentives with the respect to PSCs.   It established an <u>Investment Tax Credit</u> regime for PSCs executed prior to 1 July 1998, and an <u>Investment Tax Allowance</u> regime for PSCs executed after 1 July 1998.   In my humble view the DOA did not seek to supplant the provisions of the PPT Act Cap. P13 with respect to ITC or ITA. Section 4 of the DOA is therefore neither in conflict nor inconsistent with the PPT Act Cap. P13 as far as the legal prerequisites of the entitlement and the computation of the ITC are concerned. Specifically, I see no conflict between Section 4(1) of the DOA and Section 22 of the PPT Act Cap. P13.

6.4.54.   The Claimants' tax expert has argued very strongly that *"given the Deep Offshore PSC Decree requirement that for tax returns to be prepared and filed on a Contract Area basis rather than on individual company basis, it is irrelevant which of the parties to the PSC has incurred the costs that are deductible in the calculation of the tax payable.   Similarly, the identity of the party that has incurred the qualifying capital expenditure or that owns the assets used in the Petroleum Operations are also irrelevant"*.

6.4.55.   I have carefully considered the provisions of the PSC and also the DOA. I am unable to come to the conclusions reached above. I have not seen any provision of the DOA that stipulates that *'tax returns be prepared and filed on a contract area basis.'* Section 3(1) of the DOA provides

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

that *"The petroleum profits tax payable under a production sharing contract shall be determined in accordance with the Petroleum Tax Act: Provided that the petroleum profits tax applicable to the contract area as defined in the production sharing contract shall be 50 per cent flat rate of chargeable profits for the duration of the production sharing contracts."* This is by no means a statutory requirement to file *'tax returns to be prepared and filed on contract area basis.'* If there is such a practice it is more a matter of convenience or custom than a statutory requirement under the DOA.

6.4.56.  Indeed Section 11 of the DOA recognizes that tax receipts cannot be issued to a *'contract area'* or to a *'single fiscal entity'* but to the individual parties to the PSC that is the oil companies or the Corporation reflecting their respective tax liabilities. This is what the Section provides:

> *"11(1)   The Corporation or the holder, as the case may be, shall pay all royalty, concession rentals and petroleum profit tax on behalf of itself and the Contractor out the allocated royalty and tax oil.*
>
> *11(2)   Separate tax receipts in the names of the Corporation or the holder and contractor for the respective amounts of petroleum profit tax paid on behalf of the Corporation or the holder and contractor shall be issued by the Federal Inland Revenue Service (in this Act referred to as 'the Service') in accordance with the terms of the Production Sharing Contract."*

Page 94 of 113

6.4.57.   Now, the impression that the identities or legal rights of the parties to the
PSC have been subsumed by the '*contract area*' or '*single fiscal entity*'
does not seem borne out by the provisions of the DOA. There is nothing
in the DOA that has affected the conclusions I have reached that the
underlying assumption in relation to the claim for ITC is linked to the
ownership of the relevant assets in respect of which the crude oil
company has incurred qualifying capital expenditure.

6.4.58.   The next question is: who, under the Bonga PSC owns the relevant assets?
The answer in my opinion is provided very clearly in the PSC itself.
Clause 11.1 clearly vests the ownership of the assets in the Corporation
on arrival in Nigeria. This is what the clause state:

> "11.1.   The CONTRACTOR shall finance the cost of purchasing
> all equipment to be used in Petroleum Operations in the
> Contract Area pursuant to the Work Programmes and
> such equipment shall become the property of the
> CORPORATION on arrival in Nigeria. The
> CONTRACTOR and the CORPORATION shall have the
> right to use such equipment exclusively for Petroleum
> Operations in the Contract Area during the Term of this
> Contract. Should the CORPORATION desire to use such
> equipment outside the Contract Area, such use shall be
> subject to terms and conditions agreed by the Parties
> provided that it is understood Petroleum Operations
> hereunder shall take precedence over such use by the
> CORPORATION.

> 11.2.   *The CONTRACTOR's right to use such purchased*
> *equipment shall cease with the termination or expiration*
> *(whichever is earlier) of this Contract."*

6.4.59.   In my view the ownership of the equipment or assets under clause 11.1 of the Bonga PSC is not vested *'jointly in the Contractor and Corporation'*, neither is it vested in a *'single fiscal entity'*.   Ownership is clearly, unequivocally vested in the Corporation once the assets arrived Nigeria. I do not consider too that the restriction of the use assets in the Contract Area in any way affects the question of ownership or title to the assets.

6.4.60.   Ownership of the assets used in production sharing contracts by the state party or the national oil companies is a generally accepted feature of production sharing contracts.   It is in the nature of the structure and distribution of risks in such contracts. The Oil companies bear all risks of the mineral exploration and development of the oil fields and the associated financial risks. They recover these costs from production when successful. The ownership of the assets is usually vested in the national oil company at a designated time even as they continue to be used by the contractor in petroleum operations in the contract area.   The Bonga PSC does not deviate from this structure.

6.4.61.   I am persuaded by the Respondent's analogy drawn with the situation in the UK where a similar situation had to be dealt with respect to Capital Allowances claims by companies in production sharing contracts arrangements.   The relevant statutory provisions, Clause 80 of the Capital Allowances Act had to be amended to enable Oil Companies in Production Sharing Contracts claim Capital Allowance by allowing them

SNEPCO et Ors v NNPC Arbitration
Dissent Partial Award
Privileged and Confidential

'*a deemed ownership*'. The explanatory notes to this amendment offered by the UK Treasury is very instructive:

> ...
>
> "2.   *Under the terms of most PSCs, ownership of the machinery or plant used by the oil company generally passes at some point    to the host government, although the oil company continues to use the machinery or plant to fulfill its obligations under the contract. Before Budget day, as soon as the machinery or plant ceased to belong to the oil company, it ceased to attract machinery or plant allowances, even if the company had originally purchased the assets and was continuing to use them. This clause addresses this problem by deeming the assets to belong, even after the transfer of ownership, to the company or companies that incur capital expenditure on them ...*"

6.4.62.   The following further background is provided by the UK Treasury:

> "*UK oil companies operating overseas under PSCs often incur significant capital expenditure on plant and machinery. However, machinery and plant capital allowances are generally available only to the owner of the relevant assets. It is a feature of most PSCs that ownership of the assets used for oil exploration or production passes from the oil company to the host country at some point for example, when the assets enter the host country. Before Budget day, therefore, an oil company operating under a*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *PSC may have had no, or only a limited, entitlement to capital*
> *allowances because at some point it failed the 'ownership'*
> *test... ...The Inland Revenue has in the past generally managed to*
> *ensure that companies operating under PSCs do get effective relief*
> *for their expenditure on machinery and plant. It has achieved this*
> *by ensuring, on a case-by-case basis, that companies' tax*
> *liabilities are no higher than they would have been if machinery*
> *and plant allowances had been available. But both oil industry and*
> *the Inland Revenue take the view that it is no longer appropriate to*
> *continue this non-statutory practice[21]."*

6.4.63.  In Nigeria, this has not happened. Even if the parties had intended this to happen, the statutes as currently exist do not support that position. Under Nigerian domestic law, taxation provisions are strictly construed. In **7UP Bottling Co. Plc v. LSIRB CA (2000) 3 NWLR pt. 650 page 565** it was held by the Court of Appeal that *"There is no doubt about the existence of the principles of strict construction of tax statutes. Because of this, the Courts must be vigilant in applying such statutes to ensure that there is no room for equivocation. Regard must always be had to clear words of the statute, not just its intendment."*

6.4.64.  Guided by this principle, it appears rational that in construing the PPT Act Cap. P13 and the DOA, the Tribunal must be guided by the clear wordings of those statutes and not what the parliament or the parties may have intended. The arguments that have been put forward in relation to assets being vested in a *'single fiscal entity'* or the reasoning that the

---

[21]  See: http://archive.treasury.gov.uk/financebill/2000/Clause80A.html

legislature must have been aware of the Bonga PSC model that was negotiated by the Federal Government and therefore could not have intended to defeat the intention of the Government, are inferences or conjectures which in my humble view are not borne by the wordings of the statutes.

6.4.65.   I am therefore prepared to find and hold that the ITC and ITA claims are tied to ownership of the assets in respect of which the qualifying capital expenditure has been incurred. A crude oil producing company that has failed this *'ownership'* test cannot be entitled to ITC or ITA. This may not be what the parties had intended, but represents, in my humble view, the position of the law.

6.4.66.   Now regarding the method of computing ITC, I have no quarrel with the finding of the majority members of the Tribunal that ITC is to be deducted from Assessable Tax. However, this does not mean that it cannot also be deducted from the cost of the asset to arrive at the amount of Qualifying Expenditure before calculating the annual allowance in the manner provided in the second schedule paragraph 6 to the PPT Act. This indeed was the position of the law under Cap 354.

6.4.67.   Now, PPT Act Cap. P13, **paragraph 5** in the Second Schedule only makes provision for Petroleum Investment Allowance and does not mention ITC.   But FIRS takes the view that the *'Based on the law that introduced the ITC therefore, our position is that ITC is to be treated as a deduction from qualifying capital expenditure before arriving at the value of the asset that is available for Capital Allowances Computation*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

*on a Contract area by contract area basis without consideration (sic) of producing and non-producing contract areas[22].*

6.4.68.   In the light of this decision by the FIRS, which I do not consider unreasonable given the current state of the law, I think the only avenue for review of this determination by the FIRS will be at TAT or the Federal High Court. This Tribunal cannot go behind this determination.

6.4.69.   This in my view resolves the issues of entitlement to ITC and also the method of its calculation and application. I hold that the Claimants have not established their entitlement to ITC under the applicant statutes as they have in my opinion failed the 'ownership' test which is the primary statutory basis for the ITC claim.   This may not be what the parties intended, but represents the position of the statutes.

(3)   <u>Tax Oil Consolidation Claim</u>

6.4.70.   The issues relating to Tax Oil Consolidation Claim are covered by the parties' Agreed List of Issues 21 of the Claimant's list of issues as well as the Respondent's issue No. 29, and 30.

6.4.71.   The majority members of the Tribunal have summarized these as follows: Whether the Claimants, as the Contractor, are entitled, as matter of contract, to consolidate OPLs 219 and 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of the PPT Returns for OPL 212/OML 118.[23]

---

[22]   See *"FIRS Decisions on Production Sharing Contract Tax issues"* in Letter of 24th May 2010 Exe. C-108/RE-12 TB F/197
[23]   See paragraph 13.7.1 of the majority Partial Award

6.4.72.   The respective positions of the parties have been adequately summarized by the Tribunal. The majority members' analysis is also well set out in paragraphs 13.7.23 to 13.7.2924 of the majority Partial Award. I have already set out my reasoning regarding cost oil consolidation claim dealing with the recovery of operating costs of OPL 219, 803, 806 and 809 with those of OPL 212/OML 118. This is covered in paragraphs 6.2.14 to 6.2.21 of this Partial Award.

6.4.73.   I adopt my reasoning in relation to those issues. I am of the opinion that the PPT Act Cap. P13 and the DOA are not inconsistent with clear wordings of the Bonga PSC in Clause 8.(1) (e) which provides that "*The CONTRACTOR shall for PPT purposes consolidate OPLs 212, 219, 803, and 809 and any OMLs derived therefrom*". I agree with the Claimants' interpretation of Section 9(1) (c) of the PPT Act Cap P13. I also agree that there is no conflict between this Section and Section 3(1) of the DOA. Section 3(1) of the DOA is clearly concerned with establishing the rate PPT which it fixes at 50% flat rate of the chargeable profits. Indeed that Section begins by stating that "*The petroleum profit tax payable under a production sharing contract shall be determined in accordance with Petroleum Profits Tax Act*".

6.4.74.   I therefore abide by the declaration of the majority members of the Tribunal that the Claimants, as the Contractor, are entitled to consolidate OPLs 219 and 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of preparing PPT returns for OPL 212. However this is subject to the directives I earlier gave in relation to

---

[24] See pages 312 to 314 of the majority Partial Award

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

review of all costs, resolution of all differences and a historical
adjustment of entitlements of the parties. For this reason, and the reason
set out earlier in this award, I grant no monetary Award in respect of this
claim I expect that the parties will abide by the Award make necessary
calculations and adjust their entitlements accordingly.

6.4.75.   Tax Oil Calculation Claim

6.4.76.   I have carefully reviewed the respective submissions of the parties and
the analysis of the majority members of the Tribunal.  The difficulty of
determining these issues is stated in paragraph 13.8.46 of the majority
Partial Award. The majority members of the Tribunal have accordingly
called for further submissions on these to be persuaded that these can be
determined on contractual basis without delving into determination of tax
issues. I abide by this directive.

6.5.   **The Claimants' Stabilization Claim**

6.5.1.   Clause 19.2 of the Bonga PSC provides as follows:

> "*19.2.   In the event that any enactment of or change in the laws
> or regulations of Nigeria or any rules, procedures,
> guidelines, instructions, directives, or policies pertaining
> to the Contract introduced by any Government
> department or Government parastatals or agencies
> occurs subsequent to the Effective Date of this Contract
> which materially and adversely affects the rights and
> obligations   or   the   economic   benefits   of   the
> CONTRACTOR, the Parties shall use their best efforts to*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *agree on such modifications to this Contract as will*
> *compensate for the effect of such changes.  If the Parties*
> *fail to agree on such modifications within a period of (90)*
> *days following the date of which the change in question*
> *took effect, the matter shall thereafter be referred at the*
> *option of either party to arbitration under Article 21*
> *hereof.    Following arbitrator's determination, this*
> *Contract shall be deemed forthwith modified in*
> *accordance with that determination.”*

6.5.2.   This provision of the Bonga PSC is in my view an important mechanism agreed to by the parties that enable the parties to use their best efforts to amicably address any changes that may occur after the PSC had become effective.  It was an important instrument of protecting the edifice.  Read along with Section 16 of the DOA, it provides a veritable tool in the hands of the parties to address any issues that could potentially simmer and if not addressed escalate into a dispute. Section 16 of the DOA provides as follows:

> *“16(1) The provisions of this Act shall be subject to review to*
> *ensure that if the price of crude oil at any time exceeds*
> *$20 per barrel, real terms, the share of the government of*
> *the Federation in the additional revenue shall be*
> *adjusted under the production sharing contracts to such*
> *extent that the production sharing contracts shall be*
> *economically beneficial to the government of the*
> *Federation.*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *16(2)    Notwithstanding the provisions of subsection (1) of this*
> *section, the provisions of this Act shall be liable to review*
> *after a period of fifteen years from the date of*
> *commencement and every five years thereafter."*

6.5.3.    Be that as it may, I am inclined to hold that the Stabilisation Claim has not been properly triggered. Clause 19.2 of the Bonga PSC is clear. The Clause can only be triggered if changes in laws, regulations policies etc. have occurred which materially and adversely affect the Contractor's rights and obligations or the economic benefits under the PSC. The Contractor then calls for modifications and the parties are thereafter required to use their best efforts to agree on appropriate modifications. If within a period of 90 days following the date on which the change in question took effect, the parties are not able to agree such modification to the contract, then thereafter the matter shall at the option of either party be referred to arbitration under Article (sic) (Clause) 21 hereof.

6.5.4.    To trigger this Clause, I am of the view that the Claimants must first specify which laws, regulations, decisions or policies etc. have been introduced. They must also specify the effective date of such policies or laws and how they have materially been adversely affected. The parties are then obligated to commence negotiation in good faith to agree necessary modifications to the contract failing that (within a period of 90 days) then demand for arbitration. It is clear to me that this process was not followed. The stabilization claims cannot be triggered in course of arbitration, more so as an alternative claim.    It is failure to agree

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

modifications that would then lead to arbitration. In my view, this option is still open to the parties especially in the light of the way I have resolved matters in this Partial Award.

6.5.5.   However, I have no difficulty accepting the views of the majority that the parties be given opportunity to digest the majority Partial Award, and I will add, my dissenting views and Partial Award, and revert to the Tribunal within four weeks of the date they are able to make further submissions without breaching the injunction issued by the Federal High Court presided by Hon. Justice Adamu Bello.

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

### 7.    THE RESPONDENT'S COUNTERCLAIM

7.1     The basis of the counterclaim is set out in paragraphs 1.4 to 1.12 of the Respondent's Counterclaim. In my view it is founded on a faulty premise. The Respondent argue that Claimants have claimed '*tax-savings*" in the form of ITC or Capital Allowance etc. which they are not entitled to. The Respondent however automatically assumes that such accrues to it. I think this logic is faulty. Once the parties have filed their PPT Returns and tax is assessed by the FIRS, the matter in my view is no longer within the purview of the parties or the Respondent. The Tax authority assumes complete responsibility. Any alteration to the assessment must follow the statutory procedure set out under the PPT Act Cap. P13.

7.2     Section 36 of the PPT Act Cap. P13. provides as follows:

> "36.(1)   *If the Board discovers or is of the opinion at any time that, with respect to any company liable to tax, tax has not been charged and assessed upon the company or has been charged and assessed upon the company at a less amount than that which ought to have been charged an assessed for any accounting period of the company, the Board may within six years after the expiration of that accounting period and as often as may be necessary, assess such company with tax for that accounting period at such amount or additional amount as in the opinion of*

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

> *the Board ought to have been charged and assessed, and may make any consequential revision of the tax charged or to be charged for any subsequent accounting period of the company.*
>
> *[...]"*

7.3   In my view any wrongful claim of tax benefit can only be revised by the FIRS under this clause and cannot be a subject counterclaim by the Respondent whose responsibility on matter has ended with the filing of PPT Returns. For this reason alone, I am prepared to dismiss the Counter-Claim.

8.   **DISPOSITIVE**

8.1.   I HAVE GIVEN CAREFUL CONSIDERATION TO THE PLEADINGS OF THE PARTIES, TO THE EVIDENCE AND SUBMISSIONS PRESENTED, AND FAILING TO AGREE WITH THE MAJORITY MEMBERS OF THE TRIBUNAL ON THE SOME KEY ELEMENTS OF THIS ARBITRATION AND WITH THE MAJORITY PARTIAL AWARD, I AM OBLIGED TO SET OUT MY DISSENTING OPINION, AND ACCORDINGLY HEREBY AWARD, AND DIRECT THAT:

1.   The Tribunal has jurisdiction to hear and determine the dispute between the parties;

2.   I find that the Contractor was engaged in *'Petroleum Operations'* as defined in the PPT Act Cap. P13

3.   I find that the Bonga PSC was not illegal; It is a valid contract lawfully entered into by the parties and remains binding on the parties and enforceable legally.

4.   With Regards to the Claimants' Lifting Allocation Claim:

   (a)   I hold that the determination of the Lifting Allocation is not the exclusive sole right of the Claimants;

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(b)   I hold that the Contractor is not in breach of the Bonga PSC by not lifting available crude in accordance with the *"Contractors Lifting Allocation"*;

(c)   I also hold that the Respondent is not entitled to lift according to its own lifting allocation model;

(d)   I direct that the parties shall jointly determine the Lifting Allocation in accordance the terms of the Bonga PSC as set out in Annex C, Article III each performing its role and acting jointly where this required, as fully explained in this Partial Award, that is to say:

(i)   The Contractor is to provide a forecast of the Available Crude to be produced by grades as set out in Annex C, Art III paragraphs 1 and 2;

(ii)   The Contractor is entitled to prepare the Estimated Lifting Allocation;

(iii)   Each party is entitled to nominate and lift its allocation;

(iv)   The Contractor shall compute the proceeds Imbalance which shall be approved by the Corporation;

(v)   The parties are jointly to participate in valuation, reconciliation and adjustments;

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

(vi)   The parties should mutually appoint an Independent auditor to audit actual liftings at the end of calendar year as provided in the PSC.

5.   With regards to the Claimants' Tax Oil Claims:

(a)   I hold that the Contractor is entitled to be allocated such quantum of Available Crude Oil as will generate amount of proceeds sufficient for all Operating Costs it has incurred in the development of OPL 212/OML 118;

(b)   I also hold that such Operating Costs are those recorded in the Contractor's books and accounts;

(c)   I however find that the books and accounts have not been kept in accordance with terms of the Bonga PSC. I accordingly direct:

(i)   The parties shall henceforth fully comply with the terms of the PSC regarding the preparation of accounts and in particular the right of the Respondent to participate in the preparation of same;

(ii)   The parties shall utilize the built in mechanisms to review all operating costs up to and including 2007 and all exceptions should be addressed and resolved as provided for in the contract;

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

     (iii)   The Lifting Allocation Model shall be adjusted historically to accommodate any alterations/corrections.

6.    With Regards to Claimants' Cost Consolidation Claims:

    (a)    I find and hold that the Contractor is entitled to be allocated such quantum of Available Crude Oil under OPL 212/OML 118 as will generate amount of proceeds sufficient for the recovery of all Operating Costs it has incurred in the development of OPL 219, OPLs 803, 806 and 809;

    (b)    I direct however this is subject to my directive above that operating costs being reviewed and all exceptions resolved as envisaged in the contract.

7.    As to the Claimants' Royalty Claim, I find no merit in the Royalty Claim and accordingly dismiss it.

8.    With regards to the Claimants' PPT Return Claim, I find no merit in the claim I according dismiss it. The Claimant has no sole or exclusive right to prepare the PPT Returns.

9.    I hold that the Respondent is entitled to participate in the preparation and review or raise objections to the PPT Returns. Any differences should be resolved using the mechanism already provided in the PSC.

10.    As to the Claimants' ITC Claim, I find that the Claimants as Contractor, having failed the 'ownership' test of the assets in

*SNEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

respect of which qualifying capital expenditure was incurred are not entitled to Claim ITC. I therefore dismiss it.

11. With Regards to the Claimants' tax oil consolidation claim, I find that it has merit and hold that the Claimants are contractually entitled to consolidate OPLs 219 and 803, 806 and 809 (and any OMLs derived therefrom) with OML 118 for the purposes of PPT Returns for OPL 212/OML 118. Accordingly, I direct:

    (a) That the parties make necessary adjustments following review of all costs as directed in my Award.

    (b) That the parties amend the Lifting Allocation Model historically to accommodate the adjustments.

12. I abide by the majority Award on the Claimants Tax Oil Calculation Claim.

13. I abide by the majority Award on the Claimant's Stabilisation Claim.

14. With regards to the Respondents Counterclaim, I find no merit in it and for the reasons set out in this Partial Award, I dismiss the Counterclaim.

15. Since for the reasons set out in this Partial Award, and in line with the expressed desire of the Claimants, I have not made monetary award, I make no order as to interest.

16. I reserve to all questions of costs.

Page 112 of 113

*S.NEPCO et Ors v NNPC Arbitration*
*Dissent Partial Award*
*Privileged and Confidential*

17.   I reserve to a later Award any claims that have not been expressly
dealt with in this Partial Award.

Dated this 30 Day of *May*      2013 in Abuja, Nigeria

SIGNED

_____

**Abubakar Balarabe Mahmoud, SAN, OON, FCIArb,**
**ARBITRATOR**